1  MICHAEL F. DONNER (SBN 155944)
   JONATHAN E. SOMMER (SBN 209179)
2  STEIN & LUBIN LLP
   The Transamerica Pyramid
3  600 Montgomery Street, 14th Floor
   San Francisco, California  94111
4  Telephone:    (415) 981-0550
   Facsimile:    (415) 981-4343
5  mdonner@steinlubin.com
   jsommer@steinlubin.com
6
   Attorneys for Plaintiff
7  CAPITAL GROUP COMMUNICATIONS, INC.

8

9

10                    UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                       SAN FRANCISCO DIVISION

13

| 14 CAPITAL GROUP COMMUNICATIONS, INC., a California corporation, | Case No. C-07-03632-EMC |
|---|---|
| 15 Plaintiff, | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| 16 v. | Date:         October 17, 2007 |
| 17 | Time:         10:30 a.m. |
| 18 GOTTAPLAY INTERACTIVE, INC., a Nevada corporation;  JOHN P. GORST, an individual; MARK H. LEVIN, an individual; and DOES 1-50, inclusive, | Judge:        Hon. Edward M. Chen |
| 19 | Location:     15th Floor, Courtroom C |
| 20 Defendants. | |

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................................ 2

II.   FACTUAL BACKGROUND ......................................................................................... 5

    A.   Capital Group provides investor relations services for microcap companies and is paid only in stock, to the benefit of its clients. ............................................. 5

    B.   Capital Group and Gottaplay enter into a one-year Consulting Agreement on July 25, 2006, and Capital Group receives 2,000,000 non-refundable shares that Gottaplay agrees to register in its next registration statement so that Capital Group can sell the shares. ................................................................... 6

    C.   Gottaplay's SEC filings confirm Capital Group's ownership of the shares. .......... 7

    D.   Capital Group performs extensive services for Gottaplay for nearly a year.......... 8

    E.   When Gottaplay files a registration statement, it fails to register Capital Group's shares. ..................................................................................................... 8

    F.   After the registration statement is filed, Gottaplay notifies Capital Group of the purported termination of the Consulting Agreement and cancellation of the shares. ............................................................................................................. 9

    G.   Capital Group still owns the shares and still has a right to register and sell them. ................................................................................................................... 11

    H.   Gottaplay is also interfering with Capital Group's stock sales under SEC Rule 144. ........................................................................................................... 12

    I.   Gottaplay refuses to issue stock or refund the $125,000 separately invested by Capital Group. ............................................................................................... 13

    J.   Gottaplay's contrived defenses are insubstantial. ................................................ 14

III.  ARGUMENT .............................................................................................................. 15

    A.   Preliminary Injunction Standard .......................................................................... 15

    B.   Likelihood of Success .......................................................................................... 16

        1.   Capital Group has an express, written contractual right to registration of its 2,000,000 shares and a separate statutory right to sell shares under SEC Rule 144. ......................................................... 16

        2.   Capital Group has a right to the 125,000 shares promised by Gottaplay in exchange for its $125,000, or a right to a refund. ................ 21

    C.   Irreparable Harm/Balance of the Hardships.......................................................... 22

        1.   Capital Group's inability to sell the shares of an unstable microcap stock, which was its sole compensation for its work, constitutes irreparable harm. ....................................................................... 22

        2.   Gottaplay is not injured by being ordered to perform its express contractual obligations, and any such "injury" is self-inflicted. ............... 23

IV.   CONCLUSION ........................................................................................................... 24

1

## TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Alpha Capital Atkiengesellschaft v. Group Mgmt. Corp.*, 2002 WL 31681798
   (S.D.N.Y. Nov. 25, 2002) ................................................................................ 17, 18, 22

5

*Evans v. Riverside Int'l Raceway*, 237 Cal. App. 2d 666 (1965)................................... 21

6

*Lyons v. Stevenson*, 65 Cal. App. 3d 595 (1977) .......................................................... 21

7

*Netwolves Corp. v. Sullivan*, 2001 WL 492463 (S.D.N.Y. May 9, 2001) ........................ 18, 22, 23

*Novartis Consumer Health, Inc. v. Johnson & Johnson*, 290 F.3d 578 (3d Cir. 2002)................. 23

8

*Raich v. Ashcroft*, 352 F.3d 1222 (9th Cir. 2003) ........................................................ 15

9

*Sales Online Direct, Inc. v. Stengel*, 2001 WL 282690 (D. Md. Mar. 19, 2001).................... 18, 19

10

*State of Alaska v. Native Village of Venetie*, 856 F.2d 1384 (9th Cir. 1988)................................. 15

11

**Statutes**

12

17 C.F.R. § 230.144 ...................................................................................................... 17

13

Cal. Civil Code § 1643.................................................................................................. 21

14

**Other Authorities**

15

*SEC No Action Letter, H.C. Copeland and Association Equities, Inc.*, 1982 WL 29102
   (April 8, 1982)............................................................................................................... 21

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1

**NOTICE OF MOTION AND MOTION**

2          PLEASE TAKE NOTICE that Plaintiff's Motion for Preliminary Injunction will

3     be brought for hearing before the Honorable Edward M. Chen, Courtroom C, 15th Floor, United

4     States District Court, 450 Golden Gate Avenue, San Francisco, California, at 10:30 a.m. on

5     October 17, 2007, or at any other time the Court deems appropriate.  This application is based on

6     this Notice, the accompanying Memorandum of Points and Authorities and supporting

7     declarations, and on all pleadings, files and records in this action.

8

**STATEMENT OF RELIEF REQUESTED**

9          Plaintiff Capital Group Communications, Inc. ("Capital Group") moves this Court

10    for an injunction against defendant Gottaplay Interactive, Inc. ("Gottaplay") as follows:

11          1.     Gottaplay shall take all commercially reasonable actions to register the

12    2,000,000 shares of Gottaplay stock owned by Capital Group.

13          2.     Gottaplay shall not interfere with any sale of shares by Capital Group

14    under SEC Rule 144 and shall cooperate as may be necessary to facilitate Capital Group's sales

15    under Rule 144.

16          3.     Gottaplay shall deliver 125,000 additional registered shares and 62,500

17    stock warrants of Gottaplay or, alternatively, refund Capital Group's $125,000 with interest at the

18    statutory prejudgment rate of 10% from the date Gottaplay deposited the proceeds of Capital

19    Group's check.

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

Capital Group moves for a preliminary injunction that (1) Gottaplay shall register Capital Group's 2,000,000 shares of restricted Gottaplay stock, (2) not interfere with any sale of shares by Capital Group under Securities and Exchange Commission ("SEC") Rule 144, which allows for limited sales of unregistered shares of restricted stock, and cooperate as may be necessary to facilitate Capital Group's sale of shares under Rule 144, and (3) deliver 125,000 additional shares and 62,500 stock warrants for which Capital Group paid $125,000, or, alternatively, refund the money with interest.

## I.
## INTRODUCTION

Under the terms of a one-year consulting agreement between Capital Group and Gottaplay dated July 25, 2006, Capital Group received 2,000,000 shares of restricted Gottaplay stock that Gottaplay agreed to register as part of its next registration statement. Capital Group expected to sell those shares as its only compensation under the agreement, compensation which it needs to fund its operations, salaries, rent and other expenses. In breach of this contract, Gottaplay failed to register the shares and instead purported to terminate the contract retroactively and cancel the shares. By failing to register the shares, Gottaplay interfered with Capital Group's ability to sell the 2,000,000 shares as planned. By purporting to cancel the stock and retroactively terminate the contract, Gottaplay interfered with Capital Group's separate statutory right to sell even small amounts of stock under SEC Rule 144, which is intended to allow for the limited sale of restricted stock that has not been registered.

Capital Group's stock has never been cancelled by court order or otherwise, and Gottaplay cannot make Capital Group's stock disappear with a wave of its magic wand. Nevertheless, on May 7, 2007, shortly before completion of the consulting agreement, Gottaplay filed an SEC registration statement in which it disclosed, <u>falsely and for the first time</u>, that Gottaplay had purportedly terminated the contract back on February 22, 2007 and cancelled all of Capital Group's 2,000,000 shares on April 20, 2007. Gottaplay had never disclosed either of these purported actions to Capital Group prior to the May 7 registration. In fact, on May 14, a

1    week after the filing of the registration statement, Gottaplay sent Capital Group a letter purporting

2    to "advise" Capital Group of the alleged termination of the contract on February 22 and the

3    cancellation of the shares on April 20.  Such cancellation would have the convenient effect of

4    decreasing the outstanding stock of Gottaplay by approximately 7% while Gottaplay prepared to

5    register and sell stock warrants intended to raise over $8 million for the company.

6              After being notified of the purported termination and cancellation, Capital Group

7    contacted Colonial Stock Transfer ("Colonial"), Gottaplay's stock transfer agent, to check on the

8    status of its 2,000,000 shares.  Colonial confirmed that the stock was still registered to Capital

9    Group, that it had not been cancelled, and that Colonial would not cancel the stock on its books

10   even if Gottaplay made such a request.  Subsequently, as part of its planned sale of stock under

11   Rule 144 in August (after the initiation of this lawsuit), Capital Group submitted its stock

12   certificate to Colonial for the sole purpose of processing the Rule 144 sale, but Colonial

13   responded by taking the stock certificate without permission and then interpleading the original

14   certificate into this Court as part of a new lawsuit that was later related to this lawsuit.[1]  Colonial,

15   in collusion with Gottaplay, claimed that there was "uncertainty" as to who owned the stock

16   certificate.  There is no uncertainty, as Capital Group at all times owned the stock certificate in its

17   name before Colonial took its stock certificate without permission.  Moreover, Colonial's

18   interpleader action—in which it deposited 2,000,000 existing shares—shows that Gottaplay's

19   claim of cancellation was simply a fraud.  Gottaplay's belated counterclaims seeking to rescind

20   the shares in the future by court order do not create any uncertainty as to present ownership.

21             Capital Group has at all times held validly-issued shares which have never in fact

22   been cancelled.  Even without the right to registration provided in the consulting agreement,

23   Capital Group has a statutory right under SEC Rule 144 to sell a limited number of unregistered

24   shares without interference by Gottaplay.  That statutory right is a right incident to ownership of

25   restricted stock.  Capital Group has owned the stock since it was delivered by Gottaplay to

26   Capital Group last year, and Capital Group continues to own the stock unless this Court issues an

27   ---
     [1]      That lawsuit, Case No. C-07-4470, *Colonial Stock Transfer v. Gottaplay Interactive, Inc. and Capital Group Communications, Inc.*, was related to this case pursuant to the Court's August

28   31, 2007 Order.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    order rescinding the stock transfer.  Under the terms of the consulting agreement, Capital Group

2    has the added contractual right to have all of its shares registered by Gottaplay.  Such a

3    registration would enable Capital Group to sell all of its 2,000,000 shares, rather than the limited

4    amount permitted under Rule 144.  Gottaplay cannot deny that Capital Group has these statutory

5    and contractual rights, nor can Capital Group's rights be defeated by Gottaplay's contrived

6    defenses about why the contract should purportedly be rescinded in the future.  Where the

7    investment of a plaintiff shareholder is at risk, courts have routinely granted preliminary

8    injunctions to stop issuers from frustrating the right of shareholders to sell, no matter what after-

9    the-fact defenses and counterclaims the issuer may assert.  Capital Group took a substantial risk

10    in accepting shares as compensation from Gottaplay, and, if this Court does not enforce Capital

11    Group's rights as a shareholder now, then those rights will prove to be a mirage in the future

12    when this case finally goes to trial.

13          Though it is not necessary to prove that Gottaplay is a fraudulent actor to obtain

14    injunctive relief, it certainly is.  First, Gottaplay induced Capital Group to keep working for

15    Gottaplay <u>after</u> the purported termination of the consulting agreement and did not even inform

16    Capital Group of the alleged unilateral termination until three months later.  Second, Gottaplay

17    suddenly began demanding the return of <u>half</u> of Capital Group's shares in April, just prior to

18    filing its registration statement, not all of its shares.  Third, Gottaplay offered multiple, conflicting

19    reasons for its demand that Capital Group relinquish half of its shares, including that (a) a third-

20    party source of financing was conditioning its funding on Gottaplay's taking back Capital

21    Group's shares, (b) Gottaplay's CEO, John Gorst, felt that Capital Group owned too many shares

22    in relation to the number of shares that he owned, and Mr. Gorst felt like changing that, (c) the

23    contract was for two years and was only half over (it was in fact a one-year contract), and (d) that

24    Gottaplay was concerned that Capital Group might drive down the price of Gottaplay's thinly-

25    traded stock by selling too many shares.  In short, Gottaplay decided that it wanted Capital

26    Group's shares and proceeded to try to take as many of those shares as it could using whatever

27    pretextual reasons it could devise at the moment.  When Gottaplay was not successful in

28    intimidating Capital Group, it unilaterally and falsely declared Capital Group's shares

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   "cancelled."

2          Capital Group also moves for injunctive relief on the less significant—but

3   telling—conversion of $125,000 of Capital Group's money that Gottaplay is holding in its bank

4   account.  Gottaplay deposited the proceeds of a Capital Group check from November 2005 in the

5   amount of $125,000.  In exchange for Gottaplay's use of this money, Gottaplay's CEO, John

6   Gorst, repeatedly promised to issue to Capital Group 125,000 registered shares and 62,500 stock

7   warrants, but never did so.  Gottaplay now refuses to deliver the shares or refund the money.

8   Gottaplay's financial situation is so abysmal that, according to recent financial statements, it does

9   not even have enough cash on hand to repay the $125,000.  Gottaplay should be ordered to

10  deliver immediately 125,000 registered shares, as promised, or, alternatively, refund the money

11  with interest.  Again, if the Court does not remedy the conversion now, any future remedy will

12  likely be illusory.

13                          **II.**
                  **FACTUAL BACKGROUND**

14

15  **A.    Capital Group provides investor relations services for microcap companies and is
        paid only in stock, to the benefit of its clients.**

16          Capital Group is a small company located in Sausalito, California that specializes

17  in providing investor relations services to emerging, microcap companies.[2]  Because these

18  companies are typically share rich but cash poor, Capital Group often agrees to take stock as its

19  sole compensation for its agreement to provide consulting services.  Capital Group relies on its

20  sales of stock to fund its salaries, rent, and other operational costs.  As its client companies are

21  often unstable, Capital Group takes great risk in agreeing to accept stock in place of cash

22  compensation, including the risk that the company may go bankrupt or see its stock price severely

23  decline.  Many Capital Group employees take little or no salary and instead receive compensation

24  in the form of a percentage of shares of a client.  Capital Group's clients benefit tremendously

25  from Capital Group's willingness to accept risk, as the client is not forced to spend precious cash

26  paying for consulting services and thereby further erode precarious balance sheets.

27  _____

28  [2]    The facts asserted in the Factual Background are supported by the Declaration of its
    President, Devin Bosch.

1    Capital Group typically agrees to consult for some period of time, a commitment

2    which requires it to devote its limited resources to a client and forego other opportunities.  As a

3    small company, Capital Group must be selective in deciding who it will devote its limited

4    resources to over the coming months or years.  In exchange for the risks it assumes and the

5    devotion of its limited resources, Capital Group expects to be able to sell its stock  with its

6    clients' cooperation.

7    **B.    Capital Group and Gottaplay enter into a one-year Consulting Agreement on July
         25, 2006, and Capital Group receives 2,000,000 non-refundable shares that**

8    **Gottaplay agrees to register in its next registration statement so that Capital Group
         can sell the shares.**

9

10    On July 25, 2006, Capital Group and Gottaplay signed a consulting agreement (the

11    "Consulting Agreement").  *See* Ex. A to Declaration of Devin Bosch ("Bosch Decl.").  Capital

12    Group had already been providing consulting services to Gottaplay in anticipation of a planned

13    merger with an entity known as Western Transitions, Inc. ("Western Transitions").  Gottaplay had

14    informed Capital Group that it would be compensated for these services in stock of the newly-

15    formed entity.  Though the merger fell through, Gottaplay asked Capital Group to stay on as its

16    investor relations consultant, and, therefore, Capital Group and Gottaplay executed the

17    Consulting Agreement.  Capital Group thus committed itself to another year of work for

18    Gottaplay and gave up the opportunity to consult for another company.

19    Under Paragraph 4 of the Consulting Agreement, Capital Group received

20    2,000,000 non-refundable shares of Gottaplay.  Paragraph 4 states in part:

21    
22    For undertaking this engagement and for other good and valuable
      consideration, the Company agrees to issue and deliver to the
      Consultants a "Commencement Bonus" payable in the form of 2
23    million shares of the Company's restricted Common Stock ("Common
      Stock").  …  The Company understands and agrees that Consultant has
24    foregone significant opportunities to accept this engagement and that
      the Company derives substantial benefit from the execution of this
      Agreement and the ability to announce its relationship with Consultant.
25    These shares of Common Stock issued as a Commencement Bonus,
      therefore, constitute payment for Consultant's agreement to consult to
26    the Company and are a non-refundable, non-apportionable, and non-
      ratable retainer; such shares of common stock are not a prepayment for
27    future services.  If the Company decides to terminate this Agreement
      prior to the end date for any reason whatsoever, it is agreed and
28    understood that Consultant will not be requested or demanded by the

1    <u>Company to return any of the shares of Common Stock paid to it as
2    Commencement Bonus hereunder.</u>

3    Ex. A to Bosch Decl., ¶ 4 (emphasis added).  Having previously performed services for

4    Gottaplay, having accepted substantial risk in committing to consult for Gottaplay in exchange

5    only for stock, and having foregone other opportunities, Capital Group reasonably demanded that

6    its stock be non-refundable.  Indeed, Capital Group specifically provided for the circumstance

7    where Gottaplay might find it tempting to terminate the Consulting Agreement, as a pretext for

8    reclaiming its shares, by specifying that no such termination would allow Gottaplay to demand

9    the shares back.

10           Of course, the right to own non-refundable shares is of no value if those shares

11   cannot be sold, and restricted stock generally must be registered before it can be sold.[3]

12   Accordingly, Gottaplay further agreed in paragraph 4 of the Consulting Agreement "that <u>all</u>

13   <u>shares</u> issued to [Capital Group] hereunder shall carry 'piggy-back registration rights' whereby

14   such shares <u>will be included in the next registration statement filed by the company</u>."  Ex. A to

15   Bosch Decl. (emphasis added).

16   **C.     Gottaplay's SEC filings confirm Capital Group's ownership of the shares.**

17           On August 8, 2006, Gottaplay filed a Schedule 13D with the SEC that disclosed

18   the transfer of 2,000,000 shares to Capital Group.  Gottaplay's Schedule 13D disclosed that

19   Capital Group had sole dispositive power over 2,000,000 shares representing 6.97% of the

20   outstanding stock of Gottaplay.  *See* Ex. B to Bosch Decl., Items 1, 9 & 13.  Further confirming

21   Capital Group's ownership of the shares, Gottaplay caused to be issued to Capital Group a stock

22   certificate dated September 25, 2006 that evidenced its ownership of 2,000,000 shares.  *See* Ex. C

23   to Bosch Decl.

24           On January 16, 2007, Gottaplay filed a Form 10-KSB/A in which it again

25   disclosed that it had issued 2,000,000 shares to Gottaplay:

26           On July 25, 2006, we entered into a consulting agreement with Capital Group
             Communications and under which the terms of the agreement [sic], in
27

28   ---
     [3]      Unregistered shares of restricted stock can be sold under Rule 144, but only in limited
     amounts.  *See* Part III(B)(1), *infra*.

1    consideration of the services undertaken, we issued 2,000,000 shares of common
2    stock with a fair market value of $1.50 per share.

3    *See* Ex. D to Bosch Decl., at 24.  The total value of the shares at the time of issuance was thus

4    $3,000,000 (2,000,000 shares at $1.50 per shares).

5    **D.    Capital Group performs extensive services for Gottaplay for nearly a year.**

6    Capital Group devoted extensive time to raising Gottaplay's profile in the market,

7    and Capital Group's efforts coincided with Gottaplay's stock price doubling to over $3 per share.

8    *See* Ex. E to Bosch Decl. (attaching stock price quotations).  Most of that time was devoted to

9    speaking with potential investors about the nature of Gottaplay's services, its business plan, the

10   competitive market in which Gottaplay operates, and the like.  While Capital Group did assist in

11   preparing documents such as press releases, most of its time was spent on what were literally

12   thousands of phone calls with potential investors, some of which were logged in lengthy phone

13   logs.  While it is difficult to quantify exactly the amount of time spent by Capital Group

14   employees as Capital Group does not bill by the hour, the amount of time would easily amount to

15   many hundreds of hours.

16   In Paragraph 3 of the Consulting Agreement, Gottaplay specifically agreed that "a

17   disproportionately large amount of the effort to be expended and costs to be incurred by [Capital

18   Group] and the benefits to be received by [Gottaplay] are expected to occur within or shortly after

19   the first two months of the effectiveness of the Agreement." Ex. A to Bosch Decl.  The reason

20   for this was that most of the effort in investor relations consulting is expended in understanding

21   the client's business, introducing that company to potential investors, and preparing materials for

22   investors.  While there is follow up work, that work is typically less time-consuming.  Thus, the

23   core of Capital Group's work had been completed long before any dispute arose, though Capital

24   Group continued working for Gottaplay through April 2007.

25   **E.    When Gottaplay files a registration statement, it fails to register Capital Group's
         shares.**

26

27   On May 7, 2007, Gottaplay filed a Form SB-2 registering shares and stock

28   warrants of Gottaplay.  Ex. F to Bosch Decl.  Gottaplay did not include Capital Group's shares in

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   the registration, in violation of its agreement in paragraph 4 of the Consulting Agreement "that all

2   shares issued to [Capital Group] hereunder shall carry 'piggy-back registration rights' whereby

3   such shares will be included in the next registration statement filed by the company."

4          The opening price of Gottaplay stock on May 7, 2007—the date when Capital

5   Group's stock should have been registered—was $1.80.  Ex. E to Bosch Decl.  Thus, the value of

6   Capital Group's shares on the date of registration was $3.6 million.  Today, Gottaplay's share

7   price is around 40 cents per share so that the current value of Capital Group's shares is roughly

8   $800,000.  Ex. E to Bosch Decl.  In other words, Capital Group's compensation has declined

9   more than 75% from the time its stock should have been registered and the filing of this motion.

10  **F.      After the registration statement is filed, Gottaplay notifies Capital Group of the
            purported termination of the Consulting Agreement and cancellation of the shares.**

11

12         As part of its May 7, 2007 registration, Gottaplay made conflicting disclosures, in

13  the same document, about a purported termination of the Consulting Agreement and cancellation

14  of Capital Group's shares.  On page 32, Gottaplay disclosed:

15         In July 2006, we entered into a one-year consulting agreement with
           independent financial and business advisor, in which the consultants
16         will provide business expertise, advice and negotiations in strategic
           corporate planning, private financing, mergers and acquisitions, and
17         such other business areas as deemed necessary by our management.
           Under the terms of the agreements, the consultants received 2,000,000
18         shares of common stock.  … On February 22, 2007, we terminated this
           arrangement due to non-performance. On April 20, 2007, we cancelled
19         all shares of stock issued to this advisor.

20  Ex. F to Bosch Decl. (emphasis added).  On page 49 of the same filing, Gottaplay contradictorily

21  disclosed:

22         On July 25, 2006, we issued 2,000,000 shares of common stock to
           Capital Group Communications in consideration of services rendered,
23         with a fair market value at the date of issuance.  However, on February
           22, 2007, our board of directors voted to terminate the consulting
24         agreement.  On April 20, 2007 we issued instructions for the
           cancellation of the shares.
25

26  *Id.* (emphasis added).  Thus, in the same disclosure, Gottaplay first claimed to have terminated

27  the Consulting Agreement and later claimed merely to have held an internal vote to terminate the

28  agreement.  Similarly, Gottaplay first claimed to have cancelled the shares and later claimed

1    merely to have issued instructions to have canceled the shares at some future time.  None of this

2    had been disclosed to Capital Group.

3                It was not until May 14, 2007 that Gottaplay notified Capital Group that Gottaplay

4    had unilaterally and secretly "terminated" the Consulting Agreement on February 22, 2007 and

5    "cancelled" Capital Group's shares on April 20, 2007.  Of course, Gottaplay tried to pass the

6    blame to Capital Group, but it offered no more than generic and vague allegations that Capital

7    Group had committed unidentified fraud in the inducement and breached unspecified promises.

8    Gottaplay's arrogance shines through in the letter, set forth below in full:

9               Please be advised that on April 20, 2007, stock certificate #1064 (the
               "Certificate") standing in the name of Capital Communications, Inc.
10              [sic] was cancelled on the books of Gottaplay Interactive, Inc. (the
               "Company").  The determination to cancel the Certificate was made by
11              the Board of Directors of the Company and was based upon various
               reasons, among which was the failure of consideration, fraud in the
12              inducement, and the breach of promises by Capital Communications,
               Inc.
13
               Accordingly, you are hereby requested to send the Certificate to
14             Gottaplay for destruction.

15             Please be further advised that the Consulting Agreement dated July 25,
               2006 was terminated by Gottaplay on February 22, 2007.
16

17   *See* Ex. G to Bosch Decl.

18              Gottaplay does not identify any legal basis by which it can simply "cancel on the

19   books of Gottaplay" all of Capital Group's shares.  Even though Capital Group owned (and owns)

20   the shares and had completed virtually all of the consulting work, Gottaplay does not propose to

21   allow Capital Group to retain so much as a single share.  Even though Gottaplay is purportedly

22   terminating the Consulting Agreement, it does not bother to explain what gives it the right to

23   terminate unilaterally the Consulting Agreement.  Even though Gottaplay induced Capital Group

24   to keep working after February 22, 2007, Gottaplay does not bother to explain why it waited three

25   months to inform Capital Group of its purported termination.  Finally, as justification for these

26   extreme, unilateral actions, Gottaplay offers as justification nothing more than vague and generic

27   allegations of fraud and contract breaches to cover itself.

28

**G.     Capital Group still owns the shares and still has a right to register and sell them.**

When Gottaplay asked Capital Group on May 14 to "send the Certificate to Gottaplay for destruction," Gottaplay implicitly admitted that it did not own the shares, had no control over the shares, and needed to obtain and cancel the stock certificate for any cancellation to occur.  After receiving the May 14 letter, Capital Group repeatedly confirmed with Gottaplay's stock transfer agent, Colonial, that its shares remained valid and outstanding.

Gottaplay's purported "termination" of the Consulting Agreement on February 22, 2007 that Gottaplay later asserted its May 14 termination letter does not affect Capital Group's registration rights.  Not only is there no contract provision allowing for the termination, Capital Group continued working with Gottaplay after this time.  Indeed, Gottaplay issued a press release on March 26, 2007, <u>after</u> the purported termination, in which it listed Capital Group as its investment relations contact.  Ex. H to  Bosch Decl.  In addition, the May 14 termination letter was sent a week <u>after</u> Gottaplay breached its duty to register Capital Group's stock as part of the May 7 registration statement, and hence Gottaplay's transparent effort to backdate the termination to February 22, 2007.

Gottaplay's post-registration termination letter followed an unsuccessful campaign shortly before the May 7 registration filing to pressure Capital Group to relinquish half of its shares, as shown by the notes that Mr. Bosch took in a series of telephone calls with Gottaplay. *See* Ex. I to Bosch Decl.  It began on April 9, 2007, when Mr. Gorst telephoned Mr. Bosch.  Mr. Gorst said that "he didn't want to beat around the bush.  He was upset that I had only 1 [million] less shares than him and wanted half of my shares back."  Contradictorily, he said that an entity that was financing Gottaplay insisted that he get back the shares or Gottaplay would not receive funding.  A day later, Mark Levin, a director of Gottaplay, telephoned Mr. Bosch and "asked for ½ of our shares back since we have a 2 year agreement."  Mr. Bosch informed him that the agreement was for one-year.  Mr. Levin, seeming perplexed, said that he was asking for half the shares back because the parties had another year on the deal.  Mr. Levin called back a short time later and expressed a different alleged concern, namely that Capital Group would sell its shares at the end of its one-year contract and thereby hurt the market for Gottaplay shares.  Mr. Bosch told

1    him that Capital Group was not trying to hurt Gottaplay, but that Capital Group did have

2    registration rights to enable it to sell its shares.  Mr. Levin asked if that was in the Consulting

3    Agreement, and Mr. Bosch affirmed that it was.

4              Subsequently, as further shown in Mr. Bosch's notes, Mr. Gorst said that he would

5    fly down to discuss its alleged concerns and even claimed to have made flight reservations;

6    however, he claimed that the flight was canceled due to "mechanical" issues and never scheduled

7    another flight.  On April 26, Mr. Bosch and his colleague Richard Carpenter called Mr. Gorst,

8    who never returned their calls.

9              On April 27, Mr. Gorst sent an email stating that Gottaplay would send a letter

10   terminating the Consulting Agreement that day.  The email did not mention any prior purported

11   termination as of February 22, 2007.  Mr. Gorst stated that the upcoming letter "will explain our

12   reason for terminating our relationship."  *See* Ex. J to Bosch Decl.  Mr. Gorst expressed his

13   alleged disappointment that Gottaplay's shareholder base had not been built as much as he hoped

14   and put the blame on Capital Group.  Gottaplay had never expressed any such disappointment

15   prior to this time.

16             Contrary to the promise in his April 27 email, Gottaplay did not send a termination

17   letter that day.  The purported termination letter did not arrive until May 14, 2007, and it did not

18   identify any contractual provision permitting Gottaplay to terminate the Consulting Agreement.

19   Instead, as shown *supra*, Gottaplay resorted to the vague and unsupported allegations of "fraud in

20   the inducement" and unspecified breaches of promises as discussed in Part II(F).

21   **H.     Gottaplay is also interfering with Capital Group's stock sales under SEC Rule 144.**

22             Not satisfied with having taken away Capital Group's ability to sell its 2,000,000

23   shares, Gottaplay proceeded to interfere with Capital Group's attempted sale of a much smaller

24   amount of unregistered, restricted stock as allowed under SEC Rule 144.  As discussed more fully

25   in the legal argument *infra*, Rule 144 entitles holders of restricted stock to sell a limited amount

26   of stock every 90 days.  In compliance with this rule, on August 14, 2007 Capital Group

27   submitted its Rule 144 documentation to the stock transfer agent, Colonial, and requested to sell

28   311,011 shares of Gottaplay stock.  Normally, such requests are routinely processed by the stock

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    transfer agent.

2           In this case, however, Colonial stated to Capital Group that Gottaplay was

3    requesting that Colonial not honor the Rule 144 request.  Colonial is the agent of Gottaplay and is

4    paid by Gottaplay to act as the transfer agent.  Colonial suggested that Gottaplay file a

5    counterclaim in order to put ownership into doubt so that Colonial would not have to honor any

6    sales under Rule 144, which Capital Group had informed Colonial that it intended to do as an

7    interim measure pending its efforts to have its shares registered.  When Capital Group submitted

8    its stock certificate to Colonial, as required to process its sale of 311,011 shares, Colonial took the

9    stock certificate without permission and interpleaded the certificate into the Court registry.  In its

10   interpleader action, Colonial misleadingly suggested that it was the holder of disputed shares,

11   when in fact Capital Group had merely ceded control of those shares for the limited purpose of

12   processing its Rule 144 sale.  In spite of its lack of ownership of the shares, Colonial interpleaded

13   the shares in order to frustrate Capital Group's attempted sale under Rule 144 and to foster the

14   false impression that there is some doubt about who presently owns the shares when in fact no

15   such doubt exists.

16   **I.    Gottaplay refuses to issue stock or refund the $125,000 separately invested by
            Capital Group.**

17

18          Not only has Gottaplay received the benefit of Capital Group's services free for a

19   year, it has even caused an actual loss to Capital Group by converting the proceeds of a check.  In

20   late 2005, Gottaplay was consulting for Gottaplay as it planned a merger with Western

21   Transitions.  In anticipation of the merger, Capital Group entered into a Registration Rights

22   Agreement with Western Transitions, pursuant to which Capital Group would invest $125,000

23   and receive in exchange stock and stock warrants in the newly-formed corporation resulting from

24   the merger.  Capital Group had been asked by both entities to continue representing the newly-

25   formed entity after the merger.

26          When the merger fell through, Mr. Gorst informed Mr. Bosch that Gottaplay had

27   received and deposited the proceeds of Capital Group's check for $125,000 into Gottaplay's

28   account.  Mr. Gorst further represented that, in exchange for Gottaplay's receipt and use of

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   Capital Group's $125,000, Gottaplay would issue Gottaplay shares and stock warrants to Capital

2   Group so that it would receive 125,000 shares and 62,500 stock warrants at an exercise price of

3   $1.25 per share.  In reliance on Mr. Gorst's promise, Capital Group allowed Gottaplay to keep

4   Capital Group's $125,000.

5              Prior to this litigation, Mr. Gorst orally affirmed to Mr. Bosch that the shares

6   would be delivered.  Nonetheless, Gottaplay has failed to deliver the promised shares and

7   warrants, nor has it refunded Capital Group's $125,000 investment.  Instead, Gottaplay

8   apparently plans on just absconding with Capital Group's money.

9   **J.      Gottaplay's contrived defenses are insubstantial.**

10             On August 16, 2007, Gottaplay filed its Answer and Counterclaim and purported

11   to plead seven counterclaims, all of which are premised on two allegations.  First, Gottaplay

12   alleges that Capital Group "performed very few, if any, of the 'services' called for under

13   Paragraph 2 of the Consulting Agreement" and that "[t]he actual services performed entailed a

14   review of approximately two press releases prepared by Gottaplay."  Counterclaim, ¶¶ 21-22.  As

15   shown in Part II(D) *supra*, this is nonsense.  Capital Group performed extensive services for

16   Gottaplay, even after the purported February 22, 2007 termination that Gottaplay falsely

17   disclosed in its securities filings, and Gottaplay advertised Capital Group as its investor relations

18   firm in its March 26, 2007 press release.

19             Second, Gottaplay alleges that the Consulting Agreement was void from its

20   inception because Paragraph 5 provided for a finder's fee in the event that Capital Group

21   introduced Gottaplay to a lender or equity purchaser who ultimately financed the company.  From

22   that starting point, Gottaplay leaps to the illogical and unsupported conclusion that Capital Group

23   was a broker-dealer unlawfully selling Gottaplay securities.  Counterclaim, ¶ 29-39.  Gottaplay

24   contends that "consistent with the language of the Consulting Agreement, [Capital Group]

25   understood it was being retained to assist Gottaplay in raising capital through the issuance of

26   securities, advise Gottaplay on any such securities transactions, and perform other broker type

27   services (collectively, 'Broker Services')."  *Id.*, ¶ 31.  However, the express language of

28   Paragraph 5 states that Capital Group "is not and does not hold itself out to be a Broker/Dealer,

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  but is rather merely a 'Finder' in reference to [Gottaplay] procuring financing sources and

2  acquisition candidates." Ex. A to Bosch Decl.  Moreover, Gottaplay fails to allege that Capital

3  Group ever sold any security, or even identify any security offering with which Capital Group

4  was involved.  In sum, Gottaplay tries to render a valid contract unlawful by positing hypothetical

5  securities sales by Capital Group which were not required under the Consulting Agreement,

6  which never in fact occurred, and which have nothing to do with the pending dispute between

7  Capital Group and Gottaplay about the 2,000,000 shares—not any finder's fee under Paragraph 5.

8  Gottaplay's hypothetical is simply a post-breach effort to allow it to welch on a contract.

9
   **III.**
   **ARGUMENT**
10

11  **A.      Preliminary Injunction Standard**

12      The Ninth Circuit has authorized courts to issue an injunction based on one of two

13  tests.  Under the traditional test, the Ninth Circuit requires the applicant to demonstrate: (1) a

14  likelihood of success on the merits, (2) a significant threat of irreparable injury, (3) that the

15  balance of hardships favors the applicant, and (4) whether any public interest favors granting an

16  injunction.  *Raich v. Ashcroft*, 352 F.3d 1222, 1227 (9th Cir. 2003).  Under the alternative test, the

17  applicant may show either (1) a combination of probable success on the merits and the possibility

18  of irreparable injury, or (2) serious questions going to the merits and that the balance of the

19  hardships tips sharply in the applicant's favor.  *Id.*

20      The alternative test treats the second and third factors of the traditional test as a

21  single factor and further recognizes that the public interest is but one more interest to be balanced

22  along with the interests of the parties.  *See State of Alaska v. Native Village of Venetie*, 856 F.2d

23  1384, 1389 (9th Cir. 1988).  The two prongs under the alternative test are not to be treated as two

24  separate tests, but rather as extremes of a single continuum.  *Id.*  Under this continuum of

25  equitable discretion, the greater the relative hardship to the moving party, the less probability of

26  success must be shown.  *Raich*, 352 F.3d at 1227.  While injunctive relief is warranted here under

27  either test, Capital Group will apply the alternative test.

28      Capital Group has a clear likelihood of success on the causes of action in its

1  Complaint for breach of the contract, breach of the covenant of good faith and fair dealing,

2  specific performance and injunctive relief.  It is indisputable that Capital Group owns the

3  2,000,000 shares by virtue of a duly-issued stock certificate that has never been cancelled and

4  that, as the owner of the shares, Capital Group has specific contractual and statutory rights.  First,

5  the Consulting Agreement provides that Gottaplay will register all of the shares in its next

6  registration statement, i.e., the May 7 registration statement.  Second, SEC Rule 144 entitles

7  Capital Group to sell limited amounts of unregistered shares.  Gottaplay's phony cancellation and

8  retroactive termination breached the Consulting Agreement and demonstrates that Capital Group

9  has a clear likelihood of success on the merits.  Because Gottaplay deposited $125,000 of Capital

10 Group's money in exchange for its promise to deliver 125,000 shares and 62,500 stock warrants,

11 Capital Group also has a clear likelihood of success on its causes of action for breach of oral

12 contract and/or conversion.  As for irreparable harm and the balance of the hardships, Capital

13 Group agreed to consult for one year and forego other opportunities in exchange for the 2,000,000

14 shares, its only compensation.  Capital Group contracted for the right to have those shares

15 registered so that it could sell those shares to help fund its operations, and has a statutory right to

16 sell them.  With each passing week, the value of those rights is dissipating, and bankruptcy for

17 Gottaplay is a real possibility.  For its part, Gottaplay will suffer no harm in being ordered to

18 comply with the express terms of the Consulting Agreement and register Capital Group's shares,

19 nor will it suffer harm in being enjoined from interfering with Capital Group's sale of shares

20 under Rule 144.  Capital Group will discuss these factors in more detail below.[4]

21 **B.    Likelihood of Success**

22      1.    Capital Group has an express, written contractual right to registration of its
             2,000,000 shares and a separate statutory right to sell shares under SEC Rule 144.
23

24      Capital Group has both a contractual and statutory right to relief.  First, where a

25 contract expressly provides registration rights, the likelihood of success is clear and injunctive

26 ─────────
[4]    As for the public interest, the public has an interest in the enforcement of shareholders'
27 right to own and sell their shares without illegal self-help by issuers who, rather than seek a court
order to attempt to legitimately rescind stock, falsely purport to cancel shares by unilateral decree.
28 If issuers can simply make stock disappear, then the settled expectations of shareholders will be
disturbed.

1    relief should issue.  Second, when a stockholder has a statutory right to sell under SEC Rule 144,

2    then the Courts have likewise granted injunctive relief to effectuate that right.[5]

3           Whether the right arises from contract or under Rule 144, courts have recognized

4    the importance of validating a shareholder's right to sell, particularly where the issuer is unstable

5    financially.  For example, in *Alpha Capital Atkiengesellschaft v. Group Mgmt. Corp.*, 2002 WL

6    31681798 (S.D.N.Y. Nov. 25, 2002), the defendant was contractually required to "use its

7    reasonable commercial efforts" to register certain stock of the plaintiffs. *Id.*, at *1.  Because of

8    the defendant's failure to achieve registration by the agreed contractual date, plaintiff also

9    demanded that defendant provide "the documentation necessary to sell such shares pursuant to

10   SEC Rule 144." *Id.* at *2.  In response to the failure of defendant to achieve registration or

11   provide Rule 144 documentation, plaintiffs filed a complaint and sought injunctive relief

12   compelling defendant to register the stock and deliver the Rule 144 documentation. *Id.* at *2-3.

13   The Court issued preliminary injunctive relief requiring defendant to attempt registration of the

14   stock and provide the Rule 144 documentation, including a Rule 144 opinion authorizing

15   plaintiffs to sell the stock under that rule (whether or not registration was achieved). *Id.* at *3.

16   The order directed defendant to "provide forthwith to Plaintiffs all required opinions and all other

17   documents and instructions to the transfer agent necessary to allow Plaintiffs to sell, pursuant to

18   SEC Rule 144, all shares of [defendant's] stock" and also to "take all actions expeditiously to

19   comply with its registration obligations to Plaintiffs." *Id.* at *4 n.13.  The defendant in *Alpha*

20   *Capital* argued against injunctive relief by contending that plaintiffs had engaged in market

21   manipulation of defendant's stock, but the court found that the allegations of stock manipulation

22   _____

23   [5]     Of these two options, registration, as required Paragraph 4 of the Consulting Agreement is
     preferable to sales under Rule 144 because registration allows for the immediate sale of all shares

24   once registration becomes effective.  In contrast, Rule 144, codified at 17 C.F.R. § 230.144,
     provides that "the rule permits the public sale in ordinary trading transactions of limited amounts

25   of securities owned … by persons who have acquired restricted securities of the issuer."  17
     C.F.R. § 230.144 (Preliminary Note).  A holder of restricted securities is limited to selling, every

26   three months, no more than "one percent of the shares or other units of the class outstanding as
     shown by the most recent report or statement published by the issuer" 17 C.F.R. § 230.144

27   (e)(1)(i).  As Capital Group owns roughly 7% of the outstanding stock of Gottaplay according to
     its Schedule 13D filing, it would take almost 2 years for Capital Group to sell all of its stock

28   under this method (versus the immediate sale that would be possible if the shares were
     registered).

1   were "too flimsy a bulwark to stand in the way of Plaintiffs' contractual rights." *Id.* at *4.

2           The *Alpha Capital* court observed that the injunction in issue might be considered

3   mandatory in nature because it could require action on the part of the defendant and further

4   observed that mandatory injunctions[6] that disturb the status quo require a higher showing of

5   success on the merits. *Id.*, at *10. However, the court found that, in a case where the contract

6   terms are clear, there is no difficulty in finding a substantial likelihood of success justifying

7   injunctive relief. *Id.*

8           Another instructive case is *Netwolves Corp. v. Sullivan*, 2001 WL 492463

9   (S.D.N.Y. May 9, 2001). In that case, the holders of restricted stock had agreed not to sell until

10  18 months after a merger with the adverse company. *Id.* at *2. After the 18-month period

11  expired, the stockholders moved for a preliminary injunction requiring the company to issue an

12  opinion letter stating that the shares could be sold legally, which was necessary to sell under SEC

13  Rule 144. *Id.*, at *4, 9. The company did not dispute that Section 8-401 of the New York

14  Commercial Code—which is virtually identical to Section 8-401 of the California Commercial

15  Code—required the company to issue an opinion of counsel unless it had reasonable grounds for

16  refusing to do so. *Id.*, at *10. The company argued that the stockholders had failed to aggregate

17  their stock and that the stockholders' requested opinion letter therefore failed to properly limit the

18  number of shares that could be sold. *Id.* at 10-11. The court dismissed the company's efforts to

19  impose a technical road block by ordering the company to issue an opinion that the stockholders

20  could sell their stock up to any applicable quantity limitations imposed by Rule 144. *Id.* at *11.

21  As in *Alpha Capital*, the court focused on enforcing the clear contractual right of the stockholders

22  in order to enable them to sell their shares.

23          Finally, in *Sales Online Direct, Inc. v. Stengel*, 2001 WL 282690 (D. Md. Mar. 19,

24  2001), the plaintiff issuer sought a preliminary injunction barring the defendant from selling stock

25  _____

26  [6]     The court questioned whether such an injunction is mandatory in nature because
    determining what is the status quo in a contract case involves more semantic than substantive
    distinctions: A plaintiff's view of the status quo is the situation that would prevail had the
27  plaintiff performed while a defendant's view of the status quo is its continued failure to perform.
    *Id.* The court ultimately found it unnecessary to resolve the question of what was the status quo,
28  as contracts should be enforced when the contractual right is clear.

1    pending resolution of the litigation. *Id.* at *2. The defendant stockholder counterclaimed and

2    moved for a preliminary injunction from blocking or interfering with its sales of shares under

3    Rule 144. *Id.* at *2. The issuer argued that the court should bar the stockholder from selling its

4    shares because the sale would deny the plaintiff the possibility of seeking rescission of the stock.

5    *Id.* at *3. The court rejected the issuer's argument because there was no practical way to undo the

6    original stock transaction and put the parties back to the status quo ante, and the stockholder

7    would suffer harm from not being able to sell the stock, including its inability to use the stock

8    proceeds to fund its litigation efforts. *Id.* The court enjoined the issuer from taking any action to

9    bar the stock sales under Rule 144. *Id.* at *5. It is notable that the court's holding was based

10   primarily on the obvious right of a shareholder to sell shares, notwithstanding the pendency of

11   claims against the shareholder that could potentially support a damages verdict against the

12   shareholder. *See id.* at *4-5 & n.4.

13            Here, Gottaplay should be ordered to register Capital Group's 2,000,000 shares.

14   Paragraph 4 of the Consulting Agreement provides that "[Gottaplay] further agrees that all shares

15   issued to [Capital Group] hereunder shall carry 'piggy-back registration rights' whereby such

16   shares will be included in the next registration statement by the company." This provision, which

17   is the sole governing provision regarding registration rights, does not give Gottaplay discretion as

18   to when it must register all shares issued to Capital Group; to the contrary, the agreement

19   specifically states that all shares must be included in the next registration statement. That

20   registration statement, Ex. F to Bosch Decl., was filed on May 7, 2007. Nothing in the contract

21   allows for termination of that registration right. As for Gottaplay's belated claims in this

22   litigation that Capital Group failed to perform services adequately, that is an unlitigated, future

23   monetary claim that does not affect Capital Group's registration right which has already accrued.

24   If Gottaplay believes that Capital Group should pay back some money, it can litigate that claim.

25            In addition to registering Capital Group's shares, Gottaplay should be ordered to

26   take all commercially reasonable actions to facilitate sales under Rule 144. Gottaplay has no

27   basis for denying that Capital Group presently owns the stock. The right to sell under Rule 144 is

28   a statutory right incident to ownership of stock, and any contractual disputes about performance

1    or non-performance of services are irrelevant to Capital Group's statutory right to sell.

2            Not only has Capital Group shown its clear contractual and statutory rights,

3    Gottaplay's actions reek of fraud.  If Gottaplay had terminated the Consulting Agreement on

4    February 22 as disclosed in its securities filings, Gottaplay would not have induced Capital Group

5    to keep working for Gottaplay, would not have listed Capital Group as its investor relations

6    contact in a March 26 press release and would not have informed Capital Group of the

7    termination three months later.  If Gottaplay's purported cancellation of Capital Group's stock

8    had actually happened (as again falsely disclosed in its securities filings), Gottaplay would not

9    have had to file a claim of rescission to try to get the stock back.  *See* Counterclaim, ¶ 69.  Indeed,

10   Gottaplay's stock transfer agent, Colonial, could not have interpleaded a stock certificate that

11   evidences Capital Group's ownership of the stock if the stock had been cancelled.  The simple

12   fact is that Gottaplay "cancelled" the shares on April 20 for the sole purpose of avoiding its duty

13   to register the shares on May 7.  Then, on May 14, Gottaplay sent a letter that purported to advise

14   Capital Group of a secret termination three months earlier and of a cancellation of shares that

15   never in fact happened.  Finally, in order to avoid having to cooperate with Capital Group's sale

16   under Rule 144, Gottaplay and its agent, Colonial, interpleaded the shares based on a claim that

17   the Consulting Agreement should be rescinded and the shares returned to Gottaplay in the future.

18   <u>This strategy was only necessary because the purported cancellation was a fraud; if the</u>

19   <u>cancellation were valid, there would be no shares to interplead.</u>  Gottaplay's phony cancellation is

20   not only a fraud against Capital Group; it was blatant securities fraud as well.

21           In order to try to "turn the tables" on Capital Group, Gottaplay tries to deflect

22   attention from its own securities fraud by claiming that Capital Group violated the securities laws

23   by acting as an unlicensed broker-dealer.  Such a transparently false and contrived defense only

24   enhances Capital Group's showing of a likelihood of success.[7]  Paragraph 5 of the Consulting

25   Agreement only allows Capital Group to obtain a finder's fee for providing an introduction to an

26   entity that ultimately provides financing; it does not require Capital Group to sell Gottaplay

27

28   [7]      Capital Group intends to file a motion to dismiss all counterclaims based on allegations
     that Capital Group was an unregistered broker-dealer.

1    securities.  *See Lyons v. Stevenson*, 65 Cal. App. 3d 595, 604 (1977); *Evans v. Riverside Int'l*

2    *Raceway*, 237 Cal. App. 2d 666, 675-76 (1965) (broker-dealer license not required for any person

3    who merely brings a buyer and seller of securities together so that they may make their own

4    contract without any involvement on his part in negotiating the price or any of the other terms of

5    the transaction); *see also SEC No Action Letter, H.C. Copeland and Association Equities, Inc.*,

6    1982 WL 29102 (April 8, 1982) (a person is not a broker-dealer where he merely provides

7    documents or information to potential purchasers of securities, but does not participate in

8    negotiations).  Indeed, Paragraph 5 expressly states that Capital Group will not act as a broker-

9    dealer for Gottaplay.  It is a fundamental principle of contract law that contracts are construed to

10   be legal, and the Consulting Agreement does not call for any illegal broker-dealer activities.  *See*

11   Cal. Civ. Code § 1643 ("A contract must receive such an interpretation as will make it lawful …

12   .).  Capital Group never sold any securities for Gottaplay, and, even if it had, such an

13   extracontractual act would not affect the enforceability of the contract.  Gottaplay's counterclaims

14   are just irrelevant hypotheticals about Capital Group making sales of securities, which it never

15   did, to obtain a finder's fee, which it never received, so that Gottaplay can try to escape from a

16   contract that does not even contemplate Capital Group selling any securities in the first instance.

17   Capital Group has shown probable success on the merits of its claim for, *inter alia*,

18   breach of written contract, particularly its right to own and sell 2,000,000 shares, including the

19   right of registration under Paragraph 4 of the Consulting Agreement and the right to sell

20   unregistered shares within the limits of SEC Rule 144.

21   2.    Capital Group has a right to the 125,000 shares promised by Gottaplay in
              exchange for its $125,000, or a right to a refund.

22

23   There is no dispute that Capital Group wrote a check for $125,000 in expectation

24   of receiving shares or warrants.  *See* Ex. L to Bosch Decl. (attaching check).  While the check

25   was not originally payable to Gottaplay, Gottaplay's CEO, Mr. Gorst, has confirmed to Capital

26   Group's President, Mr. Bosch, that Gottaplay deposited the proceeds of the check after the failed

27   merger between Gottaplay and Western Transitions.  The details of how the money ended up in

28   Gottaplay's bank account is irrelevant here; the relevant fact is that Gottaplay has the money.

1    The other relevant fact is that Mr. Gorst agreed that Gottaplay would deliver 125,000 shares and

2    62,500 stock warrants priced at $1.25 per share in exchange for retaining the $125,000.

3            Given that Gottaplay has $125,000 of Capital Group's money, Capital's Group's

4    likelihood of success is virtually certain. To the extent Gottaplay may contest that it agreed to

5    deliver shares, Gottaplay will be obligated to return the money with interest. Because of the

6    dismal financial condition of Gottaplay, Capital Group's primary concern is to obtain relief while

7    Gottaplay still exists, and therefore it is of little concern to Capital Group whether Gottaplay

8    wishes to refund the money in cash or honor its agreement to deliver the shares and warrants.

9            Capital has shown probable success on the merits of its claim for, inter alia, breach

10   of oral contract, conversion and unjust enrichment and its corresponding right to the delivery of

11   125,000 shares and 62,500 stock warrants with an exercise price of $1.25, or, alternatively, the

12   return of its $125,000 with interest from the date of deposit into Gottaplay's account.

13   **C.    Irreparable Harm/Balance of the Hardships**

14           1.    <u>Capital Group's inability to sell the shares of an unstable microcap stock, which</u>
                   <u>was its sole compensation for its work, constitutes irreparable harm.</u>
15

16           Capital Group owns 2,000,000 shares of Gottaplay stock and has a right to

17   125,000 shares more plus 62,500 stock warrants. However, owning stock does not mean much if

18   the holder cannot sell it. As the courts in *Alpha Capital* and *Netwolves* both found, injunctive

19   relief is appropriate in order to protect a stockholder's investment in a company with marginal

20   prospects. The *Alpha* court repeatedly expressed its concern that in light of the defendant's

21   "precarious financial situation" the prevailing party might not have "assured access to any

22   damages it is entitled to recover." *Alpha Capital*, 2002 WL 31681798, at *3. The court found

23   that there "was little question" of irreparable harm where the defendant's financial health was

24   "dire." *Id.*, at *11.

25           In *Netwolves*, the company was not in such dire financial straits. The company

26   had $10 million cash on hand. *Netwolves*, 2001 WL 492463, at * 11. By way of comparison, on

27   page 32 of its May 7 registration statement Gottaplay reported a cash balance of $83,536 as of

28   December 31, 2006. Ex. F to Bosch Decl. In *Netwolves*, the company had revenues of over $1

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  million during a six month period, but an operating loss of over $11 million.  *Netwolves*, 2001

2  WL 492463, at * 11.  By way of comparison, in its summary table of financial information on

3  page 8 of its registration statement, Gottaplay reported revenues for its fiscal year 2006 of

4  $464,531 with an operating loss of $1,972,923.  Ex. F to Bosch Decl.  In *Netwolves*, the company

5  reported a 50% drop in its stock price.  *Netwolves*, 2001 WL 492463, at * 11.  Gottaplay's stock

6  has dropped from a 52-week high of $3.05 to its current price of roughly 40 cents, a drop of

7  almost 90%.  Ex. E to Bosch Decl.  The statement in *Netwolves* is thus equally applicable here:

8  "In circumstances similar to these, courts have found that the defendant may become insolvent

9  during the pendency of the litigation, and that monetary injury is, therefore, irreparable."

10  *Netwolves*, 2001 WL 492463, at * 11.

11      Capital Group never received a penny for its work, but still has to pay salaries, rent

12  and other obligations.  Capital Group may never realize any compensation from its work if it is

13  not able to sell its shares promptly after registration.  Not only is there the risk of bankruptcy,

14  there is also the risk of a continued decline in the stock price.

15      2.    Gottaplay is not injured by being ordered to perform its express contractual
16            obligations, and any such "injury" is self-inflicted.

17      Gottaplay will suffer no injury by being ordered to register stock which it was

18  contractually obligated to register as part of its May 7 registration statement, nor will it be injured

19  by being enjoined from interfering with Capital Group's statutory right to sell limited amounts of

20  stock Rule 144.  Capital Group's stock would already be registered if Gottaplay had complied

21  with the contract, and Capital Group's sale under Rule 144 would already have been processed

22  but for Gottaplay's interference.  A defendant cannot claim hardship based on the issuance of an

23  injunction designed to remedy the defendant's own wrongdoing.  *See Novartis Consumer Health,*

24  *Inc. v. Johnson & Johnson*, 290 F.3d 578, 596 (3d Cir. 2002) (self-inflicted harm not factored into

25  balance of the hardships).  Capital Group's ownership of 2,000,000 shares was already disclosed

26  in Schedule 13D so there is no surprise to Gottaplay, its shareholders or any potential source of

27  financing that Capital Group owns 2,000,000, which was at all times included in the outstanding

28  stock of Gottaplay until Gottaplay's fraudulent May 7 registration statement where it purported to

1    make that stock evaporate—and this purportedly nonexistent stock has since been interpleaded

2    into the Court by Gottaplay's own transfer agent.

3                                              **IV.**
                                        **CONCLUSION**
4

5            Gottaplay is a company whose future is in doubt.  Like any shareholder, Capital

6    Group should have the opportunity to salvage some compensation for its work before Gottaplay

7    may disappear.  Capital Group requests that the Court issued a preliminary injunction as set forth

8    in Capital Group's proposed order.

9
     Dated: September 7, 2007                    STEIN & LUBIN LLP
10

11
                                        By:  /s/ Jonathan Sommer
12                                           Jonathan Sommer
                                             Attorneys for Plaintiff
13                                           CAPITAL GROUP COMMUNICATIONS, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION