1  MICHAEL F. DONNER (SBN 155944)
   JONATHAN E. SOMMER (SBN 209179)
2  STEIN & LUBIN LLP
   The Transamerica Pyramid
3  600 Montgomery Street, 14th Floor
   San Francisco, California 94111
4  Telephone:    (415) 981-0550
   Facsimile:    (415) 981-4343
5  mdonner@steinlubin.com
   jsommer@steinlubin.com
6
   Attorneys for Plaintiff
7  CAPITAL GROUP COMMUNICATIONS, INC.,
   a California corporation
8

9                UNITED STATES DISTRICT COURT

10              FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                      SAN FRANCISCO DIVISION

12

13 | CAPITAL GROUP COMMUNICATIONS, | Case No. C-07-03632-EMC
   | INC., a California corporation,
14 |                                | **DECLARATION OF DEVIN J. BOSCH IN**
   |         Plaintiff,             | **SUPPORT OF PLAINTIFF'S MOTION**
15 |                                | **FOR PRELIMINARY INJUNCTION**
   | v.
16 |                                |
   | GOTTAPLAY INTERACTIVE, INC., a | Date:     October 17, 2007
17 | Nevada corporation; JOHN P. GORST, an | Time:     10:30 a.m.
   | individual; MARK H. LEVIN, an  | Judge:    Hon. Edward M. Chen
18 | individual; and DOES 1-50, inclusive, | Location: 15th Floor, Courtroom C
19 |         Defendants.            |

20

21

22

23

24

25

26

27

28

16010002/354466v2                                    Case No. C-07-03632-EMC

DECLARATION OF DEVIN J. BOSCH

I, DEVIN J. BOSCH, declare:

1. I am the President of Capital Group Communications ("Capital Group"), the plaintiff in the above-entitled matter. I have personal knowledge of the facts stated in this declaration and could and would competently testify thereto if called as a witness in any proceeding in this action.

2. Capital Group is an investor relations firm located in Sausalito, California. Although Capital Group is a small company, it is highly-regarded in the investor relations field.

3. Capital Group provides, among other things, strategic communications and investor relations services and consulting for publicly-traded "micro cap companies." Micro cap companies are companies that are not substantially capitalized and generally have low trading volume.

4. Because Capital Group's micro cap clients typically are cash poor, they often compensate Capital Group by issuing and delivering to Capital Group shares of their stock instead of paying Capital Group in cash. Many Capital Group employees take little or no salary and instead receive compensation in the form of a percentage of shares of a client. Capital Group's clients benefit tremendously from Capital Group's willingness to accept their stock as compensation because they are not compelled to spend their limited cash resources.

5. Capital Group relies on the sale of its clients' stock to fund its operational expenses, including employee salaries, office rent and other such costs. In fact, Capital Group takes great risks in accepting from its clients shares of stock instead of cash compensation. Micro cap companies frequently are unstable, have volatile stock prices, and low trading volume. The stock prices for these shares could severely decline after Capital Group receives them as compensation, and Capital Group's clients could file for bankruptcy protection or terminate their operations after Capital Group receives their shares.

6. In a typical engagement, Capital Group will consult and perform its professional services for a client during a specific period of time. Such a commitment requires Capital Group to devote its limited resources largely to that client and to forego other client relationships and business opportunities. Accordingly, as a small company Capital Group must

1  be selective in choosing engagements and in deciding which clients to which it will devote its
2  limited resources over the coming months or years.

3        7.    Gottaplay is an internet-based video game company based in Gig Harbor,
4  Washington. Gottaplay's Chief Executive Officer ("CEO") is John P. Gorst, age 38; Mark Levin,
5  age 35, is a Director; and Asra Rasheed, age 34, is its President.

6        8.    Gottaplay's stock is traded in the OTC or "over-the-counter" marketplace
7  under the symbol GTAP. Its stock currently trades around 40 cents per share and generally has
8  very low trading volume (and even no trading volume on some days).

9        9.    On July 25, 2006, Capital Group and Gottaplay signed a consulting
10  agreement (the "Consulting Agreement"). A true and correct copy is attached to this Declaration
11  as Exhibit A.

12        10.    Prior to signing the Consulting Agreement, Capital Group had already been
13  providing consulting services to Gottaplay in anticipation of a planned merger with an entity
14  known as Western Transitions, Inc. ("Western Transitions"). Gottaplay had informed Capital
15  Group that it would be compensated for these services in stock of the newly-formed entity.
16  Though the merger fell through, Gottaplay asked Capital Group to stay on as its investor relations
17  consultant, and, therefore, Gottaplay and Capital Group executed the Consulting Agreement. The
18  Consulting Agreement required Capital Group to commit to another year of work for Gottaplay
19  and give up the opportunity to consult for another company.

20        11.    Under Paragraph 4 of the Consulting Agreement, Capital Group received
21  2,000,000 non-refundable shares of Gottaplay. Having previously performed services for
22  Gottaplay, having accepted substantial risk in committing to consult for Gottaplay in exchange
23  only for stock, and having foregone other business opportunities to take on Gottaplay's
24  engagement, Capital Group reasonably demanded that its stock be non-refundable. Capital Group
25  specifically provided for the circumstance where Gottaplay might find it tempting to terminate the
26  Consulting Agreement, as a pretext for reclaiming its shares, by specifying that no such
27  termination would allow Gottaplay to demand the shares back.
28

16010002/354466v2       2      Case No. C-04-434563

DECLARATION OF DEVIN J. BOSCH

1    12. Of course, the right to own non-refundable shares is of no value if those shares cannot be sold. Accordingly, Capital Group obtained Gottaplay's agreement in Paragraph 4 of the Consulting Agreement "that all shares issued to [Capital Group] hereunder shall carry 'piggy-back registration rights' whereby such shares will be included in the <u>next</u> registration statement filed by the company." [emphasis added]

13. On August 8, 2006, Gottaplay filed a Schedule 13D with the SEC that disclosed the transfer of 2 million shares to Capital Group. Gottaplay's Schedule 13D disclosed that Capital Group had sole dispositive power over 2,000,000 shares representing 6.97% of the outstanding stock of Gottaplay. A true and correct copy of Schedule 13D is attached hereto as Exhibit B.

14. Further confirming Capital Group's ownership of the shares, Gottaplay caused to be issued to Capital Group a stock certificate dated September 25, 2006 that evidenced its ownership of 2,000,000 shares. A true and correct copy of the stock certificate is attached as Exhibit C. Capital Group retained the original stock certificate at all times prior to this litigation.

15. On January 16, 2007, Gottaplay filed a Form 10-KSB/A in which it again disclosed that it had issued 2,000,000 shares to Gottaplay. A true and correct copy of this Form 10-KSB/A is attached hereto as Exhibit D.

16. Capital Group devoted extensive time to raising Gottaplay's profile in the market, and Capital Group's efforts coincided with Gottaplay's stock price doubling to over $3 per share. True and correct copies of publicly-available price quotations as of July 25, 2006 (the date the Consulting Agreement was signed) and January 31, 2007, the date the stock rose to over $3 per share, are attached hereto as Exhibit E.

17. Most of Capital Group's time was devoted to speaking with potential investors about the nature of Gottaplay's services, its business plan, the competitive market in which Gottaplay operates, and other such items necessary to generate interest in Gottaplay. While we did assist in preparing documents such as press releases, most of our time was spent on making literally thousands of phone calls with potential investors, some of which were logged in lengthy phone logs that we maintain. As Capital Group does not bill by the hour, it is difficult to

1  quantify exactly the amount of time spent by Capital Group employees in connection with the
2  Gottaplay engagement; however, I would estimate that the amount of time would easily amount
3  to many hundreds of hours.

4        18.    In Paragraph 3 of the Consulting Agreement (attached hereto as Exhibit A),
5  Gottaplay specifically agreed that "a disproportionately large amount of the effort to be expended
6  and costs to be incurred by [Capital Group] and the benefits to be received by [Gottaplay] are
7  expected to occur within or shortly after the first two months of the effectiveness of the
8  Agreement."  The reason for this was that most of the effort in investor relations consulting is
9  expended in understanding the client's business, introducing that company to potential investors,
10 and preparing materials for investors.  While there is follow up work, that work is typically less
11 time-consuming.  Thus, the core of Capital Group's work had been completed long before any
12 dispute arose.

13       19.    On May 7, 2007, Gottaplay filed a Form SB-2 in which it registered certain
14 shares and stock warrants of Gottaplay.  A true and correct copy of the registration statement is
15 attached hereto as Exhibit F.  Gottaplay did not include Capital Group's shares in its registration,
16 even though it had specifically agreed in Paragraph 4 of the Consulting Agreement "that all
17 shares issued to [Capital Group] hereunder shall carry 'piggy-back registration rights' whereby
18 such shares will be included in the <u>next</u> registration statement filed by the company." [emphasis
19 added]

20       20.    In the registration statement, Gottaplay disclosed that it had purportedly
21 "terminated" the Consulting Agreement on February 22, 2007 and "cancelled" Capital Group's
22 stock on April 20, 2007.  This information disclosed in the registration statement had never before
23 been disclosed to Capital Group.

24       21.    The opening price of Gottaplay stock on May 7, 2007—the date when
25 Capital Group's stock should have been registered—was $1.80.  A true and correct copy of a
26 publicly-available price quotation for May 7, 2007 is attached hereto as Exhibit E.  Thus, the
27 value of Capital Group's shares on the date of registration was $3.6 million.  Today, Gottaplay's
28 share price is around 40 cents per share so that the current value of Capital Group's shares has

16010002/354466v2       4      Case No. C-04-434563

DECLARATION OF DEVIN J. BOSCH

dropped to roughly $800,000.  A true and correct copy of a publicly-available price quotation for September 7, 2007 is attached hereto as Exhibit E.

22. On May 14, 2007, Mr. Gorst sent a letter to me "advising" that Gottaplay had allegedly terminated the Consulting Agreement on February 22, 2007.  A true and correct copy of the letter is attached hereto as Exhibit G.  The May 14 letter did not identify any provision in the Consulting Agreement that allowed Gottaplay to terminate the contract on February 22.  Even if it had, Paragraph 4 of the Consulting Agreement specifically provided that Capital Group would retain its 2,000,000 shares notwithstanding any termination of the contract.

23. Prior to sending the May 14 letter, Gottaplay had never previously informed Capital Group of its alleged termination of the Consulting Agreement on February 22, 2007.  In fact, Capital Group had continued working for Gottaplay long after February 22, 2007, and the first hints of a dispute did not arise until April 2007.  Indeed, Gottaplay issued a press release on March 26, 2007, over a month after the purported termination, in which it listed Capital Group as its investment relations contact.  A true and correct copy of the press release is attached as Exhibit H.

24. The May 14 letter also "advised" that Gottaplay had cancelled Capital Group's shares on April 20, 2007, a statement that did not make sense given that Capital Group still had possession of the original stock certificate evidencing the shares.  Gottaplay asked Capital Group to return the stock certificate, which Capital Group did not do.  Instead, I called Kathy Carter of Colonial Stock Transfer ("Colonial"), who is Gottaplay's stock transfer agent.  Ms. Carter confirmed that that the 2,000,000 shares were still registered to Capital Group, that they had not been cancelled, and that Colonial would not cancel the stock on its books even if Gottaplay made such a request.

25. Gottaplay's May 14 letter followed an unsuccessful campaign shortly before the May 7 registration filing to pressure Capital Group to relinquish half of its shares during a series of telephone calls around mid-April.  I took detailed notes of these telephone calls, true and correct copies of which are attached as Exhibit I to this Declaration.  The calls began on April 9, 2007, when Mr. Gorst telephoned me and said that "he didn't want to beat around the

bush. He was upset that I had only 1 [million] less shares than him and wanted half of my shares back." Contradictorily, he said that an entity that was financing Gottaplay insisted that he get back the shares or Gottaplay would not receive funding. A day later, Mark Levin, a director of Gottaplay, telephoned me and "asked for ½ of our shares back since we have a 2 year agreement." I informed him that the agreement was for one-year. Mr. Levin, seeming perplexed, said that he was asking for half the shares back because the parties had another year on the deal. Mr. Levin called back a short time later and expressed a different alleged concern, namely that Capital Group would sell its shares at the end of its one-year contract and thereby hurt the market for Gottaplay shares. I told him that Capital Group was not trying to hurt Gottaplay, but that Capital Group did have registration rights to enable it to sell its shares. Mr. Levin asked if that was in the Consulting Agreement, and I affirmed that it was.

26. Subsequently, as further shown in my notes, Mr. Gorst said that he would fly down to discuss its alleged concerns and even claimed to have made flight reservations; however, he claimed that the flight was canceled due to "mechanical" issues and never scheduled another flight. On April 26, my colleague, Richard Carpenter, and I called Mr. Gorst, who never returned our calls.

27. On April 27, Mr. Gorst sent an email stating that Gottaplay would send a letter terminating the Consulting Agreement that day. A true and correct copy of his email is attached as Exhibit J. The email did not mention any prior purported termination as of February 22, 2007. Mr. Gorst stated that the upcoming letter "will explain our reason for terminating our relationship." Mr. Gorst expressed his alleged disappointment that Gottaplay's shareholder base had not been built as much as he hoped and put the blame on Capital Group. Gottaplay had never expressed any such disappointment prior to this time. Contrary to the promise in his April 27 email, Gottaplay did not send a termination letter that day. The purported termination letter did not arrive until May 14, 2007.

28. As Capital Group could not sell its 2,000,000 restricted shares absent registration, I decided that Capital Group would begin selling its shares under Rule 144, which I understood to allow for the sale of limited amounts of restricted stock even though the stock had

1    not been registered.  I am generally familiar with stock sales under Rule 144, and it is my

2    understanding that transfer agents routinely process such requests without delay.  Capital Group

3    submitted its documentation in support of its proposed Rule 144 sale to the SEC and Colonial.

4    Among other things, an attorney acting on behalf of Capital Group submitted an opinion letter

5    dated August 14, 2007 to Colonial opining that all of the requirements of a Rule 144 sale had

6    been complied with and requesting that Colonial issue two new share certificates:  one of which

7    would evidence that Capital Group owned 311,000 shares free of restriction, and one of which

8    would evidence the remaining 1,688,989 shares that would still be restricted.  A true and correct

9    copy of the letter is attached hereto as Exhibit K.  In addition to the opinion letter, Capital Group

10    had its broker deliver its original stock certificate to Colonial so that the original certificate could

11    be replaced by the two new certificates.

12         29.    Rather than comply with the Rule 144 request, Colonial took the original

13    stock certificate, and, without Capital Group's knowledge or authorization, filed an interpleader

14    action and submitted the stock certificate to the Court.  Capital Group had never authorized

15    Colonial to hold Capital Group's stock certificate for any purpose other than to issue two new

16    stock certificates.

17         30.    Ms. Carter has informed me that Gottaplay had been asking Colonial not to

18    honor any Rule 144 request.  Ms. Carter further informed me that she had discussed with

19    Gottaplay the possibility of filing a counterclaim so that Colonial would have some plausible

20    basis for not honoring any Rule 144 requests submitted by Capital Group (because of the

21    purported need to resolve any legal disputes prior to issuing new stock certificates).

22         31.    Capital Group has never agreed to transfer ownership of the 2,000,000

23    shares to Gottaplay.  Capital Group at all times has held the stock certificate for 2,000,000 shares

24    in the name of Capital Group, as shown on the face of the stock certificate, and relinquished that

25    certificate only for the limited purpose of having Colonial issue two new stock certificates

26    consistent with a Rule 144 sale.  If Colonial did not believe that it was required to process the

27    Rule 144 request, it should have returned the stock certificate to Capital Group, as it was not

28    authorized to have the certificate for any other purpose.

32.   Not only has Gottaplay received the benefit of Capital Group's services free for a year, it has even caused an actual loss to Capital Group by converting the proceeds of a check. As previously noted, Capital Group consulted for Gottaplay as it planned a merger with Western Transitions. In anticipation of the merger, Capital Group entered into a Registration Rights Agreement with Western Transitions, pursuant to which Capital Group would invest $125,000 and receive in exchange stock and stock warrants in the newly-formed corporation resulting from the merger. Capital Group had been asked by both entities to continue representing the newly-formed entity after the merger.

33.   When the merger fell through, Mr. Gorst informed me that Gottaplay had received and deposited the proceeds of Capital Group's check for $125,000 into Gottaplay's account. Mr. Gorst further represented that, in exchange for Gottaplay's receipt and use of Capital Group's $125,000, Gottaplay would issue Gottaplay shares and stock warrants to Capital Group so that it would receive 125,000 shares and 62,500 stock warrants at an exercise price of $1.25 per share. In reliance on Mr. Gorst's promise, I agreed to allow Gottaplay to keep Capital Group's $125,000. A true and correct copy of the check is attached hereto as Exhibit L.

34.   Prior to this litigation, Mr. Gorst orally affirmed to me that the shares would be delivered. Nonetheless, Gottaplay has failed to deliver the promised shares and warrants, nor has it refunded Capital Group's $125,000 investment.

35.   The first time I was ever told by Gottaplay that Capital Group had not fully performed its services under the Consulting Agreement was during the series of communications in April when Gottaplay was trying to reclaim shares from Capital Group. The first time I ever learned that Gottaplay claimed that Capital Group was acting as an unlicensed broker-dealer was when I received a copy of Gottaplay's Counterclaim in this case. Capital Group is not a broker-dealer, which is why the Consulting Agreement expressly states that Capital Group will not act as a broker-dealer. Capital Group never sold Gottaplay securities. Capital Group worked hard to raise Gottaplay's profile in the investment community, which is exactly what it was retained to do and which is normal and expected of investor relations firms.

1         I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

        Executed on September 7, 2007.

                                      /s/ Devin J. Bosch
                                      Devin J. Bosch

        I hereby attest that I have on file the original signature for the signature indicated above by a "conformed" signature (/S/) within this efiled document.

                                      /s/ Jonathan Sommer
                                      Jonathan Sommer