# EXHIBIT D

# PART 2

and under which the terms of the agreement, in consideration of the services
undertaken, we issued 8,333 shares of common stock with a fair market value of
$0.84 per share.

Between March, 2006 and May, 2006, we sold 5,000,000 shares to six (6)
overseas investors for aggregate proceeds of $300,000 ($.06 per share). We also
provided these investors with certain "piggyback" registration rights with
respect to the shares.

On July 14, 2006 we issued to Highgate House 8,334 shares of our common stock
as an inducement to waive a certain condition under the amendment agreement
dated June 30, 2006 with a market value of $1.20 a share.

On July 25, 2006, we entered into a consulting agreement with Capital Group
Communications and under which the terms of the agreement, in consideration of
the services undertaken, we issued 2,000,000 shares of common stock with a fair
market value of $1.50 per share.

On July 25, 2006, we entered into a consulting agreement with Silverdale
Partners, LP and under which

24

<PAGE>
the terms of the agreement, inconsideration of the services undertaken, we
issued 120,000 shares of common stock with a fair market value of $1.50 per
share.

GOTAPLAY INTERACTIVE, INC. - PRE-MERGER ISSUANCES

On July 17, 2006, we issued 447,111 shares of our common stock to Insynq,
Inc., with a fair value of $1.05 per share, in satisfaction of a Notes Payable,
including accrued interest, in the amount of $410,038.49; trade payables in the
amount of $41,841.38 and inter-company payables in the amount of $17,586.20.
This is a related party transaction.

On July 17, 2006, we issued 297,507 shares of our common stock, in
satisfaction of a Note Payable, including interest, totaling $312,381. The
shares were issued at the fair value of $1.05 per share.

ITEM 6.          MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
                 AND RESULTS OF OPERATIONS.

The following discussion and analysis should be read in conjunction with the
consolidated financial statements, including notes thereto, appearing in this
Form 10-KSB.

Some of the information in this Form 10-KSB contains forward-looking
statements that involve substantial risks and uncertainties. You can identify
these statements by forward-looking words such as "may", "will"', "believes",
"anticipates", "estimates", "expects", "continues"' and/or words of similar
import. Forward-looking statements are based upon our management's current
expectations and beliefs concerning future developments and their potential
effects upon us. There may be events in the future that we are not able to
accurately predict or over which we have no control. Our actual results could
differ materially from those anticipated for many reasons in these
forward-looking statements. Factors that could cause or contribute to the
differences include, but are not limited to, availability of financial resources
adequate for short-, medium- and long-term needs, demand for our products and
services and market acceptance, as well as those factors discussed and set forth

under "Risk Factors", "Business", "Management's Discussion and Analysis of Financial Condition and Results of Operations" and elsewhere in this report.

We believe it is important to communicate our expectations, however, our management disclaims any obligation to update any forward-looking statements whether as a result of new information, future events or otherwise.

APPLICATION OF CRITICAL ACCOUNTING POLICIES AND ESTIMATES

GENERAL

Our discussion and analysis of our financial condition and results of operations as of and for the year ended September 30, 2006 are based upon our audited consolidated financial statements, which are prepared in conformity with accounting principles generally accepted in the United States of America ("GAAP"). As such, we are required to make certain estimates, judgments and assumptions that management believes are reasonable based upon the information available. We base these estimates on our historical experience, future expectations and various other assumptions that we believe to be reasonable under the circumstances, the results of which form the basis for our judgments that may not be readily apparent from other sources. These estimates and assumptions affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the dates of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting periods. These estimates and assumptions relate to the collectibility of accounts receivable, the realization of goodwill, the expected term of a customer relationships, accruals and other factors. We evaluate these estimates and assumptions on an ongoing basis. Actual results could differ from those estimates under different assumptions or conditions, and any differences could be material.

25

<PAGE>

Our consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC") and, in the opinion of management, include all adjustments necessary for a fair statement of the consolidated results of operations, financial position, and cash flows for each period presented. Our consolidated financial statements reflect the results of operations, financial position, changes in stockholders' deficit and cash flows.

A summary of the significant accounting policies which we believe are the most critical to aid in fully understanding and evaluating the accompanying consolidated financial statements include the following:

REVENUE RECOGNITION AND DEFERRED REVENUES

In accordance with the SEC's Staff Accounting Bulletin No. 104, "REVENUE RECOGNITION", revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectibility is probable. A summary of each operating division's revenue recognition procedures follows:

VIDEO GAME RENTAL AND SUBSCRIPTION DIVISION

We charge $1 for an initial ten-day subscription trial period. At any time during the initial ten-day period, a new subscriber has the right to rescind their agreement, but will not receive credit for the $1 charge.

We charge a subscriber's credit card monthly for our services, and

thereafter, until the subscriber cancels his subscription. We recognize subscription revenue ratably during each subscriber's monthly subscription period. For financial reporting purposes, we allocate subscription fees over the number of days in the month for which the fee was charged. A subscriber has the option to select from one of three rental plans: (a.) For $12.95 per month, the subscriber is allowed one video game in his possession, (b.) For 20.95 per month, the subscriber is allowed up to two video games in his possession, and (c.) For $28.95 per month, the subscriber is allowed up to three video game's in his possession.

All deferred revenue is generally recognized in the consolidated statements of operation in the following month. All authorized refunds to subscribers are recorded as a reduction of revenues and any revenues from sales of used video games will be recorded upon shipment.

INTERNET SERVICE PROVIDER ("ISP")

Internet related revenues are recorded when they are rendered and earned. Revenues from support and maintenance contracts are recognized over the term of the contract. We recognize revenues when the products are shipped. Provisions for discounts and rebates to our customers, estimated returns and allowances, and other adjustments are provided for in the same period we record the related sales. At September 30, 2006, we reported deferred revenues and pre-billed revenues totaling $247,062, of which a significant portion will be fully recognized in the month of October 2006.

FAIR VALUE OF FINANCIAL INSTRUMENTS

Financial instruments consist principally of cash, accounts and related party receivables, trade and related party payables, accrued liabilities, and short and long-term debt obligations. The carrying amounts of such financial instruments in the accompanying consolidated balance sheets approximate their fair values due to their relatively short-term nature. It is our opinion that we are not exposed to significant currency or credit risks arising from these financial instruments.

USE OF ESTIMATES

The preparation of the consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from our estimates.

26

<PAGE>

STOCK-BASED COMPENSATION

We account for stock-based compensation in accordance with the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standard No. 123 (R), "SHARE-BASED PAYMENT", which establishes standards for transactions in which an entity exchanges its equity instruments for goods and services. This standard replaces SFAS No. 123 and supercedes Accounting Principles Board ("APB") Opinion No. 25, "ACCOUNTING FOR STOCK-BASED COMPENSATION". This standard requires a public entity to measure the cost of employee services, using an option-pricing model, such as the Black-Scholes Model, received in exchange for an award of equity instruments based on the grant-date fair value of the award. This eliminates the exception to account for

such awards using the intrinsic method previously allowable under APB No. 25. Shares of common stock issued for services rendered by a third party are recorded at fair market value, generally the quote at the close of market trading on the day.

LOSS PER COMMON SHARE

   We compute basic and diluted loss per share of common stock by dividing the net loss by the weighted average number of common shares outstanding available to common stockholders during the respective reporting period. However, common stock equivalents have been excluded from the computation of diluted loss per share of common stock for the years ended September 30, 2006 and 2005, respectively, because their effect would be anti-dilutive.

RECLASSIFICATIONS

   Certain reclassifications have been made to the previously reported amounts to conform to our Company's current year presentation.

RECENTLY ISSUED AUTHORITATIVE ACCOUNTING PRONOUNCEMENTS

   In May 2005, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 154 ("SFAS No. 154"), "ACCOUNTING CHANGES AND ERROR CORRECTIONS." This statement requires entities that voluntarily make a change in accounting principle to apply that change retrospectively to prior periods' financial statements, unless this would be impracticable. SFAS No. 154 supersedes APB Opinion No. 20, "ACCOUNTING CHANGES," which previously required that most voluntary changes in accounting principle be recognized by including in the current period's net income the cumulative effect of changing to the new accounting principle. SFAS No. 154 also makes a distinction between "retrospective application" of an accounting principle and the "restatement" of financial statements to reflect the correction of an error. SFAS No. 154 applies to accounting changes and error corrections that are made in fiscal years beginning after December 15, 2005. Management has adopted these provisions.

   In February 2006, the FASB issued SFAS Statement No. 155, "ACCOUNTING FOR CERTAIN HYBRID FINANCIAL INSTRUMENTS--AN AMENDMENT OF FASB STATEMENTS NO. 133 AND 140" ("SFAS 155"). This Statement amends FASB Statements No. 133, Accounting for Derivative Instruments and Hedging Activities, and No. 140, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities. This Statement resolves issues addressed in Statement 133 Implementation Issue No. D1, "APPLICATION OF STATEMENT 133 TO BENEFICIAL INTERESTS IN SECURITIZED FINANCIAL ASSETS." This Statement permits fair value re-measurement for any hybrid financial instrument that contains an embedded derivative that otherwise would require bifurcation, clarifies which interest-only strips and principal-only strips are not subject to the requirements of Statement 133, establishes a requirement to evaluate interests in securitized financial assets to identify interests that are freestanding derivatives or that are hybrid financial instruments that contain an embedded derivative requiring bifurcation, clarifies that concentrations of credit risk in the form of subordination are not embedded derivatives and amends Statement 140 to eliminate the prohibition on a qualifying special-purpose entity from holding a derivative financial instrument that pertains to a beneficial interest other than another derivative financial instrument. SFAS 155 is effective for all financial instruments acquired or issued for the Company for fiscal year begins after September 15, 2006. The

27

<PAGE>

adoption of this standard is not expected to have a material effect on the Company's results of operations or financial position.

In July 2006, the FASB issued FASB Interpretation No. 48, "ACCOUNTING FOR UNCERTAINTY IN INCOME TAXES - AN INTERPRETATION OF FASB STATEMENT NO. 109" ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in the financial statements and prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken in a tax return. The Company continues to evaluate the impact of FIN 48 which is to be adopted effective December 15, 2006.

In September 2006, the FASB issued SFAS No. 157, "FAIR VALUE MEASUREMENTS" ("SFAS 157"). While SFAS 157 formally defines fair value, establishes a framework for measuring fair value and expands disclosure about fair value measurements, it does not require any new fair value measurements. SFAS 157 applies under other accounting pronouncements that require or permit fair value measurements. SFAS 157 is required to be adopted effective January 1, 2008 and the Company does not presently anticipate any significant impact on its consolidated financial position, results of operations or cash flows.

In September 2006, the FASB issued SFAS No. 158, "EMPLOYERS' ACCOUNTING FOR DEFINED BENEFIT PENSION AND OTHER POSTRETIREMENT PLANS - AN AMENDMENT OF FASB STATEMENTS NO. 87, 88, 106 AND 132(R)" ("SFAS 158"). SFAS 158 requires an employer to recognize the funded status of its defined benefit pension and other postretirement plans as an asset or liability in its statement of financial position and to recognize changes in the funded status in the year in which the changes occur through other comprehensive income. The funded status of a plan is measured as the difference between plan assets at fair value and the benefit obligation, which is represented by the projected benefit obligation for pension plans and the accumulated postretirement benefit obligation for other postretirement plans. SFAS 158 requires the recognition, as a component of other comprehensive income, net of tax, of the gains or losses and prior service costs or credits that arise during the period but are not recognized as a component of net periodic benefit cost in accordance with existing accounting principles. Amounts required to be recognized in accumulated other comprehensive income, including gains and losses and prior service costs or credits are adjusted as they are subsequently recognized as components of net periodic benefit cost pursuant to the recognition and amortization provisions of existing accounting principles. In addition, SFAS 158 requires plan assets and obligations to be measured as of the date of the employer's year-end statement of financial position as well as the disclosure of additional information about certain effects on net periodic benefit cost for the next fiscal year from the delayed recognition of the gains or losses and prior service costs or credits.

The Company is required to adopt those provisions of SFAS 158 attributable to the initial recognition of the funded status of the benefit plans and disclosure provisions as of December 31, 2006. Those provisions of SFAS 158 applicable to the amortization of gains or losses and prior service costs or credits from accumulated other comprehensive income to the net periodic benefit cost are required to be applied on a prospective basis effective January 1, 2007. The Company is still in the process of evaluating the impact, if any, of SFAS 158. However, the Company does not anticipate that the adoption of SFAS 158 will have any impact on its consolidated financial statements.

OVERVIEW, HISTORY, MERGER AND BUSINESS

Gottaplay Interactive, Inc. (the "Company") was formed in Nevada in July 2004 under the name of Donobi, Inc. and is the successor to H-NET.NET, Inc., which was formed under the laws of Colorado in May 1986. On July 24, 2006, pursuant to a Merger Agreement (the "Agreement"), Gotaplay Interactive, Inc. ("Gotaplay"), a

privately held Nevada corporation, merged with Donobi, Inc. In accordance with the Agreement, the Registrant: (a.) completed a one for six reverse stock split; (b.) issued 17,744,618 post-reverse split shares of common stock to the former stockholders of Gotaplay; (c.) amended the Articles of Incorporation by changing the name of the Registrant from Donobi, Inc. to Gottaplay Interactive, Inc.; and, (d.) except for William M. Wright, III and Norm Johnson, the directors of the Registrant resigned and the three former directors of the Gotaplay were elected to the board of directors of the Registrant. As a result of the Merger, voting control changed and, except for Mr. William M. Wright, III, who remained as

28

<PAGE>

Chief Operating Officer, the other officers of Donobi resigned and were replaced by officers selected by Gottaplay's management.

Upon consummation of the Merger we assumed the business operations of Gotaplay to include their assets, their debts and their commitments and obligations, such as leases and independent consulting agreements. We now operate two distinct divisions, one division for the video game subscriptions and rentals, and, one division for our Internet connectivity.

Our primary business division will be the on-line video game rental subscription business which is dedicated to providing customers a quality rental experience through our web site www.gottaplay.com. The service is an alternative to store based gaming rentals. We also provide a subscriber the option to purchase new and/or used video game titles at a discounted price. We offer our customers an extensive selection of video games for on a monthly subscription fee. Customers can sign-up via the web page to rent and/or buy video games of their choice. The titles are then shipped to the customer via first class mail once they have made their selection(s). Active subscribers can retain the games for an indefinite period of time as long as they are active paying subscribers. Customers can exchange their selections at anytime by returning their game(s) in the pre-paid and pre-addressed mailers provided by us.

Our other division (dba Donobi) primarily operates as an Internet service provider ("ISP") with operations in Washington, Oregon and Hawaii, offering Internet connectivity to individuals, multi-family housing, businesses, non-profit organizations, educational institutions and government agencies. We provide high quality, reliable and scalable Internet access, web hosting and development, equipment co-location, and networking services to underserved rural markets. Our overall strategy is to become the dominant Internet service provider for residents and small to medium-sized businesses within rural and semi-rural communities/areas in the United States. Our current focus is within the states of Washington, Oregon and Hawaii.

We intend to grow our business divisions through technological innovations and adaptations, the implementation of our short and long-term business plans and a long-term commitment to delivering high-quality product and services to every subscriber. We believe that the key to our success will depend in a large part on out ability to promote our services, gain subscribers and expand our relationships with current subscribers. Our achievements can be identified and measured in our strategic business plan. Our focus in fiscal year 2007 is building on this foundation and executing well in key areas, such as, continuing to innovate on our ability to creatively market our products, offering unique subscriber plans, responding effectively to our subscriber needs and desires, and continuing to focus internally on product and service delivery, business efficacy, and accountability across our Company. Our key market opportunities include but are not limited to: (a.) expanding into other interactive technology

for the delivery of media to subscribers, (b.) partnering with other compatible businesses to cross-market and promote our services and products, (c.) entering and offering the interactive medium to the education community, and (d.) extending accessibility and delivery of internet services and entertainment/ educational videos to remote location subscribers. We seek to differentiate our services from our competitors by offering a fair price for exceptional service and delivery, and, in the video game rental division, delivery of first choice of product selection each time. If we are not successful in promoting our services and expanding our customer base, this may a material adverse effect on our financial condition and our ability to continue to operate the business and record profits.

SUMMARY OF CONSOLIDATED RESULTS OF OPERATIONS

As a result of these efforts, we should be able to sustain a reasonable and controlled growth rate of new customers and subscribers. The measurement of this period's revenues should not be considered necessarily indicative or interpolated as the trend to forecast our future revenues and results of operations. The financial results include a short period operation (July 24, 2006 to September 30, 2006) for the legal acquirer, the ISP division; thereby, results of the prior year's operations will not be comparative.

SEGMENT PRODUCT REVENUE AND OPERATING LOSS

29

<PAGE>

We have two operating divisions that we consider to be operating segments: (a.) On-line video game rentals and (b.) Internet Service Provider. The revenue and operating loss in this section are presented on a basis consistent with GAAP and include certain reconciling items attributable to each segment. Various corporate level administrative expenses are included in the respective segment, whereby the obligation was originally incurred prior to and after the merger date.

ON-LINE VIDEO GAME RENTALS

Video game revenue for fiscal 2006 was $127,257 with a cost of revenue of $150,598 resulting in direct loss from sales of $23,341. Its expenses, including, depreciation and amortization of $95,176, totaled $1,846,990, for an operating loss of $1,846,330. Of significance, of this division's loss from operations, is the recognition of stock-based compensation under SFAS 123R which totaled $765,549.

For fiscal 2006, interest expense totaled $66,009, and net other income was $29,107 resulting in a net other expense of $35,902 and an overall division net loss of $1,883,232.

INTERNET SERVICE PROVIDER

Internet connectivity revenue for the period of July 24, 2006 to September 30, 2006 (post-merger period) was $337,275. Its cost of revenues and operating expenses, including interest, depreciation and amortization of $40,000, totaled $417,916, for an operating loss of $80,641. Interest expense, net of other income, was $9,050, which resulted in a division net loss of $89,691.

COSTS AND EXPENSES

COSTS OF REVENUES

Costs of revenues includes all direct costs in the production of revenues and will include such items as depreciation, direct wages and related burden, cable charges, commissions and more. Total costs of revenues for fiscal 2006 and 2005 were $321,735 and $204,648, respectively.

FULFILLMENT

This category of expenses is primarily comprised of those support services and expenses in distributing video games to its subscribers/customers and include distribution centers' fees, independent contractor fees, certain communications expenses and certain wages and related burden. The total cost of fulfillment for fiscal 2006 and 2005 was $218,002 and $245,618, respectively. We expect these costs to increase in fiscal 2007 due to the increased number of distribution centers and increased number of video game subscribers.

ADVERTISING AND MARKETING

Advertising and marketing for fiscal 2006 increased $34,465 over fiscal 2005. Approximately, 91.6% of fiscal 2006 costs represent the effort by the video game rental division to gain and retain subscribers. This increase in expense was anticipated and planned. It is also planned that this category will increase substantially for both divisions in fiscal 2007.

GENERAL AND ADMINISTRATIVE EXPENSES

General and administrative expenses include Federal and State employer and business taxes, various compliance expenses and licenses, professional fees, selected wages and burden, and other unallocated expenses.

Non-cash compensation for the fiscal years ended September 30, 2006 and 2005 was $765,549 and $4,528, respectively. Of significance, to these amounts is the fact that this compensation is generally in the form of common stock and the cost for these services rendered does not affect our working capital and cash flows.

30

<PAGE>

In July 2006, we entered into a one-year consulting agreement with independent financial and business advisor, in which the consultants will provide business expertise, advice and negotiations in strategic corporate planning, private financing, mergers and acquisitions, and such other business areas as deemed necessary by our management. Under the terms of the agreements, the consultants received 2,000,000 shares of common stock. The stock was valued at the closing market price of $1.50 per share on the date of the execution of the agreements. The total value of the services was $3,000,000 and is being amortized over twelve months. We recognized $550,000 of expense in fiscal 2006.

Under the circumstances, we believe our costs are under control, as planned, and, within proximate range of management's forecasts.

LIQUID MARKET

There is currently a limited trading market for our shares of common stock, and there can be no assurance that a more substantial market will ever develop or be maintained. Any market price for our shares of common stock is likely to be very volatile and number factors beyond our control may have a significant adverse effect. In addition, the stock markets generally have experienced, and continue to experience, extreme price and volume fluctuations which have often been unrelated to the operating performance of these small companies. These

fluctuations have inversely affected the market price of many small capital companies. These broad market fluctuations, as well as general current economic and political conditions, may also adversely affect the market price of our common stock. Further, there is no correlation between the present limited market price of our common stock and our revenues, book value, assets and other established criteria of value. The present limited quotations of our common stock should not be considered indicative of the actual value of our common stock.

IMPACT OF INFLATION

We believe that inflation has had negligible effect on our operations over the past two years. We believe that we the flexibility to offset inflationary increases in expenses such as the cost of labor by increasing sales and rental fees, increasing our customer bases and continue the improvement of our overall operating procedures and systems.

LIQUIDITY AND CAPITAL RESOURCES

Our consolidated financial statements as of and for the year ended September 30, 2006 have been prepared on a going concern basis, which contemplates the realization of assets and the settlement of liabilities and commitments in the normal course of business. For the year ended September 30, 2006, we had a net loss of $1,972,923 and negative cash flows from operations of $572,422. Also at September 30, 2006, we had a working capital deficit of $2,639,074 and a stockholders' deficit of $1,376,252. Approximately 63.7% or $1,681,911 of our negative working capital is attributed to the ISP division at September 30, 2006. Our working capital deficit at September 30, 2006 may not enable us to meet certain financial objectives as presently structured.

We had a cash balance of $61,130 at September 30, 2006. We finance our operations and capital requirements primarily through private debt and equity offerings. Our current forecast anticipates substantial negative cash flows from operations. Therefore, we will have to raise capital through either equity instruments and/or debt, not only to sustain our operations but to grow and improve our operations according to our fiscal 2007 strategic business plan.

At September 30, 2006, the book value of our common stock was $(0.05) per share, our current ratio was 0.11, our cash to debt ratio was (0.02), and, our acid test ratio was (0.08). These financial indicators are not acceptable and we will have to improve our performance quickly if we expect to stay in business.

In October 2006, we consummated a $1,250,000 private placement financing agreement with four investors. In October 2006, the first level of funding was received, in the form of 9%, one-year convertible

31

<PAGE>

promissory notes and totaled $312,500. These notes are convertible into 250,000 shares of common stock with a fixed conversion price of $1.25 per share. The investors were also granted: (a.) 250,000 warrants with an exercise price at $1.50 per warrant, exercisable within two years, and (b.) 250,000 warrants with an exercise price at $2.50 per warrant, exercisable within three years.

In November and December, 2006, we have received $155,500 which will be applied toward the second level of funding under this financing arrangement.

In October 2006, the balance due on our convertible debentures was completely paid off by certain investors. Pursuant to the underlying terms to payoff the

debentures, we re-issued the 1,916,667 shares of common stock held in escrow on behalf of the original debenture holders to the new investors.

Our continuation as a going concern is dependent on our ability to grow revenues, obtain additional equity and/or financing, and, generate sufficient cash flow from operations to meet our obligations on a timely basis.

The operating results of the Company's divisions can vary materially depending on a number of factors, many of which are outside our control:

a. Demand for our services and market acceptance lags,
b. Announcements and introduction of our new products and services and/or by our competitors,
c. Our ability to upgrade infrastructure, develop new and improved systems to meet and anticipate growth and demand, d. Changing governmental rules, regulations and requirements, e. Customer/subscriber resilience and apathy due to foreign insurrections and our national and local economies, f. Product pricing competition, and g. Lack of investor/banking short-term working capital to facilitate unanticipated cash shortages

We currently have no material commitments for capital requirements. If we were forced to purchase new equipment or replace the equipment we currently lease, any new lease(s) would constitute a material capital commitment; however, we are currently unable to quantify such amounts. If this situation does occurs, we will attempt to raise the necessary finances to make such purchases, but there is no assurance that we will be able to do so. Without the ability to quantify these amounts, we nonetheless believe that it would have a material impact on our business and our ability to maintain our operations.

We are currently developing and refining our acquisition and expansion strategy. If we expand more rapidly than currently anticipated, and if our working capital needs exceed our current forecast and expectations, and if we consummate an acquisition(s), we will need to raise additional capital from equity and/or debt sources. We cannot be sure that we will be able to obtain the additional financing to satisfy our cash requirements and to implement our growth strategy on acceptable terms. If we cannot obtain such financings on terms acceptable to us, our ability to fund our planned business expansion and to fund our on-going operations will be materially adversely affected. If we incur debt, the risks associated with our business and with owning our common stock would also increase. If we raise capital through the sale of equity securities, the percentage ownership of our stockholders will be diluted accordingly. In addition, any new equity securities may have rights, preferences, or privileges senior to those of our common stock.

ITEM 7.            CONSOLIDATED FINANCIAL STATEMENTS.

The information required by this item is included in pages F-1 through F-22 attached hereto and incorporated by reference. The index to the consolidated financial statements can be found on page F-1.

ITEM 8.            CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING
                   AND FINANCIAL DISCLOSURE.

For the years ended September 30, 2006 and September 30, 2005, there have been no disagreements between Lake & Associates, CPA's LLC. and us on any matter of accounting principles or practices, financial

32

<PAGE>

statement disclosure, or auditing scope of procedures Lake & Associates, LLC's report on our financial statements for the fiscal years ended September 30, 2006 and September 30, 2005 indicated that substantial doubt existed regarding our ability to continue as a going concern.

ITEM 8A.          CONTROLS AND PROCEDURES

   (A) EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES.

   The Company maintains disclosure controls and procedures (as defined in Rule 13a-14(c) and Rule 15d-14(c) of the Exchange Act) designed to ensure that information required to be disclosed in the reports of the Company filed under the Exchange Act is recorded, processed, summarized, and reported within the required time periods. The Company's Chief Executive Officer and Chief Financial Officer has concluded, based upon their evaluation of these disclosure controls and procedures as of the date of this report, that, as of the date of their evaluation, these disclosure controls and procedures were effective at ensuring that the required information will be disclosed on a timely basis in the reports of the Company filed under the Exchange Act.

   (B) CHANGES IN INTERNAL CONTROLS.

   The Company maintains a system of internal controls that is designed to provide reasonable assurance that the books and records of the Company accurately reflect the Company's transactions and that the established policies and procedures of the Company are followed. There were no significant changes to the internal controls of the Company or in other factors that could significantly affect such internal controls subsequent to the date of the evaluation of such internal controls by the Chief Executive Officer and Chief Financial Officer, including any corrective actions with regard to significant deficiencies and material weaknesses.

ITEM 8B.          OTHER INFORMATION

   None.

PART III

ITEM 9.          DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS, CONTROL PERSONS AND
                 CORPORATE GOVERNANCE; COMPLIANCE WITH SECTION 16(A) OF
                 THE EXCHANGE ACT.

   Directors and Executive Officers

   The names of our directors and executive officers, their principal occupations, and the year in which each of our directors and executive officer initially joined the board of directors are set forth below.

<TABLE>
<CAPTION>

| NAME | AGE | FIRST ELECTED OR APPOINTED | POS |
|------|-----|---------------------------|-----|
| <s> | <c> | <c> | <c> |
| John P. Gorst | 38 | July 24, 2006 | Chairman and Chief Executi |
| M. Carroll Benton | 62 | July 24, 2006 | Chief Financial Officer, C Officer, Secretary and Tre |
| William M. Wright, III | 41 | July 24, 2006 | Chief Operating Officer an |

| | | | |
|---|---|---|---|
| Asra Rasheed | 33 | July 24, 2006 | President |

33

<PAGE>

| | | | |
|---|---|---|---|
| Mark H. Levin | 34 | July 24, 2006 | Director |
| Norm Johnson | 46 | July 24, 2006 | Director |

</TABLE>

JOHN P. GORST, Chairman of the Board, and Chief Executive Officer of Gottaplay, positions he assumed with us upon closing of the Merger between Donobi, Inc. and Gotaplay Interactive, Inc. Mr. Gorst has over 15 years experience in founding entrepreneurial technology ventures, specifically in the development of software and data services for business. His experience includes serving as chief executive officer and board chairman of Insynq, Inc., an application service provider, from August 1998 to present; vice president & general manager for a computer integration company, Interactive Information Systems Corp., from July 1996 to August 1998; and a training/IS consulting business in conjunction with Nynex Business Centers of New York. Upon closing of the Merger, Mr. Gorst's primary responsibility shall be Chairman of the Board and Chief Executive Officer. Mr. Gorst will be directing the Company's strategy, and positioning the Company in the business marketplace by forging strategic business alliances and mergers and acquisitions. Mr. Gorst will also serve as company and technology evangelist at tradeshows, press conferences and industry analyst meetings in order to increase awareness for the Company's brand. Mr. Gorst graduated top of his class as an Electronic Design Engineer from one of the top trade schools in Arizona. Mr. Gorst was also awarded a medal of honor for business leadership in 2001 and 2005 from the National Republican Congress. He intends to devote substantially all of his business time to the Company.

M. CARROLL BENTON is our Chief Financial Officer, Chief Administrative Officer, Secretary, Treasurer and Director of Gottaplay, positions she assumed upon closing of the Merger. Ms. Benton's early career spanned both the public and private sectors working largely with the banking systems and higher education institutions where she assisted in the development and deployment strategies necessary for computerization of these and other entities. Ms. Benton has successfully managed a 13 state insurance brokerage firm and has been a consultant to the small to medium business markets via accounting system design, implementation, support, and business practice analysis. She also taught undergraduate accounting courses at several Puget Sound colleges and universities. With an in-depth understanding of Gotaplay's finances, accounting infrastructure and compliance issues, Ms. Benton oversees the current compliance and financial operations and administrative functions. From December 1995 through December 1999, Ms. Benton was president of a computer integration company, Interactive Information Systems Corp. Her public sector experience includes serving as chief administrative officer, secretary, treasurer, interim chief financial officer and director for Insynq, Inc., a Pacific Northwest application service provider, from August 1998 to present. Formerly with a CPA firm, Ms. Benton brings over 38 years of financial expertise to the business.

WILLIAM M. WRIGHT, III is our Chief Operating Officer and Director. Mr. Wright was instrumental in developing the ISP division from concept to realization since December 1999. After 15 years of experience and knowledge in financial management and business operations, Mr. Wright began running the ISP division full time in early 2001, leading the successful acquisition of five companies in six months. To date, he has orchestrated a dozen acquisitions and mergers and continues to be strongly focused on our growth. Mr. Wright received his Bachelors of Science in Business Administration with an emphasis in

Financial Services from San Diego State University, California, and is a licensed Real Estate Broker in the State of Washington. He devotes substantially all of his time to the business of the Company.

ASRA RASHEED is the President of Gottaplay. She is the founder of NextRental, Inc. Ms. Rasheed has started and sold several successful businesses in the multi-media industry in the last eight years. Prior to starting NextRental.com, she was Director of Multi Media at Koyo Graphics where she managed large web development projects for clients like Warner Brothers, Sanyo, Sony, etc. She also managed the development of online video game rental and sales website for the largest distributor of Bollywood industry. Ms. Rasheed was also Vice President of Business Development for a $30 million dollar company, Luminex. She has a Bachelors of Science degree from Cal State University, Fullerton, CA.

MARK H. LEVIN, MBA is a Director of Gottaplay. Since July 2001 Mr. Levin has been CEO of Marlin Financial Group, Inc., Potomac, Maryland, a consulting firm specializing in aiding publicly traded

34

<PAGE>

companies with mergers and acquisitions, capital structure, shareholder relations, strategic alliances and licensing agreements. Prior to founding Marlin Financial, from 1996 through 2000, Mr. Levin was the CEO of Eyecity.com, Inc., an Internet eye care company, located in Plainview, NY providing, sunglasses and prescription glasses to the general public. Mr. Levin is still a Director of Eyecity.com, Inc. Mr. Levin received an M.B.A. degree in Marketing in 1997 and a B.B.A. degree in Management from Hofstra University in 1994.

NORM JOHNSON is a Director of Gottaplay. With the closing of the Merger Mr. Johnson retained his position as Director. Mr. Johnson spent 18 years as an All-Pro kicker in the NFL (Seahawks, Falcons, Steelers and Eagles). For the past five years, Mr. Johnson has worked for Reid Real Estate, Inc., a Washington corporation, representing and advising clients on their real estate investments. During his NFL career, Mr. Johnson also owned "Norm Johnson's All-Pro Sportscards" with three locations. Mr. Johnson earned his Bachelor's Degree in Economics from the University of California Los Angeles (UCLA) in 1983.

SECTION 16(A) BENEFICIAL OWNERSHIP COMPLIANCE

Section 16(a) of the Securities Exchange Act of 1934 requires our directors and executive officers, and persons who own more than 10 percent of the company's common stock to file with SEC the initial reports of ownership and reports of changes in ownership of the common stock. Officers, directors and greater than ten percent stockholders are required by the SEC regulation to furnish the Company with copies of all Section 16(a) forms they file.

Based solely upon a review of Forms 3, 4 and 5, and amendments thereto, furnished to us during fiscal year 2006, our officers and directors have filed the required Forms, but not on a timely basis as required by Section 16(a) of the Securities Exchange Act of 1934.

CODE OF ETHICS

We are presently working with our legal counsel to prepare and adopt a code of ethics that applies to our principal chief executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions (the "Code of Ethics"). The Code of Ethics is being designed with the intent to deter wrongdoing, and to promote the following:

Honest and ethical conduct, including the ethical handling of actual or apparent conflicts if interest between personal and professional relationships

Full, fair, accurate, timely and understandable disclosure in reports and documents that a small business issuer files with, or submits to, the Commission and in other public communications made by the small business issuer

Compliance with applicable governmental laws, rules and regulations

The prompt internal reporting of violations of the code to an appropriate person or persons identified in the code

Accountability for adherence to the code

AUDIT COMMITTEE

We do not have a separately designated standing audit committee. Pursuant to Section 3(a) (58) (B) of the Exchange Act, the entire Board of Directors acts as an audit committee for the purpose of overseeing the accounting and financial reporting processes, and our audits of the financial statements. The Commission recently adopted new regulations relating to audit committee composition and functions, including disclosure requirements relating to the presence of an "audit committee financial expert" serving on its audit committee. In connection with these new requirements, our Board of Directors examined the

35

<PAGE>

Commission's definition of "audit committee financial expert" and concluded that we do not currently have a person that qualifies as such an expert. Presently, there are only five (5) directors serving on our Board, and we are not in a position at this time to attract, retain and compensate additional directors in order to acquire a director who qualifies as an "audit committee financial expert", but we intend to retain an additional director who will qualify as such an expert, as soon as reasonably practicable. While neither of our current directors meets the qualifications of an "audit committee financial expert", each of our directors, by virtue of his past employment experience, has considerable knowledge of financial statements, finance, and accounting, and has significant employment experience involving financial oversight responsibilities. Accordingly, we believe that our current directors capably fulfill the duties and responsibilities of an audit committee in the absence of such expert(s).

ITEM 10.            EXECUTIVE COMPENSATION.

The following table summarizes the compensation earned by or paid to our Chief Executive Officer and the other most highly compensated executive officers whose total salary and bonus exceeded $100,000 for services rendered in all capacities during the fiscal year ended September 30, 2006. We refer to these individuals as our named executive officers.

<TABLE>
<CAPTION>

| NAME AND PRINCIPAL POSITION | YEAR | SALARY PAID ($) | BONUS ($) | OTHER ANNUAL COMPENSATION ($) | SECUR UNDER OPTIO |
|---|---|---|---|---|---|
| <s> | <C> | <C> | <C> | <C> | <C> |
| John P. Gorst, | 2006 | $55,268 | $0.00 | $0.00 | 500,0 |
| Chairman and | 2005 | $23,823 | $0.00 | $0.00 | |
| CEO | 2004 | $0.00 | $0.00 | $0.00 | |

```
William M.         2006      $120,000      $0.00        $0.00
Wright, III,       2005      $120,000      $0.00        $0.00
Chief              2004      $101,250      $0.00        $0.00
Operating
Officer
</TABLE>
```

(1) The compensation described in this table does not include medical, group
    life insurance or other benefits received by the named executive officer that
    are available generally to all of our salaried employees, and may not include
    certain perquisites and other personal benefits received by the name
    executive officer that do not exceed the lesser of $50,000 or ten percent
    (10%) of any such officer's salary and bonus disclosed in the table.

(2) Represents option for common stock granted under Gotaplay Interactive, Inc.
    prior to July 24, 2006 Merger. The option to purchase shares of common stock
    has an exercise price of $0.50 and may be exercised any time after February
    17, 2006 for a period of ten years.

(3) No other officer or director of the Company received compensation in excess
    of $100,000 in either of the past three years.

ITEM 11.          SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT
                  AND RELATED STOCKHOLDER MATTERS.

    The following table sets forth certain information regarding beneficial
ownership of our common stock as of September 30, 2006:

o  By each  person  who is known by us to  beneficially  own more than 5% of our
   common stock;
o  By each of our officers and directors; and
o  By all of our officers and directors as a group.

<div align="center">36</div>

<PAGE>

| NAME | NUMBER | PERCENT |
|------|--------|---------|
| John P. Gorst (1) (2) | 3,568,073 | 11.39% |
| M. Carroll Benton (1) (3) | 3,564,392 | 11.38% |
| William M. Wright, III (1) (6) | 443,768 | 1.54% |
| Asra Rasheed (1) (4) | 1,922,000 | 6.60% |
| Mark H. Levin (1) (5) | 3,568,666 | 11.40% |
| Norm Johnson (1) (6) | 76,668 | * |
| Capital Group Communications | 2,000,000 | 6.9% |
| All executive officers and directors as a group (6 persons) | 13,143,566 | 42.8% |

<div align="center">* Less than 1%</div>

(1) Officer and/or director.

(2) Includes 3,068,073 shares of common stock and 500,000 stock options
    exercisable within 60 days.
(3) Includes 3,064,392 shares of common stock and 500,000 stock options
    exercisable within 60 days.
(4) Includes 1,672,000 shares of common stock and 250,000 stock options
    exercisable within 60 days.
(5) Includes 3,068,666 shares of common stock and 500,000 stock options
    exercisable within 60 days.
(6) Adjusted for the one (1) for six (6) reverse stock split July 24, 2006.

ITEM 12.          CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.

    In June 2005 we entered into a five-year agreement with Insynq, Inc. whereby
it would supply our technology and communications infrastructure and programming
expertise. Insynq, Inc. is partially owned and managed by two of our officers,
John P. Gorst and M. Carroll Benton. During the fiscal year ended September 30,
2006, the amount of services provided totaled $122,112.

    Insynq also paid certain expenses on our behalf or advanced money to us. On
October 31, 2005, Insynq accepted to convert these expenses and advances into a
Note Payable in the amount of $333,837, which included interest at the rate of
8% per annum.

    On July 17, 2006, we issued 447,111 shares of common stock to Insynq, Inc. to
satisfy the Note Payable and accrued interest, a partial reduction of the trade
payable and certain other amounts either advanced or paid on our behalf. The
fair value of the shares issued was $1.05 per share.

ITEM 13.          EXHIBITS

    31.1 Certification of Chief Executive Officer Pursuant to Section 302 of the
Sarbanes-Oxley Acti of 2002.

    31.2 Certification of Chief Financial Officer Pursuant to Section 302 of the
Sarbanes-Oxley Act of 2002.

    32.1 Certification of Chief Executive Officer Pursuant to Section 906 of the
Sarbanes-Oxley Act of 2002.

    32.2 Certification of Chief Financial Officer Pursuant to Section 906 of the
Sarbanes-Oxley Act of 2002.


ITEM 14.          PRINCIPAL ACCOUNTANT FEES AND SERVICES.

AUDIT FEES

                              37
<PAGE>

    The Aggregate fees billed for each of the last two fiscal years for
professional services rendered by the principal accountant for our audit of
annual financial statements and review of financial statements included in our
Form 10-KSB and 10QSB or services that are normally provided by the accountant
in connection with statutory and regulatory filings or engagements for those
fiscal years were:

            2005          $41,300
            2006          $42,263

ALL OTHER FEES

The aggregate fees billed in each of the last two fiscal years for the products and services provided by the principal accountant, other than the services reported above were:

|      |        |
|------|--------|
| 2005 | $9,603 |
| 2006 | $2,172 |

38

<PAGE>

SIGNATURES

In accordance with the Section 13 or 15(d) of the Securities Exchange Act, the Company caused this report to signed on its behalf by the undersigned, thereunto duly authorized.

Gottaplay Interactive, Inc.

/s/ John P. Gorst
John P. Gorst
Chief Executive Officer

Dated:          January 12, 2007

<TABLE>
<CAPTION>

| SIGNATURES | TITLE | DATE |
|------------|-------|------|
| <S> | <C> | <C> |
| /s/ John P. Gorst<br>John P. Gorst | Chief Executive Officer and<br>Chairman of the Board | January 12, 2 |
| /s/ M. Carroll Benton<br>M. Carroll Benton | Chief Financial Officer,<br>Chief Administrative Officer,<br>Secretary, Treasurer and Director | January 12, 2 |
| /s/ William M. Wright, III<br>William M. Wright, III | Chief Operating Officer<br>and Director | January 12, 2 |
| /s/Asra Rasheed<br>Asra Rasheed | President | January 12, 2 |
| /s/Mark H. Levin<br>Mark H. Levin | Director | January 12, 2 |

/s/Norm Johnson                    Director                          January 12, 2
Norm Johnson
</TABLE>


                                        39
<PAGE>




                    INDEX TO CONSOLIDATED FINANCIAL STATEMENTS


        Audited Consolidated Financial Statements as of and for the Years Ended
        September 30, 2006 and 2005

        Index to Consolidated Financial Statements            F-1

        Independent Auditors' Report                          F-2

        Consolidated Balance Sheet                            F-3

        Consolidated Statements of Operations                 F-4

        Consolidated Statements of Stockholder's Deficit      F-5

        Consolidated Statements of Cash Flows                 F-7

        Notes to Consolidated Financial Statements            F-8

                                      F-1
<PAGE>

                                              LAKE & ASSOCIATES, CPA'S



               REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM


To the Board of Directors and
Stockholders of Gottaplay Interactive Inc. and Subsidiary


We have audited the accompanying consolidated balance sheets of Gottaplay
Interactive Inc., (formerly known as Donobi, Inc.) and Subsidiary as of

September 30, 2006 and related consolidated statements of operations, stockholders' equity (deficit), and cash flows for the years ending September 30, 2006 and 2005. These consolidated financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Gottaplay Interactive Inc., (formerly known as Donobi, Inc.) and Subsidiary as of September 30, 2006 and the results of its operations and its cash flows for each of the years in the two-year period ended September 30, 2006 in conformity with accounting principles generally accepted in the United States of America.

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. The Company has suffered recurring losses and has yet to generate an internal cash flow that raises substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are described in Note 3. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

LAKE & ASSOCIATES CPA'S LLC

BOCA RATON FLORIDA

JANUARY 10, 2007

225 NE Mizner Blvd
Suite 300
Boca Raton, Florida 33432
Phone: 561.982.9874
Fax: 561.982.7985

F-2

<PAGE>

Gottaplay Interactive, Inc.
and Its Wholly Owned Subsidiaries
CONSOLIDATED BALANCE SHEET

September 30, 2006

```
<TABLE>
<CAPTION>
```

### Assets

Current assets
```
<S>                                                                      <C>
        Cash .................................................... $    6
        Accounts receivable, net of $53,807 allowance for doubtful
            accounts ............................................      18
        Work-in-progress .......................................       1
        Prepaid expenses and other current assets ..............       3
        Deferred charges .......................................       4
                                                                   ------
                Total current assets ...........................      33
                                                                   ------

Fixed assets, net ..............................................      28
                                                                   ------
Other assets
        Intangible assets, net .................................   1,05
        Deposits ...............................................       1
                                                                   ------
                Total other assets .............................   1,06
                                                                   ------

                Total assets ................................... $ 1,67
                                                                   ======
```

### Liabilities and Stockholders' Deficit

Current liabilities
```
        Accounts payable .......................................  $   64
        Accounts payable - related parties .....................       4
        Accrued liabilities ....................................      42
        Accrued liabilities - related parties ..................       3
        Deferred and prebilled revenues ........................      25
        Convertible debentures .................................      46
        Current portion of notes payable .......................      30
        Notes and loans payable - related parties ..............      76
        Obligations under capitalized leases ...................       2
        Amounts due to other related parties ...................
                                                                   ------
                Total current liabilities ......................   2,96
                                                                   ------
Long-term liabilities
        Long term portion of notes payable .....................       8
                                                                   ------
Total liabilites ...............................................   3,05
                                                                   ------
Stockholders' deficit
        Preferred stock, $0.001 par value, 5,000,000 shares
            authorized, none issued and outstanding ............
        Common stock, $0.001 par value, 100,000,000 shares
            authorized, 28,893,433 issued and outstanding at
            September 30, 2006 .................................       2
        Treasury stock .........................................
        Additional paid-in capital .............................   3,58
```

Additional paid-in capital - treasury stock .......................... 23
Prepaid services paid with common stock ........................... (2,45
Accumulated deficit .............................................. (2,77
                                                                   ------
       Total stockholders' deficit ................................ (1,37
                                                                   ------

       Total liabilities and stockholders' deficit ................ $ 1,67
                                                                   ======

</TABLE>

The accompanying notes are an integral part of these consolidated financial
statements.
                                     F-3
<PAGE>

                        Gottaplay Interactive, Inc.
                     and Its Wholly Owned Subsidiaries
                    CONSOLIDATED STATEMENTS OF OPERATIONS

<TABLE>
<CAPTION>

|  | Year ended September 30, 2006 |
| --- | --- |
| <S> | <C> |
| Revenues ............................................... | $ 464,531 |
| Cost of revenues ...................................... | 321,735 |
| Loss before operating expenses ................... | 142,796 |
| | |
| Operating expenses | |
|    Fulfillment ....................................... | 225,187 |
|    Technology and development ........................ | 77,610 |
|    Advertising and marketing ......................... | 74,984 |
|    General and administrative ........................ | 1,325,482 |
|    Officers' compensation ............................ | 244,027 |
|    Related party expenses ............................ | 122,477 |
| Total operating expenses ........................... | 2,069,767 |
| Loss from operations ............................... | (1,926,971) |
| Other income (expense) | |
|    Interest income ................................... | 9,243 |
|    Gain on disposition of assets ..................... | 4,107 |
|    Other income ...................................... | 26,349 |
|    Interest expense .................................. | (85,651) |
| Total other expense ................................. | (45,952) |
| Net loss before income taxes ................... | (1,972,923) |
| Provision for income taxes ......................... | -- |
| Net loss ....................................... | $ (1,972,923) |

```
Weighted average shares outstanding of common stock,
basic and diluted ......................................        18,750,333
                                                               ============


Net loss per common shares outstanding, basic and diluted      $     (0.11)
                                                               ============

</TABLE>
```

The accompanying notes are an integral part of these consolidated financial
statements.


F-4

&lt;PAGE&gt;

Gottaplay Interactive, Inc.
and Its Wholly Owned Subsidiaries

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIT
For the Years ended September 30, 2006 and 2005

&lt;TABLE&gt;
&lt;CAPTION&gt;

| | Common Stock | | Treasury |
| | ------------ | | -------- |
| | Shares | Amount | Amount |
| | ----------- | ----------- | ----------- |
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| Balance at  September 30, 2004 .. | 13,907,500 | $    13,907 | $      -- |
| | ----------- | ----------- | ----------- |
| Recognition of non-compensated services ........................ | -- | -- | -- |
| Authorization to issue common stock for services, assets and prepaid services ................ | -- | -- | -- |
| Net loss for the year ended September 30, 2005 .............. | -- | -- | -- |
| | ----------- | ----------- | ----------- |
| Balance at September 30, 2005 ... | 13,907,500 | 13,907 | -- |
| | ----------- | ----------- | ----------- |
| Issuance of common stock | | | |

| | | | |
|---|---|---|---|
| authorized for issuance in prior year .......................... | 3,112,500 | 3,112 | -- |
| Recognition of prepaid services rendered and earned ............. | -- | -- | -- |
| Issuance of common stock in conjunction with settlement of .. debts .......................... | 744,618 | 745 | -- |
| Proceeds received from stock subscription ................... | -- | -- | -- |
| Options granted to employees (1,250,000) and non-employees (957,000) ...................... | -- | -- | -- |
| Cancellation of shares .......... | (20,000) | (20) | -- |
| Effects of reverse merger on stockholders' deficit pursuant to merger agreement on July 24, 2006 ................. | 9,028,815 | 9,029 | (379) |
| Issuance of common stock for services and prepaid services ... | 2,120,000 | 2,120 | -- |
| Net loss for the year ended September 30, 2006 .............. | -- | -- | -- |
| Balance at September 30, 2006 ... | 28,893,433 | $    28,893 | $    (379) |

</TABLE>

(Continued next page)

F-5

<PAGE>

<TABLE>
<CAPTION>

| | Additional Paid In Capital | Common Stock Authorized but Unissued | Subscription Receiveable and Prepaid Services |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Balance at  September 30, 2004 .. | $   (12,516) | $     -- | $    (300) |
| Recognition of non-compensated services ...................... | 122,500 | -- | -- |
| Authorization to issue common stock for services, assets and prepaid services ............... | -- | 8,184 | (3,500) |
| Net loss for the year ended | | | |

| | | | |
|---|---|---|---|
| September 30, 2005 .............. | -- | -- | -- |
| | ----------- | ----------- | ----------- |
| Balance at September 30, 2005 ... | 109,984 | 8,184 | (3,800) |
| | ----------- | ----------- | ----------- |
| Issuance of common stock authorized for issuance in prior year ......................... | 5,072 | (8,184) | -- |
| Recognition of prepaid services rendered and earned ............. | -- | -- | 3,500 |
| Issuance of common stock in conjunction with settlement of .. debts ......................... | 781,102 | -- | -- |
| Proceeds received from stock subscription .................... | -- | -- | 300 |
| Options granted to employees (1,250,000) and non-employees placeholder .................... | 32,049 | -- | -- |
| Cancellation of shares .......... | 18 | -- | -- |
| Effects of reverse merger on stockholders' deficit pursuant to merger agreement on July 24, 2006 ................... | (519,736) | -- | -- |
| Issuance of common stock for services and prepaid services ... | 3,177,880 | -- | (2,450,000) |
| Net loss for the year ended September 30, 2006 .............. | -- | -- | -- |
| | ----------- | ----------- | ----------- |
| Balance at September 30, 2006 ... | $ 3,586,369 | $    -- | $(2,450,000) |
| | =========== | =========== | =========== |

</TABLE>

The accompany notes are an integral part of this consolidated financial statements.

F-6

<PAGE>

Gottaplay Interactive, Inc.
and Its Wholly Owned Subsidiaries
CONSOLIDATED STATEMENTS OF CASH FLOWS

<TABLE>
<CAPTION>

|  | Year end September 30 |
|---|---|
|  | ------------ |
| Increase (Decrease) in Cash | |
| <S> | <C> |

```
Net loss ................................................  $(1,972,9
Adjustment to reconcile net loss to cash (used) in
    operating activities:
    Depreciation and amortization ........................    141,6
    Allowance for bad debts ..............................     19,9
    Basis of disposed assets .............................     (4,1
    Write-down of video game library ....................      --
    Non compensated  services rendered ..................      --
    Share-based compensation for services rendered ......    765,5

    Changes in assets and liabilities:
        Accounts receivable .............................     (88,3
        Deposits ........................................      --
        Accounts payable ................................    200,1
        Accounts payable - related parties ..............    113,2
        Accrued liabilities .............................    117,1
        Accrued liabilities - related parties ...........     (8,2
        Deferred revenue and pre-billed revenue .........    136,2
        Other current assets ............................     10,6
        Prepaid expenses ................................     (3,4
                                                            ---------
            Net cash (used) in operating activities         (572,4
                                                            ---------

Cash flows from investing activities
    Cash received from reverse merger ...................     14,8
    Purchase of equipment and leaseholds ................     (2,7
    Purchase of video game library ......................    (71,9
    Additions to note receivable ........................      --
                                                            ---------
        Net cash (used) in investing activities .........    (59,7
                                                            ---------

Cash flows from financing activities
    Proceeds from notes payable .........................    632,6
    Payments on notes payable ...........................    (95,7
    Payments on convertible debentures ..................   (210,0
    Proceeds from note payable - related parties ........    343,0
    Payments on notes payable - related parties .........      --
    Proceeds from loans - related parties ...............    187,2
    Payments on loans - related parties .................   (165,0
    Payments on capitalized leases ......................     (6,8
    Proceeds from stock subscriptions receivable ........        3
                                                            ---------
        Net cash provided by financing activities .......    685,4
                                                            ---------

Net increase in cash ....................................     53,2
Cash at beginning of period .............................      7,9
                                                            ---------
Cash at end of period ...................................  $   61,1
                                                            =========
</TABLE>
```

Supplemental disclosures and non-cash investing and financing activities - see
Note 15.

The accompanying notes are an integral part of these consolidated financial
statements.

F-7

<PAGE>

Gottaplay Interactive, Inc. and Its Wholly Owned Subsidiaries
Notes to Consolidated Financial Statements

Note 1 - Organization and Merger

On July 24, 2006, Gottaplay Interactive, Inc. ("Gottaplay" and the "Company"), formerly known as Donobi, Inc. ("Donobi"), a publicly held company, merged with Gotaplay Interactive, Inc. ("Gotaplay"), a privately held Nevada corporation pursuant to a Merger Agreement ("Agreement"). In accordance with terms of the Agreement, Donobi was to:

(a.)      Execute a one for six reverse stock split, prior to the merger, thereby reducing the number issued and outstanding shares of common stock from 65,619,481 to 10,936,580, and

(b.)      Issue 17,744,618 post-reverse split shares of common stock to the former stockholders of Gotaplay after the merger, and (c.) Amend its Articles of Incorporation by changing the name of the Company from Donobi, Inc. to Gottaplay Interactive, Inc., and

(d.)      Elect all the former directors of Gotaplay to the board of directors of Gottaplay and have all Donobi's directors resign except for two individuals, one being an officer of the Donobi and now an officer of Gotaplay.

As a result of the Agreement, the merger transaction was treated for accounting purposes as a "reverse merger", effective July 24, 2006. The legal acquirer is Donobi, Inc. and the accounting acquirer is Gottaplay Interactive, Inc. Accordingly, the consolidated financial statements include:

(a.) The assets, liabilities, and equity of the accounting and the legal acquirer at recorded historical cost,

(b.) The consolidated statements of operations include the operations of the accounting acquirer for the years presented,

(c.) The consolidated statements of operations include the results of operations of the legal acquirer for the period July 24, 2006 to September 30, 2006,

(d.) All common stock issuances of the accounting acquirer prior to the date of merger have been restated from $0.0001 par value to the legal acquirer's par value of $0.001 per share, and

(e.) All commitments and obligations were assumed on the date of merger by the accounting acquirer.

The merger has been accounted for pursuant to Statement on Financial Accounting Standards ("SFAS") No. 142, "GOODWILL AND OTHER INTANGIBLE ASSETS" and SFAS No. 141, "BUSINESS COMBINATIONS". However, no goodwill was recognized in this transaction.

ORGANIZATION AND DESCRIPTION OF BUSINESS

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. Each division and subsidiary company separately accounts for its operations and transactions and all inter-company and all inter-divisional transactions have been eliminated.

As a result of this merger there are two distinct operating divisions: (a.) a division operating as an internet service provider ("ISP") and (b.) a division for on-line video game rental service business offered to the general public. The primary core of business will be the on-line video game rental business.

ON-LINE VIDEO GAME RENTAL DIVISION

The on-line video game rental division began operations in October 2004. The division provides its subscribers access to a comprehensive library of titles via the internets as an alternative to store based gaming rentals. For the standard subscription plan of $20.95 per month, subscribers can generally have up to two titles out at the same time with no due dates, late fees or shipping charges. In addition to the standard plan, the Company offers two other service plans with different price points that allow subscribers to keep either fewer or more titles at the same time. Subscribers select titles at the Company's website,

<div align="center">F-8</div>

<PAGE>
aided by its proprietary recommendation service, and generally receive the video game within three business days by U.S. Postal mail service. The gamers then return the video game at their convenience using the Company's prepaid mailers. After a title has been returned, the Company mails a title from the subscriber's game queue. All of the Company's subscription revenues are generated in the United States of America.

INTERNET SERVICE PROVIDER DIVISION ("ISP")

Internet related services including connectivity, web access, web hosting and development, video services, networking and development and design to single and multi-unit residential and business customers across the United States of America, principally in the Northwestern part of the U.S.A.

YEAR-END AND DOMICILE

The Company and its wholly owned subsidiaries adopted September 30th as its fiscal year end and are domiciled in Nevada.

Note 2 - Accounting Policies

ACCOUNTING PRINCIPLES

The consolidated financial statements and accompanying notes are prepared in accordance with accounting principles generally accepted in the United States of America.

PRINCIPLE OF CONSOLIDATION

The financial statements include the accounts of Gottaplay Interactive, Inc. and its subsidiaries. Intercompany transactions and balances have been eliminated. Equity investments in which the Company exercises significant influence but do not control and are not the primary beneficiary are accounted for using the equity method. Investments in which the Company is not able to exercise significant influence over the investee and which do no have readily determinable fair values are accounted for under the cost method.

MANAGEMENT'S USE OF ESTIMATES AND ASSUMPTIONS

The preparation of the consolidated financial statements in conformity with generally accepted accounting principles in the United States of America

requires management to make estimates and assumptions that affect the reported amounts of the assets and liabilities, disclosure of contingent assets and liabilities at the date of the consolidated financial statements, and the reported amounts of revenue and expense during the reporting periods. Examples, though not exclusive, include estimates and assumptions of: loss contingencies; depreciation or amortization of the economic useful life of an asset; stock-based compensation forfeiture rates; estimating the fair value and/or goodwill impairment; potential outcome of future tax consequences of events that have been recognized in our financial statements or tax returns; and determining when investment impairments are other-than- temporary. Actual results may differ from those estimates and assumptions.

RECLASSIFICATIONS

Certain amounts reported in previous periods have been reclassified to conform to the Company's current period presentation.

REVENUE RECOGNITION AND DEFERRED REVENUES

In accordance with the SEC's Staff Accounting Bulletin No. 104, "REVENUE RECOGNITION", revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectibility is probable. A summary of each operating division's revenue recognition procedures follows:

F-9

<PAGE>
On-Line Video Game Rental Division

The Company charges $1 for an initial ten-day trial period. At any time during the initial ten-day period, a new subscriber has the right to rescind their agreement, but will not receive credit for the $1 charge.

If the subscriber does not cancel during the ten day period, the Company will charge his credit card account according to the plan selected by the subscriber, until the subscriber cancels his subscription. The Company recognizes subscription revenue ratably during each subscriber's monthly subscription period. For financial reporting purposes, the Company allocates subscription fees over the number of days in the month for which the fee was charged.

As of September 30, 2006, the Company reported $4,482 of deferred revenue, which will be fully recognized in the month of October 2006. All authorized refunds to subscribers are recorded as a reduction of revenues. Revenues from sales of used video games will be recorded upon shipment.

ISP Division

Internet related revenues are recorded when they are rendered and earned. Revenues from support and maintenance contracts are recognized over the term of the contract. Revenues are recognized when the products are shipped. Provisions for discounts and rebates to customers, estimated returns and allowances, and other adjustments are provided for in the same period the related sales are recorded. At September 30, 2006, the Company reported deferred revenues and pre-billed revenues of $247,062, of which a significant portion will be fully recognized in the month of October 2006.

The Company follows the percentage of completion method of accounting for contracts. The aggregate of costs incurred and income recognized on uncompleted contracts in excess of related billings is shown as a current asset in the accompanying consolidated balance sheet.

## COST OF REVENUE

Cost of revenues consists primarily of material costs, direct labor, depreciation and related expenses, which are directly attributable to the manufacture of products and the provision of services

## CASH, CASH EQUIVALENTS AND FINANCIAL INSTRUMENTS

The Company considers all highly liquid instruments with original maturities of three months or less at the date of purchase to be cash equivalents. In general, investments with original maturities of greater than three months and remaining maturities of less than one year are classified as short term investments.

## ACCOUNTS RECEIVABLE

Accounts receivable are recorded at the invoiced amount and do not bear interest. The Company extends unsecured credit to its customers in the ordinary course of business but mitigates the associated risks by performing credit checks and actively pursuing past due accounts. An allowance for doubtful accounts is established and determined based on managements' assessment of known requirements, aging of receivables, payment history, the customer's current credit worthiness and the economic environment. As of September 30, 2006, the Company recognized an allowance for doubtful accounts of $53,808.

## CONCENTRATIONS

The Company maintains its cash in bank deposit accounts, which at time may exceed the federally insured limits. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk on cash and cash equivalents.

The Company paid one vendor, critical to the ISP division's operation, approximately $72,000 for the period July 24, 2006 to September 30, 2006.

F-10

<PAGE>
FAIR VALUE OF FINANCIAL INSTRUMENTS

Financial instruments consist principally of cash, accounts and related party receivables, trade and related party payables, accrued liabilities, short-term obligations and notes receivable. The carrying amounts of such financial instruments in the accompanying consolidated balance sheets approximate their fair values due to their relatively short-term nature. It is management's opinion that the Company is not exposed to any significant currency or credit risks arising from these financial instruments.

## LOSS PER COMMON SHARE

Basic loss per common share is provided in accordance with SFAS 128, "EARNINGS PER SHARE." Basic loss per common share is computed by dividing the net loss available to the shareholders of common stock by the weighted average number of common shares outstanding during the period. Diluted loss per common share is computed by dividing the net loss by the weighted average number of common shares including the dilutive effect of common share equivalents then outstanding. Common stock equivalents are not included in the computation of diluted net loss per common share because the effect would be anti-dilutive.

## SHARE-BASED PAYMENTS

In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS No. 123 (R), "SHARE-BASED PAYMENT", which establishes standards for transactions in which an entity exchanges its equity instruments for goods and services. This standard replaces SFAS No. 123 and supercedes Accounting Principles Board ("APB") Opinion No. 25, "ACCOUNTING FOR STOCK-BASED COMPENSATION". This standard requires a public entity to measure the cost of employee services, using an option-pricing model, such as the Black-Scholes Model, received in exchange for an award of equity instruments based on the grant-date fair value of the award. This eliminates the exception to account for such awards using the intrinsic method previously allowable under APB No. 25. Shares of commons stock issued for services rendered by a third party are recorded at fair market value, generally the quote at the close of market trading on the day for issuance of the stock.

DIVIDENDS

The Company has not yet adopted any policy regarding payment of dividends. No dividends have been paid or declared since inception.

COMPREHENSIVE LOSS

The Company has no components of other comprehensive loss. Accordingly, net loss equals comprehensive loss for all periods.

ADVERTISING EXPENSES

Advertising costs are expensed as incurred. For the years ended September 30, 2006 and 2005 advertising expenses totaled $7,523 and $2,735, respectively.

SEGMENT REPORTING

The Company follows SFAS No. 130, "DISCLOSURES ABOUT SEGMENTS OF AN ENTERPRISE AND RELATED INFORMATION." This statement requires companies to report information about operating segments in interim and annual financial statements. It also requires segment disclosures about products and services, geographic areas and major customers. The Company determined that it did have two separately reportable operating segments as of September 30, 2006.

INCOME TAXES

F-11

<PAGE>
The Company follows SFAS No. 109, "ACCOUNTING FOR INCOME TAXES" for recording the provision for income taxes. Deferred tax assets and liabilities are computed based upon the difference between the consolidated financial statement and income tax basis of assets and liabilities using the enacted marginal tax rate applicable when the related asset or liability is expected to be realized or settled. Deferred income tax expenses or benefits are based on the changes in the asset or liability each period. If available evidence suggests that it is more likely than not that some portion or all of the deferred tax assets will not be realized, a valuation allowance is required to reduce the deferred tax assets to the amount that is more likely than not to be realized. Future changes in such valuation allowance are included in the provision for deferred income taxes in the period of change.

Deferred income taxes may arise from temporary differences resulting from income and expense items reported for financial accounting and tax purposes in different periods. Deferred taxes are classified as current or non-current, depending on the classification of assets and liabilities to which they relate.

Deferred taxes arising from temporary differences that are not related to an asset or liability are classified as current or non-current depending on the periods in which the temporary differences are expected to reverse.

VIDEO GAME LIBRARY

The Company records the purchase of new and/or used video games at cost. It depreciates the video game library, less estimated salvage value of $1.00 per video game, on a "sum-of-the-months" accelerated basis over the estimated economic useful life of each title. The economic useful life of a new release video game is estimated to be one year. In estimating the economic useful life of its video game library, the Company considers the potential utilization, damage and loss. Depreciation expense for the years ended September 30, 2006 and 2005 was $95,176 and $119,861, respectively.

PROPERTY AND LEASEHOLD IMPROVEMENTS

Property is recorded at cost. The cost of maintenance and repairs of equipment is charged to operating expense when incurred. Depreciation and amortization is determined based upon the assets' estimated useful lives, and is calculated on a straight-line basis when the asset is placed in service. When the Company sells, disposes or retires equipment or replaces a leasehold improvement, the related gains or losses are included in operating results. Property is depreciated over five or seven years and begins when it is placed in service.

Leasehold improvements are recorded at cost and are amortized over the remaining lease term.

Depreciation and amortization expense for the years ended September 30, 2006 and 2005 was $26,087 and $1,986, respectively.

INTANGIBLE ASSETS AND SOFTWARE

Intangible assets consist of goodwill, customer lists and non-compete covenants. The Company does not amortize goodwill in accordance with SFAS No. 142, "GOODWILL AND OTHER INTANGIBLE ASSETS". The Company assesses goodwill and customer lists for impairment annually. The annual testing for fiscal year ended September 30, 2006, resulted in no impairment of intangible assets. If an event occurs or circumstances change that would more likely than not reduce the fair value of an intangible asset below its carrying value, an evaluation for impairment will be conducted between annual tests.

Customer lists, consisting of acquired subscriber bases, are amortized over 15 years and non-compete covenants are amortized over the contractual life/term of the non-compete period.

Software applications are recorded at cost is amortized over sixty months.

Amortization expense for the years ended September 30, 2006 and 2005 was $20,365 and $5,125, respectively.

F-12

<PAGE>
IMPAIRMENT OF LONG-LIVED ASSETS

In accordance with SFAS No.144, "Accounting for the Impairment or Disposal of Long-lived Assets", the Company assesses long-lived assets, such as property and equipment and intangible assets subject to amortization, are reviewed for impairment whenever events or changes in circumstances indicate that the

carrying amount of an asset group may not be fully recoverable. Recoverability of asset groups to be held and used in measured by a comparison of the carrying amount of an asset group to estimated undiscounted future cash flows expected to be generated by the asset group. If the carrying amount exceeds its estimated future cash flows, an impairment charge is recognized by the amount by which the carrying amount of an asset group exceeds the fair value of the asset group. The Company evaluated its long-lived assets and no impairment charges were recorded for any of the periods presented.

RELATED PARTIES

Related parties, which can be a corporation or individual, are considered to be related if the Company has the ability, directly or indirectly, to control the other party or exercise significant influence over the other party in making financial and operating decisions. Companies are also considered to be related if they are subject to common control or common significant influence. The Company has these relationships and is further described in Note 7.

RECENT AUTHORITATIVE ACCOUNTING PRONOUNCEMENTS

In May 2005, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 154 ("SFAS No. 154"), "ACCOUNTING CHANGES AND ERROR CORRECTIONS." This statement requires entities that voluntarily make a change in accounting principle to apply that change retrospectively to prior periods' financial statements, unless this would be impracticable. SFAS No. 154 supersedes APB Opinion No. 20, "ACCOUNTING CHANGES," which previously required that most voluntary changes in accounting principle be recognized by including in the current period's net income the cumulative effect of changing to the new accounting principle. SFAS No. 154 also makes a distinction between "retrospective application" of an accounting principle and the "restatement" of financial statements to reflect the correction of an error. SFAS No. 154 applies to accounting changes and error corrections that are made in fiscal years beginning after December 15, 2005. Management has adopted these provisions.

In February 2006, the FASB issued SFAS Statement No. 155, "ACCOUNTING FOR CERTAIN HYBRID FINANCIAL INSTRUMENTS--AN AMENDMENT OF FASB STATEMENTS NO. 133 AND 140" ("SFAS 155"). This Statement amends FASB Statements No. 133, Accounting for Derivative Instruments and Hedging Activities, and No. 140, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities. This Statement resolves issues addressed in Statement 133 Implementation Issue No. D1, "APPLICATION OF STATEMENT 133 TO BENEFICIAL INTERESTS IN SECURITIZED FINANCIAL ASSETS." This Statement permits fair value re-measurement for any hybrid financial instrument that contains an embedded derivative that otherwise would require bifurcation, clarifies which interest-only strips and principal-only strips are not subject to the requirements of Statement 133, establishes a requirement to evaluate interests in securitized financial assets to identify interests that are freestanding derivatives or that are hybrid financial instruments that contain an embedded derivative requiring bifurcation, clarifies that concentrations of credit risk in the form of subordination are not embedded derivatives and amends Statement 140 to eliminate the prohibition on a qualifying special-purpose entity from holding a derivative financial instrument that pertains to a beneficial interest other than another derivative financial instrument. SFAS 155 is effective for all financial instruments acquired or issued for the Company for fiscal year begins after September 15, 2006. The adoption of this standard is not expected to have a material effect on the Company's results of operations or financial position.

In July 2006, the FASB issued FASB Interpretation No. 48, "ACCOUNTING FOR UNCERTAINTY IN INCOME TAXES - AN INTERPRETATION OF FASB STATEMENT NO. 109" ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized

in the financial statements and prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken

F-13

<PAGE>
in a tax return. The Company continues to evaluate the impact of FIN 48 which is to be adopted effective December 15, 2006.

In September 2006, the FASB issued SFAS No. 157, "FAIR VALUE MEASUREMENTS" ("SFAS 157"). While SFAS 157 formally defines fair value, establishes a framework for measuring fair value and expands disclosure about fair value measurements, it does not require any new fair value measurements. SFAS 157 applies under other accounting pronouncements that require or permit fair value measurements. SFAS 157 is required to be adopted effective January 1, 2008 and the Company does not presently anticipate any significant impact on its consolidated financial position, results of operations or cash flows.

In September 2006, the FASB issued SFAS No. 158, "EMPLOYERS' ACCOUNTING FOR DEFINED BENEFIT PENSION AND OTHER POSTRETIREMENT PLANS - AN AMENDMENT OF FASB STATEMENTS NO. 87, 88, 106 AND 132(R)" ("SFAS 158"). SFAS 158 requires an employer to recognize the funded status of its defined benefit pension and other postretirement plans as an asset or liability in its statement of financial position and to recognize changes in the funded status in the year in which the changes occur through other comprehensive income. The funded status of a plan is measured as the difference between plan assets at fair value and the benefit obligation, which is represented by the projected benefit obligation for pension plans and the accumulated postretirement benefit obligation for other postretirement plans. SFAS 158 requires the recognition, as a component of other comprehensive income, net of tax, of the gains or losses and prior service costs or credits that arise during the period but are not recognized as a component of net periodic benefit cost in accordance with existing accounting principles. Amounts required to be recognized in accumulated other comprehensive income, including gains and losses and prior service costs or credits are adjusted as they are subsequently recognized as components of net periodic benefit cost pursuant to the recognition and amortization provisions of existing accounting principles. In addition, SFAS 158 requires plan assets and obligations to be measured as of the date of the employer's year-end statement of financial position as well as the disclosure of additional information about certain effects on net periodic benefit cost for the next fiscal year from the delayed recognition of the gains or losses and prior service costs or credits.

The Company is required to adopt those provisions of SFAS 158 attributable to the initial recognition of the funded status of the benefit plans and disclosure provisions as of December 31, 2006. Those provisions of SFAS 158 applicable to the amortization of gains or losses and prior service costs or credits from accumulated other comprehensive income to the net periodic benefit cost are required to be applied on a prospective basis effective January 1, 2007. The Company is still in the process of evaluating the impact, if any, of SFAS 158. However, the Company does not anticipate that the adoption of SFAS 158 will have any impact on its consolidated financial statements.

Note 3 - Going Concern and Management's Plan

The Company's consolidated financial statements as of and for the periods ended September 30, 2006 and 2005 have been prepared using the generally accepted accounting principles applicable to a going concern, which contemplates the realization of assets and liquidation of liabilities in the normal course of business. The Company had net losses of $1,972,923 and $793,381 and negative cash flows from operations of $572,422 and $281,846 for fiscal years ended

September 30, 2006 and 2005, respectively. At September 30, 2006, the Company had a working capital deficit of $2,639,074 and a stockholders' deficit of $1,376,252. The accompanying consolidated financial statements do not include any adjustments that might result from the ultimate outcome of these risks and uncertainties. As of September 30, 2006, the Company's working capital deficit may not enable it to meet certain financial objectives as presently structured.

The rate at which the Company expends it financial resources is variable, may be accelerated, and will depend on many factors. In order to obtain the necessary operating and working capital, the Company is seeking either public or private equity investors and/or private debt financing. There can be no assurance that such additional funding, if any, will be available on acceptable terms. The Company's continued existence as a going concern is completely dependent upon its ability to grow sales and to secure equity and/or debt financing and there are no assurances that the Company will be successful. Without sufficient short-term financing it would be unlikely for the Company to continue as a going concern.

F-14

<PAGE>
Note 4 - Intangible Assets

The Company has the following intangible assets as of September 30, 2006:

|                               |     | Amount    |
| ----------------------------- | --- | --------- |
| Customer lists                | $   | 934,602   |
| Purchase contracts            |     | 79,399    |
| Covenants not to compete      |     | 15,500    |
| Goodwill                      |     | 188,594   |
| Organizational costs          |     | 1,009     |
|                               |     | 1,219,104 |
| Less: accumulated amortization |    | 166,375   |
| Intangible assets, net        | $   | 1,052,729 |

Note 5 - Fixed Assets

The Company has the following fixed assets as of September 30, 2006:

|                                                |     | Amount  |
| ---------------------------------------------- | --- | ------- |
| Video Game Library                             | $   | 222,752 |
| Vehicles                                       |     | 12,983  |
| Computers and software                         |     | 547,256 |
| Leasehold improvements                         |     | 15,854  |
| Furnishings                                    |     | 104,814 |
|                                                |     | 903,659 |
| Less: accumulated depreciation and amortization |    | 621,783 |
| Fixed assets, net                              | $   | 281,876 |

Note 6 - Accrued Liabilities

Accrued liabilities consist of the following at September 30, 2006:

|                                    |     | Amount   |
| ---------------------------------- | --- | -------- |
| Payroll, vacations and related     | $   | 153,609  |
| Payroll taxes                      |     | 65,379   |
| Business taxes                     |     | 47,418   |
| Other expenses                     |     | 36,486   |
| Interest                           |     | 122,997  |
| Total Accrued Liabilities          | $   | 425,889  |

Note 7 - Related Party Transactions

As of and for the year ended September 30, 2006, the Company had the following transactions with related parties:

a   A public company, managed, directed and partially owned by two of the
    officers, stockholders and

<div align="center">F-15</div>

<PAGE>

directors of the Company. Accounts payable - trade and accrued expenses totaling $36,110. In addition, at September 30, 2006, the public company owes the Gottaplay $7,354 for networking services. The Company is also committed to a forty-eight month operating lease for personal property with this party public company. See "personal property" in Note 16 for details of the lease. During fiscal year ended September 30, 2006, Gottaplay received services from the public company totaling $122,477.

The Company also owes $7,500 to the public company on an open account and payable on demand.

As of July 17, 2006, the Company owed the public company a total of $469,466 in the form of a promissory note, accounts payable, accrued interest and loans. These debts were converted into 447,111 shares of common stock. The value of the stock was determined on the date of conversion at the close of trading, which was $1.05 per share.

b   Three entities are owed $765,082. These notes and loans are all considered as
    a current liability. Applicable interest rates range from 4.00% to 18%, and
    the details of the related party obligations are: (i.)Note payable for
    $55,982 to a Director of the Board, 9.5% interest, unsecured, (ii.), Note
    payable for $59,000 to an officer of the Company, 18% interest, secured with
    personal property, and (iii.) Notes and loans totaling $650,100 to an
    investor/stockholder, 4% interest on the notes, and all debt is unsecured.

c   A private company owned and managed by two of the Company's officers and
    stockholders: The amount due is $8,715. This amount is unsecured,
    non-interest bearing and due on demand.

d   Two officers/stockholders, for an aggregate amount of $6,971. These
    obligations are unsecured, without interest and due on demand.


Note 8 - Notes Payable and Other Loans


The Company has nine notes payable at September 30, 2006 totaling $387,274.

These notes bear interest ranging from 7.79 % to 18.0% per annum. Three notes, totaling $63,376, are collateralized by personal property of the Company, and six notes totaling $323,899, do not carry any collateral. The long-term portion of these notes is estimated at $85,234.

Estimated future minimum principal maturities are:

| Fiscal Years Ended September 30: | | Amount |
|---|---|---|
| 2007 | $ | 62,088 |
| 2008 | | 23,146 |
| | $ | 85,234 |

Note 9 - Secured Convertible Debentures

In April 2005, the Company issued a total of $700,000 of 6% secured convertible debentures, under two separate private financing transactions. Both debentures are secured by certain assets and property of the Company. Pursuant to terms of these debentures, the Company, in anticipation and the consummation of any merger agreement, must place into escrow 1,916,667 shares of $0.001 par value common stock, which upon the effective date of merger, and will deliver said shares of common stock to the holder of Debentures A and B . Conversion terms of each of the private financing transactions, are as follows:

DEBENTURE A - $699,600. The conversion price for this debenture in effect on any conversion date shall be the lesser of (a) one hundred twenty percent (120%) of the average closing bid price per share of the common stock during the five (5) trading days immediately preceding the closing date (the "fixed

F-16

<PAGE>

conversion price"); and, (b) ninety percent (90%) of the lowest bid price per share of the common stock during the fifteen (15) trading days immediately preceding the conversion date (the "floating conversion price"). The maturity date of this debenture is April 11, 2007.

DEBENTURE B - $400. The conversion price for this debenture in effect on any conversion date shall be $0.001 (the "conversion price"). The maturity date for this debenture is April 11, 2008.

As of September 30, 2006, the Company owes $464,600 on Debenture A, and $400 on Debenture B. However, on October 18, 2006 both debentures plus accrued interest were paid in full and the 1,916,667 shares of common stock held in escrow were also assigned to investor group on October 2006. See also Note 17.

Note 10 - Capitalized Lease Obligations

The Company is leasing various equipment under three non-cancelable capital leases that expire at various dates through September 2007. The total obligation under the capital leases has been recorded in the accompanying consolidated balance sheet at the net present value of the future minimum lease payments, discounted at an interest rate of 10%. The net book value of capitalized equipment was approximately $77,000 at September 30, 2006.

| | | |
|---|---|---|
| Minimum future obligations | $ | 28,588 |
| Less amount representing interest | | 1,542 |

Present value of net minimum obligation            $        27,046
                                                            ============

Note 11 - Stockholders' Deficit, Options and Warrants

PREFERRED STOCK

The Company is authorized to issue 5,000,000 shares of its $0.001 par value preferred stock. As of September 30, 2006, no shares are issued and outstanding.

COMMON STOCK

The Company is authorized to issue 100,000,000 shares of its $0.001 par value common stock. This class of stock allows a stockholder one vote for each share of common stock held.

As of September 30, 2006, the issued and outstanding shares of the Company's $0.001 par value common stock were 28,893,433 shares.

TREASURY STOCK

The Company has 5,417 shares of common stock in treasury. These shares have a cost basis of $379, or approximately $0.42 per share.

OPTIONS

During fiscal year ended September 30, 2006, the Company granted 2,207,000 options, each with an exercise price of $0.50 per share, and all options will expire in February 2016. Each optionee was fully vested at the grant date. Options were granted as follows to: (a.)Three employees - 1,250,000; (b.) A director - 500,000; and, (c.) Non-employees - 457,000.

These options were recognized in the accompanying consolidated financial statements in accordance with SFAS 123R and valued using the Black-Scholes option pricing model with a total expense of $32,049.

No options were exercised during the fiscal year. Accordingly 2,207,000 were outstanding as of September 30, 2006.

                                    F-17
<PAGE>

WARRANTS

During the fiscal year ended September 30, 2006, the Company granted 922,309 warrants to purchase shares of common stock. These warrants were issued in conjunction with the terms of certain debts which were either converted into shares of common stock on July 17, 2006, or in consideration for extending the due date on a certain promissory note. The warrants carry exercise prices ranging between $1.00 and $1.50 per share and will expire in May 2007 and July 2007. As of September 30, 2006, there were 922,309 warrants outstanding.

Note 12 - Segment Reporting

The Company operates in two principal business segments, as more fully describe in Note 1. The following table sets forth the information for the Company's reportable segments and a reconciliation for the year ended September 30, 2006. The Company did not have operating segments in fiscal 2005.
<TABLE>
<CAPTION>

|  | On-line Game Rental Division | Internet Service Provider Division | Totals |
|---|---|---|---|
| \<S\> | \<C\> | \<C\> | \<C\> |
| Net sales .................. | $    127,257 | $    337,274 | $    464,531 |
| Cost of sales .............. | 150,598 | 171,137 | 321,735 |
| Interest expense ........... | 66,009 | 19,642 | 85,651 |
| Depreciation and amortization | 95,176 | 20,365 | 115,541 |
| Corporate and other expense . | 1,698,706 | 215,821 | 1,914,527 |
| Loss from segment operations | (1,883,232) | (89,691) | (1,972,923) |
| | | | |
| Capitalized expenditures .... | 71,927 | 2,737 | 74,664 |
| Assets ..................... | 120,315 | 1,558,634 | 1,678,949 |

</TABLE>

   Statement of Financial Accounting Standards No. 131, Disclosures about
Segments of an Enterprise and Related Information, establishes standards for
reporting information about operating segments. This standard requires
segmentation based on our internal organization and reporting of revenue and
operating income or loss based upon internal accounting methods. Operating
segments are defined as components of an enterprise about which separate
financial information is available that is evaluated regularly by the chief
operating decision maker, or decision making group, in deciding how to allocate
resources and in assessing performance.

   Because of the Company's integrated business structure, operating costs of
one segment may directly or indirectly benefit the other segment. Therefore,
these segments are not designed to precisely measure operating income or loss
directly related the products included in each segment. As inter-segment costs
are incurred in the future, management will accordingly recognize or estimate
the alignment of these certain costs, and plan to evaluate the alignments on a
regular basis.

   The accounting policies of the operating segments are the same as those
described in the summary of significant accounting policies in Note 2.

   Note 13 - Income Taxes

   Deferred tax assets and liabilities are recognized based on the anticipated
future tax effects arising from the differences between the financial statement
carrying amounts of assets and liabilities and their respective tax bases of
assets and liabilities using enacted tax rates. The following is a
reconciliation of the Federal and state statutory income tax amount to the
provision for income taxes for the year ended September 30, 2006:

| | | |
|---|---|---|
| Tax benefit at federal and state statutory rates at 35% | $ | (684,000) |
| Permanent differences | | 17,000 |
| Temporary differences | | 312,000 |

<PAGE>

| | |
|---|---|
| Other | (4,500) |
| | ---------------- |
| | (359,500) |
| Increase in valuation allowance | 359,500 |

```
                                                  ----------------
                                          $                     --
                                                  ================
```

The significant components of the Company's deferred tax at September 30,
2006 are as follows:

| | |
|---|---:|
| Deferred tax assets: | |
|   Net operating loss carryforwards | $    565,000 |
|   Deferred and pre-billed revenues | 88,000 |
|   Accrued vacation benefits | 25,000 |
|   Accrued taxes | 500 |
|   Basis of disposed assets | 4,000 |
|   Depreciation | 62,000 |
|   Total deferred tax assets | 744,500 |
| Deferred tax liabilities: | |
|   Amortization | 71,000 |
|   Total deferred tax liabilities | 71,000 |
| Net deferred tax assets before valuation allowance | 673,500 |
| Less: Valuation allowance | (673,500) |
| | $    -- |

For the year ended September 30, 2006, the Company incurred a net operating
loss and, accordingly, no provision for income taxes has been recorded. In
addition, no benefit for income taxes has been recorded due to the uncertainty
of the realization of any tax assets. At September 30, 2006, the Company had
approximately $1,615,000 of net operating losses available to offset future
federal and state taxable income. The net operating loss carryforwards, if not
utilized, will begin to expire in 2024. Utilization of these carryforwards is
significantly dependent on future taxable income, and, any future tax benefit
may be further limited due to a change of control in the Company's ownership as
defined by the Internal Revenue Code, Section 382.

For financial reporting purposes, the Company has incurred a loss since its
inception and based on the available objective evidence, including the Company's
history of losses, management conservatively believes it is more likely than not
that the net deferred tax assets will not be fully realizable. Accordingly, the
Company provided for a full valuation allowance against its net deferred tax
assets at September 30, 2006.

Note 14 - Employee Retirement Plan

On July 7, 2004, the legal acquirer adopted a 401(K) & Profit Sharing Plan.
The plan is primarily funded by voluntary employee contributions. The Company
may, at the sole discretion of the Trustees, contribute stock or cash to the
profit sharing plan.

Note 15 - Supplemental Cash Flow Information

Supplemental disclosures of cash flow information for the years ended
September 30, 2006 and 2005, respectively, are summarized as follows:

NON-CASH INVESTING AND FINANCING

Non-cash investing and financing activities included the following for the years ended:

F-19

\<PAGE\>
\<TABLE\>
\<CAPTION\>

|  | Sep 2006 |
| --- | --- |
| \<S\> | \<C\> |
| Net assets received from reverse merger ........................... | $   280,475 |
| Convert notes payable, accounts payable and accrued liabilities into shares of common stock .................................. | 781,848 |
| Issuance of common stock recorded as prepaid service compensation in conjunction with services to be rendered by non-employees ..................................................... | 3,000,000 |
| Convert amounts due to related party into a promissory note payable | 333,837 |
| Convert accounts payable due to related party into amended promissory note payable ........................................ | 57,859 |
| Issuance of shares of common stock and promissory notes for acquisitions of internal use software and video game library disks | -- |

\</TABLE\>

SUPPLEMENTAL CASH FLOWS INFORMATION

For the years ended, the Company paid cash for:

|  | September 30, | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Interest | $ 4,979 | $ -- |
| Taxes | -- | -- |

Note 16 - Commitments and Contingencies

FACILITIES

The Company conducts a substantial portion of its operations utilizing leased facilities. The Company is obligated on three:

a.) one for its corporate headquarters located in Gig Harbor, Washington, b.) one distribution center located in the Anaheim, California, and c.) a operational facility located in Bremerton, Washington.

Future minimum operating lease payments are:

| Years ending September 30: | |
| --- | --- |
| 2007 | $   97,000 |
| 2008 | 39,400 |
| 2009 | 13,900 |
| 2010 | -- |
|  | $ 150,300 |

```
===========
```

For the years ended September 30, 2006 and 2005, rental expense totaled approximately $93,500 and $42,700, respectively.

PERSONAL PROPERTY

The Company entered into a personal property lease for a term of forty-eight months with a related party. The Company is leasing computers, printers and other technology equipment necessary to conduct the day-to-day operations. Terms require a base rent of approximately $735 per month and applicable sales taxes.

F-20

<PAGE>

Rents may increase from time to time due to the Company needing additional equipment as it expands its operations and network of distribution centers. (See also Note 7a.)

Future minimum operating lease payments are:

|  | Years ending September 30: |
| --- | --- |
| 2007 | $    8,800 |
| 2008 |      8,800 |
| 2009 |      7,500 |
| 2010 |        -- |
|  | -------- |
|  | $ 25,100 |
|  | ======== |

For the periods ended September 30, 2006 and 2005, rental expense for personal property was approximately $8,000 and $1,500 respectively.

INDEPENDENT CONTRACTORS

During the year ended September 30, 2006 and to the date of this report, the Company has utilized continuing and recurring services of several independent contractors. Generally, these contractors' agreements are short term and subject to successive automatic renewal provisions. There are approximately eight contractors at any one time and are paid between $2,500 per month and $4,000. In the opinion of management, these individuals are not employees.

COMMITMENTS FOR DISTRIBUTION CENTERS

The Company generally enters into contractual arrangements with independent entities for the regional distribution of video games to its customers and receives into inventory when returned. Each agreement is essentially the same and generally has the following terms:

a  Monthly payments of approximately $2,500,

b  Six-month duration, with an automatic successive renewal provision for six months, and

c  Notification of termination by either party must be in writing and submitted 30 days prior to the end of term.

Total monthly distribution contractor fees approximate $10,100.

LITIGATION AND CLAIMS

The Company is subject to several other legal proceedings and business disputes involving ordinary and routine claims. The ultimate legal and financial liability with respect to such matters cannot be estimated with certainty and requires the use of estimates in recording liabilities for potential litigation settlements. Estimates for losses from litigation are made after consultation with outside counsel. If estimates of potential losses increase or the related facts and circumstances change in the future, the Company may be required to record either more or less litigation related expense.

It is management's opinion that none of the open matters at September 30, 2006, nor to January 10, 2007, will have a material adverse effect on the Company's financial condition or operations.

CONSULTING AGREEMENT

On July 25, 2006, The Company entered into a one year consulting agreement with an investor relations firm. Duties of the consultant are to assist the Company in raising capital, developing and implementing corporate strategies, introducing the Company to new financial communities, and represent the Company in investors' communications and public relations.

The Company issued 2 million shares of par value common stock per terms of the agreement. The stock was valued at $1.50 per share at the close of market on July 25, 2006. In addition, if the Consultant

F-21

<PAGE>
introduces the Company to a lender
or an equity purchaser and ultimately causes financing, it may also earn a "finder's fee" fee equal to 5% of gross funding received by the Company. The fee is payable in cash.

EMPLOYMENT AGREEMENT

The Company has an employment agreement with a corporate officer which was executed on the effective date of the merger. Terms require a base salary of $123,600 per year, plus traditional company benefits, for a minimum of two (2) years. Employee is also eligible for bonuses at the discretion of the compensation committee.

The agreement also provides for an issuance of common stock warrants. These warrants have not been granted as of the date of this report and the number of warrants to be granted have not yet been determined. Additional terms of a future grant, state that these warrants may be exercised at any time, no earlier than 12 months from the issuance date and no later than 60 months from the anniversary date of the grant. The warrants would also vest immediately.

Note 17 - Subsequent Events

PRIVATE PLACEMENT FINANCING

In October 2006, the Company consummated a private placement financing agreement with four investors for a total of $1,250,000, of which these funds will be distributed over two phases. The Company received in October and November 2006 $312,500 for the first phase, in the form of four convertible secured 9% promissory notes. These obligations are due within one year of each note's issuance and are convertible into 250,000 shares of par value common stock, valued at $1.25 per share. In conjunction with these notes, the Company granted warrants, with terms as follows:

a  250,000 warrants exercisable within two years from the date of grant at $1.50
per share, and

b  250,000 warrants exercisable within three years from the date of grant at
$2.50 per share.

The Company has also received $155,500 which will be applicable to the second
level of funding under this financial arrangement.

SECURED CONVERTIBLE DEBENTURES

In October 2006, the Company paid off the 6% secured convertible debentures,
plus the accrued interest, with borrowings from certain investors. As part of
the payoff, the investors were also issued the 1,916,667 shares of common stock
held in escrow for the benefit of the debenture holders until the debentures,
plus accrued interest were fully paid off.

```
<PAGE>
</TEXT>
</DOCUMENT>
```