# EXHIBIT F

# PART 1

```
<DOCUMENT>
<TYPE>SB-2
<SEQUENCE>1
<FILENAME>giisb2.txt
<DESCRIPTION>GOTTAPLAY FORM SB-2
<TEXT>
```

As filed with the Securities and Exchange Commission on May 7, 2007
                                        Registration No. ___-____

                            UNITED STATES
                  SECURITIES AND EXCHANGE COMMISSION
                        WASHINGTON, D.C. 20549

                              FORM SB-2

        REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

                      GOTTAPLAY INTERACTIVE, INC.
             (Exact name of small business issuer in its charter)

        NEVADA                    7372                  20-1645637
(State or jurisdiction    (Primary Standard Industrial   (I.R.S. Employer
 of incorporation or       Classification Code Number)   Identification No.)
    organization)

       3226 ROSEDALE STREET, STE. 200, GIG HARBOR, WA 98335 (253) 853-4145
            (Address and telephone number of principal executive offices)

                          JOHN P. GORST
                      CHIEF EXECUTIVE OFFICER
                   3226 ROSEDALE STREET, SUITE 200
                        GIG HARBOR WA 98335
                          (253)-853-4145
                       Fax (800) 891-4792
          (Name, Address and telephone number of agent for service)

                           COPIES TO:
                         de Castro, PC
                        309 Laurel Street
                      San Diego CA 92101
                        (619) 702-8690
                      Fax (619) 702-9401

Approximate date of proposed sale to the public: AS SOON AS PRACTICABLE AFTER
THE EFFECTIVE DATE OF THIS REGISTRATION STATEMENT.

If any of the securities being registered on this form are to be offered on a
delayed or continuous basis pursuant to Rule 415 under the Securities Act,
check the following box: [X]

If this form is filed to register additional securities for an offering

pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [ ]

If this form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [ ]

<PAGE>

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [ ]

If delivery of the prospectus is expected to be made pursuant to Rule 434, check the following box.[ ]

CALCULATION OF REGISTRATION FEE

<TABLE>
<CAPTION>

| TITLE OF EACH CLASS OF SECURITIES TO BE REGISTERED | SHARES TO BE REGISTERED(1) | PROPOSED MAXIMUM OFFERING PRICE PER SHARE(2) | PROPOSED MAXI AGGREGATE OFFERING PRIC |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Common Shares $.001 par value to be offered for resale(3) | 2,279,000 | $1.96 | $4,466,840 |
| Common Shares $.001 par value issuable upon exercise of warrants(4) | 4,801,098 | $1.96 | $9,410,152 |
| | --------- | | ---------- |
| TOTAL | 7,080,098 | | $13,876,992 |
| | ========= | | ========== |

</TABLE>

(1)  Plus such additional shares as may be issued pursuant to anti-dilution provisions of the currently outstanding warrants and the shares resulting from the exercise of which are included in this prospectus.

(2)  The registration fee has been calculated in accordance with Rule 457(c). On May 1, 2007, the average of the high and low prices for the Registrant's common stock on the Over-The-Counter Bulletin Board was $1.96.

(3)  Consisting 2,279,000 shares of common stock held by 40 selling stockholders.

(4)  Consisting of (a) 250,000 shares of common stock issuable upon exercise of common stock purchase warrants dated as of September 26, 2006, held by four (4) selling stockholders, (b) 676,298 shares of common stock issuable upon exercise of common stock purchase warrants dated as of September 28, 2006, held by four (4) selling stockholders, (c) 192,000 shares of common stock issuable upon exercise of common stock purchase warrants dated January 31, 2007, held by five (5) selling stockholders (d) 2,160,000 shares of common stock issuable upon exercise of common stock purchase warrants dated as of March 12, 2007 held by seventeen (17) selling stockholder, (e) 1,522,800 shares of common stock issuable upon exercise of common stock purchase warrants dated March 23, 2007, held by eight

(8) selling stockholders.

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES
AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE
A FURTHER AMENDMENT WHICH SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT
SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(A) OF THE
SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME
EFFECTIVE ON SUCH DATE AS THE SECURITIES AND EXCHANGE COMMISSION, ACTING
PURSUANT TO SAID SECTION 8(A), MAY DETERMINE.

RED HERRING LANGUAGE---Information contained herein is subject to completion or
amendment. A registration statement relating to these securities has been filed
with the Securities and Exchange Commission. These securities may not be sold,
nor may offers to buy, be accepted prior to the time the registration statement
becomes effective. This prospectus shall not constitute an offer to sell or the
solicitation of an offer to buy nor shall there be any sale of these securities
in any State in which such offer, solicitation or sale would be unlawful prior
to registration or qualification under the securities laws of any such State.

2

<PAGE>

### FORWARD-LOOKING STATEMENTS

This prospectus, any prospectus supplement and the documents incorporated by
reference in this prospectus contain forward-looking statements. We have based
these forward-looking statements on our current expectations and projections
about future events.

In some cases, you can identify forward-looking statements by words such as
"may," "should," "expect," "plan," "could," "anticipate," "intend," "believe,"
"estimate," "predict," "potential," "goal," or "continue" or similar
terminology. These statements are only predictions and involve known and unknown
risks, uncertainties and other factors, including the risks outlined under "Risk
Factors," that may cause our or our industry's actual results, levels of
activity, performance or achievements to be materially different from any future
results, levels of activity, performance or achievements expressed or implied by
such forward-looking statements.

Unless we are required to do so under U.S. federal securities laws or other
applicable laws, we do not intend to update or revise any forward-looking
statements.

3

<PAGE>

                    SUBJECT TO COMPLETION, DATED _____, 2007

PROSPECTUS


GOTTAPLAY INTERACTIVE, INC.

7,080,098 SHARES OF COMMON STOCK


This prospectus relates to the resale, from time to time, of up to 7,080,098 shares of our common stock, par value $.001 per share, by the selling stockholders named in this prospectus. The shares of common stock registered for sale are as follows:

- o    2,279,000 shares of common stock held by selling stockholders;

- o    3,266,298 shares of common stock issuable upon exercise of common stock purchase warrants at $1.50 per share held by selling stockholders; and

- o    1,534,800 shares of common stock issuable upon exercise of common stock purchase warrants at $2.50 per share held by selling stockholders.

The price at which the selling stockholders may sell the shares will be determined by the prevailing market price for the shares or in negotiated transactions.

We will not receive any proceeds from the sale or distribution of the common stock by the selling stockholders. However, we will receive the exercise price of any warrants that may be exercised.

Our common stock is quoted on the National Association of Securities Dealers ("NASD") Over-the-Counter Bulletin Board ("OTCBB") under the symbol "GTAP". On May 1, 2007, the closing sale price for our common stock was $1.96 on the OTCBB.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES OFFERED HEREBY ARE HIGHLY SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. SEE THE DISCUSSION TITLED "RISK FACTORS" COMMENCING ON PAGE 9.

THE DATE OF THIS PROSPECTUS IS , 2007


4

<PAGE>

TABLE OF CONTENTS

PROSPECTUS SUMMARY.................................................6
USE OF PROCEEDS...................................................8
DILUTION..........................................................9
RISK FACTORS......................................................9
DIVIDEND POLICY..................................................18
BUSINESS OF THE COMPANY..........................................18
MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION........26
MARKET FOR COMMON STOCK..........................................36
MANAGEMENT.......................................................37
SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT....39
CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS...................41
DESCRIPTION OF SECURITIES........................................41
PENNY STOCK......................................................41
SELLING STOCKHOLDERS.............................................42
PLAN OF DISTRIBUTION.............................................43
LEGAL PROCEEDINGS................................................45
LEGAL MATTERS....................................................46
INDEMNIFICATION FOR SECURITIES ACT LIABILITIES..................46
EXPERTS..........................................................46
FORWARD LOOKING STATEMENTS.......................................46
AVAILABLE INFORMATION............................................46
FINANCIAL STATEMENTS.............................................47

5

<PAGE>

PROSPECTUS SUMMARY

     This summary highlights selected information from elsewhere in this
prospectus. It is not complete and may not contain all of the information that
is important to you. To understand this offering fully, you should read the
entire prospectus carefully, including the risk factors and the financial
statements and the related notes thereto, which are included in this prospectus.

     Unless the context otherwise requires, "Gottaplay," "we," "our," "us"
and similar expressions refer to Gottaplay Interactive, Inc., a Nevada
corporation, and its predecessors, but not to the selling stockholders
identified under the caption "Selling Stockholders."

THE COMPANY

     Gottaplay Interactive, Inc. (the "Company") was formed in Nevada in
July 2004 under the name of Donobi, Inc. and is the successor to H-NET.NET,
Inc., which was formed under the laws of Colorado in May 1986. On July 24, 2006,
pursuant to a Merger Agreement (the "Agreement"), Gotaplay Interactive, Inc.
("Gotaplay"), a privately held Nevada corporation, merged with Donobi, Inc. (
the "Merger"). In accordance with the Merger Agreement, the Registrant (a)
completed a one for 6 reverse stock split; (b) issued 17,744,618 post-reverse
split shares of common stock to the former stockholders of Gotaplay; (c) amended
the Articles of Incorporation by changing the name of the Registrant from
Donobi, Inc. to Gottaplay Interactive, Inc.; and, (d) except for William M.
Wright, III and Norm Johnson, the directors of the Registrant resigned and the
three former directors of the Gotaplay were elected to the board of directors of
Registrant. As a result of the Merger, voting control changed and, except for
Mr. William M. Wright, III, who remained as Chief Operating Officer, the other
officers resigned and were replaced by officers selected by Gotaplay's
management (see "Directors and Executive Officers").

Upon consummation of the Merger we assumed all of the business operations of Gotaplay to include their assets, their debts, and their commitments, such as leases and consultant agreements. We now operate two divisions, one division for our Internet connectivity business and one division for the video game subscription and rental business.

Gottaplay Interactive, Inc.'s primary business division is on the on-line video game rental subscriptions. We are dedicated to providing customers with a quality rental experience through our web site, www.gottaplay.com. The service is an alternative to store based gaming rentals. We currently provide rental services to our subscribers, and we also offer the option to purchase new or used video game titles at a discounted price. We seek to provide customers with a large selection of video game rental choices for the payment of a monthly subscription fee. Customers can enroll, on the internet, to rent and/or buy video games offered by us. The selected games are then shipped to the customer via first class mail. Active subscribers can retain the games for an indefinite amount of time as long as they continue to pay the monthly subscription fees. Customers can return or exchange their selections at any time by returning their game(s) in the pre-paid and pre-addressed packages provided by us.

Our Donobi division ("Donobi") operates as an Internet service provider ("ISP") with operations in Washington, Oregon and Hawaii. It offers Internet connectivity to individuals, multi-family housing, businesses, organizations, educational institutions and government agencies. Donobi provides high quality, reliable and scalable Internet access, web hosting and development, equipment co-location, and networking services to underserved rural markets. Donobi's overall strategy is to become the dominant Internet service provider for residents and small to medium-sized businesses within certain rural and semi-rural areas in the United States. Our current focus is within the states of Washington, Oregon and Hawaii.

We are headquartered at 3226 Rosedale Street, Suite 200, Gig Harbor, Washington 98335 and our telephone number is (253) 853-4145. We also maintain Internet sites on the World Wide Web ("WWW") at WWW.GOTTAPLAY.COM and WWW.DONOBI.COM. Information contained on our Web sites is not and should not be deemed to be a part of this Form SB-2.

6

<PAGE>

<TABLE>
<CAPTION>

                                        THE OFFERING
<S>                                     <C>
Securities                              Offered 7,080,098 shares of
                                        common stock issued or issuable
                                        upon exercise by selling
                                        stockholders of Warrants.


Common Stock Outstanding as of          31,101,170 shares of common stock.
May 1, 2007


Common Stock to be Outstanding          35,902,268 shares of common stock (a
After this Offering                     are exercised.)


Use of Proceeds                         We will not receive any of the proce
                                        of common stock offered by this pros
                                        estimated gross proceeds of up to $8

stockholders exercise all of the currently outsta
purchase the shares of our common stock covered l
We currently intend to use such net proceeds, if
capital and general corporate purposes. See "Use

Risk                                    Factors An investment in the
                                        shares of common stock offered
                                        hereby involves a high degree of
                                        risk and should be made only by
                                        investors who can afford the
                                        loss of their entire investment.
                                        See "Risk Factors" beginning on
                                        page 9.

OTC Bulletin Board Market               GTAP
trading symbol

</TABLE>


                                7

<PAGE>


                    SUMMARY OF FINANCIAL INFORMATION

BALANCE SHEETS
<TABLE>
<CAPTION>

|  |  | December 31, 2006 (unaudited) | September 30, 2006 | Se |
|---|---|---|---|---|
| | ASSETS | | | |
| <S> | | <C> | <C> | |
| | Current Assets | $    322,678 | $    330,893 | |
| | Other Assets | 1,384,869 | 1,348,056 | |
| | Total Assets | $  1,707,547 | $  1,678,949 | |
| | LIABILITIES AND STOCKHOLDERS' (DEFICIT) | | | |
| | Current Liabilities | $  2,387,545 | $ 2 ,969,967 | |
| | Total Liabilities | 2,467,545 | 3,055,201 | |
| | Total Stockholders' (Deficit) | (759,998) | (1,376,252) | |
| | Total Liabilities and Stockholders' (Deficit) | $  1,707,547 | $  1,678,949 | |

</TABLE>

STATEMENTS OF OPERATIONS
<TABLE>
<CAPTION>

| | | Three months ended December 31, 2006 (unaudited) | Year ended September 30, 2006 | |
|---|---|---|---|---|
| `<S>` | | `<C>` | `<C>` | |
| | Revenues | $ 502,896 | $ 464,531 | |
| | Cost of Revenues | (291,077) | (321,735) | |
| | Operating Expenses | (1,470,263) | (2,069,767) | |
| | Other Expenses | (109,140) | (45,952) | |
| | Net Loss | $ (1,367,584) | $ (1,972,923) | |

</TABLE>

## USE OF PROCEEDS

We will not receive any of the proceeds from the sale of the shares of common stock offered by the selling stockholders under this prospectus. If all currently outstanding warrants to purchase the shares of common stock offered for resale in this offering were exercised, Gottaplay would receive aggregate gross proceeds of approximately $8,736,447.

The net proceeds, if any, that we receive from the exercise of warrants will be used for working capital and general corporate purposes. We may also use all or a portion of the net proceeds for the acquisition of businesses, products and technologies or otherwise to enter into strategic alliances. We can give no assurances that we will be able to reach a definitive agreement on or consummate any such related transaction. Pending any uses, we intend to invest the net proceeds from the warrant exercises in short-term, interest-bearing, investment-grade securities.

The foregoing represents our current best estimate of our use of the net proceeds derived from the exercise of the warrants to purchase the shares of common stock offered in this prospectus, if any, based upon our present plans, the state of our business operations and current conditions in the industries in which we operate. We reserve the right to change the use of the net proceeds if unanticipated developments in our

8

<PAGE>
business, business opportunities, or changes in economic, regulatory or competitive conditions, make shifts in the allocations of proceeds necessary or desirable.

## DILUTION

2,279,000 shares of $0.001 par value common stock to be sold by the selling stockholders are currently issued and outstanding. Accordingly, they will not cause dilution to our existing stockholders. However, the issuance of shares upon the exercise warrants to purchase 4,801,098 shares of our common stock will result in dilution to the interest of existing stockholders.

If all warrants were exercised, a total 4,801,098 shares would be issued and our issued and outstanding shares would increase from 31,101,170 shares to 35,902,268 shares resulting in an immediate dilution to existing stockholders. If all warrants were exercised, a total of $8,736,447 of capital would be received by us.

RISK FACTORS

        Our actual results may differ materially from those anticipated in
these forward-looking statements. We operate in a market environment that is
difficult to predict and involve significant risks and uncertainties, many of
which will be beyond the company's control. Additional risks and uncertainties
not presently known to us, or that are not currently believed to be important to
you, if they materialize, also may adversely affect us.

RISKS RELATING TO OUR BUSINESS

   WE HAVE NOT HAD AN OPERATING PROFIT SINCE ITS INCEPTION. CONTINUING LOSSES
MAY EXHAUST OUR CAPITAL RESOURCES AND FORCE US TO DISCONTINUE OPERATIONS.

        Through December 31, 2006, we have incurred cumulative losses of $4,139,333.
Our current business plan forecasted these net losses and negative cash flows
from operations. We may never generate sufficient revenues to achieve
profitability, and if we are unable to make a profit, we may not be able to
continue to operate our business. Even if we were profitable, we may not be able
to sustain or increase profitability on a quarterly or annual basis.

   WE HAVE HAD SIGNIFICANT WORKING CAPITAL DEFICITS, WHICH MAKES IT MORE
DIFFICULT TO OBTAIN CAPITAL NECESSARY FOR OUR OPERATIONS, WHICH MAY HAVE AN
ADVERSE EFFECT ON OUR FUTURE BUSINESS.

        We cannot assure you that we can achieve or sustain profitability on a
quarterly or annual basis in the future. If revenues grow more slowly than we
anticipate, or if operating expenses exceed our expectations or cannot be
adjusted accordingly, we will continue to incur losses. We will continue to
incur losses until we are able to establish significant subscriptions for our
game rentals over the Internet. Our possible success is dependent upon the
successful development and marketing of our web site and products, as to which
there is no assurance. Any future success that we might enjoy will depend upon
many factors, including factors out of our control or which cannot be predicted
at this time. These factors may include changes in or increased levels of
competition, including the entry of additional competitors and increased success
by existing competitors, changes in general economic conditions, increases in
operating costs, including costs of supplies, personnel and equipment, reduced
margins caused by competitive pressures and other factors. These conditions may
have a materially adverse effect upon us or may force us to reduce or curtail
operations. In addition, we will require additional funds to sustain and expand
our sales and marketing activities, particularly if a well-financed competitor
emerges. We will need additional financing, however there can be no assurance
that financing will be available in amounts or on terms acceptable to us, if at
all. The inability to obtain sufficient funds from operations and external
sources would require us to curtail or cease operations. Any additional equity
financing will involve substantial dilution to our then existing stockholders.

   WE ARE SUBJECT TO PRICE VOLATILITY DUE TO OUR OPERATIONS MATERIALLY
FLUCTUATING.

                                         9

<PAGE>
        As a result of the evolving nature of the markets in which we compete, as
well as the current nature of the public markets and our current financial
condition, we believe that our operating results may fluctuate materially, as a
result of which quarter-to-quarter comparisons of our results of operations may
not be meaningful. If in some future quarter, whether as a result of such a
fluctuation or otherwise, our results of operations fall below the expectations

of securities analysts and investors, the trading price of our common stock would likely be materially and adversely affected. You should not rely on our results of any interim period as an indication of our future performance. Additionally, our quarterly results of operations may fluctuate significantly in the future as a result of a variety of factors, many of which are outside our control. Factors that may cause our quarterly results to fluctuate include, among others:

o  our ability to retain existing gaming subscribers and ISP customers;
o  our ability to attract gaming subscribers and ISP customers at a steady rate;
o  our ability to maintain subscriber and customer satisfaction;
o  the extent to which our subscriber services and ISP products gain market acceptance;
o  introductions of products and services by competitors;
o  price competition in the markets in which we compete;
o  our ability to attract, train, and retain skilled management;
o  the amount and timing of operating costs and capital expenditures relating to the expansion of our business, operations, and infrastructure; and
o  general economic conditions and economic conditions specific to the Internet service and gaming industry.

IF OUR EFFORTS TO ATTRACT GAME RENTAL SUBSCRIBERS ARE NOT SUCCESSFUL, OUR REVENUES WILL BE AFFECTED ADVERSELY.

We must continue to attract and retain subscribers. We typically retain approximately 71.1% of our customers after one month of membership, 68.4% after two months of membership and 65.7% after three months of membership. Thereafter, we lose approximately 2.7% each month of our new customers. To succeed, we must continue to attract a number of subscribers who have traditionally used game retailers, and game rental outlets. Our ability to attract and retain subscribers will depend in part on our ability to consistently provide our subscribers a high quality experience for selecting, receiving, playing and returning titles. If consumers do not perceive our service offerings to be of quality, or if we introduce new services that are not favorably received by them, we may not be able to attract or retain subscribers. If our efforts to satisfy our existing subscribers are not successful, we may not be able to attract new subscribers, and as a result, our revenues will be affected adversely.

IF WE EXPERIENCE EXCESSIVE RATES OF GAME RENTAL SUBSCRIBER CHURN, OUR REVENUES AND BUSINESS WILL BE HARMED.

We must minimize the rate of loss of existing subscribers while adding new subscribers. We typically retain approximately 74.7% of our new customers from the trial to membership phase. We typically retain approximately 71.1% of our customers after one month of membership, 68.4% after two months of membership and 65.7% after three months of membership. Thereafter, we lose approximately 2.7% each month of our new customers. Subscribers cancel their subscription to our service for many reasons, including a perception that they do not use the service sufficiently, delivery takes too long, the service is a poor value and customer service issues are not satisfactorily resolved. We must continually add new subscribers both to replace subscribers who cancel and to grow our business beyond our current subscriber base. If too many of our subscribers cancel our service, or if we are unable to attract new subscribers in numbers sufficient to grow our business, our operating results will be adversely affected. Further, if excessive numbers of subscribers cancel our service, we may be required to incur significantly higher marketing expenditures than we currently anticipate replacing these subscribers with new subscribers.

IF WE ARE UNABLE TO OFFSET INCREASED DEMAND FOR GAMES WITH INCREASED
SUBSCRIBER RETENTION OUR OPERATING MARGINS AND OUR OPERATING RESULTS MAY BE
AFFECTED ADVERSELY.

                                   10
<PAGE>
     Subscribers to our service can play as many games as they want every month
and, depending on the service plan, may have between one and three games at a
time. With use our nine Distribution Centers ("DC") and our proprietary Game
Distribution System ("GDS"), we have reduced the transit time of games. As a
result, our subscribers have been able to exchange more titles each month, which
has increased our operating costs. As we establish additional DC's or further
refine our distribution process and GDS, we may see a continued increase in
usage by our subscribers. If our subscriber retention does not increase or our
operating margins do not improve to an extent necessary to offset the effect of
increased operating costs, our operating results will be adversely affected.

     In addition, subscriber demand for games may increase for a variety of other
reasons beyond our control, including promotion by manufacturers, the
introduction of new gaming platforms and the scarcity of the most popular games.
Our subscriber growth and retention may be affected adversely if we attempt to
increase our monthly subscription fees to offset any increased costs of
acquiring or delivering games.

     IF OUR GAME RENTAL SUBSCRIBERS SELECT TITLES THAT ARE MORE EXPENSIVE FOR US
TO ACQUIRE AND DELIVER MORE FREQUENTLY, OUR EXPENSES WILL INCREASE.

     Certain games cost us more to acquire depending on the source from whom they
are acquired and the terms on which they are acquired. If subscribers select
these games more often on a proportional basis compared to all games selected,
then game acquisition expenses could increase, and our gross margins could be
adversely affected.

     ANY SIGNIFICANT DISRUPTION IN SERVICE ON OUR WEB SITE OR IN OUR COMPUTER
SYSTEMS COULD RESULT IN A LOSS OF GAME RENTAL SUBSCRIBERS.

     Subscribers and potential subscribers access our service through our Web
site, where the game selection process is integrated with our delivery
processing systems and software. Our reputation and ability to attract, retain
and serve our subscribers is dependent upon the reliable performance of our Web
site, network infrastructure and fulfillment processes. Interruptions in these
systems could make our Web site unavailable and hinder our ability to fulfill
selections. Service interruptions or the unavailability of our Web site could
diminish the overall attractiveness of our subscription service to existing and
potential subscribers.

     Our servers may be vulnerable to computer viruses, physical or electronic
break-ins and similar disruptions, which could lead to interruptions and delays
in our service and operations as well as loss, misuse or theft of data. Any
attempts by hackers to disrupt our Web site service or our internal systems, if
successful, could harm our business, be expensive to remedy and damage our
reputation. We do not have an insurance policy that covers expenses related to
direct attacks on our Web site or internal systems. Efforts to prevent hackers
from entering our computer systems are expensive to implement and may limit the
functionality of our services. Any significant disruption to our Web site or
internal computer systems could result in a loss of subscribers and adversely
affect our business and results of operations.

     Our servers utilize a number of techniques to track, deter and thwart attacks
from computer viruses, physical or electronic break-ins and similar disruptions,

Further, we may not be able to effectively market our services on-line to users of the Internet. If we are unable to interact with consumers because of changes in their attitude toward use of the Internet, our subscriber acquisition and retention may be affected adversely.

IF OUR EFFORTS TO BUILD STRONG BRAND IDENTITY AND IMPROVE SUBSCRIBER SATISFACTION AND LOYALTY ARE NOT SUCCESSFUL, WE MAY NOT BE ABLE TO ATTRACT OR RETAIN SUBSCRIBERS, AND OUR OPERATING RESULTS WILL BE AFFECTED ADVERSELY.

The Gottaplay brand is young, and we must continue to build strong brand identity. To succeed, we must continue to attract and retain a number of owners of video game players who have traditionally relied on store-based rental outlets and persuade them to subscribe to our service through our Web site. We may be required to incur significantly higher advertising and promotional expenditures than we currently anticipate in order to attract new subscribers. We believe that the importance of brand loyalty will increase with a proliferation of game subscription services and other means of distributing games disks. If our efforts to promote and maintain our brand are not successful, our operating results and our ability to attract and retain subscribers will be affected adversely.

IF WE ARE UNABLE TO MANAGE THE MIX OF SUBSCRIBER ACQUISITION SOURCES, OUR SUBSCRIBER LEVELS MAY BE AFFECTED ADVERSELY AND OUR MARKETING EXPENSES MAY INCREASE.

We utilize a mix of incentive-based and fixed-cost marketing programs to promote our service to potential new subscribers. We obtain a portion of our new subscribers through our on-line marketing efforts, direct links and our active affiliate program. While we opportunistically adjust our mix of incentive-based and fixed-cost marketing programs, we attempt to manage the marketing expenses to come within a prescribed

                                    12
<PAGE>
range of acquisition cost per subscriber. To date, we have been able to manage our acquisition cost per subscriber; however, if we are unable to maintain or replace our sources of subscribers with similarly effective sources, or if the cost of our existing sources increases our subscriber levels may be affected adversely and our cost of marketing may increase.

IF WE ARE UNABLE TO CONTINUE USING OUR CURRENT MARKETING CHANNELS, OUR ABILITY TO ATTRACT NEW SUBSCRIBERS MAY BE AFFECTED ADVERSELY.

We may not be able to continue to support the marketing of our service by current means if such activities are no longer available to us or are adverse to our business. In addition, we may be foreclosed from certain channels due to competitive reasons. If companies that currently promote our service decide to enter our business or a similar business, we may no longer be given access to such channels. If the available marketing channels are curtailed, our ability to attract new subscribers may be affected adversely.

IF WE ARE UNABLE TO COMPETE EFFECTIVELY, OUR BUSINESS WILL BE AFFECTED ADVERSELY.

The market for in-home gaming products is intensely competitive and subject to rapid change. Many consumers maintain simultaneous relationships with multiple in-home entertainment providers and can easily shift spending from one provider to another. For example, consumers may rent a game from Blockbuster, buy a game from Wal-Mart and subscribe to our service, or some combination thereof, all in the same month. Competitors may be able to launch new businesses at relatively low cost. Game rentals represent only one of many existing and

which could lead to interruptions and delays in our service and operations as well as loss, misuse or theft of data. We currently use both hardware and software to secure our systems, network and, most importantly, our data from these attacks. This includes several layers of security in place for our protection and that of our member's data. We also have procedures in place to ensure that the latest security patches and software are running on our servers - thus maintaining another level of security.

IF WE EXPERIENCE EXCESSIVE CREDIT CARD CHARGEBACKS, WE MAY BE SUSPENDED FROM PROCESSING CREDIT CARD TRANSACTIONS FOR THAT PARTICULAR CREDIT CARD COMPANY, SUCH AS MASTERCARD, FOR AN INDETERMINATE PERIOD OF TIME, WHICH WOULD SIGNIFICANTLY HARM OUR BUSINESS.

We charge our subscribers monthly via the three major credit card companies, MasterCard, VISA and American Express. If we experience excessive and unauthorized chargebacks over a several successive

11

<PAGE>

months with any of these respective credit card companies, we may be suspended from processing charges in the future for an extended period of time. Excessive chargebacks in our business may result primarily from: (a.) fraud, (b.) disputed transactions, and (c.) subscribers not fully understanding the proper procedure(s) to cancel their ten-day trial period and/or their regular subscription. Accordingly, we implemented several additional procedures: (a.) to discover and mitigate a fraudulent submission, (b.) to more accurately validate the authorized user of the credit card, and (c.) to provide clearer and better website instructions for the customer who needs to cancel their subscription.

We must minimize and contain the rate and number of chargeback transactions per total transactions processed over a specified period or a credit card company may cancel all processing in accordance with the terms of our agreement. If we should lose the ability to process a major credit card, we will lose a significant amount of revenue and cash flow, which may cause our business to fail.

IF GOVERNMENT REGULATION OF THE INTERNET OR OTHER AREAS OF OUR BUSINESS CHANGES OR IF CONSUMER ATTITUDES TOWARD USE OF THE INTERNET CHANGE, WE MAY NEED TO CHANGE THE MANNER IN WHICH WE CONDUCT OUR BUSINESS, OR INCUR GREATER OPERATING EXPENSES.

The adoption or modification of laws or regulations relating to the Internet or other areas of our business could limit or otherwise adversely affect the manner in which we currently conduct our business. In addition, the growth and development of the market for on-line commerce may lead to more stringent consumer protection laws, which may impose additional burdens on us. If we are required to comply with new regulations or legislation or new interpretations of existing regulations or legislation, this compliance could cause us to incur additional expenses or alter our business model.

The manner in which Internet and other legislation may be interpreted and enforced cannot be precisely determined and may subject either us or our customers to potential liability, which in turn could have an adverse effect on our business, results of operations and financial condition. The adoption of any laws or regulations that adversely affect the popularity or growth in use of the Internet could decrease the demand for our subscription service and increase our cost of doing business.

In addition, if consumer attitudes toward use of the Internet change, consumers may become unwilling to select their entertainment on-line or otherwise provide us with information necessary for them to become subscribers.

potential new technologies for playing games. If we are unable to successfully
compete with current and new competitors and technologies, we may not be able to
achieve adequate market share, increase our revenues or achieve profitability.
Our principal competitors include, or could include:

   o  Game rental outlets, such as Blockbuster and Hollywood Entertainment;
   o  Game retail stores, such as Best Buy, Wal-Mart and Amazon.com;
   o  Subscription game rental services, such as GameFly and GameznFlix; and
   o  Online game sites, such as Rcade.com.

   Many of our competitors have longer operating histories, larger customer
bases, greater brand recognition and significantly greater financial, marketing
and other resources than we do. Some of our competitors have adopted, and may
continue to adopt, aggressive pricing policies and devote substantially more
resources to marketing and Web site and systems development than we do. The
growth of our on-line subscription business since our inception may attract
direct competition from larger companies with significantly greater financial
resources and national brand recognition. Increased competition may result in
reduced operating margins, loss of market share and reduced revenues. In
addition, our competitors may form or extend strategic alliances with
manufacturers and distributors that could adversely affect our ability to obtain
titles on favorable terms.

   IF WE EXPERIENCE DELIVERY PROBLEMS OR IF OUR SUBSCRIBERS OR POTENTIAL
SUBSCRIBERS LOSE CONFIDENCE IN THE US MAIL SYSTEM, WE COULD LOSE SUBSCRIBERS,
WHICH COULD ADVERSELY AFFECT OUR OPERATING RESULTS.

   We rely exclusively on the U.S. Postal Service to deliver game disks from our
DC's and to return the game disks to us from our subscribers. We are subject to
risks associated with using the public mail system to meet our shipping needs,
including delays caused by bioterrorism, potential labor activism and inclement
weather. Our games are also subject to risks of breakage during delivery and
handling by the U.S. Postal Service. Increased breakage rates of our games will
increase our inventory costs due to the replacement of titles.

   OUR ARTICLES OF INCORPORATION INCLUDE PROVISIONS TO THE EFFECT THAT WE MAY
INDEMNIFY ANY DIRECTOR, OFFICER, OR EMPLOYEE. IN ADDITION, PROVISIONS OF NEVADA
LAW PROVIDE FOR SUCH INDEMNIFICATION.

   Any indemnification of directors, officer, or employees, could result in
substantial expenditures being made by our company in covering any liability of
such persons or in indemnifying them. If we are required to incur
                                   13
<PAGE>
expenditures as a result of indemnification of our directors, officers or
employees for any reason our net income will decrease as a result of increased
expenses.

   WE COULD FAIL TO ATTRACT OR RETAIN KEY PERSONNEL, WHICH COULD BE DETRIMENTAL
TO OUR OPERATIONS.

   Our success largely depends on the efforts and abilities of John P. Gorst,
Chief Executive Officer, M. Carroll Benton, Chief Financial Officer, William M.
Wright, III, Chief Operating Officer, and Asra Rasheed, President. The loss of
the services of any of these individuals could materially harm our business
because of the cost and time necessary to find their successors. Such a loss
would also divert management attention away from operational issues. We do not
presently maintain key-man life insurance policies on our officers. We also have
other key consultants and outside contractors who manage our operations, and if
we were to lose their services, senior management would be required to expend

time and energy to find and train their replacements. To the extent that we are smaller than our competitors and have fewer resources we may not be able to attract the sufficient number of qualified staff.

WE ARE SUBJECT TO PRICE VOLATILITY DUE TO OUR OPERATIONS MATERIALLY FLUCTUATING.

As a result of the evolving nature of the markets in which we compete, as well as the current nature of the public markets and our current financial condition, we believe that our operating results may fluctuate materially, as a result of which quarter-to-quarter comparisons of our results of operations may not be meaningful. If in some future quarter, whether as a result of such a fluctuation or otherwise, our results of operations fall below the expectations of securities analysts and investors, the trading price of our common stock would likely be materially and adversely affected. You should not rely on our results of any interim period as an indication of our future performance. Additionally, our quarterly results of operations may fluctuate significantly in the future as a result of a variety of factors, many of which are outside our control. Factors that may cause our quarterly results to fluctuate include, among others:

o   our ability to retain existing gaming subscribers and ISP customers;
o   our ability to attract gaming subscribers and ISP customers at a steady rate;
o   our ability to maintain subscriber and customer satisfaction;
o   the extent to which our subscriber services and ISP products gain market acceptance;
o   introductions of products and services by competitors;
o   price competition in the markets in which we compete;
o   our ability to attract, train, and retain skilled management;
o   the amount and timing of operating costs and capital expenditures relating to the expansion of our business, operations, and infrastructure; and
o   general economic conditions and economic conditions specific to the Internet service and gaming industry.

IF WE ARE UNABLE TO RESPOND TO THE RAPID CHANGES IN TECHNOLOGY AND SERVICES, WHICH CHARACTERIZE OUR GAME RENTAL AND ISP SERVICES, OUR BUSINESS AND FINANCIAL CONDITION COULD BE NEGATIVELY AFFECTED.

Our game rental and ISP operations are directly impacted by changes in the Internet services industry. The Internet products and services industry is subject to rapid technological change, frequent new product and service introductions and evolving industry standards. Changes in technology could affect the market for our services. We believe that our future success will depend largely on our ability to anticipate or adapt to such changes, to offer on a timely basis, services and products that meet these evolving standards and demand of our customers. We cannot offer any assurance that we will be able to respond successfully to these or other technological changes, or to new products and services offered by our current and future competitors, and cannot predict whether we will encounter delays or problems in these areas, which could have a material adverse affect on our business, financial condition and results of operations.

WE MAY BE UNABLE TO PROTECT OUR INTELLECTUAL PROPERTY ADEQUATELY OR COST EFFECTIVELY, WHICH MAY CAUSE US TO LOSE MARKET SHARE OR REDUCE PRICES.

14

<PAGE>
Our future success depends significantly on our ability to protect and preserve its proprietary rights related to its technology and resulting products. We cannot assure you that we will be able to prevent third parties

from using our intellectual property rights and technology without our authorization. While we intend to pursue aggressively efforts to obtain patent protection for our technology, we will also rely on trade secrets, common law trademark rights and trademark registrations, as well as confidentiality and work for hire development, assignment and license agreements with employees, consultants, third party developers, licensees and customers. However, these measures afford only limited protection and may be flawed or inadequate. Also, enforcing intellectual property rights could be costly and time-consuming and could distract management's attention from operating business matters.

OUR INTELLECTUAL PROPERTY MAY INFRINGE ON THE RIGHTS OF OTHERS, RESULTING IN COSTLY LITIGATION.

In recent years, there has been significant litigation in the United States involving patents and other intellectual property rights. In particular, there has been an increase in the filing of suits alleging infringement of intellectual property rights, which pressure defendants into entering settlement arrangements quickly to dispose of such suits, regardless of their merits. Other companies or individuals may allege that we infringe on their intellectual property rights. Litigation, particularly in the area of intellectual property rights, is costly and the outcome is inherently uncertain. In the event of an adverse result, we could be liable for substantial damages and we may be forced to discontinue our use of the subject matter in question or obtain a license to use those rights or develop non-infringing alternatives. Any of these results would increase our cash expenditures, adversely affecting our financial condition.

WE MAY NOT BE ABLE TO MANAGE OUR GROWTH EFFECTIVELY, WHICH COULD ADVERSELY AFFECT OUR OPERATIONS AND FINANCIAL PERFORMANCE.

The ability to manage and operate our business as we execute our development and growth strategy will require effective planning. Significant rapid growth could strain our internal resources, and other problems that could adversely affect our financial performance. We expect that our efforts to grow the game rental services will place a significant strain on our personnel, management systems, infrastructure and other resources. Our ability to manage future growth effectively will also require us to successfully attract, train, motivate, retain and manage new employees and continue to update and improve our operational, financial and management controls and procedures. If we do not manage our growth effectively, our operations could be adversely affected, resulting in slower growth and a failure to achieve profitability.

BEING A PUBLIC COMPANY INCREASES ADMINISTRATIVE COSTS, WHICH COULD RESULT IN LOWER NET INCOME, AND MAKE IT MORE DIFFICULT FOR US TO ATTRACT AND RETAIN KEY PERSONNEL.

As a public company, we incur significant legal, accounting and other expenses. The Sarbanes-Oxley Act of 2002, as well as new rules subsequently implemented by the SEC, has required changes in corporate governance practices of public companies. We expect that these new rules and regulations will increase our legal and financial compliance costs and make some activities more time consuming. These new rules and regulations could also make it more difficult for us to attract and retain qualified executive officers and qualified members of our Board of Directors, particularly to serve on our audit committee.

RISKS RELATED TO OUR COMMON STOCK

OUR COMMON STOCK MAY BE AFFECTED BY LIMITED TRADING VOLUME AND MAY FLUCTUATE SIGNIFICANTLY, WHICH MAY AFFECT OUR STOCKHOLDERS' ABILITY TO SELL SHARES OF OUR

COMMON STOCK.

There has been a limited public market for our common stock and there can be no assurance that a more active trading market for our common stock will develop. An absence of an active trading market could adversely affect our stockholders' ability to sell our common stock in short time periods, or possibly at all. Our common stock has experienced, and is likely to experience in the future, significant price and volume fluctuations, which could adversely affect the market price of our common stock without regard to our operating performance. In addition, we believe that factors such as quarterly fluctuations in our financial

<div align="center">15</div>

<PAGE>
results and changes in the overall economy or the condition of the financial markets could cause the price of our common stock to fluctuate substantially. These fluctuations may also cause short sellers to enter the market from time to time in the belief that we will have poor results in the future. We cannot predict the actions of market participants and, therefore, can offer no assurances that the market for our stock will be stable or appreciate over time. The factors may negatively impact stockholders' ability to sell shares of our common stock.

STANDARDS FOR COMPLIANCE WITH SECTION 404 OF THE SARBANES-OXLEY ACT OF 2002 ARE UNCERTAIN, AND IF WE FAIL TO COMPLY IN A TIMELY MANNER, OUR BUSINESS COULD BE HARMED AND OUR STOCK PRICE COULD DECLINE.

Rules adopted by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 require annual assessment of our internal control over financial reporting, and attestation of its assessment by our independent registered public accountants. The SEC has extended the compliance dates for certain filers and, accordingly, we believe that this requirement will first apply to our annual report for fiscal 2008. The standards that must be met for management to assess the internal control over financial reporting as effective are new and complex, and require significant documentation, testing and possible remediation to meet the detailed standards. We may encounter problems or delays in completing activities necessary to make an assessment of our internal control over financial reporting. In addition, the attestation process by our independent registered public accountants is new and we may encounter problems or delays in completing the implementation of any requested improvements and receiving an attestation of its assessment by our independent registered public accountants. If we cannot assess our internal control over financial reporting as effective, or our independent registered public accountants are unable to provide an unqualified attestation report on such assessment, investor confidence and share value may be negatively impacted.

OUR COMMON STOCK COULD BE CONSIDERED A "PENNY STOCK" AND MAY BE DIFFICULT TO SELL.

Our common stock could be considered to be a "penny stock" if it meets one or more of the definitions in Rules 15g-2 through 15g-6 promulgated under Section 15(g) of the Exchange Act. These include but are not limited to the following: (i) the stock trades at a price less than $5.00 per share; (ii) it is not traded on a "recognized" national exchange; (iii) it is not quoted on the NASDAQ Stock Market, or even if so quoted, has a price less than $5.00 per share; or (iv) is issued by a company with net tangible assets less than $2,000,000, if in business longer than three continuous years, or with average revenues of less than $6,000,000 for the past three years. The principal result or effect of being designated a "penny stock" is that securities broker-dealers cannot recommend the stock but must trade in it on an unsolicited basis.

Additionally, Section 15(g) of the Exchange Act and Rule 15g-2 promulgated thereunder by the SEC require broker-dealers dealing in penny stocks to provide potential investors with a document disclosing the risks of penny stocks and to obtain a manually signed and dated written receipt of the document before effecting any transaction in a penny stock for the investor's account.

Moreover, Rule 15g-9 requires broker-dealers in penny stocks to approve the account of any investor for transactions in such stocks before selling any penny stock to that investor. This procedure requires the broker-dealer to:

| | |
|---|---|
| (i) | obtain from the investor information concerning his or her financial situation, investment experience and investment objectives; |
| (ii) | reasonably determine, based on that information, that transactions in penny stocks are suitable for the investor and that the investor has sufficient knowledge and experience as to be reasonably capable of evaluating the risks of penny stock transactions; |
| (iii) | provide the investor with a written statement setting forth the basis on which the broker-dealer made the determination in (ii) above; and |
| (iv) | receive a signed and dated copy of such statement from the investor, confirming that it accurately reflects the investor's financial situation, investment experience and investment objectives. Compliance with these requirements may make it more difficult for holders of our common stock to resell their shares to third parties or to otherwise dispose of them in the market or otherwise. |

16

<PAGE>

THERE IS NO ASSURANCE OF AN ESTABLISHED PUBLIC TRADING MARKET, WHICH WOULD ADVERSELY AFFECT THE ABILITY OF INVESTORS IN GOTTAPLAY TO SELL THEIR SECURITIES IN THE PUBLIC MARKET.

Even though our shares of common stock are expected to continue to be quoted on the OTC Bulletin Board, we cannot predict the extent to which a trading market will develop or how liquid that market might become. In addition, most common shares outstanding after the Merger, including the shares issued to Gotaplay stockholders, are "restricted securities" within the meaning of Rule 144 promulgated by the SEC, and will therefore be subject to certain limitations on the ability of holders to resell such shares. Accordingly, holders of our common stock may be required to retain their shares for an indefinite period of time. We are a party to certain agreements and holders of its warrants requiring it, under certain circumstances, to use its best efforts to prepare and file with the Securities and Exchange Commission a registration statement on an appropriate form covering the offer and resale to the public of the shares of our common stock upon exercise of the warrants. Consequently, we may expect to prepare and file with the Securities and Exchange Commission as soon as practical, and to use our best efforts to cause to be declared effective, such a registration statement.

The OTC Bulletin Board is an inter-dealer, over-the-counter market that provides significantly less liquidity than the NASD's automated quotation system (the "NASDAQ Stock Market"). Quotes for stocks included on the OTC Bulletin Board are not listed in the financial sections of newspapers, as are those for the NASDAQ Stock Market. Therefore, prices for securities traded solely on the OTC Bulletin Board may be difficult to obtain and holders of common stock may be unable to resell their securities at or near their original offering price or at any price. Market prices for our common stock will be influenced by a number of factors, including:

o   the issuance of new equity securities pursuant to a future offering;

Page 19 of 102

- o changes in interest rates;
- o competitive developments, including announcements by competitors of new products or services or significant contracts, acquisitions, strategic partnerships, joint ventures or capital commitments;
- o variations in quarterly operating results;
- o change in financial estimates by securities analysts;
- o the depth and liquidity of the market for Gottaplay's common stock;
- o investor perceptions of Gottaplay and of game rental generally; and
- o general economic and other national conditions.

THE AUTHORIZATION AND ISSUANCE OF PREFERRED STOCK MAY PREVENT OR DISCOURAGE A CHANGE IN OUR MANAGEMENT.

We are authorized to issue up to 5,000,000 shares of preferred stock without stockholder approval. Such shares will have terms, conditions, rights, preferences and designations as the Board may determine. The rights of the holders of our common stock will be subject to, and may be adversely affected by, the rights of the holders of any preferred stock that may be issued in the future. The issuance of preferred stock, while providing desirable flexibility in connection with possible acquisitions and other corporate purposes, could have the effect of discouraging a person from acquiring a majority of our outstanding common stock.

IT MAY BE DIFFICULT FOR A THIRD PARTY TO ACQUIRE US, AND THIS COULD DEPRESS OUR STOCK PRICE.

Nevada corporate law includes provisions that could delay, defer or prevent a change in control of our company or our management. These provisions could discourage information contests and make it more difficult for you and other stockholders to elect directors and take other corporate actions. As a result, these provisions could limit the price that investors are willing to pay in the future for shares of our common stock. For example:

- o without prior stockholder approval, the Board of Directors has the authority to issue one or more classes of preferred stock with rights senior to those of common stock and to determine the rights,

17

<PAGE>

privileges and inference of that preferred stock;

- o there is no cumulative voting in the election of directors, which would otherwise allow less than a majority of stockholders to elect director candidates; and

- o stockholders cannot call a special meeting of stockholders.

DIVIDEND POLICY

We have never declared or paid any cash dividends on our common stock. We do not anticipate paying any cash dividends to stockholders in the foreseeable future. In addition, any future determination to pay cash dividends will be at the discretion of the Board of Directors and will be dependent upon our financial condition, results of operations, capital requirements, and such other factors as the Board of Directors deem relevant.

BUSINESS OF THE COMPANY

OVERVIEW

Gottaplay Interactive, Inc. (the "Company") was formed in Nevada in

July 2004 under the name of Donobi, Inc. and is the successor to H-NET.NET, Inc., which was formed under the laws of Colorado in May 1986. On July 24, 2006, pursuant to a Merger Agreement (the "Agreement"), Gotaplay Interactive, Inc. ("Gotaplay"), a privately held Nevada corporation, merged with Donobi, Inc. In accordance with the Agreement, the Registrant (a) completed a one for 6 reverse stock split; (b) issued 17,744,618 post-reverse split shares of common stock to the former stockholders of Gotaplay; (c) amended the Articles of Incorporation by changing the name of the Registrant from Donobi, Inc. to Gottaplay Interactive, Inc.; and, (d) except for William M. Wright, III and Norm Johnson, the directors of the Registrant resigned and the three former directors of the Gotaplay were elected to the board of directors of Registrant. As a result of the Merger, voting control changed and, except for Mr. William M. Wright, III, who remained as Chief Operating Officer, the other current officers resigned and were replaced by Officers selected by Gotaplay's management (see "Directors and Executive Officers").

Upon consummation of the Merger we assumed all of the business operations of Gotaplay to include their assets, their debts and their commitments, such as leases and consultant agreements. We now operate two divisions, one division for our Internet connectivity and one division for the video game subscriptions and rentals.

Gottaplay Interactive, Inc.'s primary business division is on-line video game rental subscriptions (the " Rental Game Division") dedicated to providing customers a quality rental experience through our web site, www.gottaplay.com. The service is an alternative to store based gaming rentals. We currently provide rental services to our subscribers, and we plan to offer the option to purchase new or used video game titles at a discounted price. We seek to provide customers with a large selection of video game rental choices on a monthly subscription basis. Customers can sign-up via the web page to rent and/or buy video games of their choice. The titles are then shipped to the customer via first class mail once they have made their selection(s). Active subscribers can retain the games for an indefinite amount of time as long as they are active paying subscribers. Customers can exchange their selections at anytime by returning their game(s) in the pre-paid and pre-addressed package provided.

Our other division (DBA Donobi) operates as an Internet service provider ("ISP") with operations in Washington, Oregon and Hawaii, offering Internet connectivity to individuals, multi-family housing, businesses, organizations, educational institutions and government agencies. We provide high quality, reliable and scalable Internet access, web hosting and development, equipment co-location, and networking services to underserved rural markets. Our overall strategy is to become the dominant Internet service provider for residents and small to medium-sized businesses within rural and semi-rural areas in the United States. Our current focus is within the states of Washington, Oregon and Hawaii.

18

<PAGE>

We are headquartered at 3226 Rosedale Street, Suite 200, Gig Harbor, Washington 98335 and our telephone number is (253) 853-4145. We also maintain Internet sites on the World Wide Web ("WWW") at WWW.GOTTAPLAY.COM and WWW.DONOBI.COM. Information contained on our Web sites is not and should not be deemed to be a part of this Form 10-KSB.

BUSINESS OVERVIEW

ON-LINE VIDEO GAME RENTAL SERVICES

In the United States, we are providing subscribers monthly access to a

comprehensive library of gaming titles. We have multiple subscription plans, which allow subscribers to have one to three titles out at the same time with no due dates, late fees or shipping charges for plans ranging from $12.95 to $28.95 per month. Subscribers can receive an unlimited amount of titles in a month. Aided by our subscriber rating system, subscribers select titles on our web site, receive them by first-class mail, which are returned by them at their convenience using our prepaid mailers. Once a title has been returned, we mail the next available title in the subscriber's queue.

We utilize proprietary technology developed internally to manage the processing and distribution of our comprehensive library of games from its network of Distribution Centers nationwide. Our Game Distribution System is a network of administrative functions including Order Fulfillment, Inventory Forecasting and Procurement, Inventory Control, Billing and Customer Service. Through our GDS network, distribution centers can communicate with each other to determine which games can be sent out to subscribers enabling maximum usage of on hand inventory throughout the entire company, which in turn reduces the amount of inventory purchases that we need to make. The software has an automated process of tracking and routing titles to and from each of our DC's and allocates order responsibilities among them. Our proprietary GDS software provides us with the opportunity to scale up our operation at any given time.

Through several pilot marketing programs conducted over the last 12 months, we expect our subscriber base will experience rapid growth. This is due, primarily, to the rapid consumer adoption of console game players, our comprehensive library of titles, timely delivery of games to the subscriber, effective web and affiliate marketing programs and excellent customer service.

Currently, we promote our service to consumers through various marketing and advertising programs, such as on-line promotions. To date, this has been our main source of marketing. However, television advertising, magazine and newspaper insertions, college campus alliances, grocery and pharmacy chain marketing, and the development of strategic relationship with leading game console manufacturers and promotions with other third parties will be implemented upon the funding of the business. These programs are designed to encourage consumers to subscribe to our service, which includes a trial period. At the end of the trial period, subscribers are automatically enrolled as paying subscribers, unless they cancel their subscription. Approximately 74 percent of trial subscribers become paying subscribers. All paying subscribers are billed monthly.

We stock almost every title available on, excluding adult content. Games are shipped throughout the United States. Although we currently have nine distribution centers located throughout the United States, games can still take up to five days to reach certain subscribers. This is generally a barrier to adding or retaining subscribers. However, we have engaged several strategic partners that will offer a substantially flexible distribution network, which will give us several more strategically located distribution points throughout the United States. These distribution centers will allow us to provide the delivery and return service to our subscribers generally in one to two days.

We are focused on growing our subscriber base and revenues and utilizing our proprietary technology to minimize operating costs. The technology is extensively employed to manage and integrate this division, including a website interface, order processing, fulfillment operations and customer service. We believe our technology also allows us to maximize the library utilization and to run the fulfillment operations in a flexible manner with minimal capital requirements.

19

<PAGE>

All of the video game rental revenues are generated in the United States, and substantially all the revenues are derived from monthly subscription fees.

GOTTAPLAY'S WEB SITE--WWW.GOTTAPLAY.COM.

We have applied substantial resources to plan, develop and maintain proprietary technology to implement the features of our web site, such as subscription account signup and management, inventory optimization, overall subscriber satisfaction, and customer support. The software is written in a variety of programming languages and runs on industry standard platforms.

We believe our dynamic software optimizes subscriber satisfaction and management of the library by allowing each subscriber to view its current queue and rental history, as well as current inventory levels and real-time availability. The proprietary software also enables subscribers to prioritize their selections. In addition, the proprietary game search engine indexes its extensive library by title, genre, developer and publisher among others.

The proprietary software has been developed keeping scalability at its core. Expanding operations, including the roll-out of new distribution centers can be done with ease and in the most effective manner of time requiring the least amount of resources. The software has enabled the network of distribution centers across the country to communicate with one another in a real-time environment resulting in optimum levels of operation, delivery and customer satisfaction.

The Gottaplay website signup and management tools provide an easy to use subscriber interface familiar to on-line shoppers. We have integrated a real-time postal address validation to help subscribers enter correct postal addresses and to determine the additional postal address fields required to assure speedy and accurate delivery. We use an on-line credit card authorization service to help the subscribers avoid typographic errors in their credit card entries. These features help prevent fraud and subscriber disappointment resulting from failures to initiate a trial subscription.

Throughout the website, we have extensive measurement and testing capabilities, allowing us to continuously optimize our website for our needs as well as those of our subscribers. We use random control testing extensively.

Our website is run on hardware and software co-located at a service provider offering reliable network connections, power, air conditioning and other essential infrastructure. We manage the website 24 hours a day, seven days a week. We utilize a variety of proprietary software, freely available and commercially supported tools, integrated in a system designed to rapidly and precisely diagnose and recover from failures. We conduct upgrades and installations of software in a manner designed to minimize disruptions to its subscribers.

MERCHANDIZING

All subscribers and site visitors are given many opportunities to rate titles. We also provide ratings, reviews and third party recommendations to assist them with selecting and prioritizing their queue. The game rating service is used to help subscribers compare rating and recommendations from our on-line shared community of gamers, as well as our "Content on Demand" service, to further assist in the selection process of renting games. Reviews, ratings and discussions are compiled through our on-line shared gaming community and then displayed on our website for use by our subscribers. "Content on Demand" is an exclusive service offered to our subscribers, which provides subscribers with

reviews, screenshots, trailers and industry ratings.

        We also provide subscribers with decision support information about each title in its library. This information includes:

    o  Factual data, including rating, special game features and screen formats; and

                                        20

<PAGE>
    o  Editorial perspective, including plot synopses, game trailers and reviews written by our editors, third parties and by other Gottaplay.com subscribers.

        MARKETING

        The video game rental division has multiple marketing channels through which we attract subscribers to this service. On-line advertising is the largest source of new subscribers. We advertise the service on-line through paid search listings, permission based e-mails, banner ads, and text on popular web portals and other websites. In addition, we have an affiliate program whereby we make available web-based banner ads and other advertisements that third parties may retrieve on a self-assisted basis from our web site. Third parties that place their advertisements and generate on-line subscriber referrals are generally paid a cash bounty for each subscriber referred to us, with no minimum or maximum amounts for which we are liable.

        We believe the paid marketing efforts programs will significantly enhance subscriber referrals. During 2006, on-line and advertising accounted for approximately 95 percent of all new trial subscribers.

        We will also market through an aggressive offline retail program through gift card subscriptions. The cards will be sold at grocery, pharmacy and other mass merchants. A commission will be paid on each sale to the participating retailer. We intend to work with a number of other channels on an opportunistic basis. We also intend to develop relationships with leading consumer electronics and video retailers, which involve a variety of promotional efforts using point-of-sale materials, stickers on product packaging and other items to promote "Gottaplay.com" in their stores and those of their subsidiaries. In addition, and contingent on the securing of proper financing, we will launch television advertising campaigns in select markets beginning in the third quarter of 2007.

        SUPPLIERS

        We will acquire inventory either through revenue sharing agreements or direct purchases from distributors, wholesalers and manufacturers. Under the anticipated revenue sharing agreements with game developers and distributors, we generally would obtain titles for a low initial cost in exchange for a commitment to share a percentage of the subscription revenues for a defined period of time. After the revenue sharing period expires, the agreements generally grant us the right to acquire the title for a minimal cost. Currently, the inventory has been by direct purchases from distributors and wholesalers.

        FULFILLMENT OPERATIONS

        We currently stock more than 3,500 titles. We have allocated resources for the development, maintenance and testing of the proprietary technology that helps us manage the fulfillment of individual orders and the integration of our web site, transaction processing systems, fulfillment operations, inventory levels and coordination of the distribution centers.

With nine operating distribution centers, strategically located throughout the United States, we believe the DCs allow us to improve the subscription experience for subscribers by shortening the transit time for the games through the U.S. Postal Service. Our mission is to continuously improve on the delivery transit time to each subscriber resulting in less attrition and greater subscriber retention. We continue to work closely with the United States Postal Service in an effort to improve the operations and to reach the near term goal of providing one-day delivery service to approximately 45 percent of the U.S. population or 60% of the subscriber base. Our goal is to gradually increase one-day coverage as we roll out additional distribution centers (based on subscriber concentration) to meet the growing demand.

CUSTOMER SERVICE

We believe our ability to establish and maintain long-term relationships with subscribers depend, in part, on the strength of our customer support and service operations. We encourage and utilize frequent communication with and feedback from the subscribers in order to continually improve the web site and our service. Our customer service center is open seven days a week. We primarily utilize e-mail to proactively

21

<PAGE>
correspond with subscribers. We also offer phone support for subscribers who prefer to talk directly with a customer service representative. This division will focus on eliminating the causes of customer support calls and automating certain self-service features on the web site, such as the ability to report and correct most shipping problems.

COMPETITION

The market for in-home video game entertainment is intensely competitive and subject to rapid change. Many consumers maintain simultaneous relationships with multiple in-home game entertainment providers and can easily shift spending from one provider to another. For example, consumers may rent a game from Blockbuster, buy a game from Wal-Mart and subscribe to Gottaplay, or some combination thereof, all in the same month.

Game rental outlets and retailers with whom we compete include Blockbuster, Hollywood Entertainment, Amazon.com, Wal-Mart Stores and Best Buy. We believe our scalable business model, the subscription service with home delivery and access to our comprehensive library of titles compete favorably against traditional game rental outlets.

We also compete against other on-line game subscription services, such as GameFly.com, NumbThumb.com and GameZnFlix among others.

On-line video gaming (OVG) has received considerable media attention recently. Within a few years, we believe OVG will become widely available to Internet enabled game consoles subscribers. OVG carries as many titles as can be effectively merchandised on a game console platform, which we believe to be generally up to 100 recent releases. For consumers who primarily want the latest big releases, OVG may be a convenient distribution channel. We believe this strategy of developing a large and growing subscriber base and the ability to personalize the library to each subscriber by leveraging the extensive database of user preferences, also positions us favorably, to provide digital distribution of filmed entertainment as that market develops. We will also begin to enter the OVG market in 2007 offering gaming servers to allow gamers to play each other over the Internet.

INTELLECTUAL PROPERTY

We use a combination of copyright, trade secret laws and confidentiality agreements to protect our proprietary intellectual property. We intend to aggressively register the trademark for the "Gottaplay.com" name and copyrights on the content of our web site. We intend to file applications for additional trademarks as well.

Enforcement of intellectual property rights is costly and time consuming. To date, we have relied primarily on proprietary processes and know-how to protect our intellectual property. It is uncertain if and when patent and trademark applications may be allowed and whether they will provide us with a competitive advantage.

From time to time, we may encounter disputes over rights and obligations concerning intellectual property. We believe our service offering does not infringe the intellectual property rights of any third party. However, there can be no assurance that we will prevail in any intellectual property dispute.

GOVERNMENT REGULATION

There are currently few laws or regulations directly governing access to, or commerce upon, the Internet. Due to the increasing popularity and use of the Internet, it is possible that a number of laws and regulations may be adopted with respect to the Internet, covering issues such as user privacy, pricing and characteristics and quality of products and services.

Such legislation could dampen the growth in the use of the Internet generally and decrease the acceptance of the Internet as a communications and commercial medium, and could, thereby, have a material

22

<PAGE>
adverse effect on our business, results of operations and financial condition. Other nations, such as Germany, have taken actions to restrict the free flow of material deemed to be objectionable on the Internet. In addition, several connectivity carriers are seeking to have connectivity over the Internet regulated by the Federal Communications Commission in the same manner as other connectivity services. For example, America's Carriers Connectivity Association has filed a petition with the Commission for this purpose. In addition, because the growing popularity and use of the Internet has burdened the existing connectivity infrastructure and many areas with high Internet use have begun to experience interruptions in phone service, local telephone carriers, such as Pacific Bell, have petitioned the Commission to regulate Internet service providers and on-line service providers, in a manner similar to long distance telephone carriers and to impose access fees on these service providers. If either of these petitions is granted, or the relief sought therein is otherwise granted, the costs of communicating on the Internet could increase substantially, potentially slowing the growth in use of the Internet, which could in turn decrease the demand for our products.

Also, it is possible that laws will be adopted or current laws interpreted in a manner to impose liability on on-line service providers, such as us, for linking to third party content providers and other Internet sites that include materials that infringe copyrights or other rights of others. Such laws and regulations if enacted could have an adverse effect on our business, operating results and financial condition. Moreover, the applicability to the Internet upon the existing laws governing issues such as property ownership, copyright defamation, obscenity and personal privacy is uncertain, and we may be subject to claims that our services violate such laws. Any such new legislation

or regulation or the application of existing laws and regulations to the Internet could have a material adverse effect on our business, operating results and financial condition.

EMPLOYEES

As of April 15, 2007, the video rental division has 14 full-time employees/officers. Six of these employees are engaged in sales, marketing and operations, four are engaged in finance and administration and four are engaged in our DC operations. None of the employees are represented by a labor union or a collective bargaining agreement. We consider our relations with these employees to be good.

In addition, we use the services of contract labor provided by personnel agencies, along with independent consultants.

ISP OPERATIONS

Our ISP division is currently organized into three major parts that are closely integrated for maximum customer support and service. The three elements are: (i) Internet Services, consisting principally of ISP, email accounts, web site design and hosting, electronic commerce, database design, consulting, implementation, and reporting services; (ii) Shared Tenant Services, consisting principally of multi-user broadband access, wireless technology, and wide area networking; and (iii) DONOBi Fiber, consisting principally of fiber optic connectivity, digital audio and video, video on demand and internet telephone service.

CUSTOMER SERVICE

We currently provide customer service and technical support directly to our customers (versus outsourcing). We view customer service as one of the most important components of our business and pride ourselves on a high quality and responsive customer service department. In addition to customer service for our ISP customers, we provide the base support for the game rental division.

COMPETITION

Our current and prospective competitors include many large companies that have substantially greater market presence, financial, technical, marketing and other resources than we have. We compete directly or indirectly with the following categories of companies:

23

<PAGE>

Established national on-line services, such as AOL, MSN, Comcast and United On-line; local and regional ISPs; national telecommunications companies; regional bells operating broadband providers such as cable providers and utility companies; and local and long distance telephone companies, such as Bell South, Verizon and AT&T.

The Technology Network (TechNet), a national network of CEO's from the nation's leading technology companies has set out a series of objects to support and encouraged the government "...to make broadband a national priority and to set a goal of making an affordable 100-megabits per second broadband connection available to 100 million American homes and small businesses by 2010....with a potential impact of $500 billion on the United States economy... true broadband is the key to the next generation of communications and Internet services."(6) WWW.IDCRESEARCH.COM President Bush emphasized, "in order to make sure the

economy grows, we must bring the promise of broadband technology to millions of Americans." A large part of this growth will occur in outlying areas.

### INTELLECTUAL PROPERTY

We do not have any registered trademarks. We utilize the trade names: DONOBi, Inc; DONOBi.com; DONOBi HotSpot; Velociti; DONOBi DSL; KOA Internet, Inc.; and Hawaiian.net.

### MARKETING

Our marketing for Internet services has consisted of direct marketing, community event advertising, print ads, and radio advertising. Future advertising will consist of bundling of services with other divisions within the corporation for added value to the customer.

### SUPPLIERS

Our primary suppliers are larger telecommunications companies (Qwest and Sprint/Embarq) that provide DSL connectivity and T1 lines; local Public Utility Districts that supply us with Fiber to the Home connections; and wholesale dial up aggregators that supply a portion of our dial up phone connections to the Internet. While we rely on each of these to provide service to us, for us to in turn service our customers, no single supplier would affect all the customers.

### EMPLOYEES

As of April 15, 2007, the ISP division of our business has 10 full-time employees. Three of these are in customer service, five are engaged in technical operation and consulting, one in operations and two are in finance. None of the employees are represented by a labor union or a collective bargaining agreement. We consider our relations with these employees to be good.

### REAL PROPERTY

We are headquartered at 3226 Rosedale Street, Suite 200, Gig Harbor, Washington 98335 and our telephone number is (253) 853-4145. We lease approximately 1,500 square feet on a three (3) year lease and pay a monthly fee of approximately $2,700 for the use of these facilities. In addition, within the same Gig Harbor business complex, we lease two (2) other offices on a six month lease for an approximate total $1,150 per month. These satellite offices are used for inventory management and other administrative operations.

We lease approximately 1,900 square feet of office space at 200 N Harbor Blvd Ste 201, Anaheim CA 92805. We pay approximately $2,145 on a one (1) year lease. Our marketing and one of our distribution centers is housed in this facility.

We lease facilities at 3256 Chico Way NW, Bremerton WA 98312, which houses our ISP operations. We pay approximately $4,800 a month for approximately 3,600 square feet on a six month lease ending May 2007.

24

<PAGE>

We lease facilities in Pittsburgh, PA, which houses a distribution center. We pay approximately $800 per month for an initial term of eighteen (18) months.

Page 28 of 102

We lease two facilities in Miami Beach, FL, which houses a distribution center and an executive office. We pay approximately $3,913 per month for an initial term of six (6) months.

Our outsourced DC's are located in Northfield, CT, Atlanta, GA, Washington, DC, Sugarland, TX, Denver, CO, Chicago, IL and Phoenix, AZ. Each of these facilities are owned and operated by strategic distribution contractors at a cost of $2,500 per month.

We have a co-location arrangement for our server equipment with Shore Drive Associates in Silverdale, WA for which we pay on a monthly fee of $800 on a month to month arrangement.

We believe these arrangements are adequate to support our short term operations.

AUDIT COMMITTEE

We do not have a separately designated standing audit committee. Pursuant to Section 3(a) (58) (B) of the Exchange Act, the entire Board of Directors acts as an audit committee for the purpose of overseeing the accounting and financial reporting processes, and our audits of the financial statements. The Commission recently adopted new regulations relating to audit committee composition and functions, including disclosure requirements relating to the presence of an "audit committee financial expert" serving on its audit committee. In connection with these new requirements, our Board of Directors examined the Commission's definition of "audit committee financial expert" and concluded that we do not currently have a person that qualifies as such an expert. Presently, there are only five (5) directors serving on our Board, and we are not in a position at this time to attract, retain and compensate additional directors in order to acquire a director who qualifies as an "audit committee financial expert", but we intend to retain an additional director who will qualify as an expert, as soon as reasonably practicable. While neither of our current directors meets the qualifications of an "audit committee financial expert", each of our directors, by virtue of his past employment experience, has considerable knowledge of financial statements, finance, and accounting, and has significant employment experience involving financial oversight responsibilities. Accordingly, we believe that our current directors capably fulfill the duties and responsibilities of an audit committee in the absence of such an expert.

CODE OF ETHICS

We are presently working with our legal counsel to prepare and adopt a code of ethics that applies to our principal chief executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions (the "Code of Ethics"). The Code of Ethics is being designed with the intent to deter wrongdoing, and to promote the following:

o    Honest and ethical conduct, including the ethical handling of actual or apparent conflicts if interest between personal and professional relationships,

o    Full, fair, accurate, timely and understandable disclosure in reports and documents that a small business issuer files with, or submits to, the Commission and in other public communications made by the small business issuer,

o    Compliance with applicable governmental laws, rules and regulations,

    o     The prompt internal reporting of violations of the code to an
           appropriate person or persons identified in the code,

    o     Accountability for adherence to the code.

<div align="center">25</div>

&lt;PAGE&gt;

         MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
         AND RESULTS OF OPERATIONS.

      The following discussion and analysis should be read in conjunction
with the consolidated condensed financial statements, including notes thereto,
appearing in Registration Form SB-2 and in our September 30, 2006 Amended Annual
Report on Form 10-KSB/A and in our December 31, 2006 Quarterly Report on Form
10-QSB.

      Some of the information in this Form SB-2 contains forward-looking
statements that involve substantial risks and uncertainties. You can identify
these statements by forward-looking words such as "may", "will"', "believes",
"anticipates", "estimates", "expects", "continues"' and/or words of similar
import. Forward-looking statements are based upon our management's current
expectations and beliefs concerning future developments and their potential
effects upon us. There may be events in the future that we are not able to
accurately predict or over which we have no control. Our actual results could
differ materially from those anticipated for many reasons in these
forward-looking statements. Factors that could cause or contribute to the
differences include, but are not limited to, availability of financial resources
adequate for short-, medium- and long-term needs, demand for our products and
services and market acceptance, as well as those factors discussed and set forth
under "Risk Factors", "Business", "Management's Discussion and Analysis of
Financial Condition and Results of Operations" and elsewhere in this report.

      We believe it is important to communicate our expectations, however,
our management disclaims any obligation to update any forward-looking statements
whether as a result of new information, future events or otherwise.

      A more detailed discussion of these factors is presented in out
September 30, 2006 Amended Annual Report on Form 10-KSB/A.

APPLICATION OF CRITICAL ACCOUNTING POLICIES AND ESTIMATES

      GENERAL

      Our discussion and analysis of our financial condition and results of
operations as of and for the three months ended December 31, 2006 are based upon
our reviewed consolidated condensed financial statements. As such, we are
required to make certain estimates, judgments and assumptions that management
believes are reasonable based upon the information available. We base these
estimates on our historical experience, future expectations and various other
assumptions that we believe to be reasonable under the circumstances, the
results of which form the basis for our judgments that may not be readily
apparent from other sources. These estimates and assumptions affect the reported
amounts of assets and liabilities and the disclosure of contingent assets and
liabilities at the dates of the consolidated financial statements and the
reported amounts of revenue and expenses during the reporting periods. These

estimates and assumptions relate to the collectibility of accounts receivable, the realization of goodwill, the expected term of a customer relationships, accruals and other factors. We evaluate these estimates and assumptions on an ongoing basis. Actual results could differ from those estimates under different assumptions or conditions, and any differences could be material.

Our consolidated condensed financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC") and, in the opinion of management, include all adjustments necessary for a fair statement of the consolidated condensed results of operations, financial position, and cash flows for each period presented. Our consolidated condensed financial statements reflect the results of operations, financial position, changes in stockholders' deficit and cash flows.

A summary of the significant accounting policies which we believe are the most critical to aid in fully understanding and evaluating the accompanying consolidated condensed financial statements include the following:

26

<PAGE>

REVENUE RECOGNITION AND DEFERRED REVENUE

In accordance with the SEC's Staff Accounting Bulletin No. 104, "REVENUE RECOGNITION", revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectibility is probable. A summary of each operating division's revenue recognition procedures follows:

ON-LINE VIDEO GAME RENTAL AND SUBSCRIPTION DIVISION

We charge $1 for an initial ten-day subscription trial period. At any time during the initial ten-day period, a new subscriber has the right to rescind their agreement, but will not receive credit for the $1 charge.

We charge a subscriber's credit card monthly for our services, and thereafter, until the subscriber cancels his subscription. We recognize subscription revenue ratably during each subscriber's monthly subscription period. For financial reporting purposes, we allocate subscription fees over the number of days in the month for which the fee was charged. A subscriber has the option to select from one of three rental plans: (a.) For $12.95 per month, the subscriber is allowed one DVD in his possession, (b.) For 20.95 per month, the subscriber is allowed up to two DVD's in his possession, and (c.) For $28.95 per month, the subscriber is allowed up to three DVD's in his possession.

All deferred revenue is generally recognized in the following month. Deferred revenue at December 31, 2006 was $17,741. All authorized refunds to subscribers are recorded as a reduction of revenues and any revenues from sales of used video games will be recorded upon shipment.

INTERNET SERVICE PROVIDER

Internet related revenues are recorded when they are rendered and earned. Revenues from support and maintenance contracts are recognized over the term of the contract. Provisions for discounts and rebates to our customers, estimated returns and allowances and other adjustments are provided for in the same period we record the related sales. At September 30, 2006, we reported deferred revenues and pre-billed revenues totaling $247,062, of which a significant portion will be fully recognized in the month of October 2006.

FAIR VALUE OF FINANCIAL INSTRUMENTS

        Financial instruments consist principally of cash, accounts and related
party receivables, trade and related party payables, accrued liabilities, and
short and long-term debt obligations. The carrying amounts of such financial
instruments in the accompanying consolidated condensed balance sheets
approximate their fair values due to their relatively short-term nature. It is
our opinion that we are not exposed to significant currency or credit risks
arising from these financial instruments.

USE OF ESTIMATES

        The preparation of the consolidated condensed financial statements in
conformity with GAAP requires management to make estimates and assumptions that
affect the reported amounts of assets and liabilities and disclosures of
contingent assets and liabilities at the date of the financial statements and
the reported amounts of revenues and expenses during the reporting period.
Actual results could differ from our estimates.

STOCK-BASED COMPENSATION

        We account for stock-based compensation in accordance with the
Financial Accounting Standards Board ("FASB") issued Statement of Financial
Accounting Standard No. 123 (R), "SHARE-BASED PAYMENT", which establishes
standards for transactions in which an entity exchanges its equity instruments
for goods and services. This standard replaces SFAS No. 123 and supercedes
Accounting Principles Board ("APB") Opinion No. 25, "ACCOUNTING FOR STOCK-BASED
COMPENSATION". This standard requires a public entity to measure the cost of
employee services, using an option-pricing model, such as the Black-Scholes
Model,

                                       27
<PAGE>
received in exchange for an award of equity instruments based on the grant-date
fair value of the award. This eliminates the exception to account for such
awards using the intrinsic method previously allowable under APB No. 25. Shares
of common stock issued for services rendered by a third party are recorded at
fair market value, generally the quote at the close of market trading on the
day.

LOSS PER COMMON SHARE

        We compute basic and diluted loss per share of common stock by dividing
the net loss by the weighted average number of common shares outstanding
available to common stockholders during the respective reporting period.
However, common stock equivalents have been excluded from the computation of
diluted loss per share of common stock for the years ended September 30, 2006
and 2005, respectively, because their effect would be anti-dilutive.

RECLASSIFICATIONS

        Certain reclassifications have been made to the previously reported
amounts to conform to our Company's current year presentation.

RECENTLY ISSUED AUTHORITATIVE ACCOUNTING PRONOUNCEMENTS

        In February 2006, the FASB issued SFAS Statement No. 155, "ACCOUNTING
FOR CERTAIN HYBRID FINANCIAL INSTRUMENTS--AN AMENDMENT OF FASB STATEMENTS NO.
133 AND 140" ("SFAS 155"). This Statement amends FASB Statements No. 133,
Accounting for Derivative Instruments and Hedging Activities, and No. 140,
Accounting for Transfers and Servicing of Financial Assets and Extinguishments

of Liabilities. This Statement resolves issues addressed in Statement 133
Implementation Issue No. D1, "APPLICATION OF STATEMENT 133 TO BENEFICIAL
INTERESTS IN SECURITIZED FINANCIAL ASSETS." This Statement permits fair value
re-measurement for any hybrid financial instrument that contains an embedded
derivative that otherwise would require bifurcation, clarifies which
interest-only strips and principal-only strips are not subject to the
requirements of Statement 133, establishes a requirement to evaluate interests
in securitized financial assets to identify interests that are freestanding
derivatives or that are hybrid financial instruments that contain an embedded
derivative requiring bifurcation, clarifies that concentrations of credit risk
in the form of subordination are not embedded derivatives and amends Statement
140 to eliminate the prohibition on a qualifying special-purpose entity from
holding a derivative financial instrument that pertains to a beneficial interest
other than another derivative financial instrument. SFAS 155 is effective for
all financial instruments acquired or issued for the Company for fiscal year
begins after September 15, 2006. The adoption of this standard is not expected
to have a material effect on the Company's results of operations or financial
position.

     In July 2006, the FASB issued FASB Interpretation No. 48, "ACCOUNTING
FOR UNCERTAINTY IN INCOME TAXES - AN INTERPRETATION OF FASB STATEMENT NO. 109"
("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes
recognized in the financial statements and prescribes a recognition threshold
and measurement attribute for the financial statement recognition and
measurement of a tax position taken in a tax return. The Company continues to
evaluate the impact of FIN 48 which was adopted effective December 15, 2006.

     In June 2006, the Financial Accounting Standards Board ("FASB")
ratified the provisions of Emerging Issues Task Force ("EITF") Issue No. 06-3,
"HOW TAXES COLLECTED FROM CUSTOMERS AND REMITTED TO GOVERNMENTAL AUTHORITIES
SHOULD BE PRESENTED IN THE INCOME STATEMENT (THAT IS, GROSS VERSUS NET
PRESENTATION)." EITF Issue No. 06-3 requires that the presentation of taxes
within revenue-producing transactions between a seller and a customer, including
but not limited to sales, use, value added, and some excise taxes, should be on
either a gross (included in revenue and cost) or a net (excluded from revenue)
basis. In addition, for any such taxes that are reported on a gross basis, a
company should disclose the amounts of those taxes in interim and annual
financial statements for each period for which an income statement is presented
if those amounts are significant. The disclosure of those taxes can be done on
an aggregate basis. EITF Issue No. 06-3 is effective for fiscal years beginning
after December 15, 2006, which will be the Company's calendar year 2007. The
adoption of EITF Issue No. 06-3 is not expected to have a material impact on the
Company's results of operations or financial position.
                              28
<PAGE>
     In September 2006, the Securities and Exchange Commission issued Staff
Accounting Bulletin No.108 ("SAB No. 108"), "CONSIDERING THE EFFECTS OF PRIOR
YEAR MISSTATEMENTS WHEN QUANTIFYING CURRENT YEAR MISSTATEMENTS". SAB No. 108
requires analysis of misstatements using both an income statement (rollover)
approach and a balance sheet (iron curtain) approach in assessing materiality
and provides for a one-time cumulative effect transition adjustment. SAB No. 108
is effective for the fiscal year beginning November 15, 2006. The adoption of
SAB No. 108 is not expected to have a material impact on the Company's results
of operations or financial position.

     In September 2006, the FASB issued SFAS No. 157, "FAIR VALUE
MEASUREMENTS" ("SFAS 157"). While SFAS 157 formally defines fair value,
establishes a framework for measuring fair value and expands disclosure about
fair value measurements, it does not require any new fair value measurements.
SFAS 157 applies under other accounting pronouncements that require or permit

fair value measurements. SFAS 157 is required to be adopted effective January 1, 2008 and the Company does not presently anticipate any significant impact on its consolidated financial position, results of operations or cash flows.

In September 2006, the FASB issued SFAS No. 158, "EMPLOYERS' ACCOUNTING FOR DEFINED BENEFIT PENSION AND OTHER POSTRETIREMENT PLANS - AN AMENDMENT OF FASB STATEMENTS NO. 87, 88, 106 AND 132(R)" ("SFAS 158"). SFAS 158 requires an employer to recognize the funded status of its defined benefit pension and other postretirement plans as an asset or liability in its statement of financial position and to recognize changes in the funded status in the year in which the changes occur through other comprehensive income. The funded status of a plan is measured as the difference between plan assets at fair value and the benefit obligation, which is represented by the projected benefit obligation for pension plans and the accumulated postretirement benefit obligation for other postretirement plans. SFAS 158 requires the recognition, as a component of other comprehensive income, net of tax, of the gains or losses and prior service costs or credits that arise during the period but are not recognized as a component of net periodic benefit cost in accordance with existing accounting principles. Amounts required to be recognized in accumulated other comprehensive income, including gains and losses and prior service costs or credits are adjusted as they are subsequently recognized as components of net periodic benefit cost pursuant to the recognition and amortization provisions of existing accounting principles. In addition, SFAS 158 requires plan assets and obligations to be measured as of the date of the employer's year-end statement of financial position as well as the disclosure of additional information about certain effects on net periodic benefit cost for the next fiscal year from the delayed recognition of the gains or losses and prior service costs or credits.

The Company is required to adopt those provisions of SFAS 158 attributable to the initial recognition of the funded status of the benefit plans and disclosure provisions as of December 31, 2006. Those provisions of SFAS 158 applicable to the amortization of gains or losses and prior service costs or credits from accumulated other comprehensive income to the net periodic benefit cost are required to be applied on a prospective basis effective January 1, 2007. The Company is still in the process of evaluating the impact, if any, of SFAS 158. However, the Company does not anticipate that the adoption of SFAS 158 will have any impact on its consolidated financial statements.

OVERVIEW, HISTORY, MERGER AND BUSINESS

Gottaplay Interactive, Inc. (the "Company") was formed in Nevada in July 2004 under the name of Donobi, Inc. and is the successor to H-NET.NET, Inc., which was formed under the laws of Colorado in May 1986. On July 24, 2006, pursuant to a Merger Agreement (the "Agreement"), Gotaplay Interactive, Inc. ("Gotaplay"), a privately held Nevada corporation, merged with Donobi, Inc. In accordance with the Agreement, the Registrant: (a.) completed a one for six reverse stock split; (b.) issued 17,744,618 post-reverse split shares of common stock to the former stockholders of Gotaplay; (c.) amended the Articles of Incorporation by changing the name of the Registrant from Donobi, Inc. to Gottaplay Interactive, Inc.; and, (d.) except for William M. Wright, III and Norm Johnson, the directors of the Registrant resigned and the three former directors of the Gotaplay were elected to the board of directors of the Registrant. As a result of the Merger, voting control changed and, except for Mr. William M. Wright, III, who remained as Chief Operating Officer, the other officers of Donobi resigned and were replaced by officers selected by Gottaplay's management.

29

<PAGE>

Upon consummation of the Merger we assumed the business operations of Gotaplay to include their assets, their debts and their commitments and obligations, such as leases and independent consulting agreements. We now operate two distinct divisions, one division for the video game subscriptions and rentals, and one division for our Internet connectivity and digital video services.

Our primary business division will be the on-line video game rental subscription business which is dedicated to providing customers a quality rental experience through our web site www.gottaplay.com. The service is an alternative to store based gaming rentals. We also provide a subscriber the option to purchase new and/or used video game titles at a discounted price. We offer our customers an extensive selection of video games for on a monthly subscription fee. Customers can sign-up via the web page to rent and/or buy video games of their choice. The titles are then shipped to the customer via first class mail once they have made their selection(s). Active subscribers can retain the games for an indefinite period of time as long as they are active paying subscribers. Customers can exchange their selections at anytime by returning their game(s) in the pre-paid and pre-addressed mailers provided by us.

Our other division (dba Donobi) primarily operates as an Internet service provider ("ISP") with operations in Washington, Oregon, and Hawaii, offering Internet connectivity and digital video to individuals, multi-family housing, businesses, non-profit organizations, educational institutions and government agencies. We provide high quality, reliable and scalable Internet access, web hosting and development, equipment co-location, and networking services to underserved rural markets. Our overall strategy is to become the dominant Internet service provider for residents and small to medium-sized businesses within rural and semi-rural communities/areas in the United States. Our current focus is within the states of Washington, Oregon, and Hawaii.

We intend to grow our business divisions through technological innovations and adaptations, the implementation of our short and long-term business plans and a long-term commitment to delivering high-quality product and services to every subscriber. We believe that the key to our success will depend in a large part on out ability to promote our services, gain subscribers and expand our relationships with current subscribers. Our achievements can be identified and measured in our strategic business plan. Our focus in fiscal year 2007 is building on this foundation and executing well in key areas, such as, continuing to innovate on our ability to creatively market our products, offering unique subscriber plans, responding effectively to our subscriber needs and desires, and continuing to focus internally on product and service delivery, business efficacy, and accountability across our Company. Our key market opportunities include but are not limited to: (a.) expanding into other interactive technology for the delivery of media to subscribers, (b.) partnering with other compatible businesses to cross-market and promote our services and products, (c.) entering and offering the interactive medium to the education community, and (d.) extending accessibility and delivery of internet services and entertainment/ educational videos to remote location subscribers. We seek to differentiate our services from our competitors by offering a fair price for exceptional service and delivery, and, in the on-line video gaming division, the delivery of a gamer's first choice/selection each time, and every time. If we are not successful in promoting our services and expanding our customer base, this may a material adverse effect on our financial condition and our ability to continue to operate the business and record profits.

SUMMARY OF CONSOLIDATED CONDENSED RESULTS OF OPERATIONS

As a result of these efforts, we should be able to sustain a reasonable and controlled growth rate of new customers and subscribers. The measurement of

this period's revenues should not be considered necessarily indicative or interpolated as the trend to forecast our future revenues and results of operations. The current period financial results include a full three months operation for both divisions, whereby, any comparison to the quarter ended December 31, 2005 will only incorporate on-line game rental division because of the merger's effective date was July 24, 2006. Therefore, results operations and cash flows for the quarter ended December 31, 2005 will not be comparable.

SEGMENT PRODUCT REVENUE AND OPERATING LOSS

<div align="center">30</div>

<PAGE>

We have two operating divisions that we consider to be operating segments: (a.) On-line video game rentals and (b.) Internet service provider. The revenue and operating loss in this section are presented on a basis consistent with GAAP and include certain reconciling items attributable to each segment. Various corporate level administrative expenses are included in the respective segment, whereby the obligation was originally incurred.

### ON-LINE VIDEO GAME RENTAL DIVISION

On-line video game rental revenue for the quarter ended December 31, 2006 was $36,836 with a cost of revenue of $80,068, including $38,842 of depreciation on videos, resulting in a direct loss from sales of $43,232. Its expenses, including, depreciation and amortization of $2,909, are $1,182,434, for an operating loss of $1,225,665. Of significance, of this division's loss from operations, is the recognition of $750,000 of stock-based compensation.

For the quarter ended December 31, 2006, we reported interest expense totaling $98,833, of which $79,819 was reported as amortization for discounts recognized on warrants granted with the issuance of our secured convertible notes payable. Our current quarter's net loss for this division was $1,324,468.

### INTERNET SERVICE PROVIDER DIVISION

Internet connectivity revenue for the quarter ended December 31, 2006 was $466,060. Its direct cost of revenue was $211,009 for a gross profit from divisional operations of $255,051. Its operating expenses, including depreciation and amortization of $45,691, totaled $287,830, for an operating loss of $32,776. Interest expense was $22,253 and other income was $11,916. Our current quarter's net loss for this division was $43,116.

COSTS AND EXPENSES

### COSTS OF REVENUES

Costs of revenues includes all direct costs in the production of revenues and will include such items as depreciation, direct wages and related burden, cable charges, commissions and more. Total costs of revenues for the quarters ended December 31, 2006 and 2005 were $291,077 and $38,801 (pre-merger), respectively.

### FULFILLMENT

This category of expense is primarily comprised of those support services and expenses for the distribution of video games to subscribers/customers and include distribution centers' fees, independent contractor fees, certain communications expenses and certain wages and related burden. The total cost of fulfillment for the quarters ended December 31, 2006 and 2005 was $104,105 and 87,136 (pre-merger), respectively. We expect these costs to increase in fiscal 2007 because of our increased number of distribution