# EXHIBIT F

# PART 2

centers and our increasing number of on-line game subscribers.

### ADVERTISING AND MARKETING

Advertising and marketing for the quarter ended December 31, 2006 increased $112,420 over the same period one year ago. Approximately 96% of this quarter's expense represent the efforts of the on-line gaming division to attract, gain and retain subscribers. This increase in expense was anticipated and planned. It is also planned that this category of expense will increase substantially for both divisions during fiscal 2007.

### GENERAL AND ADMINISTRATIVE EXPENSES

General and administrative expenses include Federal and State employer and business taxes, various compliance expenses and licenses, professional fees, selected wages and burden, and other unallocated

31

<PAGE>

expenses. Total expense for this category for the current quarter ended December 31, 2006 was $1,063,349 as compared to the same quarter one year ago of $20,267 (pre-merger). This expense category includes $750,000 of charges attributable to the expensing prepaid consulting fees and as further explained in the following paragraph.

In July 2006, we entered into a one-year consulting agreement with independent financial and business advisor, in which the consultants will provide business expertise, advice and negotiations in strategic corporate planning, private financing, mergers and acquisitions, and such other business areas as deemed necessary by our management. Under the terms of the agreements, the consultants received 2,000,000 shares of common stock. The stock was valued at the closing market price of $1.50 per share on the date of the execution of this agreement. The total value of the services was $3,000,000 and is being amortized over twelve months. As such, we recognized $750,000 of non-cash compensation for the quarter ended December 31, 2006 is recorded as a consulting expense in the accompanying consolidated condensed statements of operations. At December 31, 2006 we had $1,700,000 of unamortized consulting expense and is reported in the accompanying consolidated condensed statement of stockholders' deficit. Of significance, is the fact that stock-based compensation for these services does not affect our working capital and cash flows. On February 22, 2007, we terminated this arrangement due to non-performance. On April 20, 2007, we cancelled all shares of stock issued to this advisor.

Under the circumstances, we believe our costs are under control, as planned, and, within proximate range of management's forecasts.

LIQUID MARKET

There is currently a limited trading market for our shares of common stock, and there can be no assurance that a more substantial market will ever develop or be maintained. Any market price for our shares of common stock is likely to be very volatile and number factors beyond our control may have a significant adverse effect. In addition, the stock markets generally have experienced, and continue to experience, extreme price and volume fluctuations which have often been unrelated to the operating performance of these small companies. These fluctuations have inversely affected the market price of many small capital companies. These broad market fluctuations, as well as general current economic and political conditions, may also adversely affect the market price of our common stock. Further, there is no correlation between the present limited market price of our common stock and our revenues, book value, assets and other established criteria of value. The present limited quotations of our

common stock should not be considered indicative of the actual value of our common stock.

LIQUIDITY AND CAPITAL RESOURCES

        Our financial statements as of and for the three months ended December 31, 2006 have been prepared on a going concern basis, which contemplates the realization of assets and the settlement of liabilities and commitments in the normal course of business. For the quarter ended December 31, 2006, we had a net loss of $1,367,584 and negative cash flows from operations of $338,333. We had a working capital deficit of $2,064,867 and a stockholders' deficit of $759,998. Our working capital deficit at December 31, 2006 may not enable us to meet certain financial objectives as presently structured.

        We had a cash balance of $83,536 at December 31, 2006. We finance our operations and capital requirements primarily through private debt and equity offerings. Our current forecast anticipates substantial negative cash flows from operations. Therefore, we will have to raise capital through either equity instruments and/or debt, not only to sustain our operations but to grow and improve our operations according to our fiscal 2007 strategic business plan.

        At December 31, 2006, the book value of our outstanding common stock was a negative $0.025 per share, our current ratio was .14, our cash to debt ratio was a negative .034, and, our acid test ratio was a negative .10. These financial indicators are not acceptable and we will have to improve our performance quickly if we expect to stay in business.

                                        32
<PAGE>

        In October 2006, we consummated a $1,250,000 private placement financing agreement with four investors. The agreement stipulates two phases: (a.) $312,500 due in October 2006 and (b.) $937,500 due over the next several months. The first phase of funding was received in October 2006, in the form of 9%, one-year secured convertible promissory notes. These notes are convertible into 250,000 shares of common stock with a fixed conversion price of $1.25 per share. The investors were also granted: (a.) 250,000 warrants with an exercise price at $1.50 per warrant, exercisable within two years, and (b.) 250,000 warrants with an exercise price at $2.50 per warrant, exercisable within three years. In December 2006, investors exercised 40,000 warrants at $2.50 per share for a total of $100,000.

        In November and December 2006, we received $230,000 of funding from the above investors, which will be applied toward the second phase of funding. The second phase of funding carries the same terms and conditions as the first phase. Warrants granted under phase two total 368,000.

        In January 2007, we have received a total of $120,000 from the issuance of five secured convertible note payable agreements. The terms and conditions for each of these funding agreements are essentially the same as those mentioned above in the $1,250,000 private placement.

        In October 2006, the balance due of $465,000 on our convertible debentures was completely paid off by certain investors and we re-issued the 1,916,667 shares of common stock held in escrow on behalf of the original debenture holders to the new investors. We also owed $210,000 to a related party/investor who was directly involved with closing this deal., As part of the payoff of these debentures for the shares of stock, the $210,000 obligation was also charged off.

Our continuation as a going concern is dependent on our ability to grow revenues, obtain additional equity and/or financing, and, generate sufficient cash flow from operations to meet our obligations on a timely basis.

The operating results of the Company's divisions can vary materially depending on a number of factors, many of which are outside our control:

o   Demand for our services and market acceptance lags,
o   Announcements and introduction of our new products and services and/or by our competitors,
o   Our ability to upgrade infrastructure, develop new and improved systems to meet and anticipate growth and demand,
o   Changing governmental rules, regulations and requirements,
o   Customer/subscriber resilience and apathy due to foreign insurrections and our national and local economies,
o   Product pricing competition, and
o   Lack of investor/banking short-term working capital to facilitate unanticipated cash shortages

We currently have no material commitments for capital requirements. If we were forced to purchase new equipment or replace the equipment we currently lease, any new lease(s) would constitute a material capital commitment; however, we are currently unable to quantify such amounts. If this situation does occurs, we will attempt to raise the necessary finances to make such purchases, but there is no assurance that we will be able to do so. Without the ability to quantify these amounts, we nonetheless believe that it would have a material impact on our business and our ability to maintain our operations.

On February 28, 2007, we completed the acquisition of GamerShare, Inc.("GSI"), a company in its developmental stage that is in the business of on-line video game trading. To facilitate this acquisition, we formed a wholly-owned subsidiary to hold GSI's assets, liabilities and conduct operations. GSI is an on-line resource for the video gamer community to trade their games through an interactive trading platform. GSI members can trade and/or swap video games in the most cost effective way with no rental subscription fees and no limits on trading games for fee of $1.99 per trade. We paid GSI's sole stockholder $60,000 in cash

33

<PAGE>
and 220,000 shares of our common stock valued at $2.55 per share. The total acquisition cost was $621,000. GSI had no material operations in 2006.

As part of the overall incentive for the GSI's sole stockholder to accept the offer by us, the sole stockholder was offered a total of 170,000 shares of our $0.001 par value common stock if this video game trading company achieves: (a.) a minimum of $684,297 gross annual revenues in its first year of operation, and (b.) $3,729,318 in gross annual revenues in its second year of operations. Each year is based on the anniversary date from the effective date of merger and up to 85,000 shares could be awarded upon anniversary date of this agreement year in accordance with the "Merger" agreement. In addition, the sole shareholder may be entitled up to 50,000 more shares of common stock, if during the first year, the Company consummates an agreement to purchase another business for total consideration of less than $1 million and issues common stock as part consideration.

In addition, the sole shareholder was offered a three year employment agreement, to act as president of the wholly-owned subsidiary. The compensation package sets a base salary at: (a.) $75,000 for the first year; (b.) $110,000 for the second year; and (c.) $160,000 for the third year. The employment agreement contains traditional provisions for employee benefits, incentive stock

options, severance compensation, termination and other employee rights. The awards for these incentive stock options are revenue based and are described as follows: (a.) Year One Anniversary - if minimum revenues from video game trading are $684,297, the sole shareholder will receive 30,000 options, with an exercise price at date of grant, for a period of 10 years; (b.) Year Two Anniversary - if minimum revenues from video game trading are $3,729,316, the sole shareholder will receive 30,000 options, with an exercise price at date of grant and exercisable for a period of 10 years; (c.) Year Three Anniversary - if minimum revenues from video game trading are $13,637,907, the sole shareholder will receive 30,000 options, with an exercise price at the date of grant and exercisable for a period of 10 years.

If we expand more rapidly than currently anticipated, and if our working capital needs exceed our current forecast and expectations, and if we consummate an acquisition(s), we will need to raise additional capital from equity and/or debt sources. We cannot be sure that we will be able to obtain the additional financing to satisfy our cash requirements and to implement our growth strategy on acceptable terms. If we cannot obtain such financings on terms acceptable to us, our ability to fund our planned business expansion and to fund our on-going operations will be materially adversely affected. If we incur debt, the risks associated with our business and with owning our common stock would also increase. If we raise capital through the sale of equity securities, the percentage ownership of our stockholders will be diluted accordingly. In addition, any new equity securities may have rights, preferences, or privileges senior to those of our common stock.

TRENDS AND DEVELOPMENTS

Both of our businesses are internet-based. Our ISP business targets businesses and private consumers, and the on-line video game rental business targets primarily the private consumer. Our customer base for both divisions is anticipated to increase each year. We believe the growing customer base of on-line video game customers will increase substantially over the next twelve months, while only moderate growth is expected for our broadband ISP customers from within our existing localities. We have not planned any expansion to other localities for the ISP division. Also, we have not planned any increases to the existing respective rates for either service during the next twelve months. Our ISP revenues are fairly consistent from month to month.

There is a distinct trend of consumers to switch from a dial-up connection to the broadband or DSL connection to the Internet. Our dial-up subscriber base as a whole has continued to experience attrition, as has been the experience of other local, regional, and national full service providers of this service. We believe this trend will continue as high-speed connectivity becomes more available. Over the next 12-month period, we expect to experience continued net losses of our dial-up customers, yet we also expect to see net gains in our broadband customers over this same period of time. While we will continue efforts to convert our existing dial-up customers to our broadband products, there is no assurance that the overall change will be

34

<PAGE>
positive. In fact, based on other competing broadband products, such as cable Internet, we would expect the net effect of these customers to be negative.

In order to compensate for the loss of revenue from the dial up customer attrition, we have planned to diversify our product mix and become less reliant on the changes in the Internet connectivity market. Part of that shift is to expand our IT Services department. The next twelve months should see a shift in the percentage of our business revenues coming from business

relationships with customers as we offer additional networking services, web design, development of new internet based products, such as the on-line video game rentals.

The on-line video game rental market is increasing, as more Internet users become use to the Internet as a primary venue for spending their entertainment dollars and accessing websites to service their needs. This trend can be documented with the increasing popularity of on-line movie rentals shipped via the US Postal Service. Consumers are now finding the use of the Internet to facilitate instant, convenient and secure access to various and affordable services and products, and not spend their valuable time in their vehicle to pick up and return a product, such as a game. Delivery of these products is to their front door via the USPS or by a commercial carrier. This type of delivery service is expected to grow substantially over the next several years due its convenience and cost savings to the end user, our subscriber/customer.

We offer video game rentals to our current ISP customers as well as offering our ISP and related services to the customers of Gottaplay. We expect an overall net gain of customers in our ISP business division, resulting in a more stable and loyal base of customers and an increase in revenues, primarily from the game rental division.

The game rental division's known external market trends have been limited due to the fact that the business which we operate is an emerging business within the online industry. However, these trends are generally limited to competition from well established retailers and newly formed on-line game disc rental companies. There may be a negative impact to our operations due to the seasonal availability of popular game titles, and therefore, revenues and inventory costs tend to increase during the latter part of the calendar year due to the holiday season. In anticipation of this seasonal adjustment additional inventory may be needed to accommodate these requirements of the increased volume of business, We believe that there could be a negative impact on the operations of our company due to a lack of inventory from certain suppliers that may not have certain games available due to high consumer demand of a specific title or a lack of the required capital to purchase larger amounts of inventory to fill customer demands. If we are not able to secure appropriate inventory, we will not meet our projections and the anticipated margins from the Gottaplay division will encumber the margins and profitability from the ISP division.

There can be no assurance that we will be able to achieve break-even status. We estimate that we will require a minimum of $250,000 per month in revenues to reach break-even status. We estimate that we will require a minimum of $3 million to sustain our businesses for the twelve-month period commencing approximately December 31, 2006. We have recently been able to raise a total of $2,285,000 through the private placement of our common stock and therefore we believe we are assured of viability through December 31, 2007. Thereafter, if we do not achieve break-even status, we will have to attempt to raise additional funds through the private sale of our securities. If we then are unable to raise the necessary funds to sustain and grow our video game rental business, we will have to curtail our operations until such time as capital becomes available.

INFLATION

Although our operations are influenced by general economic conditions, we do not believe that inflation had a material affect on our results of operations during our fiscal year ended September 30, 2006 and our quarter ended December 31, 2006.

MARKET FOR COMMON STOCK

35

<PAGE>
         Our common stock is quoted on the Over-the-Counter Bulletin Board under
the symbol "GTAP." The following table shows the quarterly high and low trade
prices on the Over-the-Counter Bulletin Board. The prices reflect inter-dealer
prices, without retail mark-up, mark-down, or commission and may not represent
actual transactions.

         The first trades of our shares on the Over-The-Counter Bulletin Board
started February 16, 2004, and trading has been very limited since then; there
can be no assurance that a viable and active trading market will develop. There
can be no assurance that even if a market were developed for our shares, there
will be a sufficient market so that holders of common stock will be able to sell
their shares, or with respect to any price at which holders may be able to sell
their shares. Future trading prices of our common stock will depend on many
factors, including, among others, our operating results and the market for
similar securities.

         The following sets forth information relating to the trading of our
common stock on the Over-The-Counter Bulletin Board.
<TABLE>
<CAPTION>

|  | SALES PRICES ON THE OVER-THE-COUNT BOARD ($) | |
| --- | --- | --- |
| <S> | <C><br>HIGH(1) | <<br>L |
| FISCAL YEAR ENDED SEPTEMBER 30, 2004 | | |
| First Quarter | $42.24 | $ |
| Second Quarter | $21.12 | $ |
| Third Quarter | $9.00 | $ |
| Fourth Quarter | $6.06 | $ |
| FISCAL YEAR ENDED SEPTEMBER 30, 2005 | | |
| First Quarter | $9.00 | $ |
| Second Quarter | $6.00 | $ |
| Third Quarter | $3.06 | $ |
| Fourth Quarter | $0.96 | $ |
| FISCAL YEAR ENDED SEPTEMBER 30, 2006 | | |
| First Quarter | $0.48 | $ |
| Second Quarter | $1.26 | $ |

| | | |
|---|---|---|
| Third Quarter | $2.22 | $ |
| Fourth Quarter | $2.00 | $ |
| FISCAL YEAR ENDED SEPTEMBER 30, 2007 | | |
| First Quarter | $3.00 | $ |
| Second Quarter | $3.05 | $ |

</TABLE>

(1) All prices give effect to a one for thirty-two reverse stock split on January 26, 2004 and a one for six reverse stock split which was effected on July 24, 2006.

On May 1, 2007, the closing trade price of our common stock as reported on the Bulletin Board was $1.96 per share. On that date, there were 538 stockholders of record of our common stock.

36

<PAGE>

MANAGEMENT

DIRECTORS AND EXECUTIVE OFFICERS

The names of our directors and executive officers, their principal occupations, and the year in which each of our directors and executive officer initially joined the board of directors are set forth below.

| Name | Age | Position |
|---|---|---|
| John P. Gorst | 38 | Chairman and Chief Executive Officer |
| M. Carroll Benton | 64 | Chief Financial Officer, Chief Administrative Officer, Secretary and Treasurer |
| William M. Wright, III | 41 | Chief Operating Officer and Director |
| Asra Rasheed | 34 | President |
| Mark H. Levin | 35 | Director |
| Norm Johnson | 46 | Director |

JOHN P. GORST, Chairman of the Board, and Chief Executive Officer of Gottaplay, positions he assumed with us upon closing of the Merger between Donobi, Inc. and Gotaplay Interactive, Inc. Mr. Gorst has over 15 years experience in founding entrepreneurial technology ventures, specifically in the development of software and data services for business. His experience includes serving as chief executive officer and board chairman of Insynq, Inc., an application service provider, from August 1998 to present; vice president and general manager for a computer integration company, Interactive Information Systems Corp., from July 1996 to August 1998; and a training/IS consulting business in conjunction with Nynex Business Centers of New York. Mr. Gorst directs the Company's strategy and positions the Company in the business

marketplace by forging strategic business alliances and mergers and acquisitions. Mr. Gorst also serves as the Company evangelist at tradeshows, press conferences and industry analyst meetings in order to increase awareness for the Company's brand. Mr. Gorst graduated top of his class as an Electronic Design Engineer from one of the top trade schools in Arizona. Mr. Gorst was also awarded a medal of honor for business leadership in 2001 and 2005 from the National Republican Congress. He devotes substantially all of his business time to the Company.

M. CARROLL BENTON is our Chief Financial Officer, Chief Administrative Officer, Secretary, Treasurer and Director, positions she assumed upon closing of the Merger. Ms. Benton's early career spanned both the public and private sectors working largely with the banking systems and higher education institutions where she assisted in the development and deployment strategies necessary for computerization of these and other entities. Ms. Benton has successfully managed a 13 state insurance brokerage firm and has been a consultant to the small to medium business markets via accounting system design, implementation, support, and business practice analysis. She also taught undergraduate accounting courses at several Puget Sound colleges and universities. With an in-depth understanding of Gottaplay's finances, accounting infrastructure and compliance issues, Ms. Benton is responsible for all governmental compliance and financial and administrative operations. From December 1995 through December 1999, Ms. Benton was president of a computer integration company, Interactive Information Systems Corp. Her public sector experience includes serving as chief administrative officer, secretary, treasurer, chief financial officer and director for Insynq, Inc., a Pacific Northwest application service provider, from August 1998 to present. Formerly with a CPA firm, Ms. Benton brings over 38 years of business financial expertise to Gottaplay.

WILLIAM M. WRIGHT, III is the Chief Operating Officer and a Director of Gottaplay Interactive, Inc. Mr. Wright has over 20 years of experience and knowledge in financial management and business

37

<PAGE>
operations. His experience includes the start up of DONOBi, Inc., an Internet Service Provider that specialized in the acquisition and rollup of numerous rural service providers, and the eventual taking of the company public in 2004. Mr. Wright served as both Chief Executive Officer and Chairman of the Board during his 6 year tenure with DONOBi leading to the merger with Gottaplay. Prior to his work in the technology field, Mr. Wright was a Real Estate Broker in both California and Washington, and including the position of President and minority owner of a local property management company. Mr. Wright received his Bachelors of Science in Business Administration with an emphasis in Financial Services from San Diego State University.

ASRA RASHEED has been the President of Gottaplay since 2004. From 2003 to 2004 Ms. Rasheed was the President of NextRental, Inc, an on-line video game rental subscription service. From 2002 to 2003, she was Director of Multi Media at Koyo Graphics where she managed large web development projects for clients like Warner Brothers, Sanyo, Sony, etc. At Koyo Graphics, Ms. Rasheed developed many key relationships in the entertainment and multimedia space. Also at Koyo Graphics, she managed the development of an on-line video game rental and sales website for one of the largest DVD publishers in Asia. From 1996 to 2001 Ms. Rasheed was Vice President of Business Development for Luminex Lighting, a manufacturer of fluorescent lighting fixtures. Ms. Rasheed holds a Bachelors of Arts in Business Administration - Finance from California State University, Fullerton.

MARK H. LEVIN, MBA is a Director of Gottaplay. From July 2001 to the

present, Mr. Levin has been CEO of Marlin Financial Group, Inc., Potomac, Maryland, a consulting firm specializing in aiding publicly traded companies with mergers and acquisitions, capital structure, shareholder relations, strategic alliances and licensing agreements. Prior to founding Marlin Financial, from 1996 through 2000, Mr. Levin was the CEO of Eyecity.com, Inc., an Internet eye care company, located in Plainview, NY providing, sunglasses and prescription glasses to the general public. Mr. Levin is still a Director of Eyecity.com, Inc. Mr. Levin received an M.B.A. degree in Marketing in 1997 and a B.B.A. degree in Management from Hofstra University in 1994.

NORM JOHNSON is a Director of Gottaplay. With the closing of the Merger Mr. Johnson retained his position as Director. Mr. Johnson spent 18 years as an All-Pro kicker in the NFL (Seahawks, Falcons, Steelers and Eagles). For the past five years, Mr. Johnson has worked for Reid Real Estate, Inc., a Washington corporation, representing and advising clients on their real estate investments. During his NFL career, Mr. Johnson also owned "Norm Johnson's All-Pro Sportscards" with three locations. Mr. Johnson earned his Bachelor's Degree in Economics from the University of California Los Angeles (UCLA) in 1983.

LONG TERM INCENTIVE AWARDS

OPTION GRANTS IN LAST FISCAL YEAR

We did not award options to our executive officers in 2005 or 2006 under any incentive plans.

AGGREGATE OPTION EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR END OPTION VALUES

There were no option exercises by our executive officers in 2005 and 2006.

EMPLOYMENT CONTRACT AND TERMINATION OF EMPLOYMENT AGREEMENTS

On February 28, 2007, pursuant to an Agreement of Merger and Plan of Reorganization, our wholly owned subsidiary, Gottaplay Management, Inc. entered into an Employment Agreement with Sidney Price. Mr. Price is employed as its President and also serves as Vice-President of Strategic Content for Gottaplay. The Initial Term of the Agreement is for a period of three (3) years. At the expiration of the Initial Term, the Agreement may be extended for such additional periods as agreed. If we terminate the Agreement "for cause" our obligations under the Agreement are terminated as of the termination date. If we terminate the Agreement without cause, employee shall be paid all accrued salary, bonus compensation to the extent earned, deferred compensation, any rights, including accelerated vesting, if any, of awards under the Company's stock option plan, accrued vacation and any appropriate business expenses. Severance upon change in control shall be for a period of the lesser of the remaining portion of the Initial Term or twelve (12) months from the date of such termination provided. The Agreement provides for an annual base salary of

38

<PAGE>
$75,000 during the first year, $110,000 during the second year and $160,000 during the third year. Mr. Price shall be granted at each anniversary date of the Agreement, an incentive stock option to purchase shares of common stock of Gottaplay if certain game trading milestones are met. Under the terms of the Agreement, Mr. Price is entitled to all the benefits generally made available to the Company's executive officers.

LIMITATIONS ON LIABILITY AND INDEMNIFICATION OF OFFICERS AND DIRECTORS

Our certificate of incorporation includes a provision that eliminates the personal liability of our officers and directors for monetary damages for breach of fiduciary duty to the fullest extent permitted by Nevada Revised Statutes. Our certificate of incorporation also provides that we must indemnify our directors and officers to the fullest extent permitted by Nevada law and advance expenses to our directors and officers in connection with a legal proceeding to the fullest extent permitted by Nevada law, subject to certain exceptions. We are in the process of obtaining directors' and officers' insurance for our directors, officers and some employees for specified liabilities.

The limitation of liability and indemnification provisions in our certificate of incorporation may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duty. They may also have the effect of reducing the likelihood of derivative litigation against directors and officers, even though an action of this kind, if successful, might otherwise benefit us and our stockholders. Furthermore, a stockholder's investment may be adversely affected to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions. However, we believe that these indemnification provisions are necessary to attract and retain qualified directors and officers.

SEC POLICY ON INDEMNIFICATION

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, we have been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable.

LONG TERM INCENTIVE PLANS

In February 2007, our board of directors adopted the "2007 Directors, Officers and Consultants Stock Option, Stock Warrant and Stock Award Plan" (the "Plan").

The Plan provides for the issuance of incentive and non-qualified stock options, stock appreciation rights and restricted stock to our directors, officers, employees and consultants. At the adoption of this plan, we set aside 3,000,000 shares of common stock, which may be issued upon the exercise of securities granted. As of the date of this Prospectus no securities have been granted or are outstanding.

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT.

The following table sets forth certain information regarding beneficial ownership of our common stock as of May 1, 2007:

o        By each person who is known by us to beneficially own more
         than 5% of our common stock;
o        By each of our officers and directors; and
o        By all of our officers and directors as a group.

| NAME | NUMBER | PERCENT |
|------|--------|---------|
| John P. Gorst (1) (2) | 3,568,073 | 11.29% |
| M. Carroll Benton (1) (3) | 3,564,392 | 11.28% |

39

<PAGE>

| | | |
|---|---:|---:|
| William M. Wright, III (1) | 443,768 | 1.43% |
| Asra Rasheed (1) (4) | 1,922,000 | 6.13% |
| Mark H. Levin (1) (5) | 3,568,666 | 10.29% |
| Norm Johnson (1) | 76,668 | * |
| THI Inc, LLC (6) | 2,583,181 | 8.31% |
| Whispering Pines Development, Ltd. (7) | 1,632,834 | 5.12% |
| All executive officers and directors as a group (6 persons) | 13,143,567 | 41.6% |

* Less than 1%

(1) Officer and/or director.

(2) Includes 3,068,073 shares of common stock and 500,000 stock options exercisable within 60 days.

(3) Includes 3,064,392 shares of common stock and 500,000 stock options exercisable within 60 days.

(4) Includes 1,672,000 shares of common stock and 250,000 stock options exercisable within 60 days.

(5) Includes 3,068,666 shares of common stock and 500,000 stock options exercisable within 60 days.

(6) Includes 566,667 shares of common stock, 488,838 shares issuable upon the conversion of Convertible Notes Payable and 1,527,676 warrants exercisable within 60 days.

(7) Includes 833,334 shares of common stock, 266,500 issuable upon the conversion of Convertible Notes Payable and 533,000 warrants exercisable within 60 days.

EXECUTIVE COMPENSATION

The following table summarizes the compensation earned by or paid to our Chief Executive Officer and the other most highly compensated executive officers whose total salary and bonus exceeded $100,000 for services rendered in all capacities during the fiscal year ended September 30, 2006. We refer to these individuals as our named executive officers.

<TABLE>
<CAPTION>

| NAME AND PRINCIPAL POSITION | YEAR | SALARY PAID ($) | BONUS ($) | OTHER ANNUAL COMPENSATION ($) | SECUR UNDER OPTIO |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| John P. Gorst, | 2006 | $55,268 | $0.00 | $0.00 | 500,00 |
| Chairman and | 2005 | $23,823 | $0.00 | $0.00 | - |
| CEO | 2004 | $0.00 | $0.00 | $0.00 | - |
| William M. | 2006 | $120,000 | $0.00 | $0.00 | - |

| Wright, III, | 2005 | $120,000 | $0.00 | $0.00 | - |
| Chief | 2004 | $101,250 | $0.00 | $0.00 | - |
| Operating | | | | | |
| Officer | | | | | |

</TABLE>

(1)   The compensation described in this table does not include medical,
      group life insurance or other benefits received by the named executive
      officer that are available generally to all of our salaried employees,
      and may not include certain perquisites and other personal benefits
      received by the name executive officer that do not exceed the lesser of
      $50,000 or ten percent (10%) of any such officer's salary and bonus
      disclosed in the table.

                                    40
<PAGE>
(2)   Represents option for common stock granted under Gotaplay Interactive,
      Inc. prior to July 24, 2006 Merger. The option to purchase shares of
      common stock has an exercise price of $0.50 and may be exercised any
      time after February 17, 2006 for a period of ten years.

(3)   No other officer or director of the Company received compensation in
      excess of $100,000 in either of the past three years.

              CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

      In June 2005 we entered into a five-year agreement with Insynq, Inc.
(INSN.PK) whereby it would supply our technology and communications
infrastructure and programming expertise. Insynq, Inc. is partially owned and
managed by two of our officers, John P. Gorst and M. Carroll Benton. During the
fiscal year ended September 30, 2006, the amount of services provided to Insynq
totaled $122,112.

      Insynq also paid certain expenses on our behalf or advanced money to
us. On October 31, 2005, Insynq accepted to convert these expenses and advances
into an unsecured Promissory Note in the amount of $333,837, which included
interest at the rate of 7% per annum.

      On July 17, 2006, we issued 447,111 shares of common stock to Insynq,
Inc. to satisfy the Note Payable and accrued interest, a partial reduction of
the trade payable and certain other amounts either advanced or paid on our
behalf. The fair value of the shares issued was $1.05 per share.

                      DESCRIPTION OF SECURITIES

COMMON STOCK

      The securities we are offering are shares of our common stock. We are
authorized by our Certificate of Incorporation to issue 100,000,000 shares of
common stock, $0.001 par value. We presently have issued and outstanding
31,101,170 shares of common stock.

      The holders of our common stock are entitled to one vote per share on
all matters to be voted upon by the stockholders. The holders of our common
stock do not have cumulative voting rights. Subject to preferences that may be
applicable to the holders of outstanding shares of preferred stock, if any, the
holders of our common stock are entitled to receive ratably such dividends, if
any, as may be declared from time to time by the board of directors out of funds
legally available therefore. In the event of liquidation, dissolution or
winding-up, and subject to the prior distribution rights of the holders of

outstanding shares of preferred stock, if any, the holders of shares of our common stock shall be entitled to receive pro rata all the remaining assets available for distribution to our stockholders. Our common stock has no preemptive or conversion rights or other subscription rights.

PREFERRED STOCK

     We currently have no outstanding shares of preferred stock. The board of directors has the authority, without further action by our stockholders, to issue up to five million shares of preferred stock in one or more series and to fix the rights, preferences and privileges thereof, including dividend rates and preferences, conversion rights, voting rights, terms of redemption, redemption prices, liquidation preferences and the number of shares constituting any series or the designation of such series, without further vote or action by the stockholders. Although they presently have no intention to do so, the board of directors, without stockholder approval, could issue preferred stock with voting and conversion rights which could adversely affect the voting power of the holders of common stock. The issuance of preferred stock may also have the effect of delaying or preventing a change of control of us.

THE APPLICATION OF THE "PENNY STOCK" RULES

     The Securities Exchange Act of 1934 requires additional disclosure relating to the market for "penny stocks." A penny stock is generally defined to be any equity security not listed on NASDAQ or a national
                                    41
<PAGE>
securities exchange that has a market price of less than $5.00 per share, subject to certain exceptions. Among these exceptions are shares issued by companies that have:

o     net tangible assets of at least $2 million, if the issuer has been in
      continuous operation for three years;

o     net tangible assets of at least $5 million, if the issuer has been in
      continuous operation for less than three years; or

o     average annual revenue of at least $6 million for each of the last three
      years.

     We do not currently meet the requirements of these exceptions and, therefore, our shares would be deemed penny stock for purposes of the Exchange Act if and at any time while our common stock trades below $5.00 per share. In such case, trading in our shares would be regulated pursuant to Rules 15-g-1 through 15-g-6 and 15-g-9 of the Exchange Act. Under these rules, brokers or dealers recommending our shares to prospective buyers would be required, unless an exemption is available, to:

o     deliver a lengthy disclosure statement in a form designated by the SEC
      relating to the penny stock market to any potential buyers, and obtain a
      written acknowledgement from each buyer that such disclosure statement has
      been received by the buyer prior to any transaction involving our shares;

o     provide detailed written disclosure to buyers of current price quotations
      for our shares, and of any sales commissions or other compensation payable
      to any broker or dealer, or any other related person, involved in the
      transaction; and,

o     send monthly statements to buyers disclosing updated price information for
      any penny stocks held in their accounts, and these monthly statements must

include specified information on the limited market for penny stocks.

In addition, if we are subject to the penny stock rules, all brokers or dealers involved in a transaction in which our shares are sold to any buyer, other than an established customer or "accredited investor," must make a special written determination that our shares would be a suitable investment for the buyer. The brokers or dealers must receive the buyer's written agreement to purchase our shares, as well as the buyer's written acknowledgement that the suitability determination made by the broker or dealer accurately reflects the buyer's financial situation, investment experience and investment objectives, prior to completing any transaction in our shares.

These Exchange Act rules may limit the ability or willingness of brokers and other market participants to make a market in our shares and may limit the ability of our stockholders to sell in the secondary market, through brokers, dealers or otherwise. We also understand that many brokerage firms will discourage their customers from trading in shares falling within the "penny stock" definition due to the added regulatory and disclosure burdens imposed by these Exchange Act rules.

The SEC from time to time may propose and implement even more stringent regulatory or disclosure requirements on shares not listed on NASDAQ or on a national securities exchange. The adoption of the proposed changes that may be made in the future could have an adverse effect on the trading market for our shares.

SELLING STOCKHOLDERS

The table below sets forth information concerning the resale of the shares of common stock by the Selling Stockholders. The term "Selling Stockholders" includes the persons and entities named below, and their transferees, pledges, donees, or their successors. We will file a supplement to this prospectus to name

42

<PAGE>
any successors to the Selling Stockholders who will use this Prospectus to resell their securities. We will not receive any proceeds from the resale of the common stock by the Selling Stockholders.

SELLING STOCKHOLDERS
<TABLE>
<CAPTION>

| Name | Number of Shares Owned Prior to Offering(1) | % of Shares Owned Prior to Offering (1) | Total Number of Shares Beneficially Owned Being Offered | Total Num of Share Underlyi Warrant Being Offe |
|------|------|------|------|------|
| <S> | <C> | <C> | <C> | <C> |
| Whispering Pines Dev. LLC(2) | 1,632,834 | 5.1% | 0 | 266,500 |
| Kempfer Juerg | 509,880 | 1.6% | 0 | 169,960 |
| Hanspeter Knecht | 1,387,500 | 4.3% | 320,000 | 462,500 |

| Name | Shares | Percent | Col A | Col B |
|---|---|---|---|---|
| Roland Wismer | 600,000 | 1.9% | 200,000 | 200,000 |
| Cambridge Merchantile Holdings S.A. | 468,337 | 1.5% | 0 | 62,500 |
| THI, LLC(2) | 2,583,181 | 7.3% | .0 | 488,838 |
| Dr. J. Salomon | 128,000 | * | 96,000 | 32,000 |
| Norman Dyer | 120,000 | * | 80,000 | 40,000 |
| Anthony Edlin | 80,000 | * | 40,000 | 40,000 |
| Orlando Rodriquez | 60,000 | * | 20,000 | 40,000 |
| Jeffery A. Pitt | 60,000 | * | 20,000 | 40,000 |
| San Diego Torrey Hills Capital LLC(3) | 1,530,000 | 3.9% | 30,000 | 0 |
| Andrew & Anne McDermott (5) | 840,000 | 2.2% | 280,000 | 560,000 |
| Michael & Cathy McDermott | 120,000 | * | 40,000 | 80,000 |
| Harry & Lynda Hatch | 360,000 | * | 120,000 | 240,000 |
| Troy Duncan | 60,000 | * | 20,000 | 40,000 |
| Shawn McGuire | 60,000 | * | 20,000 | 40,000 |
| Kevin Petcharck | 60,000 | * | 20,000 | 40,000 |
| Michael Rocchetti (4) | 101,000 | * | 20,000 | 81,000 |
| Greg Weiss | 60,000 | * | 20,000 | 40,000 |
| C. V. Salapare | 840,000 | 2.2% | 280,000 | 560,000 |
| M. T. Kobyluck | 48,000 | * | 16,000 | 32,000 |
| Matthew Tyrmand | 36,000 | * | 12,000 | 24,000 |
| Cathy & Allan Miller | 180,000 | * | 60,000 | 120,000 |
| Pauline Rubis | 60,000 | * | 20,000 | 40,000 |
| James & Marie-Anne McGlynn | 36,000 | * | 12,000 | 24,000 |
| Jin Lee | 120,000 | * | 40,000 | 80,000 |
| Jose & Tersita Ocampo | 540,000 | 1.4% | 180,000 | 360,000 |
| Dorothy Englese | 84,000 | * | 28,000 | 56,000 |
| Jose Joel Ocampo | 24,000 | * | 8,000 | 16,000 |
| William Ciotti | 60,000 | * | 20,000 | 40,000 |
| Joseph Museck | 60,000 | * | 20,000 | 40,000 |

| | | | | |
|---|---|---|---|---|
| Michael Dougherty | 24,000 | * | 8,000 | 16,000 |
| John F. Lee | 72,000 | * | 24,000 | 48,000 |
| Houy Chang | 120,000 | * | 40,000 | 80,000 |
| Douglas Rapoport | 431,800 | 1.1% | 0 | 431,800 |
| Michael & Whitney Rocchetti | 41,000 | * | 0 | 41,000 |
| Joe Schnaier | 37,000 | * | 0 | 37,000 |
| Harry Friedman | 37,000 | * | 0 | 37,000 |
| David Fargo | 20,000 | * | 20,000 | 0 |
| Clayton Chase | 1,520,000 | 3.9% | 20,000 | 0 |
| Marview Holdings | 40,000 | * | 40,000 | 0 |
| The Chase Family Trust | 10,000 | * | 10,000 | 0 |
| Kenneth Green | 10,000 | * | 10,000 | 0 |
| Juan Gamez | 10,000 | * | 10,000 | 0 |
| D. Allan Dillenberg, III | 20,000 | * | 20,000 | 0 |
| Daniel Lauter | 30,000 | * | 30,000 | 0 |
| Absolute Internet Services, Inc. | 5,000 | * | 5,000 | 0 |

</TABLE>

43

<PAGE>

(1)  Includes shares beneficially owned and shares underlying warrants that may
     be exercised within 60 days of this Prospectus.

(2)  Includes 408,000 shares underlying warrants that may be exercised
     within 60 days of this Prospectus owned by Whispering Pines Development
     Ltd. and THI, LLC as Joint Tenants

(3)  Includes 1,500,000 shares owned by Clifford Mastricola, sole member of San
     Diego Torrey Hills Capital LLC.

(4)  Includes 41,000 shares underlying warrants owned by Michael and Whitney
     Rocchetti as Joint Tenants.

(5)  Includes 720,000 shares owned by the McDermott Living Trust.

*Less than 1%

                        PLAN OF DISTRIBUTION

     The shares covered by this prospectus may be offered and sold from time
to time by the selling stockholders. The selling stockholders may include donees
and pledgees selling shares received from one of the selling stockholders after
the date of this prospectus. The selling stockholders will act independently of
us in making decisions with respect to the timing, manner, and size of each
sale. The selling stockholders may sell the shares being offered by this

prospectus in the over-the-counter market or otherwise, at prices and under terms then prevailing or at prices related to the then current market price or at negotiated prices. Shares may be sold by one or more of the following means of distribution:

o    block trades in which the broker-dealer so engaged will attempt to sell such shares as agent, but may position and resell a portion of the block as principal to facilitate the transaction;

o    purchases by a broker-dealer as principal and resale by such broker-dealer for its own account pursuant to this prospectus;

o    ordinary brokerage transactions and transactions in which the broker solicits purchasers;

o    privately negotiated transactions;

o    broker-dealers may agree with the selling stockholders to sell a specified number of such shares at a stipulated price per share;

o    a combination of any such methods of sale; and

o    any other method permitted pursuant to applicable laws.

AMENDMENT AND SUPPLEMENTATION NECESSITATED BY FUTURE SALES

        To the extent required, this prospectus may be amended and supplemented from time to time to describe a specific plan of distribution. In connection with distributions of such shares or otherwise, the selling stockholders may enter into hedging transactions with broker-dealer or other financial institutions. In connection with these transactions, broker-dealer or other financial institutions may engage in short sales of our common stock in the course of hedging the positions they assume with the selling stockholders. The selling stockholders may also sell our common stock short and redeliver the shares to close out such short positions. The selling stockholders may also enter into option or other transactions with broker-dealers or other financial institutions which require the delivery to the broker-dealer or other financial institution of the shares offered in this prospectus, which shares the broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction). The selling stockholders may also pledge their shares to a broker-dealer or other financial institution, and, upon a default, the broker-dealer or other financial institution may effect sales of the pledged shares pursuant to this prospectus (as supplemented or amended to reflect such transaction). In addition, any shares that qualify for sale pursuant to Rule 144 may be sold under Rule 144 rather than pursuant to this prospectus.

                                       44
<PAGE>
        In effecting sales, brokers, dealers or agents engaged by the selling stockholders may arrange for other brokers or dealers to participate. Brokers, dealers or agents may receive commissions, discounts or concessions from the selling stockholders in amounts to be negotiated prior to the sale. These brokers or dealers, the selling stockholders, and any other participating brokers or dealers may be deemed to be "underwriters" within the meaning of the Securities Act in connection with such sales, and any such commissions, discounts or concessions may be deemed to be underwriting discounts or commissions under the Securities Act. The selling stockholders have advised us that they have not entered into any agreements, understandings or arrangements with any underwriters or broker-dealers regarding the sale of their securities, nor is there an underwriter or coordinating broker acting in connection with the

proposed sale of shares by the selling stockholders.

OTHER INFORMATION REGARDING FUTURE SALES

          In order to comply with the securities laws of some states, if
applicable, the shares being offered in this prospectus must be sold in such
jurisdictions only through registered or licensed brokers or dealers. In
addition, in some states shares may not be sold unless they have been registered
or qualified for sale in the applicable state or a seller complies with an
available exemption from the registration or qualification requirement.

          We will make copies of this prospectus available to the selling
stockholders and will inform them of the need for delivery of copies of this
prospectus to purchasers at or prior to the time of any sale of the shares
offered hereby. The selling stockholders may indemnify any broker-dealer that
participates in transactions involving the sale of the shares against some
liabilities, including liabilities arising under the Securities Act.

          At the time a particular offer of shares is made, if required, a
prospectus supplement will be filed and distributed that will set forth the
number of shares being offered and the terms of the offering, including the name
of any underwriter, dealer or agent, the purchase price paid by any underwriter,
any discount, commission and other item constituting compensation, any discount
commission or concession allowed or re-allowed or paid to any dealer, and the
proposed selling price to the public. In addition, upon being notified by a
selling stockholder that a donee or pledgee intends to sell more than 500
shares, a prospectus supplement will be filed and distributed.

                              LEGAL PROCEEDINGS

          We are a party to an un-filed claim, received September 5, 2006 by
Webolution, LLC, regarding the sale of certain assets in the amount of $7,000,
which remains unpaid. We are working with the parties involved to create a
payment plan.

          On August 17, 2006 Systemmetrics Corporation filed a claim against the
Company in the circuit court of the First Circuit State of Hawaii alleging
nonpayment of services in the amount of approximately $360,000. During 2005,
Gottaplay, formerly known as Donobi, Inc. entered into an asset purchase
agreement with Koa Internet, Inc. an Internet service provider, which had
undisclosed trade payables outstanding. Systemmetrics alleges we are liable for
the outstanding balance and damages. We are vigorously defending this action and
believe this claim is without merit.

          On November 7, 2006, in the Superior Court of Washington for Grant
Country, Ron and Susan Gear filed a claim alleging sums currently due and owing
on a Promissory Note in the amount of $135,000. Gottaplay is vigorously
defending this action and believes the claim is without merit. In addition, the
Company has filed a Counterclaim. The Promissory Note was an integral part of an
asset purchase arrangement. An element of the consideration was a Non-Compete
Agreement by Mr. and Mrs. Gear. Gottaplay alleges Gear violated that agreement,
thereby rendering the majority of the consideration for the transaction
worthless.

          On February 10, 2005, we filed a claim against the PUD District No. 2
of Grant County, which began as a payment dispute with the PUD alleging
non-payment by Donobi, now known as Gottaplay, and Donobi asserting disparate
treatment at the hands of the PUD when compared to other similar entities doing
                                    45

<PAGE>

business in the PUD's area of operation. The matter was prepared for hearing and a temporary injunction was entered prohibiting the PUD from terminating service to Donobi upon the condition that Donobi pay certain sums on or before a certain date each month. The injunction remains in force, and we continue to comply with it, and Grant County PUD continues to provide services.

## LEGAL MATTERS

The validity of the shares of common stock being offered hereby will be passed upon for us by de Castro P.C., San Diego, California 92101.

## INDEMNIFICATION FOR SECURITIES ACT LIABILITIES

Our Articles of Incorporation, as amended, provide to the fullest extent permitted by Nevada law, our directors or officers shall not be personally liable to us or our stockholders for damages for breach of such director's or officer's fiduciary duty. The effect of this provision of our Articles of Incorporation, as amended, is to eliminate our rights and our stockholders (through stockholders' derivative suits on behalf of our company) to recover damages against a director or officer for breach of the fiduciary duty of care as a director or officer (including breaches resulting from negligent or grossly negligent behavior), except under certain situations defined by statute. We believe that the indemnification provisions in our Articles of Incorporation, as amended, are necessary to attract and retain qualified persons as directors and officers.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 (the "Act" or "Securities Act") may be permitted to directors, officers or persons controlling us pursuant to the foregoing provisions, or otherwise, we have been advised that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable.

## EXPERTS

Our financial statements, as of and for the periods September 30, 2006 and December 31, 2006 have been audited and reviewed, respectively, by Lake and Associates CPA's, LLC, registered independent auditors, as set forth in their report included herein and incorporated herein by reference. Such financial statements have been included in reliance upon such report given upon their authority as experts in accounting and auditing.

## NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus and the documents incorporated by reference contain forward looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act which are intended to be covered by the safe harbors created thereby. Generally, these forward-looking statements include but are not limited to statements about our plans, objectives, expectations, intentions and other statements contained in this prospectus that are not historical facts. You can identify these statements by forward-looking words, such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," "may," "will" and "continue" or similar words. You should read statements that contain these words carefully because they may discuss our future expectations, contain projections of our future results of operations or of our financial condition or state other forward-looking information. We caution readers that these forward-looking statements are not guarantees of future performance or events and are subject to a number of uncertainties, risks and other influences, many of which are beyond our control and may influence the accuracy of the statements and projections upon which the statements are based.

The factors listed in the sections captioned "Risk Factors" as well as any cautionary language in this prospectus, provide examples of risks, uncertainties and events that may cause our actual results to differ materially from the expectations we describe in our forward-looking statements. Before you invest in our common stock, you should be aware that the occurrence of the events described in the "Risk Factors" section and elsewhere in this prospectus could have a material adverse effect on our business, operating results and financial condition.

FURTHER INFORMATION

46

<PAGE>

We file annual, quarterly and special reports, proxy statements and other information with the Securities Exchange Commission, or the SEC. You may inspect and copy these materials at the public reference facilities maintained by the SEC at:

Judiciary Plaza                Citicorp Center
Room 1024                      500 West Madison Street
450 Fifth Street, N.W.         Suite 1400
Washington, D.C. 20549         Chicago, Illinois 60661

You also may obtain copies of these materials from the SEC at prescribed rates by writing to the Public Reference Section of the SEC, 450 Fifth Street, N.W., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for more information on the operation of the public reference rooms. You also can find our SEC filings at the SEC's website at HTTP://WWW.SEC.GOV.

We have filed with the SEC a registration statement on Form SB-2 under the Securities Act of 1933, as amended, or the Securities Act, with respect to the shares of common stock offered in this prospectus. This prospectus is part of that registration statement and, as permitted by the SEC's rules, does not contain all of the information set forth in the registration statement. For further information about us and our common stock, we refer you to those copies of contracts or other documents that have been filed as exhibits to the registration statement, and statements relating to such documents are qualified in all respects by such reference. You can review and copy the registration statement and its exhibits and schedules from the SEC at the address listed above or from its Internet site.

Our World Wide Web site is located at HTTP://WWW.GOTTAPLAY.COM and HTTP://WWW.DONOBI.COM . Information contained on our Web site does not constitute, and shall not be deemed to constitute, part of this prospectus.

FINANCIAL STATEMENTS

The information required by this item is included on pages F-1 through F-34 attached hereto and incorporated by reference. The index to the consolidated financial statements can be found on page F-1.

PART II - INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 24.  INDEMNIFICATION OF DIRECTORS AND OFFICERS.

Our Articles of Incorporation, as amended, provide to the fullest extent permitted by Nevada law, our directors or officers shall not be personally liable to us or our stockholders for damages for breach of such director's or officer's fiduciary duty. The effect of this provision of our

Articles of Incorporation, as amended, is to eliminate our rights and our stockholders (through stockholders' derivative suits on behalf of our company) to recover damages against a director or officer for breach of the fiduciary duty of care as a director or officer (including breaches resulting from negligent or grossly negligent behavior), except under certain situations defined by statute. We believe that the indemnification provisions in our Articles of Incorporation, as amended, are necessary to attract and retain qualified persons as directors and officers.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 (the "Act" or "Securities Act") may be permitted to directors, officers or persons controlling us pursuant to the foregoing provisions, or otherwise, we have been advised that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable.

ITEM 25.  OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

|  |  |  |
|---|---|---|
| SEC Registration Fee | $ | 426.04 |

47

<PAGE>

|  |  |  |
|---|---|---|
| Transfer Agent Fees |  | 3,000.00 |
| Legal Fees and Expenses |  | 10,000.00 |
| Printing and Engraving Expenses |  | 3,500.00 |
| | | ------------------- |
| Total | $ | $16,926.04 |
| | | =================== |

The foregoing expenses, except for the SEC fees, are estimated.

ITEM 26.  RECENT SALES OF UNREGISTERED SECURITIES

RECENT SALES OF UNREGISTERED SECURITIES

The following sets forth information regarding all sales of our unregistered securities within the past three years. All of these shares were exempt from registration under the Securities Act by reason of Section 4(2) of the Securities Act, or Regulation D promulgated thereunder, as transactions by an issuer not involving a public offering, or were exempt by reason of the application of Regulation S. The recipients of securities in each of these transactions represented their intentions to acquire the securities for investment only and not with a view to or for sale in connection with any distribution of the securities, and appropriate legends were affixed to the share certificates and warrants issued in such transactions. All recipients had adequate access, through their relationships with us or otherwise, to information about us. Unless otherwise indicated, the issuances of the securities described below were affected without the involvement of underwriters. Further, the number of shares set forth in this Item 26 gives effect to a one for six (6) reverse split of our common stock effective as of July 24, 2006.

In April 2005, we issued $700,000 of 6% secured convertible debentures, to an unrelated party. A total of 2 debentures were issued. Both debentures were secured by certain assets and property of the Company. Pursuant to terms of these debentures, in anticipation of the consummation of a merger between us and Koa Internet, Inc. a Nevada Corporation, and as additional security for the repayment of the debentures, we placed into escrow, 1,916,667 shares of our

common stock. October 18, 2006 the debentures, plus accrued interest, were paid in full and the 1,916,667 shares of common stock held in escrow were assigned to an accredited investor group which had purchased the debentures from the original holders of the debentures.

On March 17, 2006, the Company issued 500,000 shares of our Common Stock to one entity in consideration for forgiveness and in full payment of a certain Note Payable owed by us, then having a balance of principal and interest of $105,000 ($0.21 per share).

On March 17, 2006, we issued 41,667 shares of common stock to Mr. Clarke Whitney and 33,333 shares of common stock to Norm Johnson, each a director of our Company. These shares were issued in consideration for services rendered to us and had an agreed market value of $0.24 per share.

On March 21, 2006, we entered into a consulting agreement with Terry Stein and in consideration of the services undertaken, we issued 60,833 shares of common stock with a fair market value of $0.90 per share.

On March 21, 2006, we issued 302,262 shares of common stock to the "Donobi, Inc. Profit sharing Plan".

On March 24, 2006 we issued to Terry Stein 33,333 shares of common stock for past services as an officer and director at an agreed market value of $0.84 per share.

On March 24, 2006, we entered into a consulting agreement with John Loidhamer. In consideration of the services undertaken, we issued 8,333 shares of common stock with a fair market value of $0.84 per share.

48

<PAGE>

Between March, 2006 and May, 2006, we sold 5,000,000 shares of common stock to six (6) overseas investors for aggregate proceeds of $300,000 ($.06 per share). We also provided these investors with certain "piggyback" registration rights with respect to the shares.

On July 14, 2006 we issued to Highgate House Funds Ltd., 8,334 shares of our common stock as an inducement to waive a certain condition under an Amendment to an Agreement dated June 30, 2006. The shares had an agreed upon market value of $1.20 a share.

GOTAPLAY INTERACTIVE, INC. - MERGER ISSUANCES

On July 24, 2006, pursuant to a Merger Agreement (the "Agreement"), Gotaplay Interactive, Inc. ("Gotaplay"), a privately held Nevada corporation, merged with Donobi, Inc. In accordance with the Agreement, the Registrant (a) completed a one for 6 reverse stock split; (b) issued 17,744,618 post-reverse split shares of common stock to the former stockholders of Gotaplay;

POST MERGER STOCK ISSUANCES

On July 25, 2006, we issued 2,000,000 shares of common stock to Capital Group Communications in consideration of services rendered, with a fair market value at the date of issuance. However, on February 22, 2007, our board of directors voted to terminate the consulting agreement. On April 20, 2007 we issued instructions for the cancellation of the shares.

On July 26, 2006, we issued 120,000 shares of common stock to Silverdale

Partners, LP in consideration for services rendered, with a fair market value at the date of issuance.

On October 1, 2006, four accredited investors purchased a total of $312,500 in one year Convertible Promissory Notes (the 10/1/06 Notes") which are convertible into shares of our common stock at $1.25 per share. As additional consideration to these accredited investors, we issued: a) 250,000 warrants to purchase 250,000 shares of our common stock at $1.50 per share at an exercise price of $1.50 for a period of two years; and, b) 250,000 warrants to purchase 250,000 shares of our common stock at $2.50 per share for a period of three years;

On October 15, 2006, four accredited investors purchased a total of $845,373 in one year Convertible Promissory Notes (the 10/15/06 Notes") which are convertible into shares of our common stock at $1.25 per share. As additional consideration to these accredited investors, we issued: a) 676,298 warrants to purchase 676,298 shares of our common stock at $1.50 per share at an exercise price of $1.50 for a period of two years; and, b) 676,298 warrants to purchase 676,298 shares of our common stock at $2.50 per for a period of three years;

On January 22, 2007, we entered into a consulting agreement with San Diego Torrey Hills Capital LLC.. Under which the terms of the agreement, in consideration of the services, we issued 30,000 shares of common stock with a fair market price of $2.33 per share.

On January 31, 2007 five accredited investors purchased a total of $120,000 in one year Convertible Promissory Notes (the 1/10/07 Notes") which were convertible into shares of our common stock at $1.25 per share. As additional consideration to these accredited investors, we issued: a) 96,000 warrants to purchase 96,000 shares of our common stock at $1.50 per share at an exercise price of $1.50 for a period of two years; and, b) 96,000 warrants to purchase 96,000 shares of our common stock at $2.50 per for a period of three years;

On January 23, 2007, we issued to J. Roebling Fund, upon the exercise of warrants, 40,000 shares of common stock at an exercise price of $2.50 per share.

49

<PAGE>

From February 23, 2007 through March 31, 2007 we sold to 26 accredited investors, a total of 1,828,000 Units (the "Unit[s]") for $1.25 per Unit (total of $2,285,000.) Each Unit consists of: a) one share of common stock; b) one warrant to purchase one share of our common stock at a purchase price of $1.50 per share for a period of two years, and, c) one warrant to purchase one share of our common stock at a purchase price of $2.50 for a period of 3 years. Prestige Financial Center, acted as Placement Agent for 1,308,000 of the Units (total of $1,630,000) and received compensation consisting of x) a commission of 10% ($163,500) of the amount funded; y) warrants to purchase 416,000 shares of common stock at an exercise price of $1.50 per share for a period of two years; and z) warrants to purchase 130,800 shares of our common stock at an exercise price of $2.50 per share for a period of three years. No commissions were paid on the sale of 520,000 Units which were sold by officers of the Company.

On February 28, 2007, we issued 220,000 shares of our common stock with a value of $2.55 per share in connection with our acquisition of Gamershare, Inc.

On March 15, 2007 we entered into a Consulting Agreement with The Lexicomm Group to provide us with public relation services. Pursuant to the Agreement, we will issue as part of the monthly compensation, $2,500 per month in shares of our common stock with the fair market value on date of issuance. To date, we have issued 504 shares of common stock at $2.48 per share and 1,309 shares of stock at a fair market value of $1.90 per share.

On March 28, 2007, we entered into a Letter of Agreement with Andrew J. Barwicki to provide investor relation services for us. Under the terms of the Agreement, monthly compensation is $3,100 and 4,000 shares of common stock. To date we have issued 4,000 shares of common stock with a fair market value of $2.25 per share.

On March 28, 2007, we entered in a Consulting Agreement with Prominence Media Corp to provide media relations. Compensation, in anticipation of the services to be performed was $168,000 of our common stock with a fair market value of $2.25 per share totaling 74,667 shares of common stock.

ITEM 27.    EXHIBITS

| | |
|---|---|
| 4.1 | Form of Convertible Promissory Note |
| 4.2 | Form of Warrant #1 issued to Selling Stockholders |
| 4.3 | Form of Warrant #2 issued to Selling Stockholders |
| 4.4 | Form of Common Stock Purchase Agreement issued to Selling Stockholders |
| 4.5 | Form of Piggyback Registration Rights Agreement |
| 5.1 | Legal opinion and consent of de Castro P.C. |
| 10.1 | 2007 Directors, Officers And Consultants Stock Option, Stock Warrant And Stock Award Plan |
| 23.1 | Consent of de Castro P.C. (included with Exhibit 5.1) |
| 23.2 | Consent of Auditors |

ITEM 28. UNDERTAKINGS.

(a)          The undersigned registrant hereby undertakes:

(1) To file, during any period in which it offers or sells securities, a post-effective amendment to this registration statement:

50

<PAGE>

(i)          To include any prospectus required by section 10(a)(3) of the Securities Act;

(ii)          To reflect in the prospectus any facts or events which, individually or in the aggregate, represent a fundamental change in the information set forth in this registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the SEC pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the

effective registration statement; and
                                (iii)              To include any additional or changed
material information with respect to the plan of distribution.

            (2) That, for the purpose of determining any liability under
the Securities Act, treat each such post-effective amendment as a new
registration statement relating to the securities offered therein, and the
offering of such securities at that time shall be deemed to be the initial bona
fide offering thereof.

            (3) To remove from registration by means of a post-effective
amendment any of the securities being registered which remain unsold at the
termination of the offering.

            (b)              Insofar as indemnification for liabilities arising under
the Securities Act may be permitted to directors, officers, and controlling
persons of the small business issuer pursuant to the foregoing provisions, or
otherwise, the small business issuer has been advised that in the opinion of the
Securities and Exchange Commission such indemnification is against public policy
as expressed in the Act and is, therefore, unenforceable.

            In the event that a claim for indemnification against such liabilities
(other than the payment by the small business issuer of expenses incurred or
paid by a director, officer or controlling person of the small business issuer
in the successful defense of any action, suit or proceeding) is asserted by such
director, officer or controlling person in connection with the securities being
registered, the small business issuer will, unless in the opinion of its counsel
the matter has been settled by controlling precedent, submit to a court of
appropriate jurisdiction the question whether such indemnification by it is
against public policy as expressed in the Securities Act and will be governed by
the final adjudication of such issue.

            (c) Each prospectus filed pursuant to Rule 424(b) as part of a
registration statement relating to an offering, other than registration
statements relying on Rule 430B or other than prospectuses filed in reliance on
Rule 430A, shall be deemed to be part of and included in the registration
statement as of the date it is first used after effectiveness. Provided,
however, that no statement made in a registration statement or prospectus that
is part of the registration statement or made in a document incorporated or
deemed incorporated by reference into the registration statement or prospectus
that is part of the registration statement will, as to a purchaser with a time
of contract of sale prior to such first use, supersede or modify any statement
that was made in the registration statement or prospectus that was part of the
registration statement or made in any such document immediately prior to such
date of first use.

                                    51
<PAGE>


                            SIGNATURES

        In accordance with the requirements of the Securities Act of 1933, the
Registrant certifies that it has reasonable grounds to believe that it meets all
the requirements for filing on Form SB-2 and has duly caused this registration

statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Gig Harbor, State of Washington, on May 7, 2007.

                         GOTTAPLAY INTERACTIVE, INC.


                         By:/S/ JOHN P. GORST
                         ------------------------------------
                             John P. Gorst,
                             Chief Executive Officer

     In accordance with the Securities Act of 1933, Form SB-2 Registration Statement was signed by the following persons in the capacities and on the dates indicated.


Dated:  May 7, 2007


                    /S/ JOHN P. GORST
                    -------------
                    John P. Gorst
                    Chief Executive Officer and Director

Dated:  May 7, 2007


                    /S/ ASRA RASHEED
                    -------------
                    Asra Rasheed
                    President

Dated:  May 7, 2007


                    /S/ M. CARROLL BENTON
                    -----------------
                    M. Carroll Benton
                    Chief Administrative Officer,
                    Chief Financial Officer, Secretary,
                    Treasurer and Director,

Dated:  May 7, 2007


                    /S/ WILLIAM M. WRIGHT, III
                    ----------------------
                    William M. Wright, III
                    Chief Operating Officer
                    Director

Dated:  May 7, 2007


                    /S/ MARK H. LEVIN
                    --------------
                    Mark H. Levin
                    Director

Dated:  May 7, 2007        /S/ NORM JOHNSON
                    ---------------
                    Norm Johnson
                    Director

52

<PAGE>

INDEX TO FINANCIAL STATEMENTS

Interim Financial Statements for the Three Months Ended
December 31, 2006 - (unaudited)

Balance Sheets...................................................F-2
Statements of Operation..........................................F-3
Statement of Stockholders' Deficit...............................F-4
Statements of Cash Flows.........................................F-5
Notes to Financial Statements....................................F-6

Financial Statements for the Years Ended September 30, 2006
and September 30, 2005

Report of Independent Certified Public Accountants...............F-15
Balance Sheets...................................................F-16
Statements of Operations.........................................F-17
Statement of Stockholders' Deficit...............................F-18
Statements of Cash Flows.........................................F-19
Notes to Financial Statements....................................F-20

F-1

<PAGE>

Gottaplay Interactive, Inc.
and Its Wholly Owned Subsidiaries
Consolidated Condensed Balance Sheets

<TABLE>
<CAPTION>

Decem
(Un
--------

Assets

Current assets
<S>                                                                    <
    Cash ........................................................      $
    Accounts receivable, net of $49,157 allowance for doubtful
        accounts ................................................
    Work-in-progress ............................................
    Prepaid expenses and other current assets ..................
    Deferred charges ............................................
                                                                      -

        Total current assets ...................................
                                                                      -

Fixed assets, net of $688,979 of accumulated depreciation .......
                                                                      -

Other assets
    Intangible assets, net of $186,622 of accumulated
        amortization.............................................
    Deposits ....................................................

```
    Total other assets .............................................        -
                                                                            -
    Total assets ...................................................   $
                                                                       =
```

### Liabilities and Stockholders' Deficit

```
Current liabilities                                                    $
    Accounts payable ..............................................
    Accounts payable - related parties ............................
    Accrued liabilities ...........................................
    Accrued liabilities - related parties .........................
    Deferred and prebilled revenues ...............................
    Convertible debentures ........................................
    Current portion of notes payable ..............................
    Convertible notes payable, net of $327,600 unamortized
        discount...................................................
    Notes and loans payable - related parties .....................
    Obligations under capitalized leases ..........................
    Amounts due - related parties .................................

        Total current liabilities .................................        -
                                                                           -

Long-term liabilities
    Long term portion of notes payable ............................

        Total liabilities .........................................        -
                                                                           -

Stockholders' deficit
    Preferred stock, $0.001 par value, 5,000,000 shares
        authorized, none issued and outstanding ...................
    Common stock, $0.001 par value, 100,000,000 shares
        authorized, 30,810,100 shares issued and 30,806,690
        shares outstanding ........................................
    Treasury stock ................................................
    Additional paid-in capital ....................................
    Common stock authorized, but unissued .........................
    Additional paid-in capital - treasury stock ...................
    Prepaid services paid with common stock .......................
    Accumulated deficit ...........................................

        Total stockholders' deficit ...............................        -
                                                                           -
        Total liabilities and stockholders' deficit ...............   $
                                                                       =
```

    </TABLE>
The accompanying notes are an integral part of these consolidated condensed
financial statements.
                                    F-2

                        Gottaplay Interactive, Inc.
                      and Its Wholly Owned Subsidiaries
                  Consolidated Condensed Statements of Operations
                                  (Unaudited)

<TABLE>
<CAPTION>

                                                            Three months ended
                                                             December 31, 2006
                                                            -------------------

```
<S>                                                           <C>
Revenues ..................................................  $    502,896
Cost of revenues ..........................................       291,077
                                                             ------------
        Loss before operating expenses ...................       211,819
                                                             ------------
Operating expenses
     Fulfillment ..........................................       104,105
     Technology and development ...........................        21,488
     Advertising and marketing ............................       147,798
     General and administrative ...........................     1,063,349
     Officers' compensation ...............................        97,984
     Related party expenses ...............................        35,539
                                                             ------------
     Total operating expenses .............................     1,470,263
                                                             ------------
        Loss from operations ..............................    (1,258,444)
                                                             ------------
Other income (expense)
     Interest income ......................................         9,886
     Gain on disposition of assets ........................           --
     Other income .........................................         2,060
     Interest expense .....................................      (121,086)
                                                             ------------
Total other expense .......................................      (109,140)
                                                             ------------
        Net loss before income taxes ......................    (1,367,584)

Provision for income taxes ................................           --
                                                             ------------
        Net loss ..........................................  $ (1,367,584)
                                                             ============
Weighted average shares outstanding of common stock,
        basic and diluted .................................    30,453,191
                                                             ============
Net loss per common shares outstanding, basic and diluted   $      (0.05)
                                                             ============
</TABLE>
```

The accompanying notes are an integral part of these consolidated condensed
financial statements.

                              F-3
<page>

                      Gottaplay Interactive, Inc.
                    and Its Wholly Owned Subsidiaries
           Consolidated Condensed Statement of Stockholders' Deficit
                 For the three months ended December 31, 2006
                              (Unaudited)

<TABLE>

<CAPTION>

|  | Common Stock | | |
| --- | --- | --- | --- |
|  | Shares | Amount | |
|  | ------------ | ----------- | - |
| <S> | <C> | <C> | <C> |
| Balance at September 30, 2006 .... | 28,893,433 | $      28,893 | $ |
|  | ---------- | ---------- | -- |
| Allocation of discount on convertible notes payable ........ | -- | -- | |
| Recognition of prepaid services rendered and earned ............. | -- | -- | |
| Issuance of common stock in conjunction with settlement of debts .......................... | 1,916,667 | 1,917 | |
| Exercise of 40,000 warrants; stock unissued ......................... | -- | -- | |
| Treasury shares purchased ........ | (3,410) | -- | |
| Net loss for the three months ended, December 31, 2006 ......... | -- | -- | |
|  | ---------- | ---------- | --- |
| Balance at December 31, 2006 ..... | 30,806,690 | $      30,810 | $ |
|  | ========== | ========== | == |

</TABLE>

(Table Continued Below)

F-4

<page>
<TABLE>
<CAPTION>
(Continued From the Table Above)

|  | Common Stock Authorized but Unissued | Prepaid Services | Accu De |
| --- | --- | --- | --- |
|  | -------------- | ----------- | ---- |
| <S> | <C> | <C> | <C> |
| Balance at September 30, 2006 .... | $       -- | $(2,450,000) | $(2 |
|  | ----------- | ----------- | --- |
| Allocation of discount on convertible notes payable ........ | -- | -- | |
| Recognition of prepaid services rendered and earned ............. | -- | 750,000 | |
| Issuance of common stock in conjunction with settlement of | | | |

| | | | |
|---|---|---|---|
| debts ........................... | -- | -- | |
| Exercise of 40,000 warrants; stock unissued ....................... | 100,000 | -- | |
| Treasury shares purchased ........ | -- | -- | |
| Net loss for the three months ended, December 31, 2006 ........ | -- | -- | (1 |
| Balance at December 31, 2006 ..... | $  100,000 | $(1,700,000) | $(4 |

</TABLE>

The accompanying notes are an integral part of this consolidated condensed financial statement.

F-4

Gottaplay Interactive, Inc.
and Its Wholly Owned Subsidiaries
Consolidated Condensed Statements of Cash Flows
(Unaudited)

<TABLE>
<CAPTION>

| | Three months December 31 |
|---|---|
| Increase (Decrease) in Cash | |
| <S> | <C> |
| Net loss ................................................ | $(1,367,5 |
| Adjustment to reconcile net loss to cash (used) in operating activities: | |
| Depreciation and amortization .......................... | 87,4 |
| Gain on disposition of assets .......................... | -- |
| Amortization of discounts .............................. | 79,8 |
| Amortization of prepaid expenses ....................... | 750,0 |
| Share-based compensation for services rendered .......... | -- |
| Changes in assets and liabilities: | |
| Accounts receivable ................................ | 16,0 |
| Accounts payable ................................... | 25,8 |
| Accounts payable - related parties ................. | 15,7 |
| Accrued liabilities ................................ | 29,6 |
| Accrued liabilities - related parties .............. | 7,1 |
| Deferred revenue and pre-billed revenue ............ | 2,9 |
| Other current assets and prepaid expenses .......... | 14,5 |
| Net cash (used) in operating activities | (338,3 |
| Cash flows from investing activities | |
| Purchase of DVD library ................................ | (124,2 |
| Net cash (used) in investing activities .......... | (124,2 |
| Cash flows from financing activities | |

```
Proceeds from convertible notes payable ....................      542,5
Payments on notes payable ..................................      (15,1
Payments on notes payable - related parties ................     (128,1
Payments on capitalized leases .............................       (6,7
Proceeds from exercise of warrants .........................      100,0
Purchase treasury stock ....................................       (7,5
Proceeds from loans - related parties ......................        --
Payments from loans - related parties ......................        --
                                                               ---------
         Net cash provided by financing activities ........      484,9
                                                               ---------

Net increase in cash .......................................       22,4
Cash at beginning of period ................................       61,1
                                                               ---------
Cash at end of period ...................................... $     83,5
                                                               =========
```

</TABLE>

Supplemental disclosures and non-cash investing and financing activities - see Note 12.

The accompanying notes are an integral part of these consolidated condensed financial statements.

F-5

Gottaplay Interactive, Inc. and Its Wholly Owned Subsidiaries
Notes to Consolidated Condensed Financial Statements
(Unaudited)

On July 24, 2006, Gottaplay Interactive, Inc. ("Gottaplay" and the "Company"), formerly known as Donobi, Inc. ("Donobi"), a publicly held company, merged with Gotaplay Interactive, Inc. ("Gotaplay"), a privately held Nevada corporation pursuant to a Merger Agreement ("Agreement"). In accordance with terms of the Agreement, Donobi was to:

(a.) Execute a one for six reverse stock split, prior to the merger, thereby reducing the number issued and outstanding shares of common stock from 65,619,481 to 10,936,580, and

(b.) Issue 17,744,618 post-reverse split shares of common stock to the former stockholders of Gotaplay after the merger, and (c.) Amend its Articles of Incorporation by changing the name of the Company from Donobi, Inc. to Gottaplay Interactive, Inc., and (d.) Elect all the former directors of Gotaplay to the board of directors of Gottaplay and have all Donobi's directors resign except for two individuals, one being an officer of the Donobi and now an officer of Gottaplay.

As a result of the Agreement, the merger transaction was treated for accounting purposes as a "reverse merger", effective July 24, 2006. The legal acquirer is Donobi, Inc. and the accounting acquirer is Gottaplay Interactive, Inc. The merger had been accounted for pursuant to Statement on Financial Accounting Standards ("SFAS") No. 141, "Business Combinations" and SFAS No. 142, "Goodwill and Other intangible Assets".

ORGANIZATION AND DESCRIPTION OF BUSINESS

The consolidated condensed financial statements include the accounts of the Company and its wholly owned subsidiaries. Each division and subsidiary company

separately accounts for its operations and transactions and all inter-company and all intra-divisional transactions have been eliminated.

As a result of this merger there are two distinct operating divisions: (a.) a division operating as an internet service provider ("ISP") and digital video services business, and (b.) a division for on-line video game rental service business offered to the general public. The primary core of business will be the on-line video game rental business.

ON-LINE VIDEO GAME RENTAL DIVISION

The on-line video game rental division began operations in October 2004. The division provides a subscriber access to a comprehensive library of titles via the internets as an alternative to store based gaming rentals. For the standard subscription plan of $20.95 per month, subscribers can generally have up to two titles out at the same time with no due dates, late fees or shipping charges. In addition to the standard plan, the Company offers two other service plans with different price points that allow subscribers to keep either fewer or more titles at the same time. Subscribers select titles at the Company's website, aided by its proprietary recommendation service, and generally receive the game within three business days by U.S. Postal mail service. The gamers then return the game at their convenience using the Company's prepaid mailers. After a title has been returned, the Company mails a title from the subscriber's game queue. All of the Company's subscription revenues are generated in the United States of America.

INTERNET SERVICE PROVIDER DIVISION ("ISP")

Internet related services including connectivity, web access, web hosting and development, video services, networking and development and design to single and multi-unit residential and business customers across the United States of America, principally in the Northwestern part of the U.S.A.

YEAR-END AND DOMICILE
                                    F-6
<PAGE>

The Company and its wholly owned subsidiaries adopted September 30th as its fiscal year end and are domiciled in Nevada.

Note 2 - Basis of Presentation and Summary of Significant Accounting Policies

Certain information and footnote disclosures, normally included in financial statements prepared in accordance with accounting principles generally accepted in the Unites States of America, have been condensed or omitted. It is suggested that these consolidated condensed financial statements be read in conjunction with the consolidated financial statements and notes thereto included in the Amended Annual Report on Form 10-KSB/A for the fiscal year ended September 30, 2006 filed by the Company on January 16, 2007.

A summary of the significant accounting policies consistently applied in the preparation of the accompanying consolidated condensed financial statements is as follows:

PRINCIPLE OF CONSOLIDATION

The consolidated condensed financial statements include the accounts of Gottaplay Interactive, Inc. and its subsidiaries. Intercompany transactions and balances have been eliminated.

MANAGEMENT'S USE OF ESTIMATES AND ASSUMPTIONS

The preparation of the consolidated condensed financial statements in conformity with generally accepted accounting principles in the United States of America requires management to make estimates and assumptions that affect the reported amounts of the assets and liabilities, disclosure of contingent assets and liabilities at the date of the consolidated condensed financial statements, and the reported amounts of revenue and expense during the reporting periods. Actual results may differ from those estimates and assumptions.

RECLASSIFICATIONS

Certain amounts reported in previous periods have been reclassified to conform to the Company's current period presentation.

REVENUE RECOGNITION AND DEFERRED REVENUES

In accordance with the SEC's Staff Accounting Bulletin No. 104, "Revenue Recognition", revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectibility is probable. A summary of each operating division's revenue recognition procedures follows:

On-Line Video Game Rental Division

The Company charges $1.00 for an initial ten-day trial period. At any time during the initial ten-day period, a new subscriber has the right to rescind their agreement, but will not receive full credit for the $1.00 charge.

If the subscriber does not cancel during the ten day period, the Company will charge his credit card account according to the plan selected by the subscriber, and until the subscriber cancels his subscription. The Company recognizes subscription revenue ratably during each subscriber's monthly subscription period. For financial reporting purposes, the Company allocates subscription fees over the number of days in the month for which the fee was charged and will record deferred revenue at the month end for subscription fees received, but not yet earned, which will be fully recognized in the following month. The Company recognized $17,741 of deferred revenues as of December 31, 2006 for this division. All authorized refunds to subscribers are recorded as a reduction of revenues. Revenues from sales of used video games will be recorded upon shipment.

Internet Service Provider Division

                                    F-7
<PAGE>
Internet related revenues are recorded when they are rendered and earned. Revenues from support and maintenance contracts are recognized over the term of the contract. Provisions for discounts and rebates to customers, estimated returns and allowances, and other adjustments are provided for in the same period the related sales are recorded. At December 31, 2006, the Company's ISP division recognized deferred revenues and pre-billed revenues of $236,720.

FAIR VALUE OF FINANCIAL INSTRUMENTS

Financial instruments consist principally of cash, accounts and related party receivables, trade and related party payables, accrued liabilities, short-term obligations and notes receivable. The carrying amounts of such financial instruments in the accompanying consolidated condensed balance sheets approximate their fair values due to their relatively short-term nature. It is management's opinion that the Company is not exposed to any significant currency

or credit risks arising from these financial instruments.

LOSS PER COMMON SHARE

Basic loss per common share is provided in accordance with SFAS 128, "Earnings Per Share." Basic loss per common share is computed by dividing the net loss available to the shareholders of common stock by the weighted average number of common shares outstanding during the period. Diluted loss per common share is computed by dividing the net loss by the weighted average number of common shares including the dilutive effect of common share equivalents then outstanding. Common stock equivalents are not included in the computation of diluted net loss per common share because the effect would be anti-dilutive.

SHARE-BASED PAYMENTS

The Company adopted Statement of Financial Accounting Standards ("SFAS") No. 123 (Revised December 2004), "Share-Based Payment" (SFAS No. 123R), which requires the measurement and recognition of compensation expense for all share-based payment awards made to employees and directors, including stock options, employee stock purchases related to an employee stock purchase plan and restricted stock units based on estimated fair values of these awards over the requisite employee service period. SFAS No. 123R supersedes Accounting Principles Board Opinion NO. 25, "Accounting for Stock Issued to Employees", ("APB No. 25"), which the Company previously followed in accounting for stock-based awards. In March 2005, the SEC issued Staff Accounting Bulletin No. 107 ("SAB No. 107"), to provide guidance on SFAS 123R. The Company has applied SAB 107 in its adoption of SFAS No. 123R.

Under SFAS No. 123R, stock-based compensation cost is measured at the grant date, based on the estimated fair value of the award, and is recognized on a straight-line basis as expense over the employee's requisite service period. The Company has no awards with market or performance conditions. The Company adopted the provisions of SFAS 123R in its fiscal year ended September 30, 2006, using the modified prospective application method. The valuation provisions of SFAS 123R apply to new awards and to awards that are outstanding on the effective date (or date of adoption) and subsequently modified or cancelled; prior periods are not revised for comparative purposes. Estimated compensation expense for awards outstanding on the effective date will be recognized over the remaining service period using the compensation cost calculated for pro forma disclosure under FASB Statement No. 123, "Accounting for stock-Based Compensation".

SEGMENT REPORTING

The Company follows SFAS No. 130, "Disclosures About Segments of an Enterprise and Related Information." This statement requires companies to report information about operating segments in interim and annual financial statements. It also requires segment disclosures about products and services, geographic areas and major customers. The Company has two reportable operating segments as of December 31, 2006. (See also Note 11.)

RELATED PARTIES

F-8

<PAGE>
Related parties, which can be a corporation or individual, are considered to be related if the Company has the ability, directly or indirectly, to control the other party or exercise significant influence over the other party in making financial and operating decisions. Companies are also considered to be related if they are subject to common control or common significant influence. The Company has these relationships and are identified as such in the accompanying consolidated condensed financial statements.

RECENT AUTHORITATIVE ACCOUNTING PRONOUNCEMENTS

In February 2006, the FASB issued SFAS Statement No. 155, "Accounting for
Certain Hybrid Financial Instruments--an amendment of FASB Statements No. 133
and 140" ("SFAS 155"). This Statement amends FASB Statements No. 133, Accounting
for Derivative Instruments and Hedging Activities, and No. 140, Accounting for
Transfers and Servicing of Financial Assets and Extinguishments of Liabilities.
This Statement resolves issues addressed in Statement 133 Implementation Issue
No. D1, "Application of Statement 133 to Beneficial Interests in Securitized
Financial Assets." This Statement permits fair value re-measurement for any
hybrid financial instrument that contains an embedded derivative that otherwise
would require bifurcation, clarifies which interest-only strips and
principal-only strips are not subject to the requirements of Statement 133,
establishes a requirement to evaluate interests in securitized financial assets
to identify interests that are freestanding derivatives or that are hybrid
financial instruments that contain an embedded derivative requiring bifurcation,
clarifies that concentrations of credit risk in the form of subordination are
not embedded derivatives and amends Statement 140 to eliminate the prohibition
on a qualifying special-purpose entity from holding a derivative financial
instrument that pertains to a beneficial interest other than another derivative
financial instrument. SFAS 155 is effective for all financial instruments
acquired or issued for the Company for fiscal year begins after September 15,
2006. The adoption of this standard is not expected to have a material effect on
the Company's results of operations or financial position.

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty
in Income Taxes - an interpretation of FASB Statement No. 109" ("FIN 48") which
prescribes a recognition threshold and measurement attribute, as well as
criteria for subsequently recognizing, derecognizing and measuring uncertain tax
positions for financial statement purposes. FIN 48 also requires expanded
disclosure with respect to the uncertainty in income tax assets and liabilities.
FIN 48 is effective for fiscal years beginning after December 15, 2006, which
will be the Company's calendar year 2007, and is required to be recognized as a
change in accounting principle through a cumulative-effect adjustment to
retained earnings as of the beginning of the year of adoption. The adoption of
FIN 48 is not expected to have a material impact on the Company's results of
operations or financial position.

In June 2006, the Financial Accounting Standards Board ("FASB") ratified the
provisions of Emerging Issues Task Force ("EITF") Issue No. 06-3, "How Taxes
Collected from Customers and Remitted to Governmental Authorities Should Be
Presented in the Income Statement (That Is, Gross versus Net Presentation)."
EITF Issue No. 06-3 requires that the presentation of taxes within
revenue-producing transactions between a seller and a customer, including but
not limited to sales, use, value added, and some excise taxes, should be on
either a gross (included in revenue and cost) or a net (excluded from revenue)
basis. In addition, for any such taxes that are reported on a gross basis, a
company should disclose the amounts of those taxes in interim and annual
financial statements for each period for which an income statement is presented
if those amounts are significant. The disclosure of those taxes can be done on
an aggregate basis. EITF Issue No. 06-3 is effective for fiscal years beginning
after December 15, 2006, which will be the Company's calendar year 2007. The
adoption of EITF Issue No. 06-3 is not expected to have a material impact on the
Company's results of operations or financial position.

In September 2006, the Securities and Exchange Commission issued Staff
Accounting Bulletin No.108 ("SAB No. 108"), "Considering the Effects of Prior
Year Misstatements when Quantifying Current Year Misstatements". SAB No. 108
requires analysis of misstatements using both an income statement (rollover)

approach and a balance sheet (iron curtain) approach in assessing materiality
and provides for a one-time cumulative effect transition adjustment. SAB No. 108
is effective for the fiscal year beginning November 15, 2006. The adoption of
SAB No. 108 is not expected to have a material impact on the Company's results
of operations or financial position.

F-9

<PAGE>
In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements"
("SFAS 157"). While SFAS 157 formally defines fair value, establishes a
framework for measuring fair value and expands disclosure about fair value
measurements, it does not require any new fair value measurements. SFAS 157
applies under other accounting pronouncements that require or permit fair value
measurements. SFAS 157 is required to be adopted effective January 1, 2008 and
the Company does not presently anticipate any significant impact on its
financial position, results of operations or cash flows.

In September 2006, the FASB issued SFAS No. 158, "Employers' Accounting for
Defined Benefit Pension and Other Postretirement Plans - an amendment of FASB
Statements No. 87, 88, 106 and 132(R)" ("SFAS 158"). SFAS 158 requires an
employer to recognize the funded status of its defined benefit pension and other
postretirement plans as an asset or liability in its statement of financial
position and to recognize changes in the funded status in the year in which the
changes occur through other comprehensive income. The funded status of a plan is
measured as the difference between plan assets at fair value and

the benefit obligation, which is represented by the projected benefit obligation
for pension plans and the accumulated postretirement benefit obligation for
other postretirement plans. SFAS 158 requires the recognition, as a component of
other comprehensive income, net of tax, of the gains or losses and prior service
costs or credits that arise during the period but are not recognized as a
component of net periodic benefit cost in accordance with existing accounting
principles. Amounts required to be recognized in accumulated other comprehensive
income, including gains and losses and prior service costs or credits are
adjusted as they are subsequently recognized as components of net periodic
benefit cost pursuant to the recognition and amortization provisions of existing
accounting principles. In addition, SFAS 158 requires plan assets and
obligations to be measured as of the date of the employer's year-end statement
of financial position as well as the disclosure of additional information about
certain effects on net periodic benefit cost for the next fiscal year from the
delayed recognition of the gains or losses and prior service costs or credits.

The Company is required to adopt those provisions of SFAS 158 attributable to
the initial recognition of the funded status of the benefit plans and disclosure
provisions as of December 31, 2006. Those provisions of SFAS 158 applicable to
the amortization of gains or losses and prior service costs or credits from
accumulated other comprehensive income to the net periodic benefit cost are
required to be applied on a prospective basis effective January 1, 2007. The
Company is still in the process of evaluating the impact, if any, of SFAS 158.
However, the Company does not anticipate that the adoption of SFAS 158 will have
any impact on its results of operations or financial position.

Note 3 - Going Concern and Management's Plan

The Company's consolidated condensed financial statements as of December 31,
2006 and for the three month period ended December 31, 2006 have been prepared
using the generally accepted accounting principles applicable to a going
concern, which contemplates the realization of assets and liquidation of
liabilities in the normal course of business. The Company had a net loss of
$1,367,584 and negative cash flows from operations of $338,333 for the three
months ended December 31, 2006. At December 31, 2006, the Company had a working

capital deficit of $2,064,867 and a stockholders' deficit of $759,998. The accompanying consolidated condensed financial statements do not include any adjustments that might result from the ultimate outcome of these risks and uncertainties. As of December 31, 2006, the Company's working capital deficit may not enable it to meet certain financial objectives as presently structured.

The rate at which the Company expends it financial resources is variable, may be accelerated, and will depend on many factors. In order to obtain the necessary operating and working capital, the Company is seeking either public or private equity investors and/or private debt financing. There can be no assurance that such additional funding, if any, will be available on acceptable terms. The Company's continued existence as a going concern is completely dependent upon its ability to grow sales and to secure equity and/or debt financing and there are no assurances that the Company will be successful. Without sufficient short-term financing it would be unlikely for the Company to continue as a going concern.

Note 4 - Accrued Liabilities

Accrued liabilities consist of the following at December 31, 2006:

F-10

<PAGE>

|  |  | Amount |
|---|---|---|
| Payroll, vacations and related | $ | 162,729 |
| Payroll taxes |  | 76,605 |
| Business taxes |  | 47,333 |
| Other expenses |  | 25,041 |
| Interest |  | 80,695 |
| Total accrued liabilities | $ | 392,403 |

Note 5 - Notes and Loans Payable - Related Parties

Three related entities are owed a total of $431,484. These notes and loans are all considered as a current liability.

Applicable interest rates range from 4.0% to 18.0%, and the details of these related party obligations are:

(i.) Note payable for $60,509 to a Director of the Board, 9.5% interest, unsecured,
(ii.) Note payable for $59,000 to an officer of the Company, 18% interest, secured with personal property, and
(iii.) Notes and loans totaling $311,975 to an investor/stockholder; 4% interest on the notes; and, all debt is unsecured.

Note 6 - Notes Payable and Other Loans

The Company has nine notes payable at December 31, 2006 totaling $372,139. These notes bear interest ranging from 7.79 % to 18.0% per annum. Three notes, totaling $60,557, are collateralized by personal property of the Company, and six notes totaling $311,582, do not carry security or collateral. The long-term portion of these notes is estimated at $80,000.

Note 7 - Secured Convertible Notes Payable

In October 2006, the Company consummated a private placement financing agreement

with four investors for a total of $1,250,000, of which these funds will be distributed over two phases. The Company received $312,500 in October 2006 for the first phase funding, and in the form of four convertible secured 9% promissory notes. These obligations are due within one year of each note's issuance and are convertible into 250,000 shares of par value common stock, valued at $1.25 per share. In conjunction with these notes, the Company granted warrants to purchase shares of common stock, with terms as follows:

(a.) 250,000 warrants exercisable within two years from the date of grant at $1.50 per share, and

(b.) 250,000 warrants exercisable within three years from the date of grant at $2.50 per share. In December 2006, 40,000 warrants were exercised at $2.50 per share for total proceeds of $100,000. These shares were issued in January 2007.

The Company has also received of $230,000 during November and December 2006 which is applicable to the second phase of funding which totals $937,500. The convertible notes' terms under this phase are identical to the first phase terms. A total of 1.5 million warrants will be granted as funds are received, described as follows: (a.) 750,000 warrants will be exercisable within two years of the grant date at $1.50 per share, and (b.) 750,000 warrants will be exercisable within three years from the grant date at $2.50 per share.

Each purchaser has been granted a pro-rata security interest in all the Company's assets.

For the three months ended December 31, 2006, the Company recorded discounts on these convertible notes payable totaling $407,419, which are equal to the fair value of the warrants granted during the three months ended December 31, 2006, as determined using the Black-Scholes Option Pricing Model. The Company recognized $79,819 of interest expense on the discounts for the three months ended December

F-11

<PAGE>
31, 2006. The unamortized balance at December 31, 2006 is $327,600. Discounts recognized are being amortized ratably over twelve months, the term of each convertible note payable.

Note 8 - Secured Convertible Debentures

At September 30, 2006, the Company owed $464,600 on a 6% Secured Convertible Debenture A, and $400 on a 6% Secured Convertible Debenture B. On October 18, 2006 the balances due on these debentures plus accrued interest of $58,919 were paid in full with the release of 1,916,667 shares of common stock originally held in escrow for the benefit of the debenture holders as collateral on these securities. In addition, $210,000 of loans to a related party/investor was paid off as part of the complete transaction to payoff these debentures.

Note 9 - Options and Warrants

Under FASB Statement 123R, the Company estimates the fair value of each stock award at the grant date by using the Black-Scholes option pricing model with the following weighted average assumptions used for the grants, respectively; dividend yield of zero percent for all periods; expected volatility ranging from 138.16 % and 143.78%; risk-free interest rates ranging from 4.72% and 4.80%; and, expected lives ranging from 2.0 and 3.0 years for warrant awards granted during the three months ended December 31, 2006.

A summary of the Company's stock options and warrants as of December 31, 2006 and changes during the three months ended December 31, 2006 is presented below: