John R. Mayer (#197765)
JOHN R. MAYER, APLC
2550 Fifth Avenue, Suite 520
San Diego, California 92103
Phone: (619) 794-2651
Fax: (619) 794-2653

Attorneys for Defendants and Counter-Claimants Gottaplay Interactive, Inc., John P. Gorst, and Mark H. Levin

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAPITAL GROUP COMMUNICATIONS, INC., a California Corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>GOTTAPLAY INTERACTIVE, INC. a Nevada corporation; JOHN P. GORST, an individual; MARK H. LEVIN, an individual; and DOES 1 through 50, inclusive,<br><br>    Defendants. | CASE NO.:  C-07-03632-EMC<br><br>**OPPOSITION BY GOTTAPLAY INTERACTIVE, INC. TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        October 24, 2007<br>Time:       3:00 p.m.<br>Judge:      Hon. Edward M. Chen<br>Location:   15th Floor, Courtroom C |
| GOTTAPLAY INTERACTIVE, INC. a Nevada corporation; JOHN P. GORST, an individual; and MARK H. LEVIN, an individual,<br><br>    Counter-Claimants,<br><br>    v.<br><br>CAPITAL GROUP COMMUNICATIONS, INC., a California Corporation, and DOES 1-50, inclusive,<br><br>    Counter-Defendants. | |

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES

I.      INTRODUCTION                                                                          1

II.     FACTUAL BACKGROUND                                                           1

    A.      CGC Regularly Engages In Capital Raising Services                      1

    B.      CGC Boasted Its Ability to Raise Capital, Thereby Inducing Gottaplay to     2
        Retain CGC to Help Raise Capital

    C.      The Consulting Agreement Obligated CGC to Perform Capital Raising Services     6
        and Included Success-Based Compensation

    D.      CGC Did Not Perform As Promised Under the Consulting Agreement, Except
        For Limited Attempts to Raise Capital                                  7

III.    ARGUMENT                                                                         8

    A.      Preliminary Injunction Standard                                        8

    B.      CGC's Injunction Requests Are Disfavored by Courts and Require         9
        Heightened Scrutiny

    C.      The Balance of Hardships Weighs Significantly In Gottaplay's Favor     10

        1.      There is No Substantial Threat of Harm to Capital Group        10

        2.      Any Harm to Capital Group Is Outweighed by the Harm to Gottaplay     11

    D.      CGC Cannot Demonstrate A Likelihood of Success on Its Breach of Contract     12
        and Specific Performance Causes of Action

        1.      CGC Cannot Demonstrate a Likelihood of Success Because the     12
            Consulting Agreement Requires CGC to Act as an Unlicensed Broker
            and is Therefore Illegal

            a.      Federal Law Prohibits Unlicensed Broker Activities and     12
                Provides for Rescission of Any Contract Wherein A
                Purported Finder Agrees to Perform Broker Activities

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                                    C-07-03632-EMC

b.     California Law Also Prohibits Unlicensed Broker Activities     14
and Provides for Rescission of Any Contract in Which a
Purported Finder Agrees to Perform Broker Activities

c.     CGC Agreed to Perform Broker Activities Under the Consulting     15
Agreement, Thereby Making the Agreement Illegal Under Federal
and California Law

d.     CGC Actually Performed Broker Activities, Thereby Engaging in     18
in Illegal Conduct Precluding Recovery of Compensation Under
the Consulting Agreement

2.     CGC Cannot Show a Likelihood of Success Because It Fraudulently     20
Induced Gottaplay to Enter Into the Consulting Agreement

3.     CGC Cannot Show a Likelihood of Success Because Gottaplay is     22
Entitled to Rescission, Under California Civil Code Section 1689(b)(4),
Due to the Material Failure of Consideration by CGC

4.     CGC Cannot Demonstrate a Likelihood of Success Because CGC Would     24
be Unjustly Enriched if It Received 2,000,000 Shares of Gottaplay Stock

5.     CHC Cannot Demonstrate a Likelihood of Success Because Gottaplay     25
Is Not Liable for Any Debts of Western

IV.     CONCLUSION     25

OPPOSITION TO MOTION FOR PRELIM INJUNCTION      C-07-03632-EMC

# TABLE OF AUTHORITIES

## FEDERAL STATUTES

|  | Page |
|---|---|
| 15 U.S.C. § 29(b) | 12 |
| 15 U.S.C. § 78c(a)(4)(A) | 12 |
| 15 U.S.C. § 78cc(b) | 12 |
| 15 U.S.C. § 78o(a)(1) | 12, 20 |

## CALIFORNIA STATUTES

| | |
|---|---|
| Cal. Civ. Code § 1689(b)(1) | 14, 22 |
| Cal. Civ. Code § 1689(b)(4) | 22 |
| Cal. Corp. Code § 25004 | 14 |
| Cal. Corp. Code § 25210 | 14, 20 |

## FEDERAL CASES

| | |
|---|---|
| *Arcamuzi v. Continental Airlines,* 819 F.2d 935 (9th Cir. 1987). | 8 |
| *Berckeley Investment Group, Ltd. v. Colkitt,* 455 F.3d 195 (3rd Cir. 2006). | 12 |
| *Dept. of Parks & Rec. V. Bazaar Del Mundo*, 48 F.3d 1118 (9th Cir. 2006). | 9 |
| *Dominion Video Satellite v. EchoStar Satellite Corp.*, 269 F.3d 1149 (10th Cir. 1002). | 10 |
| *Massachusetts Fin. Ser*vs. *Inc. v. Securities Investor Prot. Corp.*, 545 F.2d 754 (1st Cir. 1976). | 12 |
| *Sanborn Mfg. Co. v. Campbell Hausefeld/Scott Fetzer Co.*, 997 F.2d 484 (8th Cir. 1993). | 10 |
| *Schrier v. Univ. of Colorado*, 427 F.3d 1253 (10th Cir. 2005). | 9 |
| *Simula v. Autoliv*, 175 F.3d 716 (9th Cir. 1999). | 9 |
| *Southwest Voter Registration Ed. Project v. Shelley*, 344 F.3d 914 (9th Cir. 2003). | 9 |

## CALIFORNIA CASES

| | |
|---|---|
| *Alpha Capital Atkiengesellschaft v. Group Mgmt. Corp.,* 2002 WL 31681798 (S.D.N.Y. Nov. 25, 2002). | 11 |
| *California Federal Bank v. Matreyek,* 8 Cal.App.4th 125 (1988). | 24 |
| *Evans v. Riverside International Raceway,* 237 Cal.App.2d 666 (1965). | 14, 15 |

*Lyons v. Stevenson,* 65 Cal.App.3d 595 (1977). 14, 15, 17

*Nationwide Investment Corp. v. California Funeral Service, Inc.*, 40 Cal.App.3d 494 (1974). 20

*Netwolves Corp. v. Sullian,* 2001 WL 492463 (S.D.N.Y. May 9, 2001). 11


**SECURITIES & EXCHANGE COMMISSION NO-ACTION LETTERS**

*BondGlobe, Inc.*, SEC No-Action Letter, 2001 SEC No-Act. LEXIS 140 (February 6, 2001). 13

*Dominion Resources, Inc.*, SEC No-Action Letter, 1984 SEC No-Act. LEXIS 2511 13
        (August 24, 1985).

*Dominion Resources, Inc.*, SEC No-Action Letter, 2000 SEC No-Act. LEXIS 304 13, 16, 19
        (March 7, 2000).

*H.C. Copeland and Association Equities, Inc.*, SEC No Action Letter, 1982 WL 19102 18
        (April 8, 1982).

*Hallmark Capital Corporation*, SEC No-Action Letter, 2007 SEC No-Act. LEXIS ___ 13, 14, 18
        (June 11, 2007).

*Henry Goppelt*, SEC No-Action Letter, 1974 SEC No-Act. LEXIS 2415 at 2-3 (June 2, 1974). 12, 16

*John W. Loofbourrow Associates, Inc.,* SEC No-Action Letter, 2006 SEC No-Act. LEXIS 523 13
        at 5 (June 29, 2006).

*May-Pac Management Corporation*, SEC No-Action Letter, 1973 SEC No-Act. LEXIS 1117 13
        at 1, 3-4 (Dec. 20, 1973).

*Mike Bantuveris*, SEC No-Action Letter, 1975 SEC No-Act. LEXIS 2158 at 1-2 13
        (Oct. 23, 1975).

*Paul Anka*, SEC No-Action Letter, 1991 SEC No-Act. LEXIS 925 (July 24, 1991). 13, 14

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.  INTRODUCTION**

3        The motion for preliminary injunction filed by Plaintiff/Counter-Defendant Capital Group

4   Communications, Inc. ("CGC") must be denied.  CGC cannot demonstrate a probability of success

5   on the merits of its claims for breach of contract and specific performance because the consulting

6   agreement between CGC and Defendant/Counter-Claimant Gottaplay Interactive, Inc. ("Gottaplay")

7   violates federal and state securities laws.  CGC is not licensed to perform the broker services

8   promised under the agreement, and CGC engaged in illegal broker activities in attempting to raise

9   capital for Gottaplay.  Additionally, CGC fraudulently induced Gottaplay to enter into the

10  agreement, failed to perform under the agreement, and would be unjustly enriched by receiving the

11  compensation it seeks (more than 2,000,000 shares of Gottaplay stock).

12        Furthermore, the balance of hardships weighs substantially in Gottaplay's favor.  Requiring

13  Gottaplay to register the subject shares (which have been deposited with the Court in the related

14  interpleader action) for the purpose of CGC selling such shares would give CGC all, or substantially

15  all, of the relief it could obtain if successful on the merits of its contract claims at trial.  It also

16  would significantly and irreparably harm Gottaplay and its shareholders.  Gottaplay is a very small

17  publicly traded company, and 2,000,000 shares represent 6% of the entire company.  Sale of the

18  stock on the open market would most likely cause major dilution to Gottaplay's shareholders and

19  irreparable harm to Gottaplay's capital structure, especially if the Court determines in this matter

20  that CGC is not entitled to the shares.

21        Issuing the *mandatory* injunction sought by CGC, prior to a trial on the merits, and even

22  prior to discovery, would be manifestly unjust, in light of the plain illegality of the consulting

23  agreement and the harm to Gottaplay that would result.  Accordingly, the Court should deny CGC's

24  motion for preliminary injunction.

25

**II. FACTUAL BACKGROUND**

26  **A.  CGC REGULARLY ENGAGES IN CAPITAL RAISING SERVICES**

27        CGC provides various services, including raising capital for various private and publicly-

28  traded companies, as well as assisting in effecting mergers and acquisitions.  (Declaration of John P.

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                                C-07-03632-EMC

1   Gorst in Support of Opposition to Motion for Preliminary Injunction ("Gorst Decl."), ¶ 23, and Exh.

2   B, Pages from CGC Website.)  CGC represents on its website that its

3           network of funds, institutions and high net worth individuals can steer you to
            financing you would never be able to locate on your own. As a CGC client,
4           you automatically become a beneficiary of our extensive experience, our
            reputation and industry knowledge. More importantly we will mine our
5           database of investors and companies to identify financial prospects that fit
            your company's specific criteria.
6

7   (Gorst Decl., ¶ 23, and Exh. B, CGC "Raising Capital" Webpage.)  On another page of its website,

8   CGC represents the following:

9           Our introductions spark investor interest, and that's only just the beginning!
            We work with you to foster and strengthen these relationships. We convey
10          your messages in an easy to understand and concise method that actually helps
            the financial community make investment decisions.
11

12  (Gorst Decl., ¶ 23, and Exhibit B, CGC "Financial Community Communications" Webpage.)

13  **B.  CGC BOASTED ITS ABILITY TO RAISE CAPITAL, THEREBY INDUCING**
        **GOTTAPLAY TO RETAIN CGC TO HELP RAISE CAPITAL**
14

15          Gottaplay provides video game rentals on a subscription basis through its website.

16  Gottaplay is a reporting company under the Securities & Exchange Act of 1934.  Although publicly

17  traded, Gottaplay is considered to be a "micro-cap" company.  Gottaplay became a public company

18  after merging with Donobi, Inc. ("Donobi") in July 2006.  (Gorst Decl., ¶¶ 2-3.)

19          Prior to merging with Donobi, Gottaplay was in the development stage and needed capital.

20  Gottaplay determined that its chances of raising capital would be greater if its common shares

21  became publicly traded.  In October 2005, Gottaplay commenced negotiations with Western

22  Transitions, Inc. ("Western"), whose shares were traded on the over the counter Pink Sheets, to

23  effect a "reverse merger."  Western was controlled by Phillip Knight ("Knight"), who previously

24  loaned funds to Gottaplay and is now a significant stockholder in Gottaplay.  (Gorst Decl., ¶ 4.)

25          In early November 2005, Knight introduced Gottaplay's chief executive officer, John P.

26  Gorst ("Gorst"), on the telephone to Bosch, the president of CGC.  Bosch stated that CGC was a

27  "One Stop Shop" that could handle capital raising, investor relations, financial consulting, and

28  advice with regard to mergers and acquisitions, once Gottaplay had completed the reverse merger

1   with Western.  Gottaplay was most interested in the money raising services and told Bosch that

2   Gottaplay needed to raise $2 million in working capital.  Gorst was impressed with Bosch because

3   Bosch named several investment bankers as potential sources of financing for Gottaplay.  Bosch

4   also stated that CGC would introduce Gottaplay to high net worth "accredited investors" that would

5   invest in Gottaplay if they knew that Bosch and CGC were involved.  Bosch stated that he was

6   impressed with Gottaplay's business concept.  (Gorst Decl., ¶ 5.)

7        Bosch also told Gorst that he was so confident in CGC's ability to raise the capital sought by

8   Gottaplay that CGC was willing to invest in Western even before the proposed reverse merger was

9   completed.  Gorst later learned that CGC had invested $125,000 in Western.  Bosch even

10  encouraged Gorst to review CGC's website and to review the filings made with the Securities &

11  Exchange Commission (the "SEC") by clients of CGC.  Bosch asked when Gottaplay could retain

12  CGC.  Gorst replied that Gottaplay could not retain CGC until Gottaplay became a publicly traded

13  company.  (Gorst Decl., ¶ 6.)

14       Gorst reviewed the public information on Xethanol, Inc., one of the companies Bosch

15  mentioned as a CGC client.  The information appeared to confirm that CGC would be able to raise

16  capital for Gottaplay.  (Gorst Decl., ¶ 7.)

17       On or about November 10, 2005, Gottaplay entered into a Letter of Intent with Western,

18  pursuant to which Gottaplay would merge with and into Western.  (Gorst Decl., ¶ 8.)  On November

19  17, 2005 Gottaplay borrowed a total of $250,000 from Western.  (Gorst Decl., ¶ 9.)

20       On December 16, 2005, Gorst traveled to San Francisco to attend a Christmas party hosted

21  by CGC.  Knight also attended.  Gorst attended the party because Bosch stated that potential

22  investors and sources would attend and that Gorst would be able to develop their interest in

23  investing in Gottaplay.  At the party, Bosch reiterated to Gorst how confident he was that CGC

24  would be able to raise the $2 million for Gottaplay.  He introduced Gorst and Knight to many

25  individuals, some of whom were associated with investment bankers and broker/dealers, and some

26  of whom were high net worth individuals.  Bosch boasted that each of them had either raised capital

27  for CGC's clients or had personally invested in existing clients of CGC.  Bosch again stated that

28  CGC assisted Xethanol, Inc. in raising capital through an investment banker.  (Gorst Decl., ¶ 10.)

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                                                    C-07-03632-EMC

1   On December 21, 2006, Gottaplay executed an agreement with Western pursuant to which

2   the two companies would merge, subject to certain contingencies.  (Gorst Decl., ¶ 11.)

3   Between December 17, 2005 and January 5, 2006, Gorst had several phone conversations

4   with Bosch.  In those conversations, Bosch stated that, upon engagement by Gottaplay, CGG would

5   set up many meetings and introductions to investment banks, funds, high net worth individuals, and

6   others who were potential investors in Gottaplay.  Bosch said he would introduce Gottaplay to,

7   among others, Roth Capital Partners and Brookstreet Securities, two investment banking firms that

8   would be capable of providing capital to Gottaplay.  (Gorst Decl., ¶ 12.)

9   CGC was also in discussions with Western to help raise capital for Western.  On January 5,

10  2006, since Gottaplay was in a merger transaction with Western, Gorst received a proposed

11  Consulting Agreement between CGC and Western (the "Western Consulting Agreement").  (Gorst

12  Decl., ¶ 13, and Exh. A, Western Consulting Agreement.)  The form of the Western Consulting

13  Agreement appeared identical to the one that Gottaplay eventually signed.  (Gorst Decl., ¶ 13.)

14  Gorst spoke to Bosch about several issues concerning the proposed Western Consulting

15  Agreement.  Gorst asked if CGC was registered as a broker/dealer because he did not want

16  Gottaplay to run afoul of any legal issues with investors brought in by CGC.  Bosch stated that CGC

17  was not required to be registered as a broker/dealer.  He also pointed out language of the Consulting

18  Agreement that states that CGC is not required to have any licenses under federal and state

19  securities laws.  Because Bosch and CGC came across as so impressive and knowledgeable, Gorst

20  assumed Bosch knew what he was talking about in this regard.  (Gorst Decl., ¶ 14.)

21  Although Bosch claims CGC was providing consulting services for Gottaplay in anticipation

22  of a planned merger with Western, Gottaplay is not aware of any services that CGC provided during

23  that period.  Gottaplay did not tell Bosch that CGC would be compensated in stock of a "newly

24  formed entity."  (Gorst Decl., ¶ 16.)

25  On February 17, 2006, the proposed merger with Western fell through.  (Gorst Decl., ¶ 15.)

26  Shortly thereafter, Gottaplay commenced negotiations with Donobi.  During the negotiations, Bosch

27  stated to Gorst that CGC had invested $125,000 in Western and that he was concerned about his

28  investment.  Gorst replied that Gottaplay never received any proceeds from CGC.  Gorst clarified

1    that Gottaplay had loans payable to Western recorded on its books of $305,000 and that CGC would

2    have to deal with Western directly.  These loans to Gottaplay by Western were unrelated to CGC's

3    investment in Western.  (Gorst Decl., ¶ 17.)

4           On April 27, 2006, shortly after Gottaplay entered into the merger agreement with Donobi,

5    Bosch sent Gorst a new draft of a Consulting Agreement.  The terms and conditions of this draft

6    were virtually identical to the Western Consulting Agreement.  Gorst stated to Bosch that Gottaplay

7    would not execute any agreements until the merger with Donobi was complete.  Bosch reiterated

8    that he was ready to introduce Gottaplay to his "sources of capital" as soon as Gottaplay was "on

9    board."  (Gorst Decl., ¶ 18.)

10          Between April 27, 2006 and July 25, 2006, Gorst had several conversations with Bosch

11   regarding raising capital.  Bosch stated he would make an introduction to one of CGC's sources as a

12   good faith gesture and to enhance Gorst's confidence in CGC's ability to raise capital.  Bosch

13   conducted a conference call with Gorst and Christopher Jennings, the Managing Director of Roth

14   Capital Partners ("Roth") of Newport Beach, California.  In the call, Bosch extolled the virtues of

15   Gottaplay's business plan, stated that Gottaplay wanted to raise $2 million, and urged Mr. Jennings

16   to meet with Gorst.  Mr. Jennings seemed to have interest in learning more about Gottaplay and its

17   prospects.  Mr. Jennings recommended that Gottaplay hire CGC.  (Gorst Decl., ¶ 19.)

18          Prior to July 25, 2006, Gorst, along with Asra Rasheed, president of Gottaplay, traveled to

19   Roth's offices in Newport Beach where they met with Mr. Jennings and Greg Sutton, Vice

20   President of Investment Banking for Roth about the possibility of investing in Gottaplay.  However,

21   no transaction ever materialized from this meeting.  (Gorst Decl., ¶ 20.)

22          On July 3, 2006, Gottaplay and Donobi successfully merged.  (Gorst Decl., ¶ 21.)

23          On or about July 20, 2006, Gorst received from Bosch a copy of a proposed Consulting

24   Agreement between CGC and Gottaplay.  Gorst inquired of Bosch as to why he was asking for

25   2,000,000 shares of Gottaplay stock upfront and finder's fees/commissions on all funds received

26   from sources introduced to Gottaplay by CGC.  Bosch stated that CGC would raise capital for

27   Gottaplay and handle all public and investor relations.  Bosch did not tell Gorst that the 2,000,000

28   shares were to be issued because CGC was foregoing opportunities.  (Gorst Decl., ¶ 22.)

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                                        C-07-03632-EMC

After again speaking with Bosch and being assured by Bosch that CGC would perform investor relations and raise capital for Gottaplay, Gottaplay executed the Consulting Agreement with CGC on or about July 25, 2006 (the "Consulting Agreement").  Subsequently, Gottaplay issued to CGC the 2,000,000 shares of common stock.  (Gorst Decl., ¶ 24.)

## C.  THE CONSULTING AGREEMENT OBLIGATED CGC TO PERFORM CAPITAL RAISING SERVICES AND INCLUDED SUCCESS-BASED COMPENSATION

The Consulting Agreement provides that CGC shall assist Gottaplay in raising capital. (Bosch Decl., Exh. A, Consulting Agreement, ¶ 2.)  Paragraph 2 states:

> 2)    Duties of Consultant. The Consultant agrees that it will generally provide the following specified consulting services:
>
> a)    Assist the Company in raising capital through introductions. (It is understood CGC is not an "investment banking" firm);
>
> b)    Consult and assist the Company in developing and implementing appropriate plans and means for presenting the Company….to the financial community, establishing an image for the Company in the financial community, and creating the foundation for subsequent financial public relations efforts;
>
> c)    Introduce the Company to the financial community;…
>
> f)    [d]isseminate information regarding the Company to shareholders, brokers, dealers and other investment community professionals and the general investment public;…
>
> g)    …conduct meetings, in person or by telephone with brokers, dealers, analysts and other investment professionals to communicate with them regarding the Company's plans, goals and activities…;…
>
> h)    Otherwise perform as the Company's consultant for public relation and relations with financial professionals.

(Bosch Decl., Exh. A, Consulting Agreement, ¶ 2.)  The Consulting Agreement provides for mainly two forms of compensation to CGC for all the services rendered by CGC:  (i) a fixed payment of 2,000,000 shares of Gottaplay's common stock; and (ii) a success-based commission of 5% of any financing or acquisition transaction arranged by CGC.  (Bosch Decl., Exh. A, Consulting Agreement, ¶¶ 4-5.)  Although the 2,000,000 shares payment is characterized as a "Commencement

1   Bonus," the payment is provided as "compensation for services described in this Agreement."

2   (Bosch Decl., Exh. A, Consulting Agreement, ¶ 4.)  Except for the possibility of earning success-

3   based commissions in Paragraph 5, there is no other compensation paid to CGC for any of the

4   future services to be performed under the Consulting Agreement.

5          Based on the closing price on the OTC-Bulletin Board, the value of each share of

6   Gottaplay's common stock on July 25, 2006 was $1.50 per share, or $3,000,000 for the 2,000,000

7   shares.  The shares would have represented approximately 6% of the company.  (Gorst Decl., ¶ 24.)

8          In addition to oral representations, CGC made written representations to Gottaplay under the

9   Agreement, including that CGC was not required to maintain any licenses or registrations under

10  federal or state law.  (Bosch Decl., Exh. A, Consulting Agreement, ¶ 9.)

11  **D.  CGC DID NOT PERFORM AS PROMISED UNDER THE CONSULTING**
    **AGREEMENT, EXCEPT FOR LIMITED ATTEMPTS TO RAISE CAPITAL**
12

13         Soon after Gottaplay delivered to CGC the 2,000,000 shares of common stock, it became

14  apparent to Gottaplay that CGC had little incentive to perform any services (other than attempting

15  to arrange financing in order to receive the 5% fee).

16         CGC's supposed investor and public relations services were very minimal and at times non-

17  existent.  During the latter part of 2006, Gorst told Bosch and CGC's Senior Communications

18  Consultant, Richard Carpenter ("Carpenter") that he was unhappy that the shareholder base of

19  Gottaplay was not increasing and that CGC was ineffective at promoting Gottaplay.  In addition,

20  Gottaplay itself prepared all of its corporate press releases.  CGC's sole involvement in such press

21  releases was simply reviewing some of the releases.  As a professional courtesy, Gottaplay listed

22  Carpenter's name as the "contact" person in some of the press releases.  Gorst felt CGC had

23  wrongfully induced it into giving 2,000,000 shares and decided to formally discuss this with

24  Gottaplay's board of directors.  (Gorst Decl., ¶ 31.)

25         When Gorst asked Carpenter several times why CGC was not performing any appreciable

26  public and investor relations services, as promised under the Consulting Agreement, he repeatedly

27  made excuses.  On January 10, 2007, after growing tired of CGC's unacceptable peformance and

28  excuses, Gottaplay hired a new public and investor relations firm, Prominence Media Corporation

    ("Prominence") to replace CGC.  Prominence immediately started performing financial public

1 relations beyond anything CGC had done, including coordinating financial radio and newscast

2 appearances and bringing in a research firm.  Prominence's services had an immediate impact on

3 Gottaplay.  Also, Prominence had no capital-raising duties.  (Gorst Decl, ¶ 32.)

4      With respect to CGC's capital raising efforts, CGC initially set out to arrange for Gottaplay

5 to meet their "contacts."  (Gorst Decl., ¶ 25.)  Carpenter provided information regarding Gottaplay

6 to potential funders/investors, discussed financing terms with such investors, conducted several

7 conference calls in which he extolled the virtues of Gottaplay and urged broker/dealers or

8 investment groups to invest in Gottaplay, and stated to Gottaplay that he would negotiate a fair

9 securities price on Gottaplay's behalf.  (Gorst Decl., ¶¶ 25-28.)  None of the discussions conducted

10 by CGC resulted in the receipt of any capital by Gottaplay.  Gottaplay became quite concerned

11 about CGC's failure to raise capital for Gottaplay as there was nothing to show for the two million

12 shares CGC had received.  (Gorst Decl., ¶ 29.)

13      On or about February 22, 2007, Gottaplay's board of directors terminated the Consulting

14 Agreement.  (Gorst Decl., ¶ 33.)  On April 7, 2007, Gorst talked to Bosch about the possibility of

15 canceling the 2,000,000 shares of stock.  In that conversation, Gorst explained to Bosch that CGC

16 failed to perform and that Gottaplay felt misled about CGC's capabilities.  Bosch threatened to

17 commence litigation, so Gottaplay attempted to settle this dispute by offering to allow CGC to keep

18 1,000,000 shares.  Bosch declined CGC's offer, and the board of directors cancelled the shares on

19 April 20, 2007.  (Gorst Decl., ¶ 34.)

20                                    **III.  ARGUMENT**

21 **A.  PRELIMINARY INJUNCTION STANDARD**

22      In order to obtain a preliminary injunction, the plaintiff must satisfy general equitable

23 requirements by showing a significant threat of "irreparable injury" and that the legal remedies are

24 "inadequate."  *Arcamuzi v. Continental Airlines*, 819 F.2d 935, 937 (9th Cir. 1987).  However, the

25 plaintiff must also meet the following additional criteria: (1) a likelihood of success on the merits;

26 (2) that the threatened injury outweighs any damage the injunction might cause the defendant (i.e.

27 the balance of hardships favors the plaintiff); and (3) that the injunction will not disserve the public

28 interest.  *Id.* at 542.

---
OPPOSITION TO MOTION FOR PRELIM INJUNCTION                    C-07-03632-EMC

1    Under an alternative test, the plaintiff might meet its burden by showing either: (1) a

2 combination of probable success on the merits and the possibility of irreparable injury; or (2)

3 serious questions as to these matters and the balance of hardships tipping sharply in the plaintiff's

4 favor. *Dept. of Parks & Rec. v. Bazaar Del Mundo*, 448 F.3d 1118, 1123 (9th Cir. 2006). In its

5 motion, CGC relies solely on meeting this alternative test and ignores the traditional test.

6    Under either test, the analysis "creates a continuum: the less certain the district court is of

7 the likelihood of success on the merits, the more the plaintiffs must convince the district court that

8 the public interest and balance of hardships tip in their favor." *Southwest Voter Registration Ed.*

9 *Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003). Or, as illustrated in another case, the balance

10 of harm evaluation should precede the likelihood of success analysis because the court cannot know

11 how strong and substantial the plaintiff's showing of likely success on the merits must be. *Simula v.*

12 *Autoliv*, 175 F.3d 716, 725 (9th Cir. 1999). CGC completely ignores this continuum.

13 **B.  CGC'S INJUNCTION REQUESTS ARE DISFAVORED BY COURTS AND REQUIRE**
14    **HEIGHTENED SCRUTINY**

15    Courts disfavor injunctions that fall in one or more of the following categories:  (1) requests

16 that disturb the status quo; (2) requests for mandatory injunctions as opposed to prohibitory

17 injunctions; or (3) requests that provide substantially all of the relief that the movant would obtain

18 after a full trial on the merits. *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1260-1261 (10th Cir.

19 2005).

20    Mandatory injunctions that would alter the status quo by commanding some positive act are

21 "subject to heightened scrutiny and should not be issued unless the facts and law *clearly favor the*

22 *moving party*." *Dahl v. HEM Pharmaceuticals Corp.*, 7 F. 3d 1399, 1403 (9th Cir. 1993) (emphasis

23 added). Here, CGC requests two mandatory injunctions:  (1) that Gottaplay register the two million

24 shares of stock that are the subject of the dispute; and (2) Gottaplay issue an additional 125,000

25 registered chares and 62,500 warrants, or pay $125,000 with interest.  These requests require

26 Gottaplay to commit a positive act (i.e. registering the shares, issuing additional securities, and/or

27 paying $125,000).  The granting of these requests would affect the status quo of the parties because

28 they affect the "last uncontested status that preceded the controversy." *GoTo.com, Inc. v. Walt*

*Disney Co.*, 202 F 3d 1199, 1210 (9th Cir. 2000).  Preceding this controversy, the shares were

1   unregistered and CGC had not been issued the 125,000 registered shares and 62,500 warrants.

2   Therefore, the injunction should not be issued because, as discussed in this opposition, the facts and

3   law do not *clearly* favor CGC.

4        Furthermore, the burden on the moving party is a "heavy one where…granting the

5   preliminary injunction will give [the moving party] substantially the relief it would obtain after a

6   trial on the merits." *Sanborn Mfg. Co. v. Campbell Hausefeld/Scott Fetzer Co.*, 997 F. 2d 484, 486

7   (8th Cir. 1993). In its complaint, CGC claims it is entitled to receive 2,000,000 shares of common

8   stock of Gotttaplay, to have those shares registered, and to receive an additional 125,000 registered

9   shares and 62,500 stock warrants of Gottaplay (or a refund of $125,000). In its answer and

10  counterclaim, Gottaplay contends that CGC is not entitled to the 2,000,000 shares or the 125,000

11  registered shares and 62,500 stock warrants. CGC's motion, if granted, would allow CGC all, or

12  substantially all, of the relief it seeks, *without a trial on the merits*. If CGC's motion is granted, and

13  Gottaplay ultimately prevails on the merits, CGC would likely be: (a) selling invalid shares

14  (representing about 6% of all of the outstanding shares of Gottaplay) in the open market to innocent

15  purchasers; (b) unjustly reaping all of the proceeds from the sale of invalid shares; (c) causing major

16  dilution to Gottaplay's shareholders; and (d) causing irreparable harm to Gottaplay's capital

17  structure and its shareholder base. The effect of the injunctive relief could not be undone because it

18  would make a trial on the merits largely meaningless. See *Dominion Video Satellite v. EchoStar*

19  *Satellite Corp.*, 269 F.3d. 1149, 1156 (10th Cir. 1002). Therefore, CGC must meet a heavy burden in

20  its request, which it cannot do.

21  **C. THE BALANCE OF HARDSHIPS WEIGHS SIGNIFICANTLY IN GOTTAPLAY'S**
22  **FAVOR**

23       As discussed above, the injunction analysis creates a continuum. To determine the degree of

24  showing that CGC must make in the likelihood of success analysis, the Court should weigh the

25  harm that the injunction requested would cause Gottaplay against CGC's threatened injury.

26      **1.  <u>There is No Substantial Threat of Harm to Capital Group</u>**

27       If CGC's motion is denied, the potential harm caused to CGC would be speculative.

28  Denying CGC's motion would only have the effect of delaying CGC's ability to sell the shares in

the open market, assuming CGC ultimately prevails.  CGC's concern about delay is fueled by speculation that by the time CGC is able to sell any shares the market price of Gottaplay's shares will have declined.  However, if the Court issues the injunction, the price of Gottaplay's stock very likely will drop significantly, as the public float for Gottaplay's stock will be diluted by potentially two million invalid shares that represent 6% of the entire company.   This resulting flooding of the market by CGC with attempts to sell a significant number of invalid shares demonstrates the fallacy of CGC's substantial threat of harm argument.

## 2.  Any Harm to Capital Group Is Outweighed By The Harm to Gottaplay

Conversely, the issuance of a preliminary injunction would cause significant and irreparable harm to Gottaplay and its shareholders.  Approximately 6% of the total outstanding shares of Gottaplay possibly would be invalid, causing the market for its shares to be detrimentally affected because of the uncertainty of those shares sold to innocent purchasers.  Prospective investors would most likely lose interest in investing in Gottaplay, further causing the market value of Gottaplay's shares to deteriorate.  And Gottaplay would most likely be unable to obtain additional financing for working capital purposes or to expand its business operations.  Such harm could not be undone.  Hence, the potential harm to CGC if the motion is denied is significantly outweighed by the harm to Gottaplay if the motion is granted.[1]  As a result, in addition to having to meet a heavy burden in its request (see section B above), the "continuum" analysis requires that CGC has an even heavier burden to show that it has a likelihood of success on the merits.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[1] CGC's reliance on *Alpha Capital Atkiengesellschaft v. Group Mgmt. Corp.*, 2002 WL 31681798 (S.D.N.Y. Nov. 25, 2002) and *Netwolves Corp. v. Sullivan*, 2001 WL 492463 (S.D.N.Y. May 9, 2001) is misplaced. Among other things, those cases rely on the fact that the subject contract was enforceable.  Such is not the case here, as discussed in section D.1. below.

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                    C-07-03632-EMC

**D. CGC CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON ITS BREACH OF CONTRACT AND SPECIFIC PERFORMANCE CAUSES OF ACTION**[2]

    **1.  CGC Cannot Demonstrate a Likelihood of Success Because The Consulting Agreement Requires CGC to Act as an Unlicensed Broker and is Therefore Illegal**

        a.  <u>Federal Law Prohibits Unlicensed Broker Activities and Provides for Rescission of Any Contract Wherein a Purported Finder Agrees to Perform Broker Activities</u>

The Securities & Exchange Act of 1934 (the "1934 Act") provides:

> [I]t shall be unlawful for any broker or dealer…to make use of the mails or any means of instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security …unless such broker or dealer is registered in accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1). The 1934 Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). The term "effecting transactions in securities" has been interpreted broadly. See *Massachusetts Fin. Servs. Inc. v. Securities Investor Prot. Corp.*, 545 F.2d 754 (1st Cir. 1976).

    A contract made in violation of any provision of the 1934 Act shall be void and subject to rescission. 15 U.S.C. § 29(b). "If an agreement cannot be performed without violating the securities laws, that agreement is subject to rescission under Section 29(b)." *Berckeley Investment Group, Ltd. V. Colkitt*, 455 F.3d 195, 206 (3rd Cir. 2006). Furthermore, the 1934 Act provides:

> Every contract made in violation of [the 1934 Act] or any rule or regulation thereunder, and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title or any rule or regulation thereunder, shall be void….

15 U.S.C. § 78cc(b).

    Although the SEC recognizes a "finder's exemption," such exemption is narrowly construed. The involvement of a finder must begin and end with simply bringing parties together. *Henry Goppelt*, SEC No-Action Letter, 1974 SEC No-Act. LEXIS 2415 at 2-3 (June 2, 1974).

---

[2] These are the only claims on which CGC could base its request for injunctive relief.

OPPOSITION TO MOTION FOR PRELIM INJUNCTION            C-07-03632-EMC

1  Finder status is lost when the purported finder agrees to take any role, *however minor*, in the sale of

2  securities.  *Id*.  Thus, if a purported finder even arranges meetings between the issuer of securities

3  and a prospective investor, the finder has engaged in broker activities for which a license is

4  required.  *Mike Bantuveris*, SEC No-Action Letter, 1975 SEC No-Act. LEXIS 2158 at 1-2 (Oct. 23,

5  1975); see also *May-Pac Management Corporation*, SEC No-Action Letter, 1973 SEC No-Act.

6  LEXIS 1117 at 1, 3-4 (Dec. 20, 1973).

7       The SEC recently re-established its narrow view of finders.  *Dominion Resources, Inc.*, SEC

8  No-Action Letter, 2000 SEC No-Act. LEXIS 304 (March 7, 2000) (revoking its prior letter,

9  *Dominion Resources, Inc.*, SEC No-Action Letter, 1984 SEC No-Act. LEXIS 2511 (August 24,

10  1985).  In the 2000 *Dominion* no-action letter, the SEC stated that a broker's license would be

11  required for a purported finder engaging in these activities:  (1) analyzing the issuer's financial

12  needs; (2) recommending or designing financing methods and securities to fit the issuer's needs; (3)

13  recommending a bond lawyer, underwriters, or broker-dealers for the distribution or marketing of

14  securities; (4) participating in negotiations; (5) introducing an issuer to a commercial bank to act as

15  the initial purchaser of securities and as a stand-by purchaser; (6) recommending a financial

16  institution to provide credit support for the securities; and (7) receiving a negotiated fee that would

17  generally not be payable unless the financing closed successfully.  *Id.* at 1-2.

18       The SEC has consistently stated that success-based compensation is the primary

19  characteristic of broker activity.  *Paul Anka*, SEC No-Action Letter, 1991 SEC No-Act. LEXIS 925

20  (July 24, 1991); see also *John W. Loofbourrow Associates, Inc.,* SEC No-Action Letter, 2006 SEC

21  No-Act. LEXIS 523 at 5 (June 29, 2006).  Indeed, on multiple occasions during the past seven

22  years, the SEC has determined that a finder planning to receive a fee based on successful closing of

23  financing is *not* exempt from broker registration.  *Dominion Resources, Inc.*, SEC No-Action Letter,

24  2000 SEC No-Act. LEXIS 304 (March 7, 2000); *BondGlobe, Inc.*, SEC No-Action Letter, 2001

25  / / /

26  / / /

27  / / /

28  / / /

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                       C-07-03632-EMC

1  SEC No-Act. LEXIS 140 (February 6, 2001); *Hallmark Capital Corporation*, SEC No-Action

2  Letter, 2007 SEC No-Act. LEXIS ___ (June 11, 2007).[3]

3      Furthermore, the SEC in no uncertain terms established that the regularity of a purported

4  finder's activity is pivotal in determining whether the finder is acting as a broker-dealer. *Paul*

5  *Anka*, SEC No-Action Letter, 1991 SEC No-Act. LEXIS 925 (July 24, 1991). In the seminal *Paul*

6  *Anka* no-action letter, the SEC allowed the finder exemption to stand only because the finder had

7  not previously been involved in arranging investments and agreed he would not do so in the future.

8  *Id.* Thus, where a purported finder engages in capital raising routinely and will receive success-

9  based compensation, broker registration is required. See *Hallmark Capital Corporation*, SEC No-

10 Action Letter, 2007 SEC No-Act. LEXIS ___ (June 11, 2007).

11
12      b.  <u>California Law Also Prohibits Unlicensed Broker Activities Provides for Rescission of</u>
        <u>Any Contract in Which a Purported Finder Agrees to Perform Broker Activities</u>

13      The California Corporate Securities Law of 1968 provides that

14
15          …no broker-dealer shall effect any transaction in, or induce or attempt to
            induce the purchase or sale of, any security in this state unless the broker-
            dealer has first applied for and secured from the commissioner a certificate
16          then in effect, authorizing that person to act in that capacity.

17 Cal. Corp. Code § 25210. A "[b]roker-dealer means any person engaged in the business of

18 effecting transactions in securities in this state for the account of others or for his own account…"

19 Cal. Corp. Code § 25004. "It is well settled in California that one acting as a securities broker must

20 be licensed so to do in order that he may recover agreed compensation for services rendered."

21 *Evans v. Riverside International Raceway*, 237 Cal.App.2d 666, 674 (1965); see also *Lyons v.*

22 *Stevenson*, 65 Cal.App.3d 595, 601 (1977) ("where the conduct of a broker brings him within the

23 proscription of the Corporate Securities Law, his contract will not support an action to recover

24 compensation for his services").

25

26  _____

27 [3] Due to the rather recent nature of the *Hallmark* no-action letter, Gottaplay printed the letter from the SEC's
28 website and has attached a copy of the letter to its counsel's declaration. (See Declaration of John R. Mayer
   in Support of Opposition to Motion for Preliminary Injunction, ¶ 2, and Exhibit A, *Hallmark Capital*
   *Corporation*, SEC No-Action Letter (June 11, 2007).

The California Civil Code provides that a party to a contract may rescind the contract "[i]f the consideration for the obligation of the rescinding party becomes entirely void from any cause" or "[i]f the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault." Cal. Civ. Code § 1689(b)(1) and (b)(5).

Under California law, the distinction of finders from brokers "'lies in their bringing the parties together *with no involvement of their part in negotiating the price or any of the other terms of the transaction*.'"  *Evans*, 237 Cal.App.2d at 676 (emphasis in original).  "'[A]ny participation, *however slight*, in the negotiations'" will bring a purported finder within the definition of a broker. *Lyons*, 65 Cal.App.3d at 605 (emphasis added).  A finder *may not* recommend any manner or means of consummating a transaction in securities.  California Corporations Commissioner's Opinion No. 73/67C (May 21, 1973).

  c.  <u>CGC Agreed to Perform Broker Activities Under the Consulting Agreement, Thereby Making the Agreement Illegal Under Federal and California Law</u>

At the time of the Consulting Agreement and CCG's purported performance thereunder, CGC was not registered as a broker.  (Declaration of Devin J. Bosch in Support of Plaintiff's Motion for Preliminary Injunction ("Bosch Decl."), ¶ 35.)  Yet CGC's duties under the Consulting Agreement included activities for which a broker's license is plainly required, in accordance with the foregoing discussion of federal and California law.

Paragraph 2 of the Consulting Agreement obligates CGC to, *inter alia*, do the following:

  (1) assist Gottaplay in *raising capital* through introductions (Bosch Decl., Exh. A, Consulting Agreement, ¶ 2(a));

  (2) Consult and assist Gottaplay in developing and implementing appropriate plans and means for *presenting Gottaplay and its business plans, strategy and personnel to the financial community* (Bosch Decl., Exh. A, Consulting Agreement, ¶ 2(b));

  (3) Consult and assist Gottaplay in *establishing an image for Gottaplay in the financial community* (Bosch Decl., Exh. A, Consulting Agreement, ¶ 2(b));

  (4) maintain an awareness during the term of the Agreement of Gottaplay's plans, strategy, and personnel, as they may evolve during such period, and consult and assist Gottaplay in *communicating appropriate information regarding such plans, strategy and personnel to the financial community* (Bosch Decl., Exh. A, Consulting Agreement, ¶ 2(d));

(5) disseminate information regarding Gottaplay to *brokers, dealers, other investment community professionals, and the general investing public* (Bosch Decl., Exh. A, Consulting Agreement, ¶ 2(f));

(6) *conduct meetings*, in person or by telephone, with *brokers, dealers, analysts and other investment professionals to communicate with them regarding Gottaplay's plans, goals and activities* (Bosch Decl., Exh. A, Consulting Agreement, ¶ 2(g));

(7) review business plans, strategies, mission statements budgets, *proposed transactions* and other plans for the purpose of *advising* Gottaplay of the public relations implications thereof (Bosch Decl., Exh. A, Consulting Agreement, ¶ 2(h)); and

(8) otherwise perform as Gottaplay's consultant for public relations and *relations with financial professionals* (Bosch Decl., Exh. A, Consulting Agreement, ¶ 2(i)).

The foregoing contractual responsibilities clearly demonstrate that CGC took on a role as a broker, not that of a finder who simply brings parties to a transaction together and has no further involvement.  Not only did CGC agree to assist Gottaplay in raising capital, it also agreed to market Gottaplay to investors, conduct meetings with financial players, review and advise on proposed transactions, and in general act as Gottaplay's consultant for relations with financial professionals.  A party cannot perform all of these activities without acting as a broker under federal and California law.  CGC's duties unambiguously went beyond that of a finder.  See *Henry Goppelt*, SEC No-Action Letter, 1974 SEC No-Act. LEXIS 2415 at 2-3 (June 2, 1974).

CGC's prior involvement in raising capital and similar contracts further illustrates that CGC cannot be considered a finder.  CGC represents on its website that its

network of funds, institutions and high net worth individuals can steer you to financing you would never be able to locate on your own. As a CGC client, you automatically become a beneficiary of our extensive experience, our reputation and industry knowledge. More importantly we will mine our database of investors and companies to identify financial prospects that fit your company's specific criteria.

(Gorst Decl., ¶ 23, and Exhibit B, CGC "Raising Capital" Webpage.)  CGC concedes its broker status in this passage by stating that it not only has a "network" of financing options, but also will analyze its clients' "specific criteria" in an effort to obtain appropriate financing.  See *Dominion*

///

///

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                    C-07-03632-EMC

1  *Resources, Inc.*, SEC No-Action Letter, 2000 SEC No-Act. LEXIS 304 (March 7, 2000).  On

2  another page of its website, CGC represents the following:

> 3  Our introductions spark investor interest, and that's only just the beginning!
> 4  We work with you to foster and strengthen these relationships. We convey
>    your messages in an easy to understand and concise method that actually helps
> 5  the financial community make investment decisions.

6  (Gorst Decl., ¶ 23, and Exhibit B, CGC "Financial Community Communications" Webpage.)  Thus,

7  CGC routinely engages in not only introducing clients to the financial community, but also

8  continuing *after the introduction* to strengthen and foster such relationships.  These actions, just like

9  CGC's duties under the Consulting Agreement, go well beyond acting as a mere finder.  See *Lyons*,

10  65 Cal.App.3d at 605-606.  Additionally, CGC owns and operates multiple websites marketing

11  services such as "Immediate Access Capital."  (Mayer Decl., ¶ 3, and Exhibit B, Webpages for

12  pickaxeinvestor.com, myhealthcarestocks.com, blackmudinvestor.com, and defensestockalert.com.)

13  Further, in the same timeframe as the instant Consulting Agreement, CGC entered into a contract

14  with another client, International Stem Cell, Inc., with terms virtually identical to the instant

15  Consulting Agreement.  (Mayer Decl., ¶ 4, and Exhibit C, CGC-International Stem Cell, Inc.

16  Consulting Agreement, September 1, 2006.)  These facts demonstrate that CGC is hardly a finder,

17  regularly engages in broker activities, and enters into illegal contracts.[4]

18     The 2,000,000 shares of Gottaplay stock issued to CGC can only be attributable to the

19  provision by CGC of broker services.  As more fully discussed below in subsection 3 below, if the

20  2,000,000 shares are determined to be a fully earned "commencement bonus," then illogically all of

21  the services to be provided by CGC under Paragraph 2 of the Consulting Agreement (which include

22  the broker sevices) are to be performed for free.  Moreover, Paragraph 4 explicitly contradicts the

23  characterization of this payment as a fully earned "commencement bonus."  The first sentence of

24  Paragraph 4 states, "As full and complete compensation *for services described in this Agreement*,

25  the Company shall compensate CGC...2 million shares of the Company's restricted stock."  (Bosch

26  _____

27  [4] Discovery, which has not begun, will uncover even more evidence of the regularity of CGC's actions in the
28  context of capital-raising.  Under the present circumstances, issuing the requested mandatory injunction prior
    to discovery of CGC's activities would be inequitable.

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                    C-07-03632-EMC

Decl., Exh. A, Consulting Agreement, ¶ 4 (italics added).)  Furthermore, the Consulting Agreement also calls for success-based compensation of 5% of the gross proceeds from any capital-raising arranged or introduced by CGC, another hallmark of broker status.  (Bosch Decl., Exh. A, Consulting Agreement, ¶¶ 4-5.)  This arrangement alone is sufficient for broker status.  See *Paul Anka*, SEC No-Action Letter, 1991 SEC No-Act. LEXIS 925 (July 24, 1991); *Hallmark Capital Corporation*, SEC No-Action Letter, 2007 SEC No-Act. LEXIS ___ (June 11, 2007).  Coupling the compensation arrangement with the other plain indicia of broker status as outline above, however, makes CGC's need to be licensed as a broker undeniable.[5]

As a result of CGC agreeing to perform broker services without a license in violation of federal and California law, the Consulting Agreement is illegal, void, and must be rescinded.  Thus, CGC cannot possibly show a likelihood of success on the merits of its breach of contract and specific performance claims, and the motion for preliminary injunction must be denied.

   d.  <u>CGC Actually Performed Broker Activities, Thereby Engaging in Illegal Conduct Precluding Recovery of Compensation Under the Consulting Agreement</u>

As shown above, CGC's contractual duties under the Consulting Agreement required illegal broker activities.  Additionally, CGC actually engaged in illegal broker activities in attempting, albeit futilely, to perform some of its duties under the Consulting Agreement.  CGC arranged and conducted meetings or conference calls with broker/dealers and investment groups, provided information regarding Gottaplay to potential investors[6], urged companies to raise capital for Gottaplay, and stated that it would negotiate on Gottaplay's behalf.  Although CGC fell woefully

_____

[5] CGC's representation in the Consulting Agreement that it is not and does not hold itself out to be a broker is accordingly a sham, as is its representation that it is "not required to maintain any licenses and registrations under federal and any state regulations necessary to perform the services…."  (Bosch Decl., Exh. A, Consulting Agreement, ¶¶ 5, 9.)

[6] CGC cites *H.C. Copeland and Association Equities, Inc.*, SEC No Action Letter, 1982 WL 19102 (April 8, 1982) for the proposition that a person is not a broker-dealer where he merely provides documents or information to potential purchaser of securities, but does not participate in negotiations.  However, that authority actually stands for the *exact opposite* with respect to the providing of documents or information (the SEC letter points out:  "Consultants…will not distribute sales and literature…").  Also, CGC ignores the fact that it actually participated in telephone calls and meetings with prospective investment bankers in anticipation of raising capital for Gottaplay.

1 short of fulfilling its contractual responsibilities, its efforts constitute broker activities for which a

2 license is required.

3        Several examples illustrate that CGC went well beyond mere introductions.  CGC arranged

4 a conference call in which CGC, Gottaplay, and a representative of a broker/dealer known as

5 Brookstreet Securities participated.  (Gorst Decl., ¶ 25.)  On the call, CGC's Senior

6 Communications Consultant, Richard Carpenter ("Carpenter"), extolled the virtues of Gottaplay and

7 urged Brookstreet Securities to become a placement agent for Gottaplay's securities.  (Gorst Decl.,

8 ¶ 25.)  After the call, Carpenter stated to Gorst that he would *negotiate* with Brookstreet Securities

9 to assure that Gottaplay would receive a *fair price for its securities*.  (Gorst Decl., ¶ 25.)  This

10 conduct requires a broker license.  See *Dominion Resources, Inc.*, SEC No-Action Letter, 2000 SEC

11 No-Act. LEXIS 304 (March 7, 2000).

12        In August 2006, Carpenter introduced Gottaplay to Terrence M. Cush, Director of Private

13 Placements for The Shemano Group, Inc. ("Shemano").  (Gorst Decl., ¶ 26.)  Carpenter set up a

14 conference call with Mr. Cush in which Gorst participated.  (Gorst Decl., ¶ 26.)  Again Carpenter

15 led the conversation and urged Shemano to raise capital for Gottaplay.  (Gorst Decl., ¶ 26.)  On

16 August 14, 2006, Carpenter sent an email to Gorst stating, "Talked to Terry Cush.  –Shermano [sic].

17 Liked what he has seen so far –Will be backed [sic] to you within a few days."  (Gorst Decl., ¶ 26,

18 and Exh. C, Email from Carpenter to Gorst, August 14, 2006.)  This led to Shemano sending

19 Gottaplay an Exclusive Placement Agency Agreement.  (Gorst Decl., ¶ 26, and Exh. D, Exclusive

20 Placement Agency Agreement.)  Clearly, CGC was not acting as a mere finder under these

21 circumstances, but the illegal broker conduct did not stop there.

22        On September 22, 2006, Carpenter recommended contacting the finance group Stonegate

23 Securities, a company with which he had *no prior experience*.  (Gorst Decl., ¶ 27.)  By email,

24 Carpenter stated, "Take a look at this group. While I don't have any personal experience with them

25 they seem to be a good fit.  If interested we can start a dialog, They [sic] have seen the corporate

26 profile and have interest."  (Gorst Decl., ¶ 27, and Exh. E, Email from Carpenter to Gorst,

27 September 22, 2006.)  CGC was doing more than providing its contacts to Gottaplay.  CGC was

28 "cold calling" prospective investors, just like a broker.

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                                    C-07-03632-EMC

CGC's broker activities continued in mid November 2006, when Carpenter set up what he called a "finance call" with a company known as Source Capital.  (Gorst Decl., ¶ 28, and Exh. F, Email from Carpenter to Gorst, November 14, 2006.)  In an email prior to the finance call, Carpenter stated to Gorst, "OK- info on conference call sent to you,- [sic] They have your power point and are aware of the October financing…"  (Gorst Decl., ¶ 27, and Exh. G, Email from Carpenter to Gorst, November 14, 2006.)  Mr. Gorst participated in this conference call, during which Carpenter once again led the conversation in telling Gottaplay's "story" and urging Source Capital to raise capital for Gottaplay.  (Gorst Decl., ¶ 27.)  Thus, CGC provided information regarding Gottaplay to a capital group and discussed financing terms with such group.  These activities are those of a broker.

CGC argues that it is not required to be registered as a broker/dealer because it never sold any securities for Gottaplay and, even if it had, such act would not affect the enforceability of the contract.  However, "attempts" to sell securities are expressly within the ambit of both federal and California laws governing the registration of broker/dealers.  See 15 U.S.C. Section 78o(a)(1) and Cal. Corp. Code Section 25210.  Finally, the illegality of the broker/dealer services in the Consulting Agreement cannot be severed so as to make the other provisions of the agreement enforceable.  See *Nationwide Investment Corp. v. California Funeral* Service, Inc., 40 Cal.App.3d 494 (1974) (holding the illegal broker-dealer services cannot be severed from the entire agreement).

CGC unabashedly engaged in broker activities in violation of federal and California law.  Accordingly, CGC cannot carry its burden of demonstrating a likelihood of success on its breach of contract and specific performance causes of action, and the Court should deny its motion for preliminary injunction.

## 2. CGC Cannot Show a Likelihood of Success Because It Fraudulently Induced Gottaplay to Enter into the Consulting Agreement

CGC also does not have a likelihood of success on the merits because it fraudulently induced Gottaplay to enter into the Consulting Agreement.  On these grounds alone, Gottaplay would be entitled to rescission, among other things.

CGC markets itself on its website as "world class" firm that provides "investor relations, communications, public relations, and strategic financial consulting [services] for small to micro

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                                C-07-03632-EMC

1   cap companies." (Gorst Decl., Exh. B, CGC Website "Home" Page.) CGC's website also boasts

2   that it acquired another company, American Financial Communication, in January 2006 to become

3   "one of the largest Small-Mid cap specialized IR Firms in the country." (Gorst Decl., Exh. B, CGC

4   Website "Our Team" Page.) Furthermore, CGC and Bosch boasted to and assured Gottaplay that

5   CGC had the ability to help raise capital for Gottaplay because of its extensive connections. (Gorst

6   Decl., ¶ 5-7, 10, 12, 19.) Gottaplay reasonably placed its trust and confidence in CGC, thereby

7   creating a fiduciary duty on the part of CGC to disclose all material facts, and to refrain from

8   misrepresenting any material facts, in relation to the Consulting Agreement.

9          CGC and Bosch intentionally or recklessly made material misrepresentations and/or failed to

10  disclose material facts to Gottaplay. These misrepresentations and/or omissions include:

11          (a) that CGC could and would perform various services for Gottaplay, including
        investor relations and fundraising, when in fact CGC and Bosch knew CGC was unqualified,
12      unwilling, and/or had no intention to perform the services contemplated in the Consulting
        Agreement; and
13

14          (b) that CGC maintained all requisite licenses and registrations under federal or any
        state regulations necessary to perform the services set forth in the Consulting Agreement,
15      and that CGC was not required to register as a broker/dealer under federal and state
        securities laws.
16

17         CGC drafted the Consulting Agreement such that CGC would have little or no incentive to

18  perform services. The Consulting Agreement purports that the two million shares in question were

19  "fully earned" at the time of the issuance. This could only mean that CGC was not being

20  compensated for the "services" rendered in Paragraph 2 of the Consulting Agreement because there

21  is no compensation tied into those services. Thus, CGC clearly had no incentive to perform the

22  services, and it showed. CGC performed very few services thereafter, drafting no press releases,

23  and engaging in attempted capital raising that resulted in no benefit to Gottaplay. (Gorst Decl., ¶¶

24  25-32.) Therefore, the evidence shows that CGC was unqualified, unwilling, and/or had no

25  intention to perform the services contemplated in the Consulting Agreement.

26         CGC also misled Gottaplay into believing that the services to be rendered were legal. CGC

27  told Gorst that it was not required to register as a broker/dealer under federal and state securities

28  laws. (Gorst Decl., ¶ 14.) CGC also represented in the Consulting Agreement that it was "not

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                                    C-07-03632-EMC

1   required to maintain any licenses and registrations under federal or state regulations necessary to

2   perform the services….”  (Bosch Decl., Exh. A, Consulting Agreement, ¶ 9.)  Although CGC

3   acknowledges in the Consulting Agreement that it was not a “Broker/Dealer,” that acknowledgment

4   is meaningless when, on the other hand, CGC is representing that it is not required to hold *any*

5   licenses and registrations.  This demonstrates that CGC *knew* it was required to register as a broker

6   but attempted to mitigate its own violation of federal and state securities laws by making a

7   meaningless disclosure in the Consulting Agreement.

8        CGC and Bosch have created nearly identical contracts for other clients of CGC, such as

9   International Stem Cell, Inc., which demonstrates a pattern of entering into illegal contracts.

10  (Mayer Decl., ¶ 4, and Exhibit C.)  Based on their purported experience in the industry, CGC and

11  Bosch knew or should have known that the Consulting Agreement with Gottaplay was illegal.

12       Thus, the above statements could only have been false or made with reckless disregard of

13  their truth or falsity.  Gottaplay reasonably relied upon the misrepresentations, omissions and

14  recommendations of CGC and Bosch to Gottaplay’s detriment.  Moreover, CGC and Bosch

15  intended that Gottaplay rely on the misrepresentations, omissions and recommendations, and their

16  fraudulent conduct induced Gottaplay to enter into the Consulting Agreement and issue shares of

17  common stock valued at approximately $3,000,000 at the time.  Their fraud entitles Gottaplay to

18  rescission of the Consulting Agreement under Civil Code Section 1689(b)(1).[7]  Accordingly, CGC

19  cannot show a likelihood of success on the merits of the claims on which it bases its request for a

20  preliminary injunction.

21

22       **3.  CGC Cannot Show a Likelihood of Success Because Gottaplay is Entitled to
           Rescission, Under California Civil Code Section 1689(b)(4), Due to the Material**

23         **Failure of Consideration by CGC**

24       The consideration provided by CGC under the Consulting Agreement also failed in a

25  material respect.  California Civil Code Section 1689(b)(4) provides that a party to a contract may

26

27  _____

28  [7] CGC’s fraud, coupled with its willingness to conduct illegal broker activities, also demonstrates CGC’s
    unclean hands, a defense pled by Gottaplay in its answer and counterclaim.

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                                      C-07-03632-EMC

1  rescind in the contract "if the consideration for the obligation of the rescinding party, before it is

2  rendered to him, fails in a material respect from any cause."  Cal. Civ. Code § 1689(b)(4).

3       As discussed above, CGC takes the untenable position that compensation consisting of the

4  two million shares issued to it, valued at $3,000,000 at the time of issuance, was fully earned and

5  non-refundable under all circumstances.  At the same time, such a position would require that CGC

6  provide the services under the Consulting Agreement, including the investor relations, consulting

7  services, and broker/dealer related services (collectively, the "Consulting Services"), without any

8  compensation.

9       The only logical conclusion is that the issuance of the $3,000,000 worth of shares had to be

10  related to the Consulting Services.  CGC's interpretation of the Consulting Agreement would mean

11  that CGC could be in complete breach of its duties to perform any of the Consulting Services, and

12  CGC would still be entitled to keep the $3,000,000 worth of shares.  That interpretation is

13  implausible.

14       As discussed above, CGC performed very few and ineffective investor and public relations

15  services and illegal broker/dealer services in exchange for $3,000,000 worth of stock.  Bosch's

16  statement that he estimated his firm spent "hundreds of hours" in performing services is wholly

17  unbelievable.  Gottaplay has nothing to show for CGC's purported "hundreds of hours."  CGC was

18  nowhere to be seen with respect to performing investor and public relations services.  CGC

19  prepared no press releases (these were all prepared by Gottaplay).  (Gorst Decl., ¶ 30.)  Even if

20  CGC did spend "hundreds of hours," the consideration still fails because the work amounted to no

21  benefit to Gottaplay.  Gottaplay's shareholder base never increased.  (Gorst Decl., ¶ 30.)  Gottaplay

22  had to perform its own public relations and, in fact, ended up hiring a new firm in January 2007.

23  (Gorst Decl., ¶ 30-32.)  Lastly, those "hundreds of hours" never amounted to capital raised for

24  Gottaplay, which was a principal reason for hiring CGC.  As has been shown, such capital raising

25  activities were dismal (and illegal).  Although CGC claims it made "introductions," those

26  introductions were very few in number and generated no legitimate leads, as promised.

27       Bosch's statement that CGC's efforts "coincided with Gottaplay's stock price doubling to

28  over $3.00 per share" (Bosch Decl., ¶ 16) does not establish a correlation between the stock rise and

CGC's purported services.  Indeed, Bosch himself states that CGC took "great risks" in accepting

stock because "[m]icro cap companies frequently are unstable, *have volatile stock prices*, and low

trading volume."  (Bosch Decl., ¶ 5 (emphasis added).)  Furthermore, the Consulting Agreement

states: "It is understood that Consultant's performance of its duties hereunder will in *no way be*

*measured by the price of the Company's common stock*…"  (Bosch Decl., Exh. A, Consulting

Agreement, ¶ 3 (emphasis added).)  In short, Gottaplay received no benefits from the Consulting

Agreement, and the consideration promised by CGC failed in a material respect.

　　　　CGC also makes the untenable argument that the $3,000,000 worth of stock was a

commencement bonus for foregone opportunities.  As discussed above, such a reading could only

mean that CGC was receiving no compensation for its future services, as that was the only

compensation to be received by CGC (other than a contingent fee for any capital raised). Also, CGC

claims to be one of the nation's leading investor relations firms for micro-cap companies.  (Gorst

Decl., Exh. B, CGC Website "Home" Page.)  It is impossible to believe that CGC actually lost any

opportunities in order to perform the minimal services it performed for Gottaplay, and there is no

credible evidence to the contrary.

　　　　CGC's consideration for the $3,000,000 worth of common stock clearly fails.

### 4.  CGC Cannot Demonstrate a Likelihood of Success Because CGC Would be Unjustly Enriched if It Received 2,000,000 Shares of Gottaplay Stock

　　　　A party who has been unjustly enriched at the expense of another is required to make

restitution to the other.  *California Federal Bank v. Matreyek*, 8 Cal.App.4th 125 (1988).  The

elements of a claim of unjust enrichment include:  receipt of a benefit and unjust retention of the

benefit at the expense of another.  *Lectrodryer v. SeoulBank*, 77 Cal.App.4th 723, 726 (2000).

　　　　In this case, CGC immediately received $3,000,000 worth of stock of Gottaplay before

performing any services.  On the other hand, Gottaplay, a very small company, received no benefits

under the Consulting Agreement.  Gottaplay received minimal and/or valueless investor or public

relations services.  CGC performed virtually no public or investor relations work.  Gottaplay

prepared all press releases, with CGC simply reviewing them.  Gottaplay's shareholder base, after

retaining CGC, was unacceptable.

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                                    C-07-03632-EMC

With respect to CGC's capital raising responsibilities, to the extent Gottaplay received any such services, those services were illegal because CGC did not have the requisite licenses and registrations. Thus, even if such services were performed by CGC, *Gottaplay would have been prohibited from benefiting from the services* because the services were illegal.[8] Finally, CGC completely failed in arranging for Gottaplay to receive any financing.

In short, CGC received $3,000,000 worth of common stock before performing any services. Gottaplay received little, valueless, and/or illegal services under the Consulting Agreement. Therefore, CGC was unjustly enriched.

### 5. CGC Cannot Demonstrate a Likelihood of Success Because Gottaplay Is Not Liable for Any Debts of Western

CGC also wrongfully demands that Gottaplay be held liable for CGC's investment in a third party company. CGC, which markets itself as a "world class" firm, decided to take a risk and invest in Western, a third party entity.

At one point, Gottaplay and Western entered into a transaction whereby the two companies would merge. That transaction eventually was cancelled. In a separate transaction, however, Gottaplay borrowed funds from Western and, in fact, has such amounts recorded on its books as an outstanding liability (the "Western Loans"). (Gorst Decl., ¶¶ 4, 15, 17.)

Therefore, CGC's $125,000 investment in Western is unrelated to the Western Loans. To the extent CGC has any claims for the $125,000, those claims should be made against Western.

### IV.  CONCLUSION

Based on the foregoing, Gottaplay respectfully requests that the Court deny CGC's motion for a preliminary injunction.

JOHN R. MAYER, APLC

Dated: October 3, 2007          By: _____
                                      John R. Mayer,
                                      Attorneys for Defendants/Counter-Claimants Gottaplay
                                      Interactive, Inc., John P. Gorst, and Mark Levin

---

[8] California Corporations Code section 25501.5 gives investors the right to rescind a transaction when an unregistered broker procures the investment.

OPPOSITION TO MOTION FOR PRELIM INJUNCTION                    C-07-03632-EMC