1    John R. Mayer (#197765)
     JOHN R. MAYER, APLC
2    2550 Fifth Avenue, Suite 520
     San Diego, California 92103
3    Phone: (619) 794-2651
     Fax: (619) 794-2653
4
     Attorneys for Defendants and Counter-Claimants Gottaplay Interactive, Inc., John P. Gorst, and
5    Mark H. Levin

6

7

8
                          UNITED STATES DISTRICT COURT
9
                    FOR THE NORTHERN DISTRICT OF CALIFORNIA
10

11   CAPITAL GROUP COMMUNICATIONS,          )   CASE NO.:  C-07-03632-EMC
     INC., a California Corporation,        )
                                            )
12        Plaintiff,                        )   **DECLARATION OF JOHN P. GORST IN**
                                            )   **SUPPORT OF OPPOSITION TO**
13        v.                                )   **PLAINTIFF'S MOTION FOR**
                                            )   **PRELIMINARY INJUNCTION**
14   GOTTAPLAY INTERACTIVE, INC. a Nevada   )
     corporation; JOHN P. GORST, an individual; )  Date:       October 24, 2007
15   MARK H. LEVIN, an individual; and DOES 1 )    Time:       3:00 p.m.
     through 50, inclusive,                 )   Judge:      Hon. Edward M. Chen
16                                          )   Location:   15th Floor, Courtroom C
          Defendants.                       )
17   _____)
                                            )
18   GOTTAPLAY INTERACTIVE, INC. a Nevada   )
     corporation; JOHN P. GORST, an individual; )
19   and MARK H. LEVIN, an individual,      )
                                            )
20        Counter-Claimants,                )
                                            )
21        v.                                )
                                            )
22   CAPITAL GROUP COMMUNICATIONS,          )
     INC., a California Corporation, and DOES 1-50, )
23   inclusive,                             )
                                            )
24        Counter-Defendants.               )
     _____)
25

26

27

28

1      I, John P. Gorst, declare:

2    1.  I am the Chief Executive Officer of Gottaplay Interactive, Inc., ("Gottaplay") and one of the named defendants in the above-entitled matter.  I have personal knowledge of the facts stated in this declaration and could and would completely testify thereto if called as a witness in any proceeding in this action.

6    2.  Gottaplay is in the business of providing video game rentals on a subscription basis through its website "www.gottaplay.com."   The service is an alternative to store based gaming rentals.

8    3.  Gottaplay is a reporting company under the Securities & Exchange Act of 1934.   Its common shares are traded on the OTC Bulletin Board under the symbol "GTAP.OB."   Although we are publicly traded, we are considered to be a "micro-cap" company because we have a very small market capitalization.  We became a public company after we merged with Donobi, Inc., a Nevada corporation ("Donobi") in July 2006.  In that merger, Donobi was the surviving company, but then changed its name to "Gottaplay Interactive, Inc."

14    4.  Prior to merging with Donobi, Gottaplay was in the development stage and badly in need of capital.  At that time, Gottaplay determined that its chances of raising capital would be greater if its common shares became publicly traded.  In October of 2005, Gottaplay commenced negotiations with Western Transitions, Inc. ("Western"), a Nevada corporation, whose shares were traded on the over the counter Pink Sheets, to effect a "reverse merger" between Gottaplay and Western.  Western was controlled by Phillip Knight ("Knight"), who had previously loaned funds to Gottaplay and is now a significant stockholder in Gottaplay.

21    5.  Sometime between November 1, 2005 and November 10, 2005, Knight introduced me on the telephone to Devin Bosch, ("Bosch") an individual Counter-Defendant and the President of Plaintiff/Counter-Defendant Capital Group Communications, Inc. ("CGC").  Bosch stated that CGC was a "One Stop Shop" that could handle capital raising, investor relations, financial consulting, and advice with regard to mergers and acquisitions, including finding acquisitions for Gottaplay, once Gottaplay had completed the reverse merger with Western.  Gottaplay was most interested in the money raising services that Bosch stated CGC could provide.  I told Bosch that Gottaplay needed to raise $2 million in working capital.  I was thoroughly impressed with Bosch because he

1    named several investment bankers as potential sources of financing for Gottaplay. Bosch also

2    stated that CGC would introduce Gottaplay to high net worth "accredited investors" that would

3    invest in Gottaplay if they knew that Bosch and CGC were involved with Gottaplay. Bosch stated

4    that he was impressed with Gottaplay's business concept.

5         6.  Bosch also told me that he was so confident in CGC's ability to raise the capital sought by

6    Gottaplay that CGC was willing to invest in Western even before the proposed reverse merger was

7    completed. I later learned that CGC had invested $125,000 in Western. Bosch even encouraged me

8    to review CGC's website to see what CGC can do and to review the filings made with the Securities

9    & Exchange Commission (the "SEC") by clients of CGC. Bosch asked when Gottaplay would be

10   in a position to retain CGC. I informed Bosch that Gottaplay would not be in a position to retain

11   CGC until Gottaplay became a publicly traded company.

12        7.  I reviewed the public information on Xethanol, Inc., one of the clients Bosch mentioned to

13   me as a CGC client. The information I reviewed seemed to corroborate that CGC would be able to

14   raise capital for Gottaplay.

15        8.  On or about November 10, 2005, Gottaplay entered into a Letter of Intent with Western,

16   pursuant to which Gottaplay would merge with and into Western.

17        9.  On November 17, 2005 Gottaplay borrowed a total of $250,000 from Western.

18        10. On December 16, 2005, I traveled to San Francisco to attend a Christmas Party that CGC

19   was hosting. Knight was also in attendance at that party. It was there that I met Bosch in person for

20   the first time. I attended the party because Bosch stated to me that many investment bankers,

21   broker/dealers, and high net worth individuals would attend and that I would get to tell Gottaplay's

22   story to them and develop their interest in their investing in Gottaplay. At the party, Bosch

23   reiterated to me how confident he was that CGC would be able to raise the $2 million for Gottaplay.

24   He introduced me and Knight to many individuals, some of whom were associated with investment

25   bankers and broker/dealers, and some of whom were high net worth individuals. Bosch boasted that

26   each of them had either raised capital for CGC's clients or had personally invested in existing

27   clients of CGC. Bosch again named CGC's client Xethanol, Inc., as a particular example of CGC's

28

DECL OF JOHN P. GORST IN SUPPORT OF OPP TO MOT FOR PRELIM INJUNCTION        C-07-03632-EMC

1    money raising prowess.  He again stated that CGC assisted Xethanol, Inc. in raising capital through

2    an investment banker.

3        11.  On December 21, 2006, Gottaplay executed a definitive Share Exchange Agreement with

4    Western pursuant to which the two companies would merge, subject to certain contingencies.

5        12.  Between December 17, 2005 and January 5, 2006, I had several phone conversations with

6    Bosch.  In those conversations Bosch stated that when Gottaplay engages CGC, CGG would set up

7    many meetings and introductions to investment banks, funds, high net worth individuals, and others

8    who were potential investors in Gottaplay.  He stated he would introduce Gottaplay to, among

9    others, Roth Capital Partners and Brookstreet Securities, investment banking firms that would be

10   capable of providing capital to Gottaplay.  I was becoming more and more impressed with CGC and

11   started to believe it could actually raise funds for Gottaplay.

12       13.  CGC was also in discussions with Western to help raise capital for Western.  On January 5,

13   2006, since Gottaplay was in a merger transaction with Western, I received a proposed Consulting

14   Agreement between CGC and Western (the "Western Consulting Agreement").  Attached hereto as

15   Exhibit A is a true and correct copy of the Western Consulting Agreement.  The form of the

16   Western Consulting Agreement appeared identical to the one that Gottaplay eventually signed.

17       14.  As part of Gottaplay's due diligence prior to completing the proposed merger, I spoke to

18   Bosch about several issues concerning the proposed Western Consulting Agreement.  I asked him if

19   CGC was registered as a broker/dealer because I did not want Gottaplay to run afoul of any legal

20   issues with investors brought in by CGC.  He stated that CGC was not required to be registered as a

21   broker/dealer.  He informed me that CGC's attorney had advised him on this issue.  He also pointed

22   out language of the Consulting Agreement that states that CGC is not required to have any licenses

23   under federal and state securities laws.  Because Bosch and CGC came across as so impressive and

24   knowledgeable, I assumed he knew what he was talking about in this regard.

25       15.  On February 17, 2006, the proposed merger with Western fell through.

26       16. Although Bosch claims that CGC was providing consulting services for Gottaplay in

27   anticipation of a planned merger with Western, I am not aware of any services that CGC provided

28

1   to Gottaplay during that period.  Neither I, nor, to my knowledge, any other person with authority to

2   bind Gottaplay, told Bosch that CGC would be compensated in stock of a "newly formed entity."

3       17. Shortly after the transaction with Western was cancelled, Gottaplay commenced

4   negotiations with Donobi, whose common shares were publicly traded on the OTC Bulletin Board.

5   During the negotiations with Donobi, Bosch called me and stated that CGC had invested $125,000

6   in Western and that he was concerned about his investment.  I informed Bosch that Gottaplay never

7   received any proceeds from CGC.  I clarified to Bosch that Gottaplay had loans payable to Western

8   recorded on its books of $305,000 and that CGC would have to deal with Western with regard to

9   CGC's investment in Western.  Western's loans to Gottaplay were separate and unrelated

10  transactions from CGC's investment in Western.

11      18. On April 27, 2006, shortly after Gottaplay entered into the merger agreement with Donobi,

12  Bosch sent me a new draft of a Consulting Agreement.  The terms and conditions of this draft were

13  virtually identical to the Western Consulting Agreement.  I explained to Bosch that Gottaplay was

14  not in a position to execute any agreements until the merger with Donobi was complete.  Bosch

15  reiterated that he was ready to introduce Gottaplay to his "sources of capital" as soon as we were

16  "on board."

17      19. Between April 27, 2006 and July 25, 2006, I had several conversations with Bosch regarding

18  raising capital.  Bosch stated he would make an introduction to one of CGC's sources as a good

19  faith gesture and to enhance my confidence in his and CGC's ability to raise capital.  Bosch

20  conducted a conference call with Christopher Jennings, the Managing Director of Roth Capital

21  Partners ("Roth") of Newport Beach, California, and me.  In the call, he extolled the virtues of

22  Gottaplay's business plan, stated that Gottaplay wanted to raise $2 million, and urged Mr. Jennings

23  to meet with me.  Mr. Jennings seemed to have interest in learning more about Gottaplay and its

24  prospects.  During the conversation he stated that he had dealings with CGC and Bosch and thought

25  it would be good for Gottaplay to hire CGC.

26      20. Prior to July 25, 2006, I, along with Asra Rasheed, President of Gottaplay, traveled to

27  Roth's offices in Newport Beach where we met with Mr. Jennings and Greg Sutton, Vice President

28

1    of Investment Banking for Roth about the possibility of investing in Gottaplay.  However, no

2    transaction ever materialized from this meeting.

3          21.  On July 3, 2006, the merger between Gottaplay and Donobi was completed.

4          22.  On or about July 20, 2006, I received from Bosch a copy of a proposed Consulting

5    Agreement between CGC and Gottaplay.  I inquired of Bosch as to why he was asking for two

6    million shares of common stock of Gottaplay upfront and finder's fees/commissions on all funds

7    received from sources introduced to Gottaplay by CGC.  Bosch stated that CGC would raise capital

8    for Gottaplay, as well as handle all public and investor relations.  Bosch did not tell me that the

9    2,000,000 were to be issued to CGC because CGC was foregoing any opportunities.

10         23.  In order to further assess CGC's capital raising abilities, I proceeded to look at CGC's

11   website on the Internet.  While I did not retain a copy of the CGC website at that time, I recall that it

12   was substantially identical as it appears today.  The website markets CGC as having the ability to

13   raise capital, which gave me even greater comfort with hiring CGC.  Attached hereto as Exhibit

14   B are true and correct copies of the "Home" page, "Raising Capital" page, "Financial Community

15   Communications" page, "Mergers & Acquisitions" page, "Our Team" page, and "Profiles" page

16   from CGC's website.

17         24.     After again speaking with Bosch and being assured by Bosch that CGC would perform

18   investor relations and raise capital for Gottaplay, Gottaplay executed the Consulting Agreement

19   with CGC on or about July 25, 2006.  Subsequently, Gottaplay issued to CGC the 2,000,000 shares

20   of common stock.  Based on the closing price on the OTC-Bulletin Board, the value of each share

21   of Gottaplay's common stock on July 25, 2006 was $1.50 per share, or $3,000,000 for the two

22   million shares.  The two million shares would have represented approximately 6% of the entire

23   company.

24         25.  Bosch, and CGC's Senior Communications Consultant, Richard Carpenter ("Carpenter"),

25   then set out to arrange for Gottaplay to meet their "contacts," among which were Brookstreet

26   Securities, The Shemano Group, Inc., Source Capital of Baton Rouge, Louisiana, and Stonegate

27   Securities of Dallas, Texas.  In the case of Brookstreet Securities, Carpenter arranged a conference

28   call in which he, a representative of Brookstreet, and I participated.  On the call, Carpenter extolled

1   the virtues of Gottaplay and urged Brookstreet to become a Placement Agent for Gottaplay's

2   securities.  After the call Carpenter told me that he would negotiate with Brookstreet to assure that

3   Gottaplay would receive a fair price for its securities.

4       26.  In August 2006, Carpenter introduced me to Terrence M. Cush, Director of Private

5   Placements of The Shemano Group, Inc. ("Shemano") of San Francisco.  Carpenter set up a

6   conference call with Mr. Cush in which I participated.  Again Carpenter led the conversation and

7   urged Shemano to raise capital for Gottaplay.  On August 14, 2006, Carpenter sent an email to me

8   stating, "Talked to Terry Cush.  –Shermano [sic].  Liked what he has seen so far –Will be backed

9   [sic] to you within a few days."  Attached hereto as Exhibit C is a true and correct copy of the

10  August 14, 2006 email from Carpenter to me.  This led to Shemano sending to Gottaplay an

11  Exclusive Placement Agency Agreement.   Attached hereto as Exhibit D is a true and correct copy

12  of the Exclusive Placement Agency Agreement.

13      27.  On September 22, 2006, Carpenter recommended contacting the finance group Stonegate

14  Securities, a company with which he had no prior experience.  By email, Carpenter stated, "Take a

15  look at this group. While I don't have any personal experience with them they seem to be a good fit.

16  If interested we can start a dialog, They [sic] have seen the corporate profile and have interest."

17  Attached hereto as Exhibit E is a true and correct copy of the September 22, 2006 email from

18  Carpenter to me.

19      28.  In mid November 2006, Carpenter set up what he called a "finance call" with

20  representatives from Source Capital.  Attached hereto as Exhibit F is a true and correct copy of a

21  November 14, 2006 email from Carpenter setting up the call.  In a further email that day prior to the

22  call, Carpenter stated, "OK- info on conference call sent to you,- [sic] They have your power point

23  and are aware of the October financing…"  Attached hereto as Exhibit G is a true and correct copy

24  of this additional November 14, 2006 email from Carpenter to me.  I participated in this conference

25  call, during which Carpenter once again led the conversation in telling Gottaplay's "story" and

26  urging Source Capital to raise capital for Gottaplay.

27      29.  None of the foregoing discussions coordinated by CGC even came close to the receipt of

28  capital by Gottaplay.  To say the least, Gottaplay became quite concerned about CGC's failure to

1    raise capital for Gottaplay as there was nothing to show for the two million shares CGC had

2    received.

3      30. While CGC was failing on its capital raising services, its supposed investor and public

4    relations services were very minimal and at times non-existent. During the latter part of 2006, I told

5    Bosch and Carpenter that I was unhappy that the shareholder base of Gottaplay was not increasing

6    and that they were ineffective at promoting Gottaplay. In addition, Gottaplay prepared all corporate

7    press releases. CGC's sole involvement in such press releases was simply reviewing some of the

8    releases. As a professional courtesy, Gottaplay listed Carpenter's name as the "contact" person in

9    some of the press releases. At this point, Gottaplay was trying to make the best out of an awkward

10    and difficult relationship that was providing no benefit.

11      31. It became apparent to me in January 2007 that CGC was not a competent public and

12    investor relations agency and that Bosch had misrepresented the true nature of CGC's business. As

13    discussed above, CGC seemed to be hardly spending any time on public and investor relations and

14    was also ineffective at raising capital. I felt Gottaplay was wrongfully induced into giving

15    2,000,000 shares and decided to formally discuss this with the board of directors.

16      32. When I asked Carpenter several times why CGC was not performing any appreciable public

17    and investor relations services, as promised under the Consulting Agreement, he repeatedly made

18    excuses. I grew tired of the lack of performance by CGC and the excuses, so on January 10, 2007,

19    Gottaplay hired a new public and investor relations firm, Prominence Media Corporation

20    ("Prominence") to replace CGC. Prominence immediately started performing financial public

21    relations beyond anything CGC had done, including coordinating financial radio and newscast

22    appearances and bringing in a research firm. Prominence's services had an immediate impact on

23    Gottaplay. Also, Prominence had no capital-raising duties.

24      33. On or about February 22, 2007, after discussion about failed CGC's performance,

25    Gottaplay's board of directors terminated the Consulting Agreement.

26      34. On April 7, 2007, I talked to Bosch about the possibility of canceling the 2,000,000 shares

27    of stock. In that conversation, I explained to Bosch that CGC failed to perform and that Gottaplay

28    felt misled about CGC's capabilities. Bosch threatened to commence litigation, so Gottaplay

1  attempted to settle this dispute by offering to allow CGC to keep 1,000.000 shares.  Bosch declined

2  CGC's offer, and the board of directors cancelled the shares on April 20, 2007.

3        I declare under penalty of perjury under the laws of the United States of America that the

4  foregoing is true and correct.

5

6  Executed on October 3, 2007

                                              John P. Gorst

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL OF JOHN P. GORST IN SUPPORT OF OPP TO MOT FOR PRELIM INJUNCTION          C-07-03632-EMC

Exhibit A

## CONSULTING AGREEMENT

This Consulting Agreement (the "Agreement"), effective as of November 10, 2005  , is entered into by and between **WESTERN TRANSITIONS** (Other OTC:WTTN.PK), (herein referred to as the "Company") and CAPITAL; GROUP COMMUNICATIONS, INC., a California corporation (herein referred to as the "Consultant").

## RECITALS

**WHEREAS**, Company is; and

**WHEREAS**, Company desires to engage the services of Consultant to represent the company in investors' communications and public relations with existing shareholders, brokers, dealers and other investment professionals as to the Company's current and proposed activities, and to consult with management concerning such Company activities;

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the parties hereto covenant and agree as follows:

1) <u>Term of Consultancy</u>.  Company hereby agrees to retain the Consultant to act in a consulting capacity to the Company, and the Consultant hereby agrees to provide services to the Company commencing once this contract has been executed and ending 12 month thereafter.

2) <u>Duties of Consultant.</u>  The Consultant agrees that it will generally provide the following specified consulting services:

   a) Assist the Company in raising capital through introductions. (It is understood CGC is not an "investment banking" firm);
   b) Consult and assist the Company in developing and implementing appropriate plans and means for presenting the Company and its business plans, strategy and personnel to the financial community, establishing an image for the Company in the financial community, and creating the foundation for subsequent financial public relations efforts;
   c) Introduce the Company to the financial community;
   d) With the cooperation of the Company, maintain an awareness during the term of this Agreement of the Company's plans, strategy and personnel, as they may evolve during such period, and consult and assist the Company in communicating appropriate information regarding such plans, strategy and personnel to the financial community;
   e) Assist and consult the Company with respect to its (i) relations with stockholders, (ii) relations with brokers, dealers, analysts and other investment professionals, and (iii) financial public relations generally;
   f) Upon the Company's direction and approval, disseminate information regarding the Company to shareholders, brokers, dealers, other investment community professionals and the general investing public;

1.

g) Upon the Company's approval, conduct meetings, in person or by telephone, with brokers, dealers, analysts and other investment professionals to communicate with them regarding the Company's plans, goals and activities

h) At the Company's request, review business plans, strategies, mission statements budgets, proposed transactions and other plans for the purpose of advising the Company of the public relations implications thereof; and,

i) Otherwise perform as the Company's consultant for public relations and relations with financial professionals.

3) <u>Allocation of Time and Energies.</u> The Consultant hereby promises to perform and discharge faithfully the responsibilities which may be assigned to the Consultant from time to time by the officers and duly authorized representatives of the Company in connection with the conduct of its financial and public relations and communications activities, so long as such activities are in compliance with applicable securities laws and regulations. Consultant and staff shall diligently and thoroughly provide the consulting services required hereunder. Although no specific hours-per-day requirement will be required, Consultant and the Company agree that Consultant will perform the duties set forth herein above in a diligent and professional manner. The parties acknowledge and agree that a disproportionately large amount of the effort to be expended and the costs to be incurred by the Consultant and the benefits to be received by the Company are expected to occur within or shortly after the first two months of the effectiveness of this Agreement. It is explicitly understood that Consultant's performance of its duties hereunder will in no way be measured by the price of the Company's common stock, nor the trading volume of the Company's common stock. It is also understood that the Company is entering into this Agreement with Capital Group Communications, Inc. ("CGC"), a corporation and not any individual member of CGC, as such, Consultant will not be deemed to have breached this Agreement if any member, officer or director of CGC leaves the firm or dies or becomes physically unable to perform any meaningful activities during the term of the Agreement, provided the Consultant otherwise performs its obligations under this Agreement.

4) <u>Remuneration.</u> As full and complete compensation for services described in this Agreement, the Company shall compensate CGC as follows:

a) For undertaking this engagement and for other good and valuable consideration, the Company agrees to issue and deliver to the Consultants a "Commencement Bonus" payable in the form of 1,300,000 shares of the Company's Common Stock ("Common Stock"). This Commencement Bonus shall be issued to the Consultant immediately following execution of this Agreement and shall, when issued and delivered to Consultant, be fully paid and non-assessable. The Company understands and agrees that Consultant has foregone significant opportunities to accept this engagement and that the Company derives substantial benefit from the execution of this Agreement and the ability to announce its relationship with Consultant. These shares of Common Stock issued as a Commencement Bonus, therefore, constitute payment for Consultant's agreement to consult to the Company and are a nonrefundable, non-apportionable, and non-ratable retainer; such shares of common stock are not a prepayment for future services. If the Company decides to terminate this Agreement prior to end date for any reason whatsoever, it is agreed and understood that Consultant will not be requested or demanded by

2.

the Company to return any of the shares of Common Stock paid to it as Commencement Bonus hereunder. Further, if and in the event the Company is acquired in whole or in part, during the term of this agreement, it is agreed and understood Consultant will not be requested or demanded by the Company to return any of the shares of Common stock paid to it hereunder. It is further agreed that if at any time during the term of this agreement, the Company or substantially all of the Company's assets are merged with or acquired by another entity, or some other change occurs in the legal entity that constitutes the Company, the Consultant shall retain and will not be requested by the Company to return any of the shares. The Company further agrees that all shares issued to Consultant hereunder shall carry "piggyback registration rights" whereby such shares will be included in the next registration statement filed by the company.

b) With each transfer of shares of Common Stock to be issued pursuant to this Agreement (collectively, the "Shares"), Company shall cause to be issued a certificate representing the Common Stock and a written opinion of counsel for the Company stating that said shares are validly issued, fully paid and non-assessable and that the issuance and eventual transfer of them to Consultant has been duly authorized by the Company. Company warrants that all Shares issued to Consultant pursuant to this Agreement shall have been validly issued, fully paid and non-assessable and that the issuance and any transfer of them to Consultant shall have been duly authorized by the Company's board of directors.

c) Consultant acknowledges that the shares of Common Stock to be issued pursuant to this Agreement (collectively, the "Shares") have not been registered under the Securities Act of 1933, and accordingly are "restricted securities" within the meaning of Rule 144 of the Act. As such, the Shares may not be resold or transferred unless the Company has received an opinion of counsel reasonably satisfactory to the Company that such resale or transfer is exempt from the registration requirements of that Act.

d) In connection with the acquisition of Shares hereunder, the Consultant represents and warrants to the Company, to the best of its/his knowledge, as follows:
   i) Consultant acknowledges that the Consultant has been afforded the opportunity to ask questions of and receive answers from duly authorized officers or other representatives of the Company concerning an investment in the Shares, and any additional information which the Consultant has requested.
   ii) Consultant has had experience in investments in restricted and publicly traded securities, and Consultant has had experience in investments in speculative securities and other investments which involve the risk of loss of investment. Consultant acknowledges that an investment in the Shares is speculative and involves the risk of loss. Consultant has the requisite knowledge to assess the relative merits and  a of this investment without the necessity of relying upon other advisors, and Consultant can afford the risk of loss of his entire investment in the Shares.

3.

5) <u>Financing "Finder's Fee"</u>.  It is understood that in the event Consultant introduces Company, or its nominees, to a lender or equity purchaser, not already having a preexisting relationship with the Company, with whom Company, or its nominees, ultimately finances or causes the completion of such financing, Company agrees to compensate Consultant for such services with a "finder's fee" in the amount of 5.0% of total gross funding provided by such lender or equity purchaser, such fee to be payable in cash.  This 5.0% will be in addition to any fees payable by Company to any other intermediary, if any, which shall be the subject of separate agreements, negotiated between Company and such other intermediary.  It is also understood that in the event Consultant introduces Company, or its nominees, to an acquisition candidate, either directly or indirectly through another intermediary, not already having a preexisting relationship with the Company, which Company, or its nominees, ultimately acquires or causes the completion of such acquisition, Company agrees to compensate Consultant for such services with a "finder's fee" in the amount of 5% of total gross consideration provided by such acquisition, such fee to be payable in cash.  This 5% will be in addition to any fees payable by Company to any other intermediary. It is specifically understood that Consultant is not and does not hold itself out be a Broker/Dealer, but is rather merely a "Finder" in reference to the Company procuring financing sources and acquisition candidates. Any obligation to pay a "Finder's Fee" hereunder shall survive the merging, acquisition, or other change in the form of entity of the Company and to the extent it remains unfulfilled shall be assigned and transferred to any successor to the Company.

a) It is further understood that Company, and not Consultant, is responsible to perform any and all due diligence on such lender, equity purchaser or acquisition candidate introduced to it by Consultant under this Agreement, prior to Company receiving funds or closing on any acquisition.  However, Consultant will not introduce any parties to Company about which Consultant has any prior knowledge of questionable, unethical or illicit activities.

b) Company agrees that said compensation to Consultant shall be paid in full at the time said financing or acquisition is closed, such compensation to be transferred by Company to Consultant within seven (7) business days of the execution of the financing of acquisition closing document.  Payment of said compensation, shall be a condition precedent to the closing of such financing or acquisition, and Company shall execute any and all documents necessary to effect said compensation.

c) As further consideration to Consultant, Company, or its nominees, agrees to pay with respect to any financing or acquisition candidate provided directly or indirectly to the Company by any lender or equity purchaser covered by this Section 5 during the period of one year from the close of the term of this Agreement, a fee to Consultant equal to that outlined in Section 5 herein.

d) Consultant will notify Company of introductions it makes for potential sources of financing or acquisitions in a timely manner (within approximately 3 days of introduction) via facsimile memo.  If Company has a preexisting relationship with such nominee and believes such party should be excluded from this Agreement, then Company will notify Consultant immediately within twenty-four (24) hours of Consultant's facsimile to Company of such circumstance via facsimile memo.

4.

6) <u>Non-Assignability of Services</u>. Consultant's services under this contract are offered to Company only and may not be assigned by Company to ant entity with which Company merges or which acquires the Company or substantially all of its assets. In the event of such merger or acquisition, all compensation to Consultant herein under the schedules set forth herein shall remain due and payable, and any compensation received by the Consultant may be retained in the entirety by Consultant, all without any reduction or pro-rating and shall be considered and remain fully paid and non-assessable. Notwithstanding the non-assignability of Consultant's services, Company shall assure that in the event of any merger, acquisition, or similar change of form of entity, that its successor entity shall agree to complete all obligations to Consultant, including the provision and transfer of all compensation herein, and the preservation of the value thereof consistent with the rights granted to Consultant by the Company herein, and to Shareholders.

7) <u>Expenses</u>. Consultant agrees to pay for all its expenses (phone, mailing, labor, etc.), other than extraordinary items (travel required by/or specifically requested by the Company, luncheons or dinners to large groups of investment professionals, mass faxing to a sizable percentage of the Company's constituents, investor conference calls, print advertisements in publications, etc.) approved by the Company prior to its incurring an obligation for reimbursement.

8) <u>Indemnification.</u> The Company warrants and represents that all oral communications, written documents or materials furnished to Consultant by the Company with respect to financial affairs, operations, profitability and strategic planning of the Company are accurate and Consultant may rely upon the accuracy thereof without independent investigation. The Company will protect, indemnify and hold harmless Consultant against any claims or litigation including any damages, liability, cost and reasonable attorney's fees as incurred with respect thereto resulting from Consultant's communication or dissemination of any said information, documents or materials.

9) <u>Representations</u>. Consultant represents that it is not required to maintain any licenses and registrations under federal or any state regulations necessary to perform the services set forth herein. Consultant acknowledges that, to the best of its knowledge, the performance of the services set forth under this Agreement will not violate any rule or provision of any regulatory agency having jurisdiction over Consultant. Consultant acknowledges that, to the best of its knowledge, Consultant and its officers and directors are not the subject of any investigation, claim, decree or judgment involving any violation of the SEC or securities laws. Consultant further acknowledges that it is not a securities Broker Dealer or a registered investment advisor. Company acknowledges that, to the best of its knowledge, that it has not violated any rule or provision of any regulatory agency having jurisdiction over the Company. Company acknowledges that, to the best of its knowledge, Company is not the subject of any investigation, claim, decree or judgment involving any violation of the SEC or securities laws.

10) <u>Legal Representation</u>. The Company acknowledges that it has been represented by independent legal counsel in the preparation of this Agreement. Consultant represents that it has consulted with independent legal counsel and/or tax, financial and business advisors, to the extent the Consultant deemed necessary.

11) <u>Status as Independent Contractor</u>. Consultant's engagement pursuant to this Agreement shall be as independent contractor, and not as an employee, officer or other agent of the Company. Nei-

ther party to this Agreement shall represent or hold itself out to be the employer or employee of the other. Consultant further acknowledges the consideration provided hereinabove is a gross amount of consideration and that the Company will not withhold from such consideration any amounts as to income taxes, social security payments or any other payroll taxes. All such income taxes and other such payment shall be made or provided for by Consultant and the Company shall have no responsibility or duties regarding such matters. Neither the Company nor the Consultant possesses the authority to bind each other in any agreements without the express written consent of the entity to be bound.

12) Attorney's Fee. If any legal action or any arbitration or other proceeding is brought for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with or related to this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs in connection with that action or proceeding, in addition to any other relief to which it or they may be entitled.

13) Waiver. The waiver by either party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach by such other party.

14) Choice of Law, Jurisdiction and Venue. This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of California. The parties agree that San Francisco County, CA. will be the venue of any dispute and will have jurisdiction over all parties.

15) Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the alleged breach thereof, or relating to Consultant's activities or remuneration under this Agreement, shall be settled by binding arbitration in California, in accordance with the applicable rules of JAMS Endispute, San Francisco, California, and judgment on the award rendered by the arbitrator(s) shall be binding on the parties and may be entered in any court having jurisdiction as provided by Paragraph 14 herein. The provisions of Title 9 of Part 3 of the California Code of Civil Procedure, including section 1283.05, and successor statutes, permitting expanded discovery proceedings shall be applicable to all disputes that are arbitrated under this paragraph.

16) <u>Complete Agreement.</u>  This Agreement contains the entire agreement of the parties relating to the subject matter hereof.  This Agreement and its terms may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

AGREED TO:


"Company"                     **WESTERN TRANSITIONS** (Other OTC:WTTN.PK),

Date:                         By: _____
                                   signing party's name here



" Consultant"                 CAPITAL GROUP COMMUNICATIONS, INC.

Date:                         By: _____
                                   Devin Bosch, President


7.

Exhibit B



Wednesday October 03



*Acclaimed*
*as one of the nation's leading investor relations, public relations, and media relations firms with a primary emphasis on the micro cap and small cap financial markets.*

| ABOUT US | APPROACH | OUR SERVICES | PROFILES | CONTACT US |

**FEATURED PARTNERS**


fueling the future

Better Biodiesel ("BBD") is a Domestic Energy Partners technology, and marks a new era in alternative fuel prod BBD patent-pending biodiesel production technology is significantly more efficient than traditional biodiesel prod methods, and costs substantially less per gallon to prod addition, our technology allows for large volume biodiese production.

>> LEARN MORE

**QUICK SUBSCRIBE**

Learn more and stay up to date! Get complimentary information on our portfolio companies sent directly to your In Box.

Select a Portfolio Client

>> SUBMIT

**BECOME A PARTNER**

Each of our clients goes through a qualification process similar to the process that major financial investment banks put their clients through in order to assess a match. To find ou how you can become a client and take advantage of our vast experience in the broad spectrum of investor relations and financial services to grow your shareholder value pleas review the "Become A Partner" webpage.

>> BECOME OUR PARTNER

© 2006 Capital Group Communications    Home  |  Disclaimer  |  Sitemap



Tuesday October 02



| ABOUT US | APPROACH | OUR SERVICES | PROFILES | CONTACT US |



**Raising Capital**

CGC's network of funds, institutions and high net worth individuals can steer you to financing you would never be able to locate on your own. As a CGC client, you automatically become a beneficiary of our extensive experience, our reputation and industry knowledge. More importantly we will mine our database of investors and companies to identify financial prospects that fit your company's specific criteria. Our numerous years of familiarity in the financial community means we have weeded through the various funds, so that we now focus directly on the most favorable financial and investment firms in the industry that are ready, willing, and able to make the introductions that fit your specific needs.

Raising capital with CGC is a highly customized process, based on the needs of each client company. We identify targets for each investor audience based on the firm's profile: from environmental and socially responsible, to hi-tech and medical advancement companies, we know which strategies to pursue to jump-start your company into the next level of financing. Working with us, your organization will maximize its potential to garner interest, negotiate, and finalize deals with investment firms.

Capital Group Communications is not an investment banker nor licensed CPA or Securities Broker. This website and any files transmitted with it are confidential and maybe legally privileged. It is intended solely for the addressee. This website may contain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Exchange Act of 1934 and is subject to safe harbor created by these sections. Your full cooperation is appreciated.

© 2006 Capital Group Communications    Home  |  Disclaimer  |  Sitemap



Tuesday October 02



| ABOUT US | APPROACH | OUR SERVICES | PROFILES | CONTACT US |

**Financial Community Communications**

In the world of small cap financing, creating visibility is the name of the game. In order to win the game, it is essential that your IR communications target the influential small cap investors that are the key to your success. CGC has a successful track record in generating the type of results small cap companies want most: investor interest, financing and coverage.

Partnering with CGC gives you access to our qualified contacts that will expand your company's reach into the institutional investment community. We introduce your company, product, and services to our community of licensed financial news leaders in the analyst, institutional fund management, broker, and market manager communities. Our introductions spark investor interest, and that's only just the beginning! We work with you to foster and strengthen these relationships. We convey your messages in an easy to understand and concise method that actually helps the financial community make investment decisions. We disseminate and communicate your company's progress in achieving each company milestone on an ongoing basis, whether it be in business development, products and service launches, or financials. We achieve this by piggybacking our communications onto your company's milestone, whether it's a press release or a referral to a four-star promotional event.

© 2006 Capital Group Communications     Home    |    Disclaimer    |    Sitemap





Tuesday October 02

| ABOUT US | APPROACH | OUR SERVICES | PROFILES | CONTACT US |



**Mergers & Acquisitions**

Acquiring or disposing of a business successfully is an enormous undertaking. The strategic, financial, legal and fiscal implications are formidable. CGC can help you with the initial hurdles associated with this process by providing contacts for merger and acquisition (M&A) deals, and then assist you in identifying and evaluating opportunities.

CGC has aligned itself with some of the leading technology, security, and consulting firms that specialize in the introduction of new technologies and in creating connections with companies ready to be acquired. As your M&A partner, we will help you develop marketing strategies to attract the right partners, negotiate purchase and close the deal. We can identify problem areas which could influence the price of the merged company and the balance sheet of the acquiring company. Providing M&A services for companies that are too small to be considered by large investment banking companies is our forte.

CGC has a network of SEC attorneys that handle all of our mergers and acquisitions and specialize in the field. CGC and partners perform pre-acquisition due diligence, integration reviews for assessing smooth transitions, pre-close and post-close process consulting on M&A deals.

© 2006 Capital Group Communications    Home  |  Disclaimer  |  Sitemap



Wednesday October 03



| ABOUT US | APPROACH | OUR SERVICES | PROFILES | CONTACT US |



## Our Team

Capital Group Communications, Inc. ("CGC") is a leading group of seasoned professionals advancing our clients' position within the competitive and demanding investment crowd. We offer unmatched counsel from senior-level professionals. Using investor relations, public relations and financial consulting tactics, CGC provides a unique opportunity to increase each of our clients' visibility and shareholder value by providing brokers, fund managers and institutions with world-class investor relations for our dynamic-growth companies.

## Growing Our Business Through Acquisition

Capital Group Communications acquired American Financial Communications (AFC) January 12, 2006. In an aggressive strategy, CGC acquired the assets and hired to contract, the employees of AFC. This strategic acquisition made CGC one of the largest Small-Mid cap specialized IR Firms in the country. "I first learned of CGC through an analyst and then follow their track record and realized that CGC was making waves in the industry. When I contacted Devin Bosch, CEO of CGC, discuss possible synergies I was astonished to learn that CGC already had a full due diligence package on my company, business model and strategies and that CGC made it a point to know all their competition, in order to stay ahead of the curve. I am proud that AFC is now under the CGC umbrella" stated Richard Carpenter, CEO American Financial Corporation, now VP Investor relations Capital Group Communications.

## CGC TEAM PLAYERS :

|    |    |    |
|----|----|----|
| »  | Devin J. Bosch | President/ CEO |
| »  | Abigail E. F. Bruce | VP Business Development & Client Relations |
| »  | Anthony Evans | VP Investor Relations |
| >> | Mark Bernhard | VP Corporate Communications |
| >> | George Carpenter | Sr. Investor Relations Specialist |
| »  | Richard Carpenter | Sr. Corporate Consultant |
| >> | Jeff Jordan | Sr. Investor Relations |
| >> | Daniel Shea | Investor Relations |
| >> | Lindsay Thompson | Executive Assistant |
| »  | Ryan Drutman | VP Corporate Communications, San Diego |





Wednesday October 03

| ABOUT US | APPROACH | OUR SERVICES | PROFILES | CONTACT US |



ENVIRONMENTAL

TECHNOLOGY

HEALTHCARE /
BIOSCIENCE

HOMELAND SECURITY

Overview

Capital Group Communications, Inc. prides itself on providing IR to a vast array of clientele whose services span several marketplace sectors. From clients working on national security to environmentally conscientious businesses, Capital Group Communications client companies span the entire world.

## Environmental

Renewable Energy:



**Better BioDiesel** (OTCBB:BBDS)    >> GO TO PROFILE
**Better Biodiesel** ("BBD") technology marks a new era in alternative fuel production. BBD patent-pending biodiesel has developed a proprietary waterless, continuous flow process capable of processing high grade biodiesel from multiple feedstocks. The company's unique technology is able to utilize low grade feedstocks, including animal tallow, without pre-processing or post-polishing. The process utilized requires relatively little space. Better Biodiesel believes that it has significant advantages in the cost to build and operate biodiesel production facilities. Better Biodiesel's objective is to become one of the world's largest producers of biodiesel. Better Biodiesel believes that it can achieve this objective through its revolutionary technology position. (www.betterbiodiesel.com)

## Technology

Internet Information
providers:





**Triton Distribution Systems, Inc.** (OTCBB: TTDS)    >> GO TO PROFILE
**Triton Distribution Systems** is a pioneer in low-cost, business-to-business Internet-based travel distribution and procurement solutions. Triton provides the electronic distribution of travel inventory from airlines, car rental companies, hotels, tour and cruise operators, and other travel vendors to travel agencies and their clients on a global basis. Their revenue model is designed so that Triton receives a transaction fee from vendors (providers of travel services) each and every time a booking occurs over our system. Triton's proprietary products and services fill crucial needs in the travel industry, and offer product, pricing, and marketing advantages



**Xedar Corporation** (OTCBB: XDRC)    >> GO TO PROFILE
The Company is the result of Premier Data Services, Inc.'s recent merger into the publicly traded shell Xedar Corporation. Focused on the development and delivery of enterprise solutions for business-critical applications, the Company specializes in complex data management for government entities (local, state, and federal divisions) to include

Geographic and Land Information Systems, IT Consulting Services, Court Management Systems, and Customer Relationship Management Systems. The primary focus is on the technology and the solutions to manage complex data and processes.

Electronics/Photonics:



**Powershares Capital Management** (AMEX: PXN)    >> see the details
PowerShares currently offers over 70 compelling investment opportunities through style, industry, commodities, currencies, specialty access and broad market Exchange-Traded Funds. In-depth information about these funds as well as ETFs in general is provided their website.



**TIBCO Software** (NASDAQ: TIBX)    >> see the details
TIBCO provides enterprise software that helps companies achieve SOA and BPM success. With over 3,000 customers, TIBCO has given leading organizations around the world better awareness and agility — what TIBCO calls The Power of Now®.

**Photo Violation Technologies Corp** (OTCBB: NCII)    >> see the details
Photo Violation Technologies Corporation wants to Revolutionize The Parking Industry™ Perfecting How People Park™ with the PhotoViolationMeter™ Solution. Photo Violation Technologies Corp wishes to improve the parking experience with PhotoViolationMeter™ while assisting municipalities and parking operators to maximize their parking management systems.



Games/Entertainment:

 

**DirecTV, Inc.** (NASDAQ:DTV)    >> see the details

Healthcare/Bioscience
Stem Cell:



**International Stem Cell Corporation**(OTCBB: ISCO)    >> see the details
International Stem Cell Corporation ("ISC") is developing stem cell lines that have Embryonic-like function but never involve fertilized eggs, nor have they been exposed to non-human cells. These factors will provide ISC a unique leadership role in the field of regenerative cell therapy.

**Cubist Pharmaceutical, Inc.** (NASDAQ: CBST)    >> see the details
Cubist Pharmaceuticals, Inc. is a biopharmaceutical company focused on the research, development and commercialization of pharmaceutical products that address unmet medical needs in the acute care environment. In the U.S., Cubist markets CUBICIN(R) (daptomycin for injection), the first antibiotic in a new class of antiinfectives called lipopeptides. The Cubist product pipeline includes our lipopeptide program and our natural products screening program. Cubist is headquartered in Lexington, MA.



Homeland Security
Communications/Tracking:

**VSI Wireless** (OTCBB: MYGP)    >> see the details
**Veritas Solutions Incorporated (VSI Wireless)** was formed in 2004 to capitalize on the



well-established trend toward Remote Asset Management. In a post-9/11 era, the global tracking of high-value mobile assets— vessels, cargo containers, trucks, aircraft, etc.—and the monitoring of high-value fixed assets—fuel tanks, bridges, pipelines, etc.—have become significant priorities for homeland security and commerce in general. Overall, the worldwide infrastructure for the tracking of assets is highly fragmented, and VS offers the only complete remote asset management solution, one that is customizable as well as communications and hardware independent. Early adopters of the Company's comprehensive, open-architecture software suite include the United States Coast Guard, United States Navy, United States Customs, State of Hawaii, Department of Transportation, various port authorities (Honolulu, New York/New Jersey, Seattle, Tacoma), Boeing, Lockheed Martin, Carniva Cruises, Celebrity Cruises, Matson Lines, Princess Cruises, Cemex, Chevron, Exxon Mobil and CITGO, among others.

© 2006 Capital Group Communications    Home  |  Disclaimer  |  Sitemap

Exhibit C

-----Original Message-----
**From:** Richard Carpenter [mailto:richard@capitalgc.com]
**Sent:** Monday, August 14, 2006 9:24 AM
**To:** John Gorst
**Cc:** devin@capitalgc.com
**Subject:**

Talked to Terry Cush –Shermano
Liked what he has seen so far –Will be backed to you within a few days.
Regards

Richard Carpenter
Senior Communications Consultant
Capital Group Communications Inc.
1750 Bridgeway A-200
Sausalito, California, 94965
415-332-7200- P
415-332-7201- F
Richard@capitalgc.com
www.capitalgc.com

10/3/2007

Exhibit D

## EXCLUSIVE PLACEMENT AGENCY AGREEMENT

This Placement Agency Agreement (this "Agreement") is made as of September 26, 2006, between Gottaplay Interactive, Inc., a Nevada corporation (the "Company"), and The Shemano Group, Inc., a California corporation (the "Placement Agent"). The Placement Agent and the Company agree:

1. **Engagement of Placement Agent**: The Company hereby engages the Placement Agent, and the Placement Agent hereby accepts such engagement, to act as the Company's exclusive Placement Agent with respect to sales by the Company in a private placement transaction (the "Offering") of up to $8 million aggregate principal amount of Equity, Equity-Related or Debt Securities (the "Securities") of the Company to the investors during the term of this Agreement as set forth in Section 6.

2. **Offering Procedures**: The Placement Agent will introduce the Company to investors who the Placement Agent reasonably believes to be "accredited investors," as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "1933 Act"),. (the "Offerees").

3. **Placement Agent's Compensation**: In consideration for the services rendered by the Placement Agent hereunder, the Company shall pay to the Placement Agent, or cause the Placement Agent to be paid, compensation as provided in this section within 3 days of the Company's receipt of funds from the Offerees.

    (a) **Cash Compensation:** The Company shall pay to the Placement Agent cash compensation equal to seven percent (7%) of the gross Offering funds received in the Offering.

    (b) **Warrants:** The Placement Agent shall receive three percent (4%) warrant compensation. The warrant calculation translates to 40,000 warrants per $1 million raised. The above-referenced warrants to be issued to the Placement Agent shall equal the strike, expiration and registration rights of any warrants sold to the Offerees in the Offering, and if the Offering does not provide for the issuance of warrants, then the warrants issued to the Placement Agent shall have a strike price equal to the Offering price of any Equity or Equity-Related Securities sold, have a five-year term and cashless exercise after one year if the underlying shares are not then registered. The warrant shares shall be subject to equitable adjustment for stock splits, stock dividends and similar events. The warrant shares shall have "piggyback" registration rights.

    For purposes of determining the Placement Agent's compensation under this Section 3, the gross offering funds received in the Offering(s) shall include any amounts paid to the Company by investors in respect to an exercise or conversion of any of the Securities or Warrants, including the value allocated to any securities not issued pursuant to a "cashless exercise" or similar provision, whenever actually received by the Company.

4.    **Certain Matters Relating to Placement Agent's Duties:**

(a)    The Placement Agent's responsibilities shall be limited to introducing potential investors to the Company, and the Placement Agent shall not have authority to offer or sell the Securities to any potential investor. Placement Agent shall not use any general solicitation or general advertising within the meaning of the applicable securities laws in connection with any offering. The Placement Agent shall have no responsibility but may participate or assist in any negotiations between any potential investor and the Company. Further, the Placement Agent shall have no responsibility for fulfilling any SEC reporting or filing requirements as relates to the Company provided however, Placement Agent agrees to provide Company with reasonable assistance related to any registration, qualification or other requirements of applicable securities laws and other regulatory matters, upon request of the Company.

(b)    The Placement Agent agrees to introduce the Company to Offerees only in states in which the Placement Agent has been advised by the Company that offers and sales of Securities can be legally made by the Company.

(c)    The Placement Agent shall perform its duties under this Agreement in a manner consistent with the instructions of the Company. Such performance shall include, but not be limited to, the delivery to each Offeree a current copy of the Private Placement Memorandum, Subscription Agreement and/or any Offering Questionnaire and/or similar documents provided to the Placement Agent by the Company, as such documents may be amended from time to time by the Company and delivered to the Placement Agent. The Placement Agent shall maintain a copy of any written information the Placement Agent obtains regarding the suitability of each Offeree; and only use the Private Placement Memorandum in introducing Offerees to the Company.    The Company shall, promptly following execution of this Agreement, provide the Placement Agent with a written list of prospective Offerees which the Company does not want the Placement Agent to contact. The Placement Agent agrees to not contact the persons on such list, and the Placement Agent shall not be entitled to the compensation set forth in Section 3 with respect to any investment made by such person in the Company's Securities.

(d)    The Placement Agent is and will hereafter act as an independent contractor and not as an employee of the Company and nothing in this Agreement shall be interpreted or construed to create any employment, partnership, joint venture, or other relationship between the Placement Agent and the Company. The Placement Agent will not hold itself out as having, and will not state to any person that the Placement Agent has, any relationship with the Company other than as an independent contractor. The Placement Agent

shall have no right or power to find or create any liability or obligation for or in the name of the Company or to sign any documents on behalf of the Company.

5.  **Right of First Refusal**. In consideration for the Placement Agent acting as the Placement Agent in connection with the proposed offering, the Company hereby grants the Placement Agent a right of first refusal to serve as the Company's exclusive financial advisor and investment banker in connection with any financial transaction for a period of 1 year from the closing of the transaction. In the event the company advises the Placement Agent that it desires to effect any financial transaction, the Company and the Placement Agent will negotiate in good faith the terms of the Placement Agent's engagement in a separate agreement which would set forth, among other matters, compensation for the Placement Agent based upon customary fees for the services provided.

6.  **Termination of Agreement**. Either party may terminate this Agreement by notifying the other party in writing upon a material breach by that other party, unless such breach is curable and is in fact cured within 15 days after such notice. This Agreement will otherwise terminate upon completion or termination of the Offering. The Company may terminate this Agreement following ninety (90) days after the date hereof upon written notice. Notwithstanding the foregoing, all provisions of this Agreement other than section 1, 2, 4 and 5 shall survive the termination of this Agreement with respect to Offerees who the Placement Agent introduces to the Company prior to any termination with respect to the Offering. The Placement Agent shall be entitled to compensation under section 3 based on investments made by such Offerees prior to the termination of this Agreement or at any time within one year thereafter.

7.  **Indemnification**. The Company and the Placement Agent each shall indemnify and defend the other and the other's affiliates, directors, officers, employees, agents, consultants, attorneys, accountants and other representatives (each an "Indemnified Person") and shall hold each Indemnified Person harmless, to the fullest extent permitted by law, from and against any and all claims, liabilities, losses, damages and expenses (including reasonable attorney's fees and costs), as they are incurred, in connection with the Offering, resulting from the indemnifying party's negligence, bad faith or willful misconduct in connection with the Offering, any violation by the indemnifying party (not caused by an Indemnified Person) of Federal or state securities laws in connection with the Offering, or any breach by the indemnifying party of this Agreement. In case any litigation or proceeding shall be brought against any Indemnified Person under this section, the indemnifying party shall be entitled to assume the defense of such litigation or proceeding with counsel of the indemnifying party's choice at its expense (in which case the indemnifying party shall not be responsible for the fees and expenses of any separate counsel retained by such Indemnified Person, except in the limited circumstances described below in this section); provided, however, that such counsel shall be reasonably satisfactory to the Indemnified Person. Notwithstanding the indemnifying party's election to assume the

defense of such litigation or proceeding (a) such Indemnified Person shall have the right to employ separate counsel and to participate in the defense of such litigation or proceeding, and (b) the indemnifying party shall bear the reasonable fees, costs and expenses of separate counsel if (but only if) the use of counsel selected by the indemnifying party to represent such Indemnified Person would present such counsel with a conflict of interest under applicable laws or rules of professional conduct.

8.  **Confidentiality of Offeree Information**. The Company acknowledges that the identity of the Offerees, and all confidential information about Offerees received by the Company from an Offeree or the Placement Agent, is confidential information of the Placement Agent and may not be shared with any other person without the consent of the Placement Agent.

9.  **Notices**. Any notice, consent, authorization or other communication to be given hereunder shall be in writing and shall be deemed duly given and received when delivered personally, when transmitted by fax, three days after being mailed by first class mail, or one day after being sent by a nationally recognized overnight delivery service, charges and postage prepaid, properly addressed to the party to receive such notice, at the following address or fax number for such party (or at such other address or fax number as shall hereafter be specified by such party by like notice):

   **(a)**  If to the Company, to:

   John P. Gorst
   Chairman and CEO
   3226 Rosedale Street N.W. , Suite 220
   Gig Harbor, WA  98335
   Phone:         (253) 722-5615
   Fax:           (800) 891-4792
   E-Mail:        jgorst@gotaplay.com

   **(b)**  If to the Placement Agent, to:

   Gary J. Shemano
   Chairman and CEO
   601 California Street, Suite 1150
   San Francisco, CA  94108
   Phone:         (415) 274-3200
   Fax:           (415) 274-3238
   E-Mail:        garyshemano@shemano.com

10. **Company to Control Transactions.** The prices, terms and conditions under which the Company shall offer or sell any Securities shall be determined by the Company in its sole discretion.  The Company shall have the authority to control all discussions and negotiations regarding any proposed or actual offering or sale of Securities. Nothing in this Agreement shall obligate the Company to actually offer or sell any

Securities or consummate any transaction. The Company may terminate any negotiations or discussions at any time and reserves the right not to proceed with any offering or sale of Securities. Compensation pursuant to this Agreement shall only be paid to the Placement Agent in the event of an actual Closing of the Offering to an Offeree introduced by Placement Agent.

11.    **Confidentiality of Company Information**. The Placement Agent, and its officers, directors, employees and agents shall maintain in strict confidence and not copy, disclose or transfer to any other party (1) all confidential business and financial information regarding the Company and its affiliates, including without limitation, projections, business plans, marketing plans, product development plans, pricing, costs, customer, vendor and supplier lists and identification, channels of distribution, and terms of identification of proposed or actual contracts and (2) all confidential technology of the Company. In furtherance of the foregoing, the Placement Agent agrees that it shall not transfer, transmit, distribute, download or communicate, in any electronic, digitized or other form or media, any of the confidential technology of the Company. The foregoing is not intended to preclude the Placement Agent from utilizing, subject to the terms and conditions of this Agreement, the Private Placement Memorandum and/or other documents prepared or approved by the Company for use in the Offering.

All communications regarding any possible transactions, requests for due diligence or other information, requests for facility tours, product demonstrations or management meetings, will be submitted or directed to the Company, and the Placement Agent shall not contact any employees, customers, suppliers or contractors of the Company or its affiliates without express permission. Nothing in this Agreement shall constitute a grant of authority to the Placement Agent or any representatives thereof to remove, examine or copy any particular document or types of information regarding the Company, and the Company shall retain control over the particular documents or items to be provided, examined or copied. If the Offering is not consummated, or if at any time the Company so requests, the Placement Agent and its representatives will return to the Company all copies of information regarding the Company in their possession.

The provisions of this Section shall survive any termination of this Agreement.

12.    **Press Releases, Etc**. The Company shall control all press releases or announcements to the public, the media or the industry regarding any offering, placement, transaction or business relationship involving the Company or its affiliates. Except for communication to Offerees in furtherance of this Agreement and the provision of the Private Placement Memorandum and/or offering documents, the Placement Agent will not disclose the fact that discussions or negotiations are taking place concerning a possible transaction involving the Company, or the status or terms and conditions thereof. Notwithstanding the foregoing, the Company agrees to issue a press release prior to the opening of the market on the business day following the Company's receipt of executed agreements binding Offerees to purchase Securities in at least the

amount of the minimum Offering (if there is any such minimum) setting forth the material terms of the Offering.

13. **Expenses, Etc**. The compensation described in Section 3 of this Agreement shall be the Placement Agent's sole compensation for all of its services and efforts to the Company and its affiliates, in connection with any offering or placement of Securities. However, while the Placement Agent shall pay all of its own costs and expenses exceeding ten thousand ($10,000) in carrying out its activities hereunder; the Company will reimburse the Placement Agent for the first $10,000 of aforementioned expenses after they have been incurred by the Placement Agent, and an itemized accounting has been provided to the Company. The Company further agrees to retain counsel not unacceptable to the Placement Agent for preparation of all legal documentation and is furthermore responsible for all expenses as they relate to such matters.  The Placement Agent shall be exclusively responsible for any compensation, fees, commissions or payments of its employees, agents representatives, co-Placement Agents or other persons or entities utilized by it in connection with its activities on behalf of the Company, and the Placement Agent will indemnify and hold harmless the Company and its affiliates from the claims of any such persons or entities.

14. **Covenants of the Company**.  The Company will provide the Placement Agent for delivery to all offerees and purchasers and their representatives any additional information, documents and instruments which the Placement Agent shall deem necessary to comply with the rules, regulations and judicial and administrative interpretations in those states and jurisdictions where the Securities are to be offered for sale or sold.  The Company will file all post-Offering forms, documents or materials and take all other actions required by states in which the Securities have been offered or sold.  The Placement Agent will not make offers or sales of the Securities in any jurisdiction in which the Securities have not been qualified or registered or are not exempt from such qualification or registration.

Reg. D Compliance.  The Company will comply in all respects with the terms and conditions of Reg. D and applicable state securities laws with respect to the Offering and the sale of the Securities.

Due Diligence Materials. The Company shall provide the Placement Agent copies of all information provided to all prospective offerees and copies of all documents pertaining to the closing and sale of Securities. Additionally, the Company shall provide the Placement Agent copies of any documentation reasonably requested by the Placement Agent.

Background Investigation. The Company shall deliver authorization (s) to have background investigations conducted by an outside third party on officers or directors determined by the Placement Agent.

Public Information. The Company acknowledges that all information regarding their officers, directors and majority shareholders have been filed with all appropriate

regulatory agencies and are public record. The Company agrees to provide the Placement Agent with any material differences that have not been filed.

15. **Compliance with Laws**. The Placement Agent represents and warrants that it is a duly registered broker/dealer and in good standing with the SEC, NASD and the State of California and has and shall maintain such registrations as well as all other necessary licenses and permits to conduct its activities under this Agreement, which it shall conduct in compliance with applicable federal and state laws relating to a private placement under Regulation D of the 1933 Act. The Placement Agent represents that it is not a party to any other agreement which would conflict with or interfere with the terms and conditions of this Agreement.

16. **Assignment Prohibited**.  No assignment of this Agreement shall be made without the prior written consent of the other party.

17. **Amendments**.  Neither party may amend this Agreement or rescind any of its existing provisions without the prior written consent of the other party.

18. **Governing Law**.  This Agreement shall be deemed to have been made in the State of California and shall be construed, and the rights and liabilities determined, in accordance with the law of the State of California, without regard to the conflicts of laws rules of such jurisdiction.

19. **Waiver**.  Neither Placement Agent's nor the Company's failure to insist at any time upon strict compliance with this Agreement or any of its terms nor any continued course of such conduct on their part shall constitute or be considered a waiver by Placement Agent or the Company of any of their respective rights or privileges under this Agreement.

20. **Severability**. If any provision herein is or should become inconsistent with any present or future law, rule or regulation of any sovereign government or regulatory body having jurisdiction over the subject matter of this Agreement, such provision shall be deemed to be rescinded or modified in accordance with such law, rule or regulation. In all other respects, this Agreement shall continue to remain in full force and effect.

21. **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and will become effective and binding upon the parties at such time as all of the signatories hereto have signed a counterpart of this Agreement. All counterparts so executed shall constitute one Agreement binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the same counterpart. Each of the parties hereto shall sign a sufficient number of counterparts so that each party will receive a fully executed original of this Agreement.

22. **Entire Agreement**.  This Agreement and all other agreements and documents referred herein constitute the entire agreement between the Company and the Placement Agent.  No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any party hereto to any other party concerning the subject matter hereof.   All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning the subject matter hereof are merged herein. This is an integrated Agreement.

23. **Arbitration.**  The parties agree that this Agreement and all controversies which may arise between the Placement Agent and the Company, whether occurring prior, on or subsequent to the date of this Agreement, will be determined by arbitration.  The parties understand that:

   (a)     Arbitration is final and binding on the parties.

   (b)     The parties are waiving their right to seek remedies in court, including the right to a jury trial.

   (c)     Pre-arbitration discovery is generally more limited than and different from court proceedings.

   (d)     The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification or rulings by the arbitrators is strictly limited.

   (e)     The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

The parties agree that any arbitration under this Agreement will be held at the facilities of and before an Arbitration Panel appointed by the National Association of Securities Dealers, Inc. ("NASD"), or if the NASD refuses to accept jurisdiction, then before JAMS/ENDISPUTE in San Francisco, California. The award of the arbitrators, or of the majority of them, will be final, and judgments upon the award may be entered in any court, state or federal, having jurisdiction. The parties hereby submit themselves and their personal representatives to the jurisdiction of any state or federal court for the purpose of such arbitration and entering such judgment.

Any forbearance to enforce an agreement to arbitrate will not constitute a waiver of any rights under this Agreement except to the extent stated herein.

**THIS AGREEMENT IS GOVERNED BY A PRE-DISPUTE ARBITRATION CLAUSE CONTAINED IN PARAGRAPH 23 OF THIS AGREEMENT**

**The Shemano Group, Inc.** (the "Placement Agent")


By:_____
Gary J. Shemano
Title: Chairman and CEO


**Gottaplay Interactive, Inc.** (the "Company")


By: _____
John P. Gorst
Title: Chairman and CEO

Exhibit E

-----Original Message-----
**From:** Richard Carpenter [mailto:richard@capitalgc.com]
**Sent:** Friday, September 22, 2006 7:41 AM
**To:** John Gorst
**Cc:** Devin Bosch
**Subject:** FW: Stonegate Securities--GTAP & EUSI

John,
Take a look at this group. While I don't have any personal experience with them they seem to be a good fit.
If interested we can start a dialog. They have seen the corporate profile and have interest.
Regards

Richard Carpenter
Senior Communications Consultant
Capital Group Communications Inc.
1750 Bridgeway A-200
Sausalito, California, 94965
415-332-7200- P
415-332-7201- F
Richard@capitalgc.com
www.capitalgc.com

Disclaimer: This is not a solicitation to buy or sell any securities. Capital Group Communications, Inc. (CGC) is not in any way affiliated with, sponsored or endorsed by, The Capital Group Companies, Inc. Capital Group Communication, Inc. is not an investment banker nor licensed CPA or Securities Brokerage and in keeping with section 17(b) of the securities Act of 1933 we hereby direction you to the CGC disclaimer. This e-mail and any files transmitted with it are confidential and maybe legally privileged. It is intended solely for the addressee. If you are not the intended recipient, please destroy this e-mail and notify us immediately. Any disclosure, copying or distribution of this e-mail is prohibited and may be unlawful. There are risks in communicating by e-mail. E-mail may be susceptible to data corruption, delay, interception and unauthorized amendment and neither Capital Group Communications, Inc. nor any of its subsidiaries or affiliates does accept liability for any such corruption, delay, interception or amendment or their consequences. This e-mail may contain forward-looking statements within the meaning of Section 27(A) of the Securities Act of 1933 and Section 21(E) of the Exchange Act of 1934 and is subject to safe harbor created by these sections. Information contained in this distribution may constitute material non-public information within the meaning of Regulation FD promulgated by the Securities and Exchange Commission. You may be restricted in trading in the referenced Issuer's securities and from conveying such material non-public information to third parties, until such information becomes generally available to the public. Your full cooperation is appreciated.

**From:** Luke Shagets [mailto:luke@stonegateinc.com]
**Sent:** Thursday, September 21, 2006 11:29 AM
**To:** richard@capitalgc.com
**Subject:** Stonegate Securities--GTAP & EUSI

9/30/2007



Richard,

Please feel free to forward the attached information about Stonegate to management. Stonegate is a 30-year-old research and investment banking boutique based in Dallas, Texas that is dedicated to serving the needs of emerging micro cap companies. Our research department covers a number of companies in a variety of industries in the micro cap space. We pride ourselves on providing quality investment ideas to our large universe of institutional investors.

In addition to our block trading capabilities, since 2000 we have consistently ranked in the top 1% of all placement agents in the number of private placements completed for micro cap (sub $400 million market cap) companies.

If we get to a point where either GTAP or EUSI would like to engage Stonegate, we would happily provide references. If it works for you, let's have an initial call with management and see if there is a mutuality of interest.


Best Regards,

Luke Shagets
Stonegate Securities
5950 Sherry Lane, 4th Floor
Dallas, Texas 75225
214-987-4121
214-987-1981 Fax
www.stonegateinc.com

Exhibit F

-----Original Message-----
**From:** Richard Carpenter [mailto:richard@capitalgc.com]
**Sent:** Tuesday, November 14, 2006 12:45 PM
**To:** John Gorst; gsacks@sourcegrp.com
**Cc:** devin@capitalgc.com
**Subject:** Finance call

Finance call with Gottaplay's CEO John Gorst and Source Capital's Gary sacks and Mike Cole

Time 11 am Friday 11/17
Call in 605 772 3001 # 599689
Garys # is 800 862 1095  x 231
John's 253-853-4145
Thanks

Richard Carpenter
Senior Communications Consultant
Capital Group Communications Inc.
1750 Bridgeway A-200
Sausalito, California, 94965
415-332-7200- P
415-332-7201- F
Richard@capitalgc.com
www.capitalgc.com

Disclaimer: This is not a solicitation to buy or sell any securities. Capital Group Communications, Inc. (CGC) is not in any way affiliated with, sponsored or endorsed by, The Capital Group Companies, Inc. Capital Group Communication, Inc. is not an investment banker nor licensed CPA or Securities Brokerage and in keeping with section 17(b) of the securities Act of 1933 we hereby direction you to the CGC disclaimer. This e-mail and any files transmitted with it are confidential and maybe legally privileged. It is intended solely for the addressee. If you are not the intended recipient, please destroy this e-mail and notify us immediately. Any disclosure, copying or distribution of this e-mail is prohibited and may be unlawful. There are risks in communicating by e-mail. E-mail may be susceptible to data corruption, delay, interception and unauthorized amendment and neither Capital Group Communications, Inc. nor any of its subsidiaries or affiliates does accept liability for any such corruption, delay, interception or amendment or their consequences. This e-mail may contain forward-looking statements within the meaning of Section 27(A) of the Securities Act of 1933 and Section 21(E) of the Exchange Act of 1934 and is subject to safe harbor created by these sections. Information contained in this distribution may constitute material non-public information within the meaning of Regulation FD promulgated by the Securities and Exchange Commission. You may be restricted in trading in the referenced Issuer's securities and from conveying such material non-public information to third parties, until such information becomes generally available to the public. Your full cooperation is appreciated.

10/3/2007

Exhibit G

-----Original Message-----
**From:** Richard Carpenter [mailto:richard@capitalgc.com]
**Sent:** Tuesday, November 14, 2006 12:50 PM
**To:** John Gorst
**Cc:** devin@capitalgc.com
**Subject:** RE: Source Capital

OK- info on conference call sent to you,- They have your power point and are aware of the October financing,

Missed you on weekly call
If this time etc. doesn't work let me know.
Richard

---

**From:** John Gorst [mailto:jgorst@gotaplay.com]
**Sent:** Tuesday, November 14, 2006 12:03 PM
**To:** richard@capitalgc.com
**Subject:** RE: Source Capital

Sure, let me know what works, I am open.
-----Original Message-----
**From:** Richard Carpenter [mailto:richard@capitalgc.com]
**Sent:** Tuesday, November 14, 2006 10:36 AM
**To:** John Gorst; phillipknight@pathcom.com
**Subject:** Source Capital

Financing group I have dealt with is interested in having a conversation Thursday or Friday between 11-1psd.
If there is no interest or need-Let me know,
Thanks

Richard Carpenter
Senior Communications Consultant
Capital Group Communications Inc.
1750 Bridgeway A-200
Sausalito, California, 94965
415-332-7200- P
415-332-7201- F
Richard@capitalgc.com
www.capitalgc.com

Disclaimer: This is not a solicitation to buy or sell any securities. Capital Group Communications, Inc. (CGC) is not in any way affiliated with, sponsored or endorsed by, The Capital Group Companies, Inc. Capital Group Communication, Inc. is not an investment banker nor licensed CPA or Securities Brokerage and in keeping with section 17(b) of the securities Act of 1933 we hereby direction you to the CGC disclaimer. This e-mail and any files transmitted with it are confidential and maybe legally privileged. It is intended solely for the addressee. If you are not the intended recipient, please destroy this e-mail and notify us immediately. Any disclosure, copying or distribution of this e-mail is prohibited and may be unlawful. There are risks in communicating by e-mail. E-mail may be susceptible to data corruption, delay, interception and unauthorized amendment and neither Capital Group Communications, Inc. nor any of its subsidiaries or affiliates does accept liability for any such corruption, delay, interception or amendment or their consequences. This e-mail may contain forward-looking statements within the meaning of Section 27(A) of the Securities Act of 1933 and Section 21(E) of the Exchange Act of 1934 and is subject to safe harbor created by these sections. Information contained in this distribution may constitute material non-

public information within the meaning of Regulation FD promulgated by the Securities and Exchange Commission. You may be restricted in trading in the referenced Issuer's securities and from conveying such material non-public information to third parties, until such information becomes generally available to the public. Your full cooperation is appreciated.