1  John R. Mayer (#197765)
   JOHN R. MAYER, APLC
2  2550 Fifth Avenue, Suite 520
   San Diego, California 92103
3  Phone: (619) 794-2651
   Fax: (619) 794-2653
4
   Attorneys for Defendants and Counter-Claimants Gottaplay Interactive, Inc., John P. Gorst, and
5  Mark H. Levin

6

7

8                          **UNITED STATES DISTRICT COURT**

9                    **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10
    CAPITAL GROUP COMMUNICATIONS,        )   CASE NO.:  C-07-03632-EMC
11  INC., a California Corporation,       )
                                          )
12      Plaintiff,                        )   **DECLARATION OF JOHN R. MAYER IN**
                                          )   **SUPPORT OF OPPOSITION TO**
13      v.                                )   **PLAINTIFF'S MOTION FOR**
                                          )   **PRELIMINARY INJUNCTION**
14  GOTTAPLAY INTERACTIVE, INC. a Nevada  )
    corporation; JOHN P. GORST, an individual;  )   Date:       October 24, 2007
15  MARK H. LEVIN, an individual; and DOES 1  )   Time:       3:00 p.m.
    through 50, inclusive,                )   Judge:      Hon. Edward M. Chen
16                                        )   Location:   15th Floor, Courtroom C
        Defendants.                       )
17  _____      )
                                          )
18  GOTTAPLAY INTERACTIVE, INC. a Nevada  )
    corporation; JOHN P. GORST, an individual;  )
19  and MARK H. LEVIN, an individual,     )
                                          )
20      Counter-Claimants,                )
                                          )
21      v.                                )
                                          )
22  CAPITAL GROUP COMMUNICATIONS,         )
    INC., a California Corporation, and DOES 1-50,  )
23  inclusive,                            )
                                          )
24      Counter-Defendants.               )
    _____      )
25

26

27

28

DECL OF JOHN R. MAYER IN SUPPORT OF OPP TO MOT FOR PRELIM INJUNCTION          C-07-03632-EMC

1       I, John R. Mayer, declare:

2    1.  I am the Chief Executive Officer of Gottaplay Interactive, Inc., ("Gottaplay") and one of the

3   named defendants in the above-entitled matter.  I have personal knowledge of the facts stated in this

4   declaration and could and would completely testify thereto if called as a witness in any proceeding

5   in this action.

6    2.  Due to the rather recent nature of the No-Action Letter by the Securities & Exchange

7   Commission (the "SEC") to Hallmark Capital Corporation ("Hallmark"), dated June 11, 2007, I

8   printed the letter from the SEC's website.  Attached hereto as Exhibit A are true and correct copies

9   of the SEC no-action letter to Hallmark, and Hallmark's letter to which the SEC responds.

10    3.  I located on the Internet the following websites that state they are owned and operated by

11   Plaintiff/Counter-Defendant Capital Group Communications, Inc. ("CGC") and that market services

12   such as "Immediate Access Capital."  These websites are pickaxeinvestor.com,

13   myhealthcarestocks.com, blackmudinvestor.com, and defensestockalert.com.  I printed the pages of

14   these websites and attach true and correct copies of what I printed hereto as Exhibit B.

15    4.  On the SEC's Filings & Forms (EDGAR) website, I located an exhibit to a filing by the

16   company International Stem Cell, Inc. entitled Consulting Agreement and dated September 1, 2006.

17   This Consulting Agreement is between International Stem Cell, Inc. and CGC.  It contains terms

18   virtually identical to those in the Consulting Agreement between Gottaplay and CGC.  I printed the

19   CGC-International Stem Cell, Inc. Consulting Agreement, dated September 1, 2006, a true and copy

20   of which is attached hereto as Exhibit C.

21    I declare under penalty of perjury under the laws of the United States of America that the

22   foregoing is true and correct.

23

24   Executed on October 3, 2007      _____

25                           John R. Mayer

26

27

28

DECL OF JOHN R. MAYER IN SUPPORT OF OPP TO MOT FOR PRELIM INJUNCTION    C-07-03632-EMC

Exhibit A



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

DIVISION OF
MARKET REGULATION

June 11, 2007

Ms. Patricia Hall
Managing Director
Hallmark Capital Corporation
230 Park Avenue, Suite 2430
New York, NY 10169

Re: Hallmark Capital Corporation

Dear Ms. Hall:

This is in response to your letter dated February 26, 2007. As an initial matter, we note that the staff of the Division of Market Regulation, as a matter of policy, does not provide advice regarding ongoing activity.

Nonetheless, based on the general descriptions of the activities included in your letter, it appears that Hallmark Capital Corporation ("HallCap") would be required to register with the Commission as a broker-dealer pursuant to Section 15(b) of the Securities Exchange Act of 1934. For additional information, you may wish to refer to the Division of Market Regulation's "Guide to Broker-Dealer Registration," posted on the Commission's website at http://www.sec.gov/divisions/marketreg/bdguide.htm, and to the staff's letter to Country Business, Inc., dated November 8, 2006, at http://www.sec.gov/divisions/marketreg/mr-noaction/cbi110806.htm. You may also wish to refer to the American Bar Association's publication, Report and Recommendations of the Task Force on Private Placement Broker-Dealers, published in The Business Lawyer in May 2005.[1]

We express no view with respect to other questions HallCap's activities may raise, including the applicability of any other provision of the federal securities laws, any state law, or any self-regulatory organization rules. Before continuing with the activities described in your letter, you should consult with private counsel familiar with the federal securities laws to obtain legal advice as

---

[1] The staff expresses no view on this publication, citing it solely as one example of private counsels' views.

Ms. Patricia Hall
June 11, 2007
Page 2

to how the above issues should be resolved in your particular circumstances.  Private counsel would
be in a position to advise you on the basis of a more thorough understanding of your activities.

Sincerely,

Catherine McGuire
Chief Counsel

# Hallmark Capital Corporation

230 Park Avenue  Suite 2430
New York, NY 10169
(212) 661-4141

COPY
#7

SECURITIES AND EXCHANGE COMMISSION
RECEIVED

FEB 27 2007

DIVISION OF MARKET REGULATION

Securities Exchange Act of 1934
Section 15

February 26, 2007

Catherine McGuire, Esq.
Chief Counsel and Associate Director
Division of Market Regulation
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549

Office of Chief Counsel
MAR 0 8 2007
Division of Market Regulation

Re:     Request for No Action Letter – Finder Activities

Dear Ms. McGuire:

With regards to Hallmark Capital Corporation, a Delaware Corporation ("HallCap"), we request assurance that the staff of the Division of Market Regulation (the "Staff") of the Securities and Exchange Commission (the "Commission") will not recommend enforcement action to the Commission under Section 15(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") for HallCap's engagement in the activities described in this letter without registering as a broker-dealer pursuant to Section 15(b) of the Exchange Act.

## Background: HallCap

HallCap is a financial consultant and finder for small businesses that assists the owners of businesses in raising capital, facilitates mergers and acquisitions and provides strategic business consulting services. Before the commencement of any assignment, HallCap informs the client that it is not a broker-dealer. HallCap does not act as an agent for the client company and does not effectuate transactions for the account of others. At no point does HallCap offer to sell securities to or solicit investment funds from the general investing public.

## Assistance in Raising Capital

HallCap assists small businesses with revenues under $25 million with their debt and equity capital needs. In the case of equity capital, HallCap assists the client company by preparing a confidential information summary describing the business, identifying broker-dealer firms that might be interested in working with the company and arranging meetings leading to an engagement of the broker-dealer by the client company to raise capital. Once the broker-dealer is engaged, it has control of and oversight over all significant aspects of any securities transaction, including investor solicitation and execution of the transaction.

Ms. Catherine McGuire
February 26, 2007
Page 2

 In the case of a client company's bank debt needs, HallCap identifies bank lenders that might have an interest in the client company's industry, prepares a confidential information summary describing the business, assists the client with the loan application process and arranges meetings leading to the extension of bank credit facilities to the client company.

 HallCap is compensated with a modest upfront retainer and a fee based on the outcome of the transaction. The primary reason for this arrangement is to enable an otherwise financially-strapped small business client company to benefit from HallCap's services without having to pay for those services unless and until the assignment is successful and a transaction providing funds takes place. Due to the small size of the client company and its inability to attract small amounts of capital on its own, it often takes HallCap hundreds of hours of work over many months before a transaction is completed.

 At no point does HallCap handle the securities or funds of others.

Assistance with Mergers and Acquisitions

 HallCap assists small businesses with revenues under $25 million with mergers and acquisitions. If a client company owner wants to sell his business, HallCap prepares a confidential information summary describing the business, identifies companies that might be interested in buying the client company, qualifies their interest in and ability to pay the owner's asking price and arranges exploratory meetings between the buyer and seller. If serious interest is expressed by the buyer and accepted by the seller, the client company's attorney spearheads any negotiations leading to definitive agreements and the execution of a transaction.

 If a client company is interested in acquisitions, HallCap and the client company identify possible acquisition targets. HallCap conducts preliminary information gathering interviews, which include a discussion of the proposed asking price/terms, and prepares an acquisition profile on the target company for the purpose of preliminary screening, i.e., determining if the client company is interested in taking a serious look at the possible acquisition target given the expected asking price/terms. If the client company is seriously interested in pursuing the acquisition target after this preliminary screening process, the client company's legal counsel spearheads any negotiations leading to definitive agreements and the execution of a transaction. All merger and acquisition transactions involve a single buyer.

 HallCap is compensated with a modest upfront retainer and a fee based on the outcome of the transaction. The primary reason for this arrangement is to enable an otherwise financially-strapped small business client company to benefit from HallCap's services without having to pay for those services unless and until the assignment is completed, which is under the control of, and at the sole discretion of, the client company. HallCap often provides hundreds of hours of work over many months before a transaction is completed.

Ms. Catherine McGuire
February 26, 2007
Page 3

At no point does HallCap act as agent for the client company, effectuate transactions for the account of others, handle the securities or funds of others, or bind either party to the transaction. Rather, HallCap plays the role of a consultant bringing to bear its knowledge and expertise to identify and evaluate merger and acquisition targets.

Strategic Business Consulting Services

HallCap assists both small businesses with revenues under $25 million, as well as larger corporate clients including Fortune 500 firms, with strategic business consulting services intended to advance the client company's overall business and strategic objectives. Services include strategic planning, advice with respect to business and management issues, and assistance with formulating and implementing corporate marketing and general public relations strategies.

HallCap is compensated with pre-negotiated fixed fees paid over the term of the engagement. At no point is HallCap involved in effectuating transactions for the account of others.

Request for No Action

In summary, HallCap does not engage in the activities of a broker-dealer, does not effectuate transactions for the account of others, does not take a central role in the negotiations leading to a completed transaction, does not act as an agent on behalf of the client company and does not solicit investment funds from the general public. HallCap does receive transaction-based compensation, but the primary reason for this arrangement is to enable the small company client to afford to retain the services of HallCap without any obligation to close on a transaction. Absent this arrangement, the small business owners we serve would be unable retain the professional services that would enable them to be successful in raising capital and in mergers and acquisitions.

HallCap acts as a finder and plays a very limited role in the execution of a transaction once the preliminary exploratory process has been completed and the parties have expressed serious interest in pursuing a possible transaction.

We do not believe that a regulatory problem exists, but on occasion, we are questioned about the possible need for regulatory oversight, including registration as a broker-dealer, an action that we do not believe is necessary given the limited scope of our activities.

We respectfully request that the Staff confirm that it will not recommend enforcement action to the Commission under Section 15(a) of the Exchange Act for HallCap's engagement in the activities described in this letter without registering as a broker-dealer pursuant to Section 15(b) of the Exchange Act.

Sincerely,

Patricia Hall
Managing Director

Exhibit B



| welcome | services | profile | commentary | subscribe | clients | contact us |

## PICK AXE INVESTOR SERVICES



**Market Commentary**

News for your investment knowledge specific to our companies.
› read more

› **HOW WE DELIVER**

PickAxeInvestor.com can offer Financial Public Relations, Investor Relations and General Business Development, plus Strategic Planning, Mergers & Acquisitions, Immediate Access Capital, Networking and Officer/Director Recruiting.

› **WHY US**

PickAxeInvestor.com accepts only a small number of clients and takes on their financial and portfolio needs with a watchful eye and round-the-clock, dedication to the success of those clients .



**PickAxeInvestor.com** serving companies that care about the investor.

› **CONTACT US**

Let us offer you some ideas for making your investment or company rise to the top by sending us an inquiry

PickAxeInvestor.com was created to bridge the gap between companies and their most valuable asset - the Shareholder.

### Subscribe to our FREE Newsletter

Utilizing our ingenious communicatons structure of newsletters, personal calls, alerts via phone and structured conference calls, we are dedicated to help you  the shareholder, make decisions with the utmost clarity and confidence.

Best of all it's a FREE service to you!

| welcome | :: | services | :: | profile | :: | commentary | :: | subscribe | :: | clients | :: | contact us |

Copyright 2005© PickAxeInvestor.com. All rights reserved. • Disclaimer • Site owned and operated by Capital Group Communications



# MyHealthCareStocks.com

Dedicated to helping the stockholder

## SUBSCRIBE
### TO OUR INSTANT ALERTS
**Never miss an important development again**



**CEO TALK**
news & info
direct from the CEO



**NEWS ALERTS**
stay ahead of
the other investors



→ WELCOME

→ SERVICES

→ COMMENTARY

→ PROFILE

→ CONTACT

→ SUBSCRIBE





**CONFERENCE CALLS**





**COMMENTARY**
Gives free information
about the health
care industry

---

☼ **WHAT WE OFFER**



→ **Market Commentary**
about news specific to our companies.

→ **News Alerts**
lets you stay ahead of other investors.



→ **CEO Talk**
gives you news and information directly from the CEO.

**MyHealthCareStocks.com** serving companies that care about the investor.

## *COMPANY PROFILE*

**MyHealthCareStocks.com has caught the eye of the investment and corporate communities because of their innovative and resourceful approach to improving shareholder value. MyHealthCareStocks investor relations, shareholder communications and public relations services are committed to your success.**

### WHY US

**MyHealthCareStocks.com accepts only a small number of clients and takes on their financial and porfolio needs with a watchful eye and round-the-clock, dedication to the success of those clients.**

### WHAT WE OFFER

**MyHealthCareStocks.com can offer Financial Public Relations, Investor Relations and General Business Development, plus Strategic Planning, Mergers & Acquisitions, Immediate Access Capital, Networking and Officer/Director Recruiting.**

---

☒ redinews financial content chart bar

---

Copyright © 2004 MyHealthCareStocks.com • DISCLAIMER •

site owned and operated by Capital Group Communications



# MyHealthCareStocks.com
Dedicated to helping the stockholder

SUBSCRIBE
TO OUR INSTANT ALERTS
Never miss an important
development again



**CEO TALK**
news & info
direct from the CEO

**CONFERENCE CALLS**



**NEWS ALERTS**



**COMMENTARY**



→ WELCOME
→ SERVICES
→ COMMENTARY
→ PROFILE
→ CONTACT
→ SUBSCRIBE



## WHAT WE OFFER



→ **Market Commentary** about news specific to our companies.



→ **News Alerts** lets you stay ahead of other investors.

→ **CEO Talk** gives you news and information directly from the CEO.

**MyHealthCareStocks.com** serving companies that care about the investor.

## COMPANY SERVICES

All of MyHealthCareStocks.com services are completely
FREE OF CHARGE.

We communicate to you, THE SHAREHOLDER,
through multiple means of media:

NEWSLETTERS

PRESS RELEASE ALERTS

STRUCTURED CONFERENCE CALLS

CEO TALK

Our belief is that every current or potential shareholde should hear
from the CEO to the head of Sales. We don't only believe that
companies needs to personally contact their shareholders,
WE REQUIRE IT!



**RediNews Financial Content**                 Sales office: (500) 733-1160

| Monday Aug 06, 2007 market closed | COMP 2,547.33 ↑ +36.08 | | SPX 1,467.67 ↑ +34.61 | | NYA 9,553.77 ↑ +183.17 | |
|---|---|---|---|---|---|---|

Copyright © 2004 MyHealthCareStocks.com • DISCLAIMER •

site owned and operated by Capital Group Communications



# Black Mud Investor



BlackMudInvestor.com

> REPLAY

| HOME | PROFILE | COMMENTARY | SERVICE | CONTACT US |

## Grow

**SEEKING TO GROW YOUR WEALTH THROUGH SMART INVESTING**

FREE Newsletter  ≫

### COMPANY SERVICES

#### HOW WE DELIVER

**BlackMudInvestor.com** can offer Financial Public Relations, Investor Relations and General Business Development, plus Strategic Planning, Mergers & Acquisitions, Immediate Access Capital, Networking and Officer/Director Recruiting.

#### WHY US

**BlackMudInvestor.com** accepts only a small number of clients and takes on their financial and portfolio needs with a watchful eye and round-the-clock, dedication to the success of those clients.

#### CONTACT US

Let us offer you some ideas for making your investment or company rise to the top by sending us an inquiry.

**BlackMudInvestor.com was created to bridge the gap between companies and their most valuable asset - the Shareholder.**

**Utilizing** our ingenious communicatons structure of newsletters, personal calls, alerts via phone and structured conference calls, we are dedicated to help you, the shareholder, make decisions with the utmost clarity and confidence.

**Best of all** it's a **FREE** service to you!

**Market Commentary** about news specific to our companies.



**CEO Talk** gives you news and information directly from the CEO.



**News Alerts** lets you stay ahead of other investors.



### Newsletter Subscription

**Name:**

**Phone Number:**

**E-mail Address:**

[ Submit ]

BlackMudInvestor.Com © 2005 • Disclaimer - Site Owned and operated by Capital Group Communications, Inc



**Black Mud Investor**

BlackMudInvestor.com

HOME    PROFILE    COMMENTARY    SERVICE    CONTACT US

# Grow

SEEKING TO GROW YOUR WEALTH
THROUGH SMART INVESTING

FREE Newsletter »

**COMPANY PROFILE**

In today's world of investment strategies and corporate communicatons, a *Leader* has arisen, **BLACKMUDINVESTOR.COM**

*Acclaimed* as one of the nation's leading public relations, media relations and investor relations firms with a primary emphasis on the small and micro cap financial market.

*Respected* for its principals and business model that foregoes all salaries, hourly rates and expenses for restricted stock.

*Valued* for its next generation technologies, skillful employees and ethical boundaries.

*Honored* to empower those selected to utilize our network of brokers, financial newsletters, top industry specific analysts, print and media specialists and our own proprietary in house corporate communications, including **Broker Talk, Company Voice** and **My Shareholder.**

*Together* we can make a difference!

Sincerely, **BlackMudInvestor.com**

**Market Commentary**
about news specific to
our companies.

**CEO Talk**
gives you news and
information directly from
the CEO.

**News Alerts**
lets you stay ahead of other
investors.

▶ REPLAY

» **Newsletter Subscription**

Name:

Phone Number:

E-mail Address:

Submit

BlackMudInvestor.Com © 2005 • Disclaimer - Site Owned and operated by Capital Group Communications, Inc



**Defense Stock Alert.com**

- ⬜ Welcome
- ⬜ Services
- ⬜ Commentary
- ⬜ Profile
- ⬜ Contact

## DefenseStockAlert.com Disclaimer

The DefenseStockAlert.com Newsletter is owned and operated by Capital Group Communications, Inc. (CGC). CGC maintains other web sites as a service to its subscribers.

By using the DefenseStockAlert.com web site, you agree to the following terms of use, which CGC may unilaterally change at any time.

Warning: The unauthorized reproduction or distribution of this copyrighted work is illegal. Criminal copyright infringement, including infringement without monetary gain, is investigated by the FBI and is punishable by up to 5 years in CGC fedderal prison and a fine of $250,000.

CGC web site -- http://www.DefenseStockAlert.com -- and our newsletter can only be verified by its unique identifying IP address. There are hundreds of online stock newsletters, some of which are reputable and many more that are nothing more than "Pump & Dump" Spam. These fakes use disposable names and web addresses often containing the word "CGC", "Capital", and or "CGC" to give the reader the impression it is legitimate or an affiliate web site, and can easily be mistaken for the CGC . CGC DOES NOT PROFILE PINK SHEET STOCKS

If you receive any emails, are directed to a web site or visit a web site that appears to be a forgery of the CGC or contains any of our copywrited materials that is profiling a PINK SHEET STOCK and or the email has another IP address other than ours, or if there is a concern that you have received a misleading spam email or forgery of the CGC, please report this activity to info@DefenseStockAlert.com and deputies@spamcop.net immedieitely. Please "Forward" the entire original email along with the entire header. The header can be located in the properties of the email prior to forwarding. In the event you cannot find the header it is very important that you email us at info@DefenseStockAlert.com and retain the original suspect email in its original form. Please do not delete the suspect email until after you have contacted us.

Newsletter Service

The complimentary CGC newsletter is NEVER to be confused with other List, member supported subscription services.

CGC Privacy Policy

CGC does not represent, warrant, or endorse the accuracy, reliability, completeness or timeliness of any of the information, content, views, opinions, recommendations or advertisements (collectively, the "Materials") contained on, distributed through, or linked, downloaded or accessed from any of the services contained on the CGC site (the "Service"), nor the quality of any products, information or other materials displayed, purchased, or obtained by you as a result of an advertisement or any other information or ofCGCr in or in connection with the Service (the "Products"). You hereby acknowledge that any reliance upon any Materials shall be at your sole risk.

The CGC Complimentary Newsletter is an electronic publication committed to providing our readers with information on selected publicly traded companies. The "materials" contained on, distributed through, or linked, downloaded or accessed have been derived from the company, press releases, and or the company's filings with the Securities and Exchange Commission. The "materials" are neither an offer nor solicitation to buy or sell any securities mentioned. While CGC believe its sources of information to be factual and reliable, in no way does CGC represent or guarantee the accuracy thereof, nor the statements made herein. Readers should independently verify all claims.

The advertisements and materials relating to CGC's respective customers are not intended to directly or indirectly provide advice as to the value of the securities of the companies described or as to the advisability of investing in, purchasing, holding or selling such securities. Instead CGC's customers may or may not have paid for advertising services; and the publications and advertisements are not endorsements, recommendations, analysis or advisories of any nature by the Publisher. CGC does not endorse any opinions or recommendations regarding the materials advertised, nor does it give tax or investment advice or advocate the purchase or sale of any security or investment. An offer to buy or sell can be made only with accompanying disclosure documents and only in the states and provinces for which they are approved. Many states have established rules requiring the approval of a security by a state security administrator. Check with http://www.nasaa.org and call your state security administrator to determine whether a particular security is licensed for sale in your state. Many companies have information filed with state securities regulators and many will supply investors with additional information on request. No advice or recommendation is made by CGC.

All statements and opinions contained in the "materials" are the sole opinion of the authors and are subject to change without notice. CGC is not liable for any investment decisions by our readers. Readers should independently investigate and fully understand all risks before investing. It is strongly recommended that any purchase or sale decision be discussed with a licensed financial adviser or broker prior to completing any such purchase or sale transaction. Neither CGC nor its officers, directors, and or employees are registered investment advisers, or broker-dealers, or members of any financial regulatory bodie. It should be understood that there is no guarantee past performance will be indicative of future results. Any references in the newsletter to past performance(s) of companies previously advertised may, or may not be, specially selected to be referenced based on their favorable performance. Some companies and the companies referenced below may not be representative of all past advertised companies since not all past advertised companies may have performed as well. Readers are cautioned that small and micro-cap stocks are high-risk investments and that they may lose all or a portion of their investment if they make a purchase in our advertised stocks. Since CGC in most cases receives compensation from some of the advertised companies in the Complimentary Newsletter and the Captured Company page, there is an inherent conflict of interest in our statements and opinions and such statements and opinions in the complimentary newsletter cannot be considered independent. Exact compensation is listed below in the chart and may be paid to CGC in the form of cash, free trading

and or restricted shares, warrants, or options. The following is a direct quote form the SEC's web site: "While legitimate online newsletters can help investors gather valuable information, some online newsletters are tools for fraud. Some online newsletters spread false information or promote worthless stocks. The most notorious sometimes "scalp" the stocks they hype, driving up the price of the stock with their baseless information and then selling their own holdings at high prices and high profits." CGC urges all CGC members to visit the SEC's page on "Tips for Checking Out Newsletters" located at:
http://www.sec.gov/investor/pubs/cyberfraud/newsletter.htm

CGC policy with regard to the sale of all stock compensation: CGC employees are forbidden from holding long or short stock positions in any of the Complimentary Newsletter advertised companies or companies listed in the 'Profile' section of the web site. This includes before, during or after CGC is in negotiations phases with any company. CGC may unintentionally benefit from an increase in share price of any advertised company however, that is never the intent. CGC may continue to cover any advertised company at its discretion free of charge for longer periods of time after the expiration of any contract, but the "No CGC affiliate trading rule" still applies as long as the stock is listed on the site, an/or CGC has direct contact with the company and/or its principals, or CGC is updating the company in the newsletter. CGC may sell shares pledged for payment without giving prior notice, be that before, or after the release of advertisements, but not at the time of a mailing. This practice of selling at the time of a mailing is discussed on the SEC's page listed below concerning "Newsletters", and is also forbidden by CGC. CGC encourages our members to visit the SEC web site and become more educated on the rules regarding penny stocks, promotion over the Internet, and the rules regarding proper disclosure of payments to newsletters. The liquidation of stock always has the potential to negatively impact any securities of a given company, including decreasing market value of the company's securities. Every precaution is taken by CGC to prevent this from occurring, and CGC makes every effort to sell only when there are buyers for the shares, or there is enough trading volume to absorb the sale of our shares without negatively impacting the share price. It should be understood that CGC does not make price targets and/or projections for any stocks, and strongly discourages the practice of 'short selling' CGC Bulletin Board stocks.

Complimentary Users Opt-out or Email Change Instructions: Subscribers to the CGC Complimentary Newsletter may at anytime remove their information in real-time from our database. Unsubscribing removes your email address and zip code from our database in real-time and will automatically cancel delivery of the CGC newsletter, unless you happen to unsubscribe while a mailing is in progress. In this situation, you will most likely receive that mailing which is in progress, but will not receive any future communications once that mailing has completed. To unsubscribe, simply email us and we will unsubscribe the new email address. This is also the correct method for changing your email address. First unsubscribe your old email, and then re-subscribe the new email address. Please do not send emails requesting a change of email address. Our systems must receive electronic verification from you personally after subscribing in order for you account to be activated. Simply subscribing does not mean you will receive the newsletter. You must verify by clicking a link in the verification email that is sent to the email address you provide. This is to verify your identity and your desire to receive the CGC newsletter. At the time you click the verification link, CGC records the time, date and your IP address in the event you ever claim that you did not subscribe and accuse CGC of sending you spam or unsolicited email. This makes it impossible for an email to enter our database without a log file showing exactly when the email entered our database, and the exact computer connection used by tracing the IP address. Please read our FAQ page for details regarding personal spam filters and the use of Pop-up blockers which, can potentially disrupt the subscription process and prevent a successful subscription.

IMPORTANT NOTICE: If after subscribing, you do not receive an email requesting your verification, and your then are not directed to a thank you page after clicking on the verification link, or you experience any problems not mentioned, please email us at info@DefenseStockAlert.com.

Neither CGC nor its officers, directors, consultants, and or employees accept any liability whatsoever for any direct or consequential loss arising from any use of any of the information, content, views, opinions, recommendations or advertisements (collectively, the "Materials") contained on, distributed through, or linked, downloaded or accessed from any of the services contained on the CGC site (the "Service"), nor the quality of any products, information or other materials displayed, purchased, or obtained by you as a result of an advertisement or any other information or offer in or in connection with the Service (the "Products").

Profiles may contain forward-looking statements. Actual results may vary due to a variety of risk factors, including, but not limited to, execution of definitive agreements, completion of due diligence, availability of substantial additional financing, dependence on management, government regulations, dependence on outside contractors and other risks generally associated with a start-up development ventures. Further information on potential factors that could affect any of the companies mentioned is included in that Company's filings with the Securities and Exchange Commission. **Updated May 2006.**

In keeping with Section 17b of the Securities Act of 1933 full disclosure of all considerations received are listed below for each client company:

| **Corporate Name: Quintessence Photonics Corporation** |
|---|
| **Symbol & Exchange: OTCBB PLFC** |
| **Coverage Initiated: May 12, 2006** |
| **Compensation:** CGC has received 1,200 ,000 shares of RULE 144 restricted common stock  for the coverage and dissemination of information and other consulting services. |

DefenseStockAlert.com © 2006 • DISCLAIMER • Site owned and operated by Capital Group Communications

Exhibit C

Exhibit 10.6



"Educating, Empowering, Elevating."

### CONSULTING AGREEMENT

This Consulting Agreement (the "Agreement"), effective as of September 1, 2006 , is entered into by and between, International Stem Cell, Inc., (herein referred to as the "Company") and CAPITAL GROUP COMMUNICATIONS, INC., a California corporation (herein referred to as the "Consultant").

### RECITALS

**WHEREAS**, Company is; and

**WHEREAS**, Company desires to engage the services of Consultant to represent the company in investors' communications and public relations with existing shareholders, brokers, dealers and other investment professionals as to the Company's current and proposed activities, and to consult with management concerning such Company activities;

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the parties hereto covenant and agree as follows:

1) <u>Term of Consultancy</u>. Company hereby agrees to retain the Consultant to act in a consulting capacity to the Company, and the Consultant hereby agrees to provide services to the Company commencing once this contract has been executed and ending 12 month thereafter.

2) <u>Duties of Consultant.</u> The Consultant agrees that it will generally provide the following specified consulting services:

    a)    Assist the Company in raising capital through introductions. (It is understood CGC is not an "investment banking" firm);

    b)    Consult and assist the Company in developing and implementing appropriate plans and means for presenting the Company and its business plans, strategy and personnel to the financial community, establishing an image for the Company in the financial community, and creating the foundation for subsequent financial public relations efforts;

    c)    Introduce the Company to the financial community;

    d)    With the cooperation of the Company, maintain an awareness during the term of this Agreement of the Company's plans, strategy and personnel, as they may evolve during such period, and consult and assist the Company in communicating appropriate information regarding such plans, strategy and personnel to the financial community;

    e)    Assist and consult the Company with respect to its (i) relations with stockholders, (ii) relations with brokers, dealers, analysts and other investment professionals, and (iii) financial public relations generally;

1.

f)  Upon the Company's direction and approval, disseminate information regarding the Company to shareholders, brokers, dealers, other investment community professionals and the general investing public;

g)  Upon the Company's approval, conduct meetings, in person or by telephone, with brokers, dealers, analysts and other investment professionals to communicate with them regarding the Company's plans, goals and activities

h)  At the Company's request, review business plans, strategies, mission statements budgets, proposed transactions and other plans for the purpose of advising the Company of the public relations implications thereof; and,

i)  Work and contract with other consultants/ companies to perform additional Investor Relations services

j)  Otherwise perform as the Company's consultant to disseminate information and relations with financial professionals and potential shareholders.

3)  Allocation of Time and Energies. The Consultant hereby promises to perform and discharge faithfully the responsibilities which may be assigned to the Consultant from time to time by the officers and duly authorized representatives of the Company in connection with the conduct of its financial and public relations and communications activities, so long as such activities are in compliance with applicable securities laws and regulations. Consultant and staff shall diligently and thoroughly provide the consulting services required hereunder. Although no specific hours-per-day requirement will be required, Consultant and the Company agree that Consultant will perform the duties set forth herein above in a diligent and professional manner. The parties acknowledge and agree that a disproportionately large amount of the effort to be expended and the costs to be incurred by the Consultant and the benefits to be received by the Company are expected to occur within or shortly after the first two months of the effectiveness of this Agreement. It is explicitly understood that Consultant's performance of its duties hereunder will in no way be measured by the price of the Company's common stock, nor the trading volume of the Company's common stock. It is also understood that the Company is entering into this Agreement with Capital Group Communications, Inc. ("CGC"), a corporation and not any individual member of CGC, as such, Consultant will not be deemed to have breached this Agreement if any member, officer or director of CGC leaves the firm or dies or becomes physically unable to perform any meaningful activities during the term of the Agreement, provided the Consultant otherwise performs its obligations under this Agreement.

4)  Remuneration. As full and complete compensation for services described in this Agreement, the Company shall compensate CGC as follows:

a)  For undertaking this engagement and for other good and valuable consideration, the Company agrees to issue and deliver to the Consultants a "Commencement Bonus" payable in the form of 1,000,000 shares the Company's Common Stock ("Common Stock"). This Commencement Bonus shall be issued to the Consultant immediately following execution of this Agreement and shall, when issued and delivered to Consultant, be fully paid and non-assessable. The Company understands and agrees that Consultant has foregone significant opportunities to accept this engagement and that the Company derives substantial benefit from the execution of this Agreement and the ability to announce its relationship with Consultant. The shares of Common Stock issued as a Commencement Bonus, therefore, constitute payment for Consultant's agreement to consult to the

2.

Company and are a nonrefundable, non-apportionable, and non-ratable retainer; such shares of common stock are not a prepayment for future services. If the Company decides to terminate this Agreement prior to end date for any reason whatsoever, it is agreed and understood that Consultant will not be requested or demanded by the Company to return any of the shares of Common Stock paid to it as Commencement Bonus hereunder. Further, if and in the event the Company is acquired in whole or in part, during the term of this agreement, it is agreed and understood Consultant will not be requested or demanded by the Company to return any of the shares of Common stock paid to it hereunder. It is further agreed that if at any time during the term of this agreement, the Company or substantially all of the Company's assets are merged with or acquired by another entity, or some other change occurs in the legal entity that constitutes the Company, the Consultant shall retain and will not be requested by the Company to return any of the shares. The Company further agrees that all shares issued to Consultant hereunder shall carry "piggyback registration rights" whereby such shares will be included in the next registration statement filed by the company after the first registration other than a registration on Form S-8 with respect to the Company's Stock Option or Equity Participation Plan.

b)   With each transfer of shares of Common Stock to be issued pursuant to this Agreement (collectively, the "Shares"), Company shall cause to be issued a certificate representing the Common Stock and a written opinion of counsel for the Company stating that said shares are validly issued, fully paid and non-assessable and that the issuance and eventual transfer of them to Consultant has been duly authorized by the Company. Company warrants that all Shares issued to Consultant pursuant to this Agreement shall have been validly issued, fully paid and non-assessable and that the issuance and any transfer of them to Consultant shall have been duly authorized by the Company's board of directors.

c)   Consultant acknowledges that the shares of Common Stock to be issued pursuant to this Agreement (collectively, the "Shares") have not been registered under the Securities Act of 1933, and accordingly are "restricted securities" within the meaning of Rule 144 of the Act. As such, the Shares may not be resold or transferred unless the Company has received an opinion of counsel reasonably satisfactory to the Company that such resale or transfer is exempt from the registration requirements of that Act.

d)   In connection with the acquisition of Shares hereunder, the Consultant represents and warrants to the Company, to the best of its/his knowledge, as follows:

i)    Consultant acknowledges that the Consultant has been afforded the opportunity to ask questions of and receive answers from duly authorized officers or other representatives of the Company concerning an investment in the Shares, and any additional information which the Consultant has requested.

ii)   Consultant has had experience in investments in restricted and publicly traded securities, and Consultant has had experience in investments in speculative securities and other investments which involve the risk of loss of investment. Consultant acknowledges that an investment in the Shares is speculative and involves the risk of loss. Consultant has the requisite knowledge to assess the relative merits and a of this investment without the necessity of relying upon other advisors, and Consultant can afford the risk of loss of his entire investment in the Shares.

3.

5)   Financing "Finder's Fee". It is understood that in the event Consultant introduces Company, or its nominees, to a lender or equity purchaser, not already having a preexisting relationship with the Company, with whom Company, or its nominees, ultimately finances or causes the completion of such financing, Company agrees to compensate Consultant for such services with a "finder's fee" in the amount of 5.0% of total gross funding provided by such lender or equity purchaser, such fee to be payable in cash. This 5.0% will be in addition to any fees payable by Company to any other intermediary, if any, which shall be the subject of separate agreements, negotiated between Company and such other intermediary. It is also understood that in the event Consultant introduces Company, or its nominees, to an acquisition candidate not already having a preexisting relationship with the Company, which Company, or its nominees, ultimately acquires or causes the completion of such acquisition, Company agrees to compensate Consultant for such services with a "finder's fee" in the amount of 5% of total gross consideration provided by such acquisition, such fee to be payable in cash. This 5% will be in addition to any fees payable by Company to any other intermediary. It is specifically understood that Consultant is not and does not hold itself out be a Broker/Dealer, but is rather merely a "Finder" in reference to the Company procuring financing sources and acquisition candidates. Any obligation to pay a "Finder's Fee" hereunder shall survive the merging, acquisition, or other change in the form of entity of the Company and to the extent it remains unfulfilled shall be assigned and transferred to any successor to the Company.

   a)   It is further understood that Company, and not Consultant, is responsible to perform any and all due diligence on such lender, equity purchaser or acquisition candidate introduced to it by Consultant under this Agreement, prior to Company receiving funds or closing on any acquisition. However, Consultant will not introduce any parties to Company about which Consultant has any prior knowledge of questionable, unethical or illicit activities.

   b)   Company agrees that said compensation to Consultant shall be paid in full at the time said financing or acquisition is closed, such compensation to be transferred by Company to Consultant within seven (7) business days of the execution of the financing of acquisition closing document. Payment of said compensation, shall be a condition precedent to the closing of such financing or acquisition, and Company shall execute any and all documents necessary to effect said compensation.

   c)   As further consideration to Consultant, Company, or its nominees, agrees to pay with respect to any financing or acquisition candidate provided directly or indirectly to the Company by any lender or equity purchaser covered by this Section 5 during the period of one year from the close of the term of this Agreement, a fee to Consultant equal to that outlined in Section 5 herein; provided, however, that this subsection shall not restrict the Company from hiring an investment banker or broker to obtain financing for the Company, and no fee shall be payable if such banker or broker should independently obtain financing from a financing source previously introduced by Consultant.

4.

d) Consultant will notify Company of introductions it makes for potential sources of financing or acquisitions in a timely manner (within approximately 3 days of introduction) via facsimile memo. If Company has a preexisting relationship with such nominee and believes such party should be excluded from this Agreement, then Company will notify Consultant immediately within twenty-four (24) hours of Consultant's facsimile to Company of such circumstance via facsimile memo. To avoid inadvertent interference with the Company's own joint venture development efforts, Consultant will not contact any pharmaceutical companies, cell biology companies or other companies in the Company's market arena without prior approval by the Company.

6) <u>Non-Assignability of Services</u>. Consultant's services under this contract are offered to Company only and may not be assigned by Company to any entity with which Company merges or which acquires the Company or substantially all of its assets. In the event of such merger or acquisition, all compensation to Consultant herein under the schedules set forth herein shall remain due and payable, and any compensation received by the Consultant may be retained in the entirety by Consultant, all without any reduction or pro-rating and shall be considered and remain fully paid and non-assessable. Notwithstanding the non-assignability of Consultant's services, Company shall assure that in the event of any merger, acquisition, or similar change of form of entity, that its successor entity shall agree to complete all obligations to Consultant, including the provision and transfer of all compensation herein, and the preservation of the value thereof consistent with the rights granted to Consultant by the Company herein, and to Shareholders.

7) <u>Expenses</u>. Consultant agrees to pay for all its expenses (phone, mailing, labor, etc.), other than extraordinary items (travel required by/or specifically requested by the Company, luncheons or dinners to large groups of investment professionals, mass faxing to a sizable percentage of the Company's constituents, investor conference calls, print advertisements in publications, etc.) approved by the Company prior to its incurring an obligation for reimbursement.

8) <u>Indemnification.</u> The Company warrants and represents that all oral communications, written documents or materials furnished to Consultant by the Company with respect to financial affairs, operations, profitability and strategic planning of the Company are accurate and Consultant may rely upon the accuracy thereof without independent investigation. The Company will protect, indemnify and hold harmless Consultant against any claims or litigation including any damages, liability, cost and reasonable attorney's fees as incurred with respect thereto resulting from Consultant's communication or dissemination of any said information, documents or materials.

9) <u>Representations</u>. Consultant represents that it is not required to maintain any licenses and registrations under federal or any state regulations necessary to perform the services set forth herein. Consultant acknowledges that, to the best of its knowledge, the performance of the services set forth under this Agreement will not violate any rule or provision of any regulatory agency having jurisdiction over Consultant. Consultant acknowledges that, to the best of its knowledge, Consultant and its officers and directors are not the subject of any investigation, claim, decree or judgment involving any violation of the SEC or securities laws. Consultant further acknowledges that it is not a securities Broker Dealer or a registered investment advisor. Company acknowledges that, to the best of its knowledge, that it has not violated any rule or provision of any regulatory agency having jurisdiction over the Company. Company acknowledges that, to the best of its knowledge, Company is not the subject of any investigation, claim, decree or judgment involving any violation of the SEC or securities laws.

5.

10) Legal Representation. The Company acknowledges that it has been represented by independent legal counsel in the preparation of this Agreement. Consultant represents that it has consulted with independent legal counsel and/or tax, financial and business advisors, to the extent the Consultant deemed necessary.

11) Status as Independent Contractor. Consultant's engagement pursuant to this Agreement shall be as independent contractor, and not as an employee, officer or other agent of the Company. Neither party to this Agreement shall represent or hold itself out to be the employer or employee of the other. Consultant further acknowledges the consideration provided hereinabove is a gross amount of consideration and that the Company will not withhold from such consideration any amounts as to income taxes, social security payments or any other payroll taxes. All such income taxes and other such payment shall be made or provided for by Consultant and the Company shall have no responsibility or duties regarding such matters. Neither the Company nor the Consultant possesses the authority to bind each other in any agreements without the express written consent of the entity to be bound.

12) Attorney's Fee. If any legal action or any arbitration or other proceeding is brought for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with or related to this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs in connection with that action or proceeding, in addition to any other relief to which it or they may be entitled.

13) Waiver. The waiver by either party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach by such other party.

14) Choice of Law, Jurisdiction and Venue. This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of California. The parties agree that San Francisco County, CA. will be the venue of any dispute and will have jurisdiction over all parties.

15) Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the alleged breach thereof, or relating to Consultant's activities or remuneration under this Agreement, shall be settled by binding arbitration in California, in accordance with the applicable rules of JAMS Endispute, San Francisco, California, and judgment on the award rendered by the arbitrator(s) shall be binding on the parties and may be entered in any court having jurisdiction as provided by Paragraph 14 herein. The provisions of Title 9 of Part 3 of the California Code of Civil Procedure, including section 1283.05, and successor statutes, permitting expanded discovery proceedings shall be applicable to all disputes that are arbitrated under this paragraph.

16) Complete Agreement. This Agreement contains the entire agreement of the parties relating to the subject matter hereof. This Agreement and its terms may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

6.

AGREED TO:

"Company"

International Stem Cell,

Date:

By: _____ /S/ KENNETH C. ALDRICH _____

Kenneth C. Aldrich, Chairman

"Consultant"

CAPITAL GROUP COMMUNICATIONS, INC.

Date:

By: _____ /S/ DEVIN BOSCH _____

Devin Bosch, President

7.