MICHAEL F. DONNER (SBN 155944)
JONATHAN E. SOMMER (SBN 209179)
STEIN & LUBIN LLP
The Transamerica Pyramid
600 Montgomery Street, 14th Floor
San Francisco, California 94111
Telephone:  (415) 981-0550
Facsimile:  (415) 981-4343
mdonner@steinlubin.com
jsommer@steinlubin.com

Attorneys for Plaintiff
CAPITAL GROUP COMMUNICATIONS, INC.,
a California corporation

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CAPITAL GROUP COMMUNICATIONS, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>GOTTAPLAY INTERACTIVE, INC., a Nevada corporation; JOHN P. GORST, an individual; MARK H. LEVIN, an individual; and DOES 1-50, inclusive,<br><br>Defendants. | Case No. C-07-3632-EMC<br><br>Related Case No. C-07-4470 EMC<br><br>**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:      October 24, 2007<br>Time:      3:00 p.m.<br>Judge:    Hon. Edward M. Chen<br>Location: 15th Floor, Courtroom C |

I. INTRODUCTION ...................................................................................................................1
II. FACTUAL BACKGROUND..................................................................................................3
    A. Gottaplay does not contest Capital Group's contractual right to registration..........3
    B. Gottaplay does not contest Capital Group's statutory right to sell under Rule 144........................................................................................................................4
    C. The Consulting Agreement did not require Capital Group to engage in unlawful broker activities. ...........................................................................................5
    D. Gottaplay is in disarray, and Court action is needed now. .......................................6
III. ARGUMENT............................................................................................................................7
    A. There is a significant threat of irreparable harm to Capital Group, and the balance of the hardships tip in its favor. ...................................................................7
        1. The Irreparable Harm to Capital Group..........................................................7
        2. The Balance of Hardships Favors Capital Group. .........................................7
    B. Capital's Group's contractual and statutory rights are clear and undisputed. .........9
        1. Capital Group has the undisputed contractual right to registration of all of its 2,000,000 shares deposited in the Court's registry........................9
        2. Capital Group has the undisputed statutory right to sell a limited number of shares under SEC Rule 144. ........................................................9
    C. Capital Group has a high likelihood of success in showing that the Consulting Agreement is lawful. ..............................................................................10
        1. Under both federal and state law, a contract is enforceable if its central purpose does not require a violation of the securities laws. ...........10
        2. Nothing in the Consulting Agreement requires Capital Group to provide any services as a broker. ....................................................................12
    D. Whether Capital Group actually performed any broker services is irrelevant, and it did not perform broker services in any case. ..............................13
    E. Gottaplay implicitly admits taking Capital Group's $125,000, and Capital Group consented to Gottaplay's exercise of control only if Gottaplay issued shares. .........................................................................................................15

# TABLE OF AUTHORITIES

Page

**Cases**

*Alpha Capital Atkiengesellschaft v. Group Mgmt. Corp.*, 2002 WL 31681798 (S.D.N.Y. Nov. 25, 2002) ...................................................................................................................................9

*Berckeley Investment Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) ........................... 11, 12

*Evans v. Riverside Int'l Raceway*, 237 Cal. App. 2d 666, 675-76 (1965) ...................................11

*Fischer v. Machado*, 50 Cal. App. 4th 1069 (1996) ...................................................................15

*Freeman v. Jergins*, 125 Cal. App. 2d 536 (1954), ............................................................. 11, 12

*Hardy v. Musicraft Records, Inc.*, 93 Cal. App. 2d 698 (1949) ..................................................10

*Lyons v. Stevenson*, 65 Cal. App. 3d 595, 604 (1977) ........................................................ 11, 14

*Netwolves Corp. v. Sullivan*, 2001 WL 492463 (S.D.N.Y. May 9, 2001) ..................................7, 9

*Reynolds v. Reynolds*, 54 Cal.2d 669 (1960) ............................................................................10

*Sales Online Direct, Inc. v. Stengel*, 2001 WL 282690 (D. Md. Mar. 19, 2001) ......................8, 9

*Simon v. Steelman*, 224 Cal. App. 3d 1002 (1990) ...................................................................10

**Statutes**

15 U.S.C. § 78cc(b) ....................................................................................................................11

Cal. Civil Code § 1643 ...............................................................................................................11

**Other Authorities**

*BondGlobe, Inc.* 2001 WL 103418 (Feb. 6, 2001) .....................................................................15

*Dana Investment Advisers, Inc.*, 1994 WL 718968 (Oct. 12, 1994) ..........................................14

*H.C. Copeland and Assoc. Equities, Inc.*, 1982 WL 29102 (April 8, 1982) ...............................15

*Hallmark Capital Corporation*, 2007 WL 1879799 (June 11, 2007) ..........................................14

*Henry Goppelt*, 1974 WL 10669 (Apr. 19, 1974) ......................................................................14

*John DiMeno*, 1979 WL 13717, at *1 (Apr. 1, 1979) .................................................................14

*May-Pac Corporation*, 1973 WL 10806 (Sept. 17, 1973 ..........................................................14

*Mike Bantuveris*, 1975 WL 10654 (August 1, 1975) .................................................................14

## TABLE OF AUTHORITIES
(continued)

Page

*Mona/Kauai Corp.*, 1974 WL 8804, at *4 (June 1, 1974) .............................................................. 14

*Paul Anka*, 1991 WL 176891 (July 24, 1991) .............................................................................. 15

*Samuel Black*, 1977 WL 14905 (Jan. 20, 1977) ........................................................................... 15

# I.
# INTRODUCTION

Capital Group Communications, Inc. ("Capital Group") moved for a preliminary injunction that (1) defendant Gottaplay Interactive, Inc. ("Gottaplay") shall register Capital Group's 2,000,000 shares of restricted Gottaplay stock, (2) not interfere with any sale of shares by Capital Group under Securities and Exchange Commission ("SEC") Rule 144, which allows for limited sales of unregistered shares of restricted stock, and (3) deliver 125,000 additional shares and 62,500 stock warrants for which Capital Group paid $125,000, or, alternatively, refund the money with interest.

In its Motion, Capital Group cited three cases where registration was required and/or interference in Rule 144 sales was prohibited, *Alpha Capital, Netwolves* and *Sales Online Direct*. In its Opposition, Gottaplay does not contest that courts can and do issue preliminary injunctions requiring registration and/or prohibiting interference in Rule 144 sales; instead, Gottaplay tries to dismiss these cases in a footnote by contending that the contracts in those cases were enforceable. Gottaplay's strategy is to shift attention away from its own conduct and focus on its purported counterclaim for rescission of Capital Group's shares based on its claim—asserted for the first time in this litigation—that the consulting agreement between Capital Group and Gottaplay dated July 25, 2006 (the "Consulting Agreement") was illegal. This effort fails.

Gottaplay, relying on the declaration of its CEO, John Gorst, asserts that Capital Group was retained to raise $2 million in capital for Gottaplay and thus agreed to provide broker services without registering with the SEC. There are two fatal flaws in its argument: (1) the integrated Consulting Agreement does not impose such an obligation, rather, it imposes a duty to assist Gottaplay in raising its profile in the financial community, and (2) Mr. Gorst states in a press release, issued by Gottaplay the day after the signing of the Consulting Agreement, that it is retaining Capital Group for its <u>"ability to effectively communicate with our current shareholders as well as with the investment community."</u> That is what Capital Group does, investor relations.

Leading up to and during this litigation, Gottaplay made every effort to swindle Capital Group before belatedly asserting its purported defense of unlawful broker activitites:

- Gottaplay claimed its Board voted to terminate the Consulting Agreement on February 22, 2007, but Gottaplay did not notify Capital Group of any such vote and encouraged Capital Group to continue working after this time;

- Gottaplay attempted to recover half of Capital Group's shares in April 2007 under various pretexts, including the false statement admitted by its Director Mark Levin, that the Consulting Agreement was for two years, not one year;

- Gottaplay then purported to "cancel" the shares on April 20, 2007 as a means of avoiding its clear contractual duty to register the shares as part of its May 7, 2007 registration statement;

- Gottaplay did not send a letter of termination until May 14, 2007 and did not identify any provision in the Consulting Agreement authorizing termination;

- When Capital Group submitted its stock certificate to Colonial on August 14, 2007 in order to sell a limited number of unregistered shares under Rule 144, Gottaplay interfered with Capital Group's clear statutory right by instructing its stock transfer agent not to honor the request;

- Capital Group's 2,000,000 shares were never cancelled and are deposited with this Court;

In essence, Gottaplay asks the Court to validate retroactively its sham termination, its sham cancellation of Capital Group's shares, its failure to register the shares and its interference with Capital Group's sale under Rule 144, all based on the alleged newfound illegality of the contract.

Gottaplay's belated claim that the contract should be deemed illegal has no merit. Under both federal and California law, a consultant must register as a broker-dealer only if the provision of broker services is the central purpose of the contract. Broker services are not the central purpose of the Consulting Agreement; indeed, such services are not called for by the contract even tangentially. Moreover, even if Capital Group were to perform a broker service on some occasion, the law is clear that, as long as the contract is lawful, such allegations are irrelevant and immaterial to the enforceability of the contract.

In addition to being irrelevant, Gottaplay's allegation that Capital Group performed broker services is not true. Capital Group is a member of the National Investor Relations Institute ("NIRI"), a leading trade association, and understands the difference between raising awareness of a company in the financial community and selling securities as a broker. While Gottaplay suggests that Capital Group's contacts with the financial community must be sinister, that is in fact why investor relations firms exist. Capital Group does not, however,

attempt to sell or negotiate the terms of securities sales, period.  Gottaplay admits that it cannot document a sale of a single security by Capital Group, or even an attempted sale.

It is imperative that the Court act now.  Not only is Gottaplay's financial condition abysmal and its stock price in a downward spiral, Gottaplay also disclosed, without explanation, that two of its five directors just resigned on October 4, 2007.  Capital Group has been informed that a third director will resign this week, meaning that a majority of the Board will have been replaced since the filing of Capital Group's motion.

Finally, there is the issue of the $125,000 check from Capital Group for which it was to receive Gottaplay shares.  Gottaplay does not deny receiving the proceeds of the check; rather, Gottaplay suggests that it received the money in the form of a loan from a third party.  Gottaplay cannot document any loan, did not repay the loan, and does not submit any declaration from the purported lender verifying any such loan.  Capital Group allowed Gottaplay to exercise control over the $125,000 on the condition that Gottaplay would issue shares.  Gottaplay exercising control over the money, but without Capital Group's consent.

## II.
## FACTUAL BACKGROUND

A.  **Gottaplay does not contest Capital Group's contractual right to registration.**

Gottaplay does not challenge the fact that Gottaplay agreed in Paragraph 4 of the Consulting Agreement "that <u>all shares</u> issued to [Capital Group] hereunder shall carry 'piggy-back registration rights' whereby such shares <u>will be included in the next registration statement filed by the company.</u>"  Ex. A to Declaration of Devin J. Bosch in Support of Plaintiff's Motion for Preliminary Injunction ("Bosch Decl.") (emphasis added).

Mr. Gorst claims that the "board of directors cancelled the shares on April 20, 2007," but attaches no evidence supporting his bald assertion.  *See* Declaration of John P. Gorst in Support of Opposition to Plaintiff's Motion for Preliminary Injunction ("Gorst Decl."), ¶ 34.  More importantly, Mr. Gorst does not explain (1) how the shares were actually cancelled, (2) why, in his May 14, 2007 letter, he asked Capital Group to return its stock certificate, (3) why Gottaplay requested in its Prayer for Relief in its Answer to Complaint for Interpleader (Docket #

27) that it be "determined the rightful owner of all of the Disputed Shares" if those shares have been cancelled, or (4) why Gottaplay's stock transfer agent, Colonial, deposited the shares in the Court's registry if the shares have been cancelled. The simple fact is that, even assuming Gottaplay held a Board vote to "cancel" the shares, the shares were never actually cancelled.

Any such Board vote was held for one purpose: to have some pretext for not registering Capital Group's shares as part of its May 7, 2007 registration statement, seventeen days after the purported Board vote. It is also no coincidence that Mr. Gorst first notified Capital Group of his intent to send a letter terminating the Consulting Agreement on April 27, ten days before the May 7 registration. *See* Ex. J to Bosch Decl. Mr. Gorst did not send his termination letter until May 14 and claimed, without explanation, that the Consulting Agreement was terminated by Gottaplay three months earlier, on February 22. *See* Ex. G to Bosch Decl. If it had been terminated on February 22, there would have been no need for a second termination letter on May 14. Again, Gottaplay needed a pretext for breaching its duty to register Capital Group's shares and backdated the alleged termination to February 22 for the sake of appearances.

Though Capital Group presented all of this evidence in its Motion, Mr. Gorst responds by cavalierly declaring that on February 22, 2007, "Gottaplay's board of directors terminated the Consulting Agreement." Gorst Decl., ¶ 32. Mr. Gorst does not allege that Gottaplay actually notified Capital Group of the purported February 22 termination. Even assuming such a Board vote took place (and again no evidence is attached), a Board vote is meaningless without notice to Capital Group. Moreover, Mr. Gorst does not explain why Gottaplay listed Capital Group as its investor relations firm on its March 26, 2007 press release or respond to the evidence that Capital Group continued working for Gottaplay after February 22, 2007. *See* Bosch Decl., ¶ 23; Reply Declaration of Richard Carpenter ("Carpenter Reply Decl."), ¶ 5 & Ex. A (attesting to work after February 22 and attaching email reflecting same).

B. **Gottaplay does not contest Capital Group's statutory right to sell under Rule 144.**

On August 14, 2007 Capital Group submitted its Rule 144 documentation to Gottaplay's stock transfer agent, Colonial Stock Transfer ("Colonial"), and requested to sell 311,011 shares of Gottaplay stock. *See* Bosch Decl., ¶¶ 28-31. Normally, such requests are

routinely processed by the stock transfer agent. In this case, however, Gottaplay instructed Colonial not honor the Rule 144 request. When Capital Group submitted its stock certificate to Colonial, as required to process its sale of 311,011 shares, Colonial took the stock certificate without permission and interpleaded the certificate into the Court registry.

Gottaplay does not contest any of these facts and offers no defense to its statutory duty to register the transfer of shares. Gottaplay simply avoids ever mentioning the proposed sale under Rule 144, its statutory duty to cooperate in the sale and its interference in the sale.

C. **The Consulting Agreement did not require Capital Group to engage in unlawful broker activities.**

Having failed to offer any defense to Capital Group's contractual right to registration and statutory right to sell under Rule 144, Gottaplay stakes its entire defense on its claim that Capital Group unlawfully agreed to raise capital, i.e. act as a broker. In addressing this defense, it is important to understand the role of an investor relations firm.

Capital Group is a member of the National Investor Relations Institute ("NIRI"), which is the leading professional association of corporate officers and investor relations consultants responsible for communication among corporate management, the investing public and the financial community. Reply Declaration of Devin Bosch in Support of Plaintiff's Motion for Preliminary Injunction ("Bosch Reply Decl."), ¶ 6 & Ex. E. Among the "typical services" which an investor relations firm may provide, NIRI includes arranging meetings "with targeted analysts and institutional investors," and developing "fully integrated financial communication programs and platforms," including investor information kits and retail brokerage meetings. *See Standards of Practice for Investor Relations*, Ex. F to Bosch Reply Decl., at 17-18. Similarly, a NASDAQ publication on the subject states that an investor relations firm will assist in marketing the company "by creating target lists, pitching meetings and setting up itineraries to meet with existing and potential new investors, efficiently leveraging management's time." NASDAQ, *A Guide for North American Companies to Listing on the U.S. Securities Markets*, Ex. G to Bosch Reply Decl., at 62 (in Section 5, titled "Role of the investor relations firm."). Thus, while Gottaplay tries to make hay out of efforts by Capital Group to introduce Gottaplay to persons in

the financial community, that is what is expected of an investor relations firm, and in no way implies any unlawful selling of securities.

The Consulting Agreement is consistent with Capital Group's role as an investor relations firm. Ironically, Gottaplay highlights excerpts of Capital Group's duties under Paragraph 2 such as the following: "presenting Gottaplay and its business plans, strategy and personnel to the financial community," "establishing an image for Gottaplay in the financial community," "communicating appropriate information regarding such plans, strategy and personnel to the financial community," "conduct meetings ... to communicate with [investment professional] regarding Gottaplay's goals, plans and activities," "advising Gottaplay of the public relations implications [of business plans, proposed transactions, etc.]," and otherwise performing as a "consultant for public relations and relations with financial professionals." Opp., at 15-16.

The only other duty that Capital Group had, and which Gottaplay constantly misstates, was to "assist Gottaplay in raising capital <u>through introductions</u>." Consulting Agreement, Ex. A to Bosch Decl., ¶ 2(a) (emphasis added). Gottaplay cites Capital Group's purported duty to "raise capital," as if Capital Group were an investment banking firm or a brokerage house, while omitting the other language that shows that Capital Group would only arrange introductions, i.e., act as a potential finder.

**D.    <u>Gottaplay is in disarray, and Court action is needed now.</u>**

On October 4, 2007, Gottaplay filed an 8-K disclosing that two of its five directors, William M. Wright III and Norm Johnson, have resigned. *See* Ex. A to Bosch Reply Decl. Gottaplay did not disclose any reason for the resignations. Phil Knight recently informed Mr. Bosch that M. Carroll Benton intended to resign by the end of this week. Bosch Reply Decl., ¶ 2. That will leave two directors, defendants John Gorst and Mark Levin.

As shown in a Form 10-QSB filed in 2006 by a company known as Insynq, Inc., Gottaplay is not the first company that Gorst has driven into the ground. Ex. B to Bosch Reply Decl. Gorst is identified as the CEO, and M. Carroll Benton as a director. *Id.* at 30. The Form shows that Insynq has no money, a string of legal problems, and has defaulted on a payment plan with the IRS for back taxes and penalties. *Id.* at 11, 24-26. Mr. Gorst caused Insynq to enter into

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

related party transactions with Gottaplay pursuant to which Insynq would obtain cash and shares.[1] *See id.* at 22-23. Insynq's stock is listed at one cent per share. Ex. C to Bosch Reply Decl.

### III.
### ARGUMENT

**A.  There is a significant threat of irreparable harm to Capital Group, and the balance of the hardships tip in its favor.**

   1.   **The Irreparable Harm to Capital Group.**

On page 22 of its Motion, Capital Group cited the rule that "[i]n circumstances similar to these, courts have found that the defendant may become insolvent during the pendency of the litigation, and that monetary injury is, therefore, irreparable." *Netwolves Corp. v. Sullivan*, 2001 WL 492463, at *11 (S.D.N.Y. May 9, 2001). In its Motion, Capital Group showed that Gottaplay's finances are far worse than the issuer's finances in *Netwolves*, where this rule was applied. Gottaplay ignores this authority and fails to provide any evidence to the Court about its viability as a going concern. Of course, Gottaplay cannot provide such assurances because its Form SB-2 states that its viability is in substantial doubt. *See* Ex. F to Bosch Decl., at 9 & F-10.

Board turnover is another sign of instability. The resignation of two of Gottaplay's directors and potential resignation of a third director shows that Gottaplay's existence has become only more tenuous since the filing of Capital Group's motion. Whether or not Gottaplay survives in some form, it is undisputed that Gottaplay's stock price had dropped precipitously this year. Capital Group will be irreparably harmed if Gottaplay's stock price falls further to some *de minimis* level for which it would receive only nominal compensation. Capital Group should not be left holding 2,000,000 shares of worthless stock while others sell.

   2.   **The Balance of Hardships Favors Capital Group.**

Capital Group is suffering from a clear hardship. The shares represent its only compensation under the Consulting Agreement, and Capital Group relies on those shares to help fund its salaries, rent and other operations. As Gottaplay heads toward potential extinction, it faces the prospect of losing the compensation that it earned without having any opportunity to sell

---

[1] Mr. Gorst also appears to have falsely claimed an MBA degree in an SEC filing. *See* Exs. A & B to Reply Declaration of Jonathan Sommer (SEC filing and New York Post article).

shares and obtain at least some compensation (even at the current severely reduced price).

Gottaplay claims to be concerned about the alleged "dilution" of its stock and resulting decline in its stock price if this Court enforces Capital Group's rights. Opposition, at 10-11. Gottaplay's argument is specious, for it is Gottaplay that "diluted" its stock when it agreed to issue 2,000,000 shares to Capital Group on July 25, 2006. Numerous securities filings confirmed to Gottaplay investors that those 2,000,000 shares had been issued, and, consequently, any dilution had occurred upon issuance. What Gottaplay has sought to do is <u>inflate</u> its stock price by purporting to "cancel" Capital Group's shares, thereby <u>reducing</u> the outstanding stock of Gottaplay by 6%. Those "cancelled" shares are in the Court's registry, are not cancelled, and will not dilute anything. Gottaplay further claims that its "diluted" stock price will "likely drop significantly" if Capital Group is allowed to sell stock. *Id.* As shown in Capital Group's Motion, the stock price has already dropped almost 90% this year. Capital Group should not be barred from selling its stock while other shareholders sell their stock.

Gottaplay's arguments were rejected in *Sales Online Direct, Inc. v. Stengel*, 2001 WL 282690 (D. Md. Mar. 19, 2001). The plaintiff issuer sought a preliminary injunction barring the defendants from selling stock pending resolution of its claim for rescission of the stock. *Id.* at *2. The issuer argued that it would suffer harm because sales by defendants, who owned 40% of the issuer's stock, could adversely affect the price. *Id.* The court rejected this claim because (1) there was no conclusive evidence that additional sales of stock would further and permanently depress the stock price, and (2) the issuer was "undoubtedly aware" that the stockholder would be able to sell stock, with a corresponding effect on price, but "the parties included no contractual limitations on insider sales, which they certainly could have done had they believed it necessary." *Id.* at 2-3. Here, Gottaplay knew that Capital Group would be able to sell unregistered stock under Rule 144 and all of its stock after registration. Moreover, Gottaplay has presented no evidence that its stock price would be permanently depressed by any stock sales, especially a Rule 144 sale limited to no more than 1% of Gottaplay stock over a three-month period.

B. **Capital's Group's contractual and statutory rights are clear and undisputed.**

1. **Capital Group has the undisputed contractual right to registration of all of its 2,000,000 shares deposited in the Court's registry.**

Gottaplay does not contest Capital Group's contractual right to registration of its 2,000,000 shares. That is a critical concession.

In *Alpha Capital Atkiengesellschaft v. Group Mgmt. Corp.*, 2002 WL 31681798 (S.D.N.Y. Nov. 25, 2002), plaintiffs filed a complaint and sought injunctive relief compelling defendant to register the stock and deliver Rule 144 documentation. *Id.* at *2-3. The Court issued preliminary injunctive relief requiring defendant to attempt registration of the stock and provide the Rule 144 documentation, including a Rule 144 opinion authorizing plaintiffs to sell the stock under that rule (whether or not registration was achieved). *Id.* at *3. The defendant in *Alpha Capital* argued against injunctive relief by contending that plaintiffs had engaged in market manipulation of defendant's stock, but the court found that the allegations of stock manipulation were "too flimsy a bulwark to stand in the way of Plaintiffs' contractual rights." *Id.* at *4.

Here, Gottaplay fails to identify any "bulwark" that should stand in the way of Capital Group's undisputed contractual right to registration. Gottaplay claims that the contract should not be enforced because of its pending claim for rescission based on the alleged illegality of the contract.[2] Gottaplay fails to cite any case on point where a party's comparable contractual rights were not enforced as a result of such a claim. In *Alpha Capital*, *Sales Online Direct* and *Netwolves*, the issuers similarly tried to raise defenses to registration and Rule 144 sales, but were unsuccessful in the face of the clear contractual and statutory rights of the stockholders.

2. **Capital Group has the undisputed statutory right to sell a limited number of shares under SEC Rule 144.**

Gottaplay does not identify any "bulwark" that should stand in the way of Capital

---

[2] Gottaplay also makes the cursory claim that there was a failure of consideration because Capital Group's "work amounted to no benefit to Gottaplay." Opposition, at 23. Gottaplay does not explain what it would consider sufficient "benefit" from Capital Group's efforts to raise awareness of Gottaplay in the financial community, or identify any provision in the Consulting Agreement which obligates Capital Group to provide some specific "benefit" to Gottaplay. In other words, it is undisputed that Capital Group performed services, and any claim that Capital Group failed to perform adequately affects only the "measure rather than the existence of liability." *Alpha Capital*, 2002 WL 31681798, at *10.

1  Group's clear statutory right to sell under Rule 144. Indeed, Gottaplay consciously omits any
2  reference at all to Capital Group's proposed sale of 311,011 shares over a three-month period
3  under Rule 144, as submitted to Colonial on August 14, 2007.

There are a number of reasons why Gottaplay avoids addressing the Rule 144 issue: First, Gottaplay's actions with respect to Capital Group's shares conflict with its purported cancellation of the stock, so Gottaplay seeks to avoid the whole issue. If Capital Group's shares had been cancelled on April 20, 2007, Gottaplay would never have needed to interfere with Capital Group's proposed sale. Gottaplay had to conspire with Colonial to block the sale because Capital Group owned the stock certificate, which is a negotiable instrument, and Gottaplay had no power to cancel it absent Capital Group's voluntary surrender of the certificate or a court order. *See Reynolds v. Reynolds*, 54 Cal.2d 669 (1960) (adoption of Uniform Stock Transfer Act made stock certificates negotiable instruments, and corporation cannot change its stock register absent surrender of stock certificate); *Simon v. Steelman*, 224 Cal. App. 3d 1002, 1006 (1990) (owner voluntarily surrendered stock and agreed to mark it "cancelled"); *Hardy v. Musicraft Records, Inc.*, 93 Cal. App. 2d 698, 702 (1949) (title to stock passes only upon delivery).

Second, the requested injunction is <u>prohibitory</u>, not mandatory in nature. Capital Group asks only that the Court enjoin Gottaplay from interfering in the sale. The sale could have proceeded without any act by Gottaplay, as Capital Group's counsel had provided an opinion letter in support of the sale. Ex. K to Bosch Decl. As hard as it is for Gottaplay to try to justify its failure to register Capital Group's shares, it is even harder for Gottaplay to try to justify its affirmative interference with Capital Group's statutory rights under Rule 144

Third, Gottaplay's claim that its stock will be "diluted" if Capital Group can sell its 2,000,000 shares is even more misguided when Capital Group is limited to selling slowly only 311,011 shares, i.e., <u>1% of Gottaplay's stock over a three-month period.</u>

C. **<u>Capital Group has a high likelihood of success in showing that the Consulting Agreement is lawful.</u>**

   1. **<u>Under both federal and state law, a contract is enforceable if its central purpose does not require a violation of the securities laws.</u>**

The Consulting Agreement is an integrated agreement, and its terms do not require

Capital Group to engage in any broker activities. California and federal law both seek to validate contracts, notwithstanding any claim that some illegal act tangential to or outside the contract may have occurred. Unless the Consulting Agreement <u>requires</u> Capital Group to violate the securities laws, it should be enforced.

California law seeks to validate, not void contracts. *See* Cal. Civ. Code § 1643 ("A contract must receive such an interpretation as will make it lawful … ."). The leading case of *Freeman v. Jergins*, 125 Cal. App. 2d 536 (1954), states:

> It is well settled that if a contract can be performed legally, it will not be presumed that the parties intended for it to be performed in an illegal manner, and it will not be declared void merely because it was performed in an illegal manner.

*Id.* at 546. In *Jergins*, the defendants sought to avoid paying a finder's fee by alleging that the finder had also participated in offering and selling the stock of the oil company. *Jergins*, 125 Cal. App. 2d at 546. The court rejected this contention and held that the finder was entitled to his compensation because he had fulfilled his contractual promise to locate a buyer and that any activities that the plaintiff may have performed beyond what was required by the contract— including any broker activities—were irrelevant to and could not void the contract. *Id.* Subsequent to *Jergins*, California courts have repeatedly affirmed the legality of finder's fees. *See, e.g., Lyons v. Stevenson*, 65 Cal. App. 3d 595, 604 (1977); *Evans v. Riverside Int'l Raceway*, 237 Cal. App. 2d 666, 675-76 (1965) (broker-dealer license not required for finders as long as they do not negotiate the price or other terms of the transaction).

Federal law also enforces contracts if they can be performed without violating the securities laws. *Berckeley Investment Group, Ltd. v. Colkitt*, 455 F.3d 195, 206 (3d Cir. 2006). While a contract that requires violation of the securities law is voidable at the option of the innocent party under Section 29(b) (codified at 15 U.S.C. § 78cc(b)), unlawful transactions made pursuant to lawful contracts do not fall within the ambit of Section 29(b). *Id.* at 205, 207. The dispositive issue is whether performance of the agreement requires a violation of the securities laws, i.e., whether "the securities violations are <u>inseparable</u> from the underlying agreement between the parties." *Id.* at 206 (emphasis added).

2. **Nothing in the Consulting Agreement requires Capital Group to provide any services as a broker.**

Gottaplay fails to cite a single federal or state case where a court found that contractual provisions similar to those in the Consulting Agreement were unlawful. Gottaplay's mantra is that Capital Group was "raising capital." Every time Gottaplay makes this claim, it conveniently omits the full context of Paragraph 2(a) of the Consulting Agreement, where Capital Group agreed to "[a]ssist the Company in raising capital through introductions. (It is understood [Capital Group] is not an 'investment banking' firm.)."[3] Ex. A to Bosch Decl., ¶ 2(a) (emphasis added). In regard to raising capital, the only service that Capital Group agreed to provide was an introduction. Accordingly, Paragraph 5 provides for a finder's fee when an "introduction" leads to financing. *Id.*, ¶ 5(a). That is perfectly legal.

Gottaplay further misrepresents that Capital Group agreed to "review and advise on proposed transactions," insinuating that Capital Group agreed to advise on the terms of proposed securities transactions. In truth, Capital Group agreed to "review" proposed transactions "for the purpose of advising the Company of the public relations implications thereof." *Id.*, ¶ 2(h). It is telling, but unsurprising, that Gottaplay is reduced to misrepresenting the contract terms. The contract specifies that Capital Group is not an investment banking firm, is not a broker-dealer, and is being retained "to represent the company in investors' communications and public relations." *Id.*, ¶¶ 2(a), 5, 9 & Recital.

As required by *Jergins* and *Colkitt*, this Court should construe the Consulting Agreement to be lawful and reject Gottaplay's strained effort to distort and misrepresent the language of the contract in order to create an unlawful interpretation of it. As the plain language of the Consulting Agreement does not require Capital Group to engage in broker activities, and certainly does not make broker activities a central purpose of the contract, Capital Group has a high likelihood of success in showing that the contract is enforceable.

---

[3] In its Counterclaim, Gottaplay went so far as to change the language of Section 2(a) in alleging that Capital Group agreed "to assist Gottaplay in raising capital through the issuance of securities." *See* Counterclaim, ¶ 31 (emphasis added).

**D.      Whether Capital Group actually performed any broker services is irrelevant, and it did not perform broker services in any case.**

As shown above, the dispositive issue is whether the Consulting Agreement is lawful, not whether some unlawful act may have occurred. Nonetheless, Capital Group will address Gottaplay's "evidence" of Capital Group's alleged broker activities. Gottaplay attached a grand total of four communications from Capital Group in support of its claim that it provided broker services. *See* Exs. C, E, F & G to Gorst Decl. All of them are banal emails referring to potential introductions, and this is the best that Gottaplay can offer as evidence. There is no reference to any terms of any proposed securities transactions, much less any suggestion that Capital Group is negotiating those terms. Without any corroborating evidence, Mr. Gorst declares that Capital Group gratuitously volunteered to negotiate the price of securities, Gorst Decl., ¶ 25, and Gottaplay relies on this alleged oral offer heavily, *see* Opp., at 19 (highlighting the claim). This never happened, and one oral conversation—one that is much too convenient as well as false—does not establish anything more than a flimsy and unsupported claim of illegal conduct. *See* Carpenter Reply Decl., ¶ 3 (swearing that he never offered to or did negotiate any sale of securities). Moreover, Mr. Gorst does not explain how he can allege that Capital Group was negotiating the price of securities while simultaneously claiming that Gottaplay never "came close to the receipt of capital" as a result of any activity of Capital Group. Gorst Decl., ¶ 7.

Only by applying misstated facts to the law can Gottaplay create the impression that Capital Group may be providing broker services. Gottaplay relies heavily on SEC no-action letters, in which a person discloses facts to the SEC and then inquires as to whether, based on those disclosed facts, the SEC would take enforcement action. If the SEC grants no-action relief, the applicant has some assurance that its activities are lawful (though SEC opinions do not bind courts). In contrast, when no-action relief is denied, the denial means only that at least one fact described in the letter raises a question of law in the view of the SEC, though the SEC often does not identify what that specific fact is. Denial of no-action relief does not mean that <u>every</u> activity described in the letter might cause the SEC to take action; it means only that at least <u>one</u> activity described in the letter might cause the SEC to take action.

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

The SEC has regularly allowed consultants to arrange introductions, as "finders," to potential investors and receive transaction-based compensation. The primary concern that permeates SEC no-action letters is whether the consultant is moving beyond introductions to negotiation of the sales of securities. The Consulting Agreement does not contemplate any participation by Capital Group in the negotiation or sale of securities. Capital Group's activities are indistinguishable from the activities described and approved by the SEC in the no-action letter, *Samuel Black*, 1977 WL 14905 (Nov. 4, 1976).[4]

Because Gottaplay cannot cite a single state or federal case where any person was held to have acted unlawfully as a broker under similar circumstances, Gottaplay is reduced to misrepresenting a series of SEC no-action letters.[5] Aside from Mr. Gorst's self-serving and

---

[4] In that letter, the SEC granted no-action relief to a finder who would introduce borrowers to bank representatives with whom he had a relationship. *Id.* at *1. If the borrower received financing from the bank, the finder would receive a fee dependent upon the amount of financing. *Id.* The participation of the finder included bringing the parties together and facilitating the exchange of documents or other information in connection with the financing. *Id.* at 1-2. The finder would not, on the other hand, "play an integral role in negotiating any loan." *Id.* at 2. *See also* SEC No-Action Letter, *Dana Investment Advisers, Inc.*, 1994 WL 718968, at *15 (Oct. 12, 1994) (allowing finder to introduce potential investors to investment fund and receive compensation based on percentage of fund's assets); SEC No-Action Letter, *H.C. Copeland and Assoc. Equities, Inc.*, 1982 WL 29102, at *1-2 (April 8, 1982) (allowing consultant to introduce potential buyers of annuity plans and receive commissions); SEC No-Action Letter, *John DiMeno*, 1979 WL 13717, at *1 (Apr. 1, 1979) (allowing 5% commission for finder); SEC No-Action Letter, *Mona/Kauai Corp.*, 1974 WL 8804, at *4 (June 1, 1974) (allowing 2-3% referral fee to finders). In sum, the SEC authorizes finder to arrange introductions of parties to a securities transaction, facilitate the exchange of documents and receive transaction-based compensation, as long as the finder does not play an integral role in negotiating any securities transaction. California law similarly distinguishes finders from brokers. *See Lyons v. Stevenson*, 65 Cal. App. 3d 595, 605 (1977) (stating that a finder is a "middleman" or "intermediary" who allows the parties to negotiate their own terms, as opposed to a broker whose duty it is to bring the parties to an agreement on his employer's terms).

[5] On page 13, Gottaplay claims that if a finder "even arranges meetings between the issuer of securities and a prospective investor, the finder has engaged in broker activities for which a license is required." Opp. at 13. Gottaplay's statement is flatly dishonest, as it relies on *Mike Bantuveris*, 1975 WL 10654 (August 1, 1975). In *Bantuveris*, the SEC advised that a person who was negotiating the terms of and consummating mergers and acquisitions should register. Gottaplay's citation to *Hallmark Capital Corporation*, 2007 WL 1879799 (June 11, 2007), *May-Pac Corporation*, 1973 WL 10806 (Sept. 17, 1973), and *Henry Goppelt*, 1974 WL 10669 (Apr. 19, 1974), are equally misplaced, as all these cases involved the negotiations of mergers and acquisitions.

On page 13, Gottaplay claims that in *Dominion Resources* the SEC "re-established its narrow view of finders" as purportedly set forth in *Goppelt, Bantuveris* and *May-Pac*. As shown above, in those three cases the person requesting no-action relief was negotiating the sales of securities. Dominion Resources likewise involved the negotiation of securities sales all the way through closing of the sale. *See Dominion Resources*, 1985 WL 54428, at *5 (Aug. 24, 1985);

completely uncorroborated testimony, there is no evidence that Capital Group did anything other than arrange introductions. That is the lawful role of a finder.

E. **Gottaplay implicitly admits taking Capital Group's $125,000, and Capital Group consented to Gottaplay's exercise of control only if Gottaplay issued shares.**

Mr. Gorst states that he told Mr. Bosch that he had never received the proceeds of Capital Group's $125,000, but then later "clarified" that he had received "loans" from Western Transition, which is an implicit admission that Gottaplay did in fact receive the proceeds and knew that the proceeds originated from Capital Group. Opp., at 5-6. Moreover, Mr. Gorst fails to deny Mr. Bosch's sworn statement that Mr. Gorst admitted receiving the proceeds of the check. Bosch Decl., ¶ 33. If Gottaplay had not received the proceeds, Mr. Gorst would so declare.

Simply stated, conversion is the assumption of control over someone's property without permission, including identifiable money. *Fischer v. Machado*, 50 Cal. App. 4th 1069, 1072-73 (1996). Capital Group never agreed that Western Transitions could loan the $125,000 to Gottaplay (assuming such a loan exists, which is not documented by Gottaplay). As Gottaplay knew that Western Transitions was transferring Capital Group's money to it, Gottaplay could not lawfully assume control over that money with Capital Group's consent. As attested to by Mr. Bosch, Capital Group assented to Gottaplay's control over the proceeds on condition that Gottaplay issued shares. Bosch Decl., ¶ 33. Gottaplay's exercise of control beyond the scope of Capital Group's consent constitutes conversion. The Court should order Gottaplay to return Capital Group's $125,000 as Gottaplay has refused to issue the shares.

---

*Dominion Resources*, 2000 WL 669838, at *2 (Mar. 7, 2000).
   On page 13, Gottaplay claims that *Paul Anka*, 1991 WL 176891 (July 24, 1991), stands for the proposition that "success-based compensation is the primary characteristic of broker activity." Opp., at 13. *Paul Anka* says nothing of the kind; indeed, it recommends no action where an entertainer would receive 10% of the transaction amount. Gottaplay also cites *BondGlobe, Inc.* 2001 WL 103418 (Feb. 6, 2001), but that no-action letter involved an online brokerage service, not a finder (as falsely claimed by Gottaplay). As for Joe Loofbourrow, he had already been accused by the SEC of securities fraud. *See* SEC Administrative Proceedings, File No. 3-9934 (July 21, 1999).
   A page later, Gottaplay claims that in the "seminal *Paul Anka* no-action letter, the SEC allowed the finder exemption to stand only because the finder had not previously been involved in arranging investments and agreed to do so in the future." Opp., at 14. Again, the SEC said no such thing. *Compare Samuel Black*, 1977 WL 14905 (Jan. 20, 1977); *H.C. Copeland and Assoc. Equities, Inc.*, 1982 WL 29102 (April 8, 1982) (both permitting finder's exemption where finders would continue to act in that capacity in the future).

| | | |
|---|---|---|
| Dated: October 10, 2007 | | STEIN & LUBIN LLP |

                                By:  /s/ Jonathan Sommer
                                      Jonathan Sommer
                                      Attorneys for Plaintiff
                                      CAPITAL GROUP COMMUNICATIONS, INC.