MICHAEL F. DONNER (SBN 155944)
JONATHAN E. SOMMER (SBN 209179)
STEIN & LUBIN LLP
The Transamerica Pyramid
600 Montgomery Street, 14th Floor
San Francisco, California 94111
Telephone:    (415) 981-0550
Facsimile:    (415) 981-4343
mdonner@steinlubin.com
jsommer@steinlubin.com

Attorneys for Plaintiff
CAPITAL GROUP COMMUNICATIONS, INC.,
a California corporation

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CAPITAL GROUP COMMUNICATIONS, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>GOTTAPLAY INTERACTIVE, INC., a Nevada corporation; JOHN P. GORST, an individual; MARK H. LEVIN, an individual; and DOES 1-50, inclusive,<br><br>Defendants. | Case No. C-07-3632-EMC<br><br>Related Case No. C-07-4470 EMC<br><br>**REPLY DECLARATION OF DEVIN J. BOSCH IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:      October 24, 2007<br>Time:      3:00 p.m.<br>Judge:     Hon. Edward M. Chen<br>Location:  15th Floor, Courtroom C |

Case No. C-07-3632-EMC

REPLY DECLARATION OF DEVIN J. BOSCH

I, DEVIN J. BOSCH, declare:

1. I am the President of Capital Group Communications, Inc. ("Capital Group"), the plaintiff in the above-entitled matter. I have personal knowledge of the facts stated in this declaration and could and would competently testify thereto if called as a witness in any proceeding in this action.

2. Attached as Exhibit A hereto is a true and correct copy of a Form 8-K filed by Gottaplay Interactive, Inc. ("Gottaplay") on October 4, 2007 disclosing that two of its five directors, William M. Wright III and Norm Johnson, have resigned. I have been informed by Phil Knight that a third director, M. Carroll Benton, will resign this week. Mr. Knight is referred to as a "significant stockholder" of Gottaplay in paragraph 4 of the declaration filed by John Gorst (the CEO of Gottaplay).

3. Attached as Exhibit B hereto is a true and correct copy of a Form 10-QSB filed by Insynq, Inc., which lists Mr. Gorst as its CEO. Attached as Exhibit C hereto is a true and correct copy of a Yahoo printout showing the stock price of Insynq, Inc. to be one cent per share.

4. Attached as Exhibit D hereto is a true and correct copy of a press release issued by Gottaplay on July 26, 2006, the day after the signing of the Consulting Agreement between Capital Group and Gottaplay. The press release makes clear that Capital Group was retained to raise Gottaplay's profile in the investment community.

5. Capital Group provides primarily investor relations services and, incidentally, sometimes introduces its clients to other persons who may have potentially interest in the client that they wish to explore. Capital Group does not, however, go beyond introductions in connection with any raising of capital or advise on mergers or acquisitions, for Gottaplay or anyone else. I note that paragraph 29 of Mr. Gorst's declaration states that "[n]one of the foregoing discussions coordinated by [Capital Group] even came close to the receipt of capital by Gottaplay." As Capital Group is not retained to raise capital, there is no reason why any discussion coordinated by Capital Group would lead to the receipt of capital.

6. Capital Group is a member of National Investor Relations Institute ("NIRI"). Attached as Exhibit E to this declaration is a copy of a web page explaining what NIRI

is. Attached as Exhibit F to this declaration is a true and correct copy of NIRI's Standards of Practice for Investor Relations.

7. Attached as Exhibit G to this declaration is a true and correct copy of excerpts of the NASDAQ publication: A Guide for North American Companies to Listing on the U.S. Securities Markets.

8. In the Consulting Agreement, Capital Group agreed to establish an image for Gottaplay in the financial community. That is the core of Capital Group's work, and press releases are at most a minor part of this work. An investor relations firm cannot issue a press release a day (as there is no reason to do so), but it can make daily efforts to raise a company's profile in the financial community. The essence of Capital Group's effort is to contact reputable financial professionals to determine whether they may be interested in learning about the company. In so doing, Capital Group will disclose publicly-available information (that has been sanctioned by the company) to the financial professional. Capital Group does not discuss non-public information (and generally does not know of such information or want to know), does not recommend investments, does not negotiate the terms of any transaction that may occur sometime in the future (a speculative and remote possibility), and does not execute any transactions.

9. Capital Group's efforts are solely focused on raising the awareness of the company in the financial community, not negotiating, selling or attempting to sell securities (and Capital Group has never negotiated on behalf of a client the terms of a financing or any other security).

10. In the process of raising its clients' profiles in the investment community, Capital Group may potentially introduce a client to a lender or acquisition partner. In that fortuitous event, its client agree to pay a finder's fee, as set forth in Paragraph 5 of the Consulting Agreement. Capital Group has never actually received such a finder's fee, and the fee is thought of as a bonus that Capital Group will likely never receive rather than as any sort of core part of Consulting Agreement or Capital Group's work.

11. I did introduce Gottaplay to Roth Capital Partners; however, it was not as part of any plan to raise capital for Gottaplay, and Capital Group had not even entered into the

1  Consulting Agreement as of that time. Prior to the introduction, Mr. Gorst had been complaining
2  to me that Phil Knight had promised to raise substantial funds for Gottaplay, but had failed to do
3  so. When Mr. Gorst asked me (prior to signing the Consulting Agreement) if I knew of anyone
4  who might be able to raise money for Gottaplay, I referred Mr. Gorst to someone I knew at Roth
5  Capital Partners. Mr. Gorst thus understood that Capital Group itself would not be involved in
6  raising capital. I saw nothing objectionable about occasionally introducing Mr. Gorst to persons
7  who I thought might find Gottaplay's line of business to be of interest.

8       12.   I never stated or suggested in any way to Mr. Gorst that I would raise $2
9  million for Gottaplay, or any other amount.

10      13.   I never stated or suggested in any way to Mr. Gorst that Xethanol, Inc., a
11 Capital Group client, was an example of Capital Group's ability to raise money or that Capital
12 Group assisted Xethanol in raising money. In fact, Xethanol had completed a financing before
13 retaining Capital Group to perform investor relations services for Xethanol.

14      14.   Prominence Media Corporation ("Prominence") is an entity that I believe
15 to be controlled or associated with Phil Knight and essentially run by his assistant, Jelena
16 Popovic. I have met Ms. Popovic, and it is my understanding that she had no prior background in
17 investor relations. Capital Group even assisted Ms. Popovic in learning more about investor
18 relations practices. Mr. Knight told me that Gottaplay retained Prominence—in addition to
19 Capital Group—in order to do a mass mailer and hire an analyst to write a report on Gottaplay. I
20 am not aware of Prominence making any outreach efforts comparable to what Capital Group was
21 doing in trying to raise awareness of Gottaplay in the financial community.

22      15.   Gottaplay's lawyer, John Mayer, attaches certain websites to his
23 declaration as Exhibit B that are controlled by Capital Group. These websites were set up a
24 couple years ago as experimental websites to determine if these market segments might be of
25 interest to Capital Group to further explore. We determined two years ago that they were not, and
26 the websites have remained dormant. Capital Group has never obtained a client through the
27 websites attached as Exhibit B to Mr. Mayer's declaration.
28

16. Mr. Gorst states in paragraph 30 that he listed Capital Group on press releases as a "professional courtesy." That makes no sense as persons interested in the company would contact Capital Group as a result of being listed on press releases. If Mr. Gorst had any objection to Capital Group's performance, he would not invite persons in the financial community to contact Capital Group. As explained in my original declaration, Gottaplay never objected to Capital Group's performance prior to Gottaplay's efforts in April 2007 to take back half of Capital Group's shares, nor did Gottaplay ever inform Capital Group of any alleged termination of the Consulting Agreement on February 22, 2007 prior to Mr. Gorst's letter dated May 14, 2007. If Gottaplay had informed me on or about February 22, 2007 that Capital Group was terminated, Capital Group would not have continued working for Gottaplay after that time, as Capital Group continued to do.

17. Mr. Gorst's declaration is filled with many other false statements. The core of his false testimony is that Capital Group ever agreed or made any effort to raise capital for Gottaplay, other than some introductions. I am not aware of any document reflecting any agreement by Capital Group to do so, and the Consulting Agreement certainly does not refer to any capital-raising efforts other than introductions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 10, 2007.

/s/ Devin J. Bosch
Devin J. Bosch

I hereby attest that I have on file the original signature for the signature indicated above by a "conformed" signature (/S/) within this efiled document.

/s/ Jonathan Sommer
Jonathan Sommer

16010002/357285v1