**EXHIBIT F**   - Part 1

NATIONAL INVESTOR RELATIONS INSTITUTE

# STANDARDS OF PRACTICE
# FOR INVESTOR RELATIONS

### THIRD EDITION

January 2004



Copyright © 2004
National Investor Relations Institute
Third Edition


Published by

National Investor Relations Institute
8020 Towers Crescent Drive, Suite 250
Vienna, VA  22182
USA
Tel 703-506-3570
Fax 703-506-3571
info@niri.org

ISBN 0-9652339-3-6

NIRI encourages publicly traded companies and their staffs to provide the *Standards of Practice for Investor Relations* to all professional staff members. Additional copies are available for purchase through our online bookstore at www.niri.org.

|  |  |
|---|---|
| Printed: | $50 to NIRI members |
|  | $75 to non-members |
| Electronic: | Free to members |
|  | $50 to non-members |

*Neither this publication nor any part of it may be reproduced or transmitted in any form by any means — electronic, photocopying, or otherwise — without the prior permission of the National Investor Relations Institute.*

# CONTENTS

**Preface** ...................................................................................................................5

## Responsibilities of the Corporate Investor Relations Officer
➤ Integral Participant in the Evolution of Corporate Strategy ...................................6
➤ Providing Market Intelligence to Senior Management and the Board of Directors ...................7
➤ Keeping Senior Management Apprised of Publicly Disclosed Information ...................7

## Corporate Disclosure Issues
➤ Representing the Company Credibly and Objectively ...................................8
➤ Duty to Correct in a Timely Manner ...................................................8
➤ Duty to Update in a Timely Manner ...................................................8
➤ Corporate Disclosure Policy ........................................................8
➤ Using the Safe Harbor for Forward-Looking Information ...........................10
➤ What Is Not Covered by the Safe Harbor ...........................................11
➤ What Is Considered a Forward-Looking Statement ...................................12
➤ Discussion of Nonfinancial Performance Factors ...................................12
➤ Dissemination of Information ......................................................13
➤ Insider Trading Policy for Senior Management and the Board of Directors ...................14
➤ Communicating with Nonmanagement Employees ...................................15

## The Role of the Investor Relations Counselor
➤ Professionalism ...................................................................16
➤ Competence ......................................................................16
➤ Objectivity ......................................................................17
➤ Conflicts of Interest .............................................................17
➤ Representing the Client Company ...................................................17
➤ Strategic and Tactical Services ...................................................18
➤ Compensation ....................................................................19

## Standards and Guidance for Corporate Disclosure
➤ Introduction .....................................................................21

### Disclosure Guidelines
➤ Materiality of Information ........................................................22
➤ Disclosure of Material Information ...................................................23
➤ Discussing Public Information .....................................................24
➤ Differential Disclosure ...........................................................25
➤ Use of Mosaic Information ........................................................25
➤ Distributing or Referring to Analysts' Reports ...................................26
➤ Dealing with Rumors or Leaks .....................................................26

➤ Responding to Rumors or Inquiries Regarding a Possible Earnings Decline ..........................27
➤ Quiet Period..........................................................................................................................27
➤ Nondisclosure Briefings .......................................................................................................28
➤ Providing Material Information to Reporters on an Exclusive Basis  ...................................28
➤ Duty to Correct/Duty to Update Material Changes in Information ........................................29

**Information Dissemination Guidelines**
➤ Use of Technology.................................................................................................................30
➤ Internet..................................................................................................................................30
➤ Conference Calls ..................................................................................................................31
➤ One-on-One Meetings...........................................................................................................32
➤ Responsibilities of Analysts Who Receive Material, Nonpublic Information ........................33

**Guidelines Governing Relations Between Corporate Issuers and Analysts/Investors**
➤ Access to Information and Corporate Management ..............................................................35
➤ Review of Draft Analyst Reports/Models .............................................................................36
➤ Guidance of Analysts ...........................................................................................................37
➤ Issuer-Paid Research ...........................................................................................................37
➤ Company-Sponsored Trips for Analysts and Investors  .......................................................38
➤ Company Gifts for Analysts and Investors ...........................................................................39
➤ Conclusion ...........................................................................................................................39

**Appendix A**
➤ Sample Corporate Disclosure Policy ....................................................................................40

**Appendix B**
➤ Frequently Asked Questions .................................................................................................49
➤ Earnings Conference Calls and Webcasts ........................................................................49
➤ Regulation G ....................................................................................................................51

**Appendix C**
➤ Guidelines for Improving the Quality of Earnings Announcements.......................................55

**Appendix D**
➤ NIRI Code of Ethics .............................................................................................................57

# PREFACE

Investor relations is defined as a strategic management responsibility that integrates finance, communication, marketing and securities law compliance to enable the most effective two-way communication between a company and the financial community and other constituencies, which ultimately contributes to a company's securities achieving fair valuation.

The process of marketing a company's stock involves identification of the target audiences (institutional, individual and employee investors and analysts) who might have an interest in investing in or analyzing the company's securities and presenting historical and prospective information about the company to enable them to make an informed investment decision or recommendation. This is done through the careful development of corporate documentation and response to queries from analysts, investors and the media, as well as group and face-to-face meetings with analysts, investors and the media (including conference calls, webcasts and meetings with management). Marketing in this context does not mean "selling" a company's securities to investors, but rather a process of identifying target audiences and educating them about the present and potential value of those securities so they can make educated investment decisions.

Critical to the marketing process is the provision of accurate, complete and transparent information about the company, along with a duty to update that information when material changes occur. Although a more complete definition of "materiality" will be addressed under Disclosure Guidelines, it basically means information that taken within the total mix of information would cause a reasonable investor to make an investment decision.

The Securities and Exchange Commission implemented Regulation Fair Disclosure on October 23, 2000, which was designed to address the commission's concern that selective disclosure of material, nonpublic information was affecting the integrity of the financial markets and, out of fairness, all investors should have equal access to market-moving information. The methods for achieving equal access, as stipulated in Reg FD, are based on dissemination means spelled out in the section of this booklet on Information Dissemination Guidelines.

The NIRI board of directors, as the policy-making authority for the institute, has approved this document. I wish to thank the board for its input and Debbie Kelly, who chaired the first NIRI corporate disclosure task force, for her assistance in preparing the sample corporate disclosure policy.

Louis M. Thompson, Jr.
President & CEO
January 30, 2004

# RESPONSIBILITIES OF THE CORPORATE INVESTOR RELATIONS OFFICER

## Integral Participant in the Evolution of Corporate Strategy

To be effective, the investor relations officer has a "need to know" and, therefore, must have full access to senior management and, preferably, a seat at the table with senior management. In this way, he or she can speak authoritatively and credibly about the company's strategic direction and prospects for performance. If an IRO is restricted by a company's top officers from providing strategic and other forward-looking information to the investment community, there will often be greater demands from analysts and investors for greater access to the chief financial officer and the chief executive officer in order to obtain this information.

Full knowledge about the company's strategy, budgets, forecasts and various developments under consideration (e.g., mergers, acquisitions, spinoffs, etc.) does not mean that a spokesperson will discuss these subjects with the investment community at will. Rather, it will be done only upon authorization of the company's CEO or other senior officer with responsibility in this area and in line with the company's disclosure policy.

Anyone in a spokesperson role must be completely familiar with the company's record of disclosure in order to guard against unauthorized disclosures of material, nonpublic information. Moreover, in *SEC v. Carnation, Co.*, the court decided that ignorance on the part of a spokesperson who misspoke and unknowingly provided misleading information in response to a question is not excused. (Carnation's treasurer, who was unaware the company was engaged in pre-merger discussions with Nestle, publicly denied rumors to that effect.) Moreover, under Reg FD, to detect inadvertent disclosure of material, nonpublic information or to avoid potentially intentional disclosure of such information, the IRO should accompany senior officials in meetings with analysts and investors and listen in on telephone calls between senior officials and analysts or investors. If there should be an inadvertent disclosure of such information, the company must issue a news release within 24 hours of when the official became aware of such disclosure or before the next trading day, whichever is later.

Credibility comes not only from knowledge of the company and provision of accurate, complete and timely information, but also from a demonstrated willingness to correct or update changes in information on a timely basis. Failure to do so may cause long-term or irreparable damage to the company's management and the spokesperson's credibility.

The IRO is also responsible for assuring a "level playing field" for investors by providing information on a fair and impartial basis. However, under the concept of "differential disclosure," analysts and portfolio managers may receive more detailed information regarding a company's performance and prospects than is required by most individual investors or financial reporters, so long as that information is not material, nonpublic information and is not withheld from other investors, analysts or the media if requested. Differential disclosure may become a form of selective disclosure, which can be detrimental to the financial markets if a company goes into greater supporting detail in its discussions with analysts and institutional investors, yet refuses to provide the same information to reporters or the general public when requested.

## Providing Market Intelligence to Senior Management and the Board of Directors

IROs should also play a key role through providing market intelligence to senior management and the board of directors for use in their strategic decision-making. This might include analyst and investor comments about the company, both in published reports as well as questions gleaned from daily discussions. This market intelligence may also include information about competitors and market research on the industry that may be valuable in developing corporate strategy. Monitoring the company's mix of shareholders (institutional, individual, employees, officers and directors, etc.) and their investment styles is essential in determining the company's desired shareholder mix.

## Keeping Senior Management Apprised of Publicly Disclosed Information

Keeping senior management apprised of the company's disclosure record is a very important function for the IRO, particularly with the adoption of Reg FD. Knowing what one should not say is just as important as knowing what to say. Avoiding inadvertent disclosure of material, nonpublic information in selective forums is essential if one wants to avoid allegations of selective disclosure. The IRO should keep a record of all public disclosures of material information. Training or briefing senior managers who serve as spokespersons at analyst meetings and on conference calls, etc., on matters that have or have not been publicly released, is one way to avoid selective or inadvertent disclosure.

It is critical that all management spokespersons are communicating a consistent message and that they understand the extent to which corporate matters will be discussed with analysts and investors. Moreover, it is important that they discuss these matters with "one voice." Controlling access to inside information also helps avoid inadvertent disclosure. A policy of restricting access to material inside information should be part of a company's written disclosure policy. (A sample corporate disclosure policy is provided in Appendix A.)

# CORPORATE DISCLOSURE ISSUES

### Representing the Company Credibly and Objectively

Credibility is an essential component of an effective investor relations program and a cornerstone of good business. Credibility is built by reporting company information truthfully, accurately and completely throughout the continual disclosure process.

### Duty to Correct in a Timely Manner

Avoiding investor surprises in the process of continual disclosure is important, but even more important is a willingness to disclose information beyond what the investment community is expecting in a timely, complete, accurate and transparent manner using a news release, a fully accessible, non-exclusionary webcast conference call or presentation or an SEC filing. Excessive delays in disclosing negative information can erode a company's long-term credibility. As a matter of law, companies have a duty to correct material information that they believed was correct when first disclosed but is later determined to be incorrect. In *Ross v. A. H. Robins Co.*, the company had reported in its annual reports and other publicly disclosed documents on the safety and efficacy of the Dalkon shield. Once it was discovered that there were some safety problems with the product, it did not promptly correct its previous public statements and was found liable in this regard.

### Duty to Update in a Timely Manner

A duty to update occurs in situations in which information was correct at the time of public disclosure but subsequently there is a material change in that information. Though the case law supporting a duty to update is not as strong as in a duty to correct, it is nevertheless a matter of good investor relations practice and good business to update public information on material changes, positive or negative, in a timely manner.

### Corporate Disclosure Policy

A complete disclosure policy represents a public company's commitment to full, fair and consistent disclosure and to maintain realistic investor expectations as best it can. It is also a commitment to tell the truth in a timely manner, even when it may be tempting to downplay bad news. Having a

corporate disclosure policy, and following it, can bring structure and discipline to the disclosure process. It provides clear policies to all parties who have a direct or indirect role in disclosing corporate information, with respect to the various issues companies face on a daily basis. In addition, having a written disclosure policy, along with a written insider-trading policy, may result in a lower cost of directors' and officers' liability insurance. In footnote 90 of the Reg FD implementing release, the SEC recommends that companies express their disclosure policies in writing and goes on to say, "The existence of an appropriate policy, and the issuer's general adherence to it, may often be relevant to determining the issuer's intent with regard to a selective disclosure."

A disclosure policy should be a policy document, not a "how-to" or operational statement. Being too specific in how to deal with various disclosure issues, should you vary from the written procedures in the course of handling a disclosure matter, may later be cited in shareholder litigation.

When a company begins developing a disclosure policy, the most obvious and important question is how much corporate information, beyond that which is required by the SEC, should be volunteered to the investment community. A most important consideration under Reg FD is how much publicly released earnings guidance a company believes it can provide, in what publicly available forms earnings guidance will be presented and how that guidance is updated during the quarter.

A 1996 study by professors Russell Lundholm, University of Michigan, and Mark Lang, University of North Carolina[1], found that companies with a more open disclosure policy have less dispersion in earnings forecasts, lower stock price volatility and a larger analyst following than peer companies disclosing less information. Imputed in this research is the notion that these factors can result in a lower cost of equity capital, depending on the company, the industry in which the company operates and the number of shares outstanding.

The SEC rule implementing Section 404 of the Sarbanes-Oxley Act of 2002 suggests companies create a disclosure committee to oversee the internal financial control process. While the rule does not specify who should participate in that committee, NIRI believes the committee, at a minimum, should consist of the senior IRO, the controller, the general counsel and the chief corporate communications officer (if the latter is separate from the IR function). Some companies exclude the CFO from the disclosure committee when reviewing financial documents for CEO/CFO certification. In other matters involving the committee, such as making materiality decisions, the CFO is often included.

---

[1] Russell Lundholm and Mark Lang, "The Benefits of More Forthcoming Disclosure Practices," University of Michigan School of Business Administration, Ann Arbor, MI, 1994.

The disclosure committee typically reviews financial documents to be filed with the SEC and news releases on the company's financial performance prior to submission to the audit committee for review and approval. The disclosure committee also should be able to react quickly to developments requiring, e.g., a decision on whether new information is material and the timing of its disclosure or how the company should respond to a significant market rumor. It is important that the role of the disclosure committee is not construed as conducting investor relations activities "by committee" but rather as providing guidance for decision-making.

## Using the Safe Harbor for Forward-Looking Information

When the U.S. Congress passed the Private Securities Litigation Reform Act of 1995, a cornerstone of the legislation was the Safe Harbor for Forward-Looking Information. The safe harbor is designed to provide protection from securities litigation for companies that make good-faith forward-looking statements so long as investors are appropriately and adequately warned of the most likely potential risks that might cause projections to be wrong.

In passing the Private Securities Litigation Reform Act, Congress recognized that companies needed to discuss their prospects for performance with the investment community. One of the objectives of the act is to encourage companies to provide equal access to forward-looking information, using the safe harbor as protection against shareholder litigation. It is particularly important in the Reg FD era that companies that publicly provide forward-looking information with respect to earnings guidance, as well as other forms of forecasting, develop and disclose risk factors specific to those forecasts and not rely on "boilerplate," generalized statements of risk.

A 1998 University of Michigan survey[2] of 547 firms in three industry areas (computers, software and pharmaceutical) found an increase in the frequency of sales and earnings forecasts along with the average number of forecasts following enactment of the reform act. The researchers also found an increase in short-horizon, bad-news forecasts that they attribute to the reputational costs of disappointing security analysts. The net benefit of providing guidance was higher during the post-reform-act period. Two other findings were that the net benefit of providing guidance to analysts was higher in the post-reform-act period, and that managers have become less hesitant to disclose forecasts specifying a more precise estimate of future earnings or sales.

---

[2] Marilyn Johnson, Ron Kasznik and Karen Nelson, "Impact of Securities Litigation Reform of the Disclosure of Forward-Looking Information by High Technology Firms," University of Michigan School of Business Administration, Ann Arbor, MI, 1998.

In a 1997 4th U.S. District Court decision, *Racheedi v. Cree Research*, Judge Richard Erwin dismissed a suit against Cree Research. In his decision he noted that Cree, in its public statements, used the safe harbor, and even though the factor that caused Cree's actual results to differ materially was not mentioned among the cautionary factors, the judge believed that, in the total mix of information, investors were warned that there was risk involved in the forward-looking statements. The judge specifically referred to the Private Securities Litigation Reform Act "Statement of Managers" (the House-Senate Conference Committee report that interprets the act) to support his decision.

The statement says that not all potential risk factors need to be listed among the cautionary factors, and even if the risk factor that eventually causes the statement to change materially is not listed, so long as in the "total mix of information" investors are warned that there is a risk involved, the safe harbor has been accomplished. In written documents, the forward-looking statements must be accompanied by the relevant risk factors.

In oral statements (e.g., conference calls with analysts and investors, analyst conferences or meetings), one may refer to other readily available written documents (public releases or documents filed with the SEC) for the risk factors. To be safe, companies should consider archiving these teleconferences or other webcast events or transcripts of the same on their Web sites to provide other investors and the media an opportunity to listen to or view these sessions. Once this information changes in a material way, a company should consider moving the information to an archived section of its Web site where it is clearly labeled as historical information that should not necessarily be relied on when making an investment decision.

There is no value in using the safe harbor "warning" in documents that do not contain forward-looking statements. In fact, using the safe harbor in this situation might deceive investors by causing them to look for prospective information when there is none. However, companies that make written or oral forward-looking statements and fail to use the safe harbor may well subject themselves to unnecessary legal liability.

## What Is Not Covered by the Safe Harbor

The safe harbor does not cover forward-looking statements made in conjunction with an initial public offering, tender offer, Section 13(d) disclosure or a going-private or roll-up transaction. Additionally, financial statements are not covered.

## What Is Considered a Forward-Looking Statement

The following are considered forward-looking statements:

- Projections of revenues, income, earnings per share, capital expenditures, dividends, capital structure or other financial items;

- Management's plans or objectives for future operations;

- Plans or objectives for the company's products or services;

- Statements relating to future economic performance;

- Information in the Management's Discussion and Analysis in Forms 10-K and 10-Q;

- Any statement of the assumptions underlying the above; and

- Any report issued by an outside reviewer retained by the company that assesses forward-looking statements made by the company.

## Discussion of Nonfinancial Performance Factors

There is a growing body of research and literature that strongly suggests that a corporation's stock is not properly valued without incorporating the hidden value from its intangible assets. Professor Baruch Lev, from the Stern School of Business at New York University, found in the early 1990s that 40 percent of the average S&P 500 company's market value was not found in the financial statements. He began a decade-long search for the nonfinancial factors that can impact a company's stock price. Today, Professor Lev says that more than half of the average S&P 500 company's market value is due to intangible assets. In a 1997 Ernst & Young study[3], Professor Sarah Mavrinac found that quality of management headed the list of nonfinancial factors that a sample of 250 portfolio managers valued in allocating fund assets to 16 companies used in the study. Quality of management was followed by quality of products and services, strength of market position, effectiveness of new-product development, effectiveness of compensation policies, quality of investor communications, level of customer satisfaction and strength of corporate culture, in that order. The relative importance of these factors varied by the industry groups of the companies involved in the study.

---

[3] Sarah Mavrinac, "Measures that Matter," Richard Ivey School of Business, University of Western Ontario, London, Ontario, Canada, 1996.

A 1997 Conference Board[4] study group on disclosing nonfinancial performance measures recommended in its final report that there be no specific disclosure regime for reporting on these factors, but said that there is value in discussing them with analysts and investors. Obviously, most of these measures cannot be audited for reporting purposes, but can nonetheless be significant considerations in making an investment decision.

More recent research and literature by Professor Lev, Jonathan Low of Cap Gemini Ernst & Young former Harvard Business School Professor Robert Eccles, along with Robert Herz, former partner at PricewaterhouseCoopers and now chairman of the Financial Accounting Standards Board, not only have helped define the important nonfinancial factors that can impact a company's market value but were able to assign some relative value to these factors.

The importance of "quality of management" suggests that companies should expose their senior managers to the investment community on a periodic basis, particularly in one-on-one situations, so that analysts and investors have an opportunity to evaluate who is running the company and determine how they visualize where the company is going and whether they have the resources to get there.

At this time, many sell-side analysts pay insufficient attention to nonfinancial factors because these factors typically are omitted from their earnings models. However, research in this area suggests that portfolio managers do consider intangibles in making investment decisions. NIRI believes it is incumbent upon company officials to volunteer information on their intangible assets or nonfinancial performance measures in meetings with investors.

## Dissemination of Information

Information required to be filed with the SEC in the Form 10-K annual report, Form 10-Q quarterly report and Form 8-K current report is considered to be in the realm of "structured disclosure." Information such as the traditional glossy annual and quarterly reports, earnings and other news releases, management speeches, the Internet Web site, conference calls, face-to-face meetings and phone calls with analysts and investors are considered means for "unstructured disclosure." How this information is disseminated and under what conditions are covered in the section of this booklet titled Standards and Guidance for Corporate Disclosure. The accepted means for accomplishing full public dissemination of information are contained in SEC regulations and the disclosure sec-

---

[4] Communicating Corporate Performance: "A Delicate Balance," Conference Board Special Report 97-1, New York, NY, 1997.

STANDARDS OF PRACTICE FOR INVESTOR RELATIONS

tions of the listed-company manuals published by the self-regulatory organizations including the New York Stock Exchange, the Nasdaq Stock Market and the American Stock Exchange.

Congress, through the Sarbanes-Oxley Act, gave the SEC additional regulatory authority over some areas of unstructured disclosure that are covered in Regulation G. While the SEC cannot require a company to issue a news release containing financial information, should a company issue such a release, it now must "furnish" that release on a Form 8-K within five business days. There is certain non-GAAP information under Reg G that must be posted on the company's Web site. (See Frequently Asked Questions related to Reg G in Appendix B.)

### Insider Trading Policy for Senior Management and the Board of Directors

Certain senior managers and the board of directors will normally be considered insiders under Section 16 of the Securities and Exchange Act. When they buy or sell stock in the company or exercise their stock options, they must file with the SEC within 48 hours and post that information on the company's Web site. When in possession of material, nonpublic information, an insider may not trade in the company's stock. Full disclosure of the material information must be accomplished before an insider may trade (*SEC v. Texas Gulf Sulphur*). Normally, when companies establish trading windows, the windows are not opened until several days after the information has been fully disclosed to the public. This is to allow sufficient time for the information to be fully disseminated into the marketplace.

Here is one area where the roles of the IRO, the corporate secretary and the corporate counsel are critical in keeping a record of what material information has been fully disclosed and what has not to avoid insider trading. Most companies have established written insider trading policies. These policies generally cover what kind of material inside information is provided to the various levels of corporate managers as well as the board of directors. Some companies are relatively open in terms of communicating inside information to corporate management; others tend to compartmentalize information so relatively few have the full picture or are aware of all material developments. It is important to have a company compliance officer (in most cases the general counsel or the corporate secretary) who is aware of all material corporate developments or potential developments and gives final approval for Section 16 filers' trades in the company's securities. These policies also establish trading windows when officials are allowed to trade their shares or options. It is the role of the compliance officer to close the trading window when it is necessary.

## Communicating with Nonmanagement Employees

One question that often arises is, should the company treat its employee shareholders who are not corporate insiders under Section 16 any differently from nonemployee investors when it comes to providing them with information about the company? Some companies adopt the position that they will not provide any information to employee shareholders that they would not provide to nonemployee shareholders. A more prevalent practice is to provide employee shareholders information about the company that is either fully public or, if nonpublic, it should be nonmaterial information, along with a digest of analyst reports on the company (some provide all, others a representative sample).

> NOTE: The practice of disseminating analyst reports to nonemployee investors is strongly discouraged since the courts contend that such dissemination implies that the company endorses the report or reports. This issue is sometimes raised in shareholder lawsuits when a company has provided analyst reports to brokers or investors that say the company's prospects for performance will likely be better than the results that actually occur. It is appropriate, however, for companies to provide, on their Web sites or in investor packets, a complete listing of analysts who follow the company.

When employees are briefed on material, nonpublic corporate plans or developments or provided material nonpublic forecasts, corporate management must advise them that they are insiders and must not trade on that information.

# THE ROLE OF THE
# INVESTOR RELATIONS COUNSELOR

Investor relations counselors are expected to practice their profession in such a way that they provide the highest level of knowledge, expertise and value-added services in support of their clients' goals and objectives. By exercising the highest level of professionalism, they will serve the public interest, honor the public trust, adhere to society's laws and maintain the integrity of the capital markets.

Counselors have an overriding obligation to judiciously balance public interests with those of their clients and to place both those interests above their own. Counselors should exercise careful professional and ethical judgments in assisting their clients in carrying out their responsibilities, as detailed in the corporate section of this document. Counselors should act with integrity, objectivity and due care, guided by the precept that when investor relations consultants fulfill their responsibilities to the public, they best serve the interests of their clients and employers.

It should be noted that there are a few firms operating in the U.S. markets that call themselves "investor relations firms" when their primary function is to promote the status of their clients' stocks. These firms often work in conjunction with so-called boiler-room brokerage firms that promote micro- and small-cap stocks traded on the OTC bulletin board but do not file periodic financial reports with the SEC. This practice of stock promotion, in the name of "investor relations," is in no way condoned as a proper practice.

## Professionalism

Counselors are expected to provide quality services, enter into fee arrangements and offer a range of services — all in a manner that demonstrates a level of professionalism consistent with NIRI's *Standards of Practice for Investor Relations*. In return for the faith the public reposes in investor relations counselors, they should continually seek to demonstrate their dedication to professional excellence.

## Competence

Counselors should diligently discharge responsibilities to clients, employers and the public; render services promptly, carefully and thoroughly; and comply with all applicable technical, legal and ethical standards. A counselor's competence represents the ability to impart a level of understand-

ing and knowledge that enables the investor relations professional to render services with competence and sound judgment. If a professional engagement begins to exceed the competence of a counselor or his or her firm, the counselor should recommend a consultant specializing in that particular area to provide greater professional experience, education and judgment required for the specific client engagement.

## Objectivity

A counselor should also maintain objectivity and be free of conflicts of interest in discharging his or her professional responsibilities. Integrity requires a counselor to be, among other things, honest and candid within the constraints of client confidentiality. Integrity can accommodate the inadvertent error and the honest difference of opinion; it cannot accommodate deceit or subordination of principles for personal gain or advantage.

## Conflicts of Interest

Counselors must not work for more than one client or employer whose goals may be in conflict without the express consent of those concerned, given after a full disclosure of the facts. Additionally, counselors must be particularly sensitive to alleviate situations where a conflict of interest — or even a perception of such a conflict — could originate. In no instances will counselors use or share inside information that is not otherwise available to the general public, for any manner of personal gain as might be realized, for example, through trading in the stock of a client company. Further, counselors are expected to respect the confidentiality of information pertaining to present, former and prospective clients, and avoid future associations wherein inside information is used that would give a desired advantage over the respective counselor's previous clients.

## Representing the Client Company

A counselor should exercise caution when speaking on behalf of a client company and should refrain from addressing matters related to future company performance. Consultants who speak for a client company in this regard are potentially liable for the veracity of the information provided by the company that they might, in turn, communicate to analysts or investors.

It is, however, appropriate for consultants to describe the nature of a company's business and discuss historical company information when arranging meetings between company officials and analysts and/or investors who may not be familiar with the company. It is also appropriate for consult-

ants to interview the participants following company presentations as a third-party means of evalu-
ating the presentations and providing feedback to the company's management.

## Strategic and Tactical Services

The following is an alphabetical list of typical services offered by investor relations counseling
firms. The range of services provided may vary based on a firm's expertise in certain areas.

Analyst and Investor Meetings. Assist with effective targeting of the most suitable buy- and sell-
side analysts and portfolio managers whose investment style and interests best fit the company's
characteristics. Arrange company presentations to brokerage-sponsored or corporate-hosted analyst
and portfolio manager conferences or meetings, as well as one-on-one meetings with targeted ana-
lysts and institutional investors. Identify suitable, cost-effective individual investor forums.

Counsel. Provide strategic counsel, policy guidance and program execution leading to sound
investor relations performance and consistent, credible communications programs with the domes-
tic and international investment communities.

Crisis Communication. Structure and implement effective crisis communication programs in
anticipation of or in response to litigation, rating/regulatory agency actions, restructuring
announcements, product recalls, plant closures, market withdrawals, a significant earnings short-
fall, competitive rumors, loss of a key manager, takeover or merger speculation, stock volume and
price volatility, natural catastrophes, theft, fire and other crises.

Disclosure. Guide the management team with respect to public disclosure requirements, issues
and practices surrounding financial reporting, and provide guidance and communication about fast-
breaking corporate events that impact the price of a company's debt and equity issues. Assist man-
agement in developing a corporate disclosure policy if it does not have one.

Financial Communication. Develop customized, cost-effective, high-quality, high-impact and
fully integrated financial communication programs and platforms, including annual reports, finan-
cial fact books, corporate profiles, capabilities brochures, analyst meetings or presentations,
investor fact sheets and information kits, quarterly earnings releases, Web sites, analyst conference
calls, executive financial presentations, retail brokerage meetings and other individually tailored
activities designed to support corporate objectives.

IR Spokesperson Training. Train company executives and investor relations contacts to be effec-
tive and consistent presenters in analyst and investor conferences, before the media and in day-to-
day interaction with the investment community.

Media Relations. Leverage proactive investor relations programs with fully integrated national and regional financial and trade media placements to provide all-important third-party testimonials for growing investor awareness of the company's evolving investment appeal.

Messages. Develop investor relations messages that will most proactively leverage senior management's strategic vision, operational and financial performance and ongoing business expertise to deliver the optimum P/E multiple and lower the company's cost of capital.

Positioning. Highlight the company's management team to effectively personify the "who" and "how" behind the strategy and objectives so Wall Street can evaluate intangible aspects of potential buy decisions.

Research. Research and track current and prospective securities analysts and institutional and individual shareholders, their perceptions and attitudes. Benchmark these measurables against realization of program objectives.

Strategy Development. Assist management with the development of high-impact strategic approaches to the equity and debt markets that will deliver enhanced shareholder value and lower the company's cost of capital. Help management identify the ideal shareholder mix to support the company's investment objectives.

## Compensation

In general, counseling firms receive cash compensation for work performed for their clients. Occasionally, clients or prospective clients will offer compensation in the form of stock, stock options or warrants (or a combination of these) in addition to or in lieu of cash. Typically, these offers are made by start-up companies that have limited cash flow to pay for consulting services on the part of attorneys, accountants, investor relations consultants or public relations consultants.

In April 1999, the SEC amended its Form S-8 stock distribution regulation and specifically stated that investor relations and shareholder communication consultants could *not* receive stock or stock options distributed through a Form S-8 filing for their services. In a letter to NIRI dated June 14, 2000, the SEC stated: "The amendments and release addressed only the availability of Form S-8 to register compensatory transactions, not the availability of equity compensation generally. The release stated that Form S-8 is not available to register equity compensation to consultants who provide investor relations or shareholder communications services. These consultants may continue to receive equity compensation, provided that it is registered on another available registration form or issued in a bona fide private placement, consistent with the federal securities laws."

This essentially means that stock or options registered in a Form S-1 or S-3 filing may be used to compensate IR consultants for their services. The Form S-1 is available for any publicly traded company. The S-3 is available only for those publicly traded companies that have filed at least one Form 10-K annual report with the SEC and have a market float of at least $74 million. The reason stock registered through these forms may be used to compensate IR consultants is that these forms are reviewed by the SEC staff, whereas the Form S-8 is not.

Should an employee of a counseling firm already hold securities in a newly acquired corporate client, at a minimum that person should inform the client company that he or she holds shares in the company and should be considered an insider. As an insider, the employee should clear transactions with the client company before executing any trades of the company's securities to ensure that the company is not in possession of material, inside information of which the employee may not be aware.

Like corporate members, counselor members of NIRI must annually renew their commitment to the NIRI Code of Ethics that is published in Appendix D of this booklet. According to this code, investor relations consultants must maintain the confidentiality of information acquired in the course of their work for client companies, for example. And a consultant must consider herself or himself an insider in relation to the company and observe the company's insider trading policies as well as the federal securities laws with respect to insider trading.

# STANDARDS AND GUIDANCE FOR CORPORATE DISCLOSURE

## Introduction

The integrity of the capital markets is based on full and fair disclosure of information. Although the securities laws in the United States encourage the disclosure of material information to the marketplace, the laws do not impose a general disclosure obligation upon participants in the securities markets beyond the specific disclosure requirements mandated by the SEC. In fact, the mere possession of material, nonpublic information does not give rise to a legal duty to disclose that information.

However, corporate insiders who wish to trade their stock must disclose any material, nonpublic information in their possession or abstain from trading on the basis of that information.

In May 1995, NIRI completed a survey of corporate practices in the area of investor communication. The survey revealed a strong need for standards and guidance with respect to corporate disclosure and communication practices. In response, the NIRI Board of Directors commissioned a task force to examine the disclosure issues confronting corporate investor relations professionals, and with input from representatives from the Association for Investment Management and Research, developed the Standards and Guidance for Corporate Disclosure.

These standards and guidance have been revised to conform to relevant provisions of the SEC's Reg FD and Reg G. When the SEC issued Reg G as a result of the Sarbanes-Oxley Act, the commission expressed the intent that Regs FD and G work in tandem.

# DISCLOSURE GUIDELINES

## Materiality of Information

Corporations must continually identify the information they are required to publicly release and determine how and when to release that information. The first step in making these determinations is deciding whether the information at issue is "material." Materiality should be viewed from the perspective of anyone making an investment recommendation or decision, not merely a decision to trade securities. For example, an analyst will consider such information in the context of making an investment recommendation, which may or may not result in a trade.

In determining whether facts are material, a company may apply the legal definition of materiality adopted by the U.S. Supreme Court in *TSC Industries, Inc. v. Northway, Inc.* as the standard for materiality for actions under SEC Rule 10b-5 (antifraud provisions), which has been stated as follows:

> *There must be a substantial likelihood that the disclosure of an omitted fact would have been viewed by the reasonable investor as having significantly altered the "total" mix of information made available.*

The court further developed the following definition of materiality:

> *Information is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision.*

There are obviously no "bright lines" from a legal standpoint to assist in determining what information is material and what is not. The SEC, in Reg FD, provided a list of types of information or events that should be carefully reviewed to determine whether they are material. The SEC cautions that the list is not "exhaustive" but includes the following: (1) earnings information; (2) mergers, acquisitions, tender offers, joint ventures or changes in assets; (3) new products or discoveries, or developments regarding customers or suppliers (e.g., the acquisition or loss of a contract); (4) changes in control or management; (5) change in auditors or auditor's notification that the issuer may no longer rely on an auditor's audit report; (6) events regarding the issuer's securities — e.g., defaults on senior securities, calls of securities for redemption, repurchase plans, stock splits or changes in dividends, changes to the rights of security holders, public or private sales of additional securities; and (7) bankruptcies or receiverships.

SEC Staff Accounting Bulletin 99, issued in August 1999, also discusses issues related to materiality and says, among other things, that movement in a company's stock price may be evidence of materiality and that quantitative information, in addition to qualitative information, may also be material. Some contend that SAB 99 expands the definition of materiality by suggesting that stock price movement may be evidence of materiality and therefore, from the standpoint of SEC enforcement of Reg FD, unusual stock price movement around a time a company held a private meeting with analysts and/or investors could be a red flag.

The process of determining the materiality of information is made even more difficult by the fact that company officials often have little time for deliberation. For example, a company official may disclose information that analysts believe is material given in response to questions during a meeting with analysts or investors. The company must then determine whether it has made an inadvertent disclosure of material, nonpublic information so it can release it promptly as described under Reg FD. At that point, analysts are then free to use that information. This underscores the extreme importance that the IRO, or someone who also knows the company's disclosure record, be present in senior management meetings with analysts and investors.

Determining the materiality of information is clearly an area where judgment and experience are of great value. In addition to examining information in the context of the legal definition of materiality, one should use good judgment, and if it is a borderline decision, the information should probably be considered material and released using broad means of dissemination. Similarly, if several company officials have to deliberate extensively over whether information is material, they should err on the side of materiality and release it publicly.

## Disclosure of Material Information

Under the rules of the exchanges and the Nasdaq Stock Market, in normal circumstances, once a determination is made that facts are material and that there is a duty to disclose those facts, the information at issue must be disclosed immediately and broadly disseminated to the investment community. "Broad dissemination" normally requires that the information be released in the form of a news release and disseminated over one or more of the major wire services. Nasdaq also recognizes a fully accessible webcast or teleconference call or presentation as a means for full dissemination. However, if a company knows it is going to disseminate new material information through one of those means, it must notify the appropriate Nasdaq officials at least 10 minutes in advance. NIRI, however, believes the best practice, under any circumstances, is to first issue a broadly disseminated news release containing the new material information.

Reg FD gives an issuer considerable flexibility in choosing appropriate methods of public disclo-
sure, but it also places a responsibility on the issuer to choose methods that are, in fact, "reasonably
designed" to effect a broad and nonexclusionary distribution of information to the public. In some
circumstances, according to Reg FD, an issuer may be able to demonstrate that disclosure made on
its Web site could be part of a combination of methods that are "reasonably designed" to provide
broad, nonexclusionary distribution of information.

Decisions to promptly disclose material information may be qualified by "confidentiality."
Company officials may withhold material information for legitimate business purposes, such as the
benefit of the company or its shareholders, as long as no insider trades on that information. For
example, information about pending acquisition discussions or pre-merger negotiations, informa-
tion that might damage a company's competitive position or information about a new product in
development that the company is not yet prepared to release may appropriately be withheld from
immediate disclosure.

> NOTE: Information regarding pending acquisition discussions or pre-merger negotia-
> tions presents a particularly sensitive timing issue. Companies often withhold such
> information until the respective parties reach an "agreement in principle." However,
> the U.S. Supreme Court in Basic, Inc. v. Levinson said that if there is a high probability
> that an agreement in principle will be reached and there are strong market rumors to
> that effect, the company may need to disclose such information prior to reaching an
> agreement in principle. In all of these instances, controlling the knowledge of this infor-
> mation by insiders is critical so that it is not inadvertently disclosed.

This does not mean that a company can withhold "bad news" indefinitely because such informa-
tion may not be beneficial to the company or its shareholders due to its effect on share price. The
SEC has stated that a company must disclose information having a significant effect on its profits
or losses in the MD&A section of the company's next periodic report. In some circumstances, that
information may be required to be publicly released in a news release, a Form 8-K filing or both
before the next Form 10-Q is filed.

## Discussing Public Information

Material or nonmaterial information that the company has publicly released or that is already in
the public domain may be discussed on an individual or selective basis. Nonmaterial, nonpublic
information may also be provided on an individual or selective basis. If a company has provided

certain nonmaterial, nonpublic information to analysts or portfolio managers, it should also provide that information to a reporter or individual investor upon request.

## Differential Disclosure

The concept of "differential disclosure" is based on the notion that, ordinarily, analysts and portfolio managers use more detailed information to make their analyses and assessments regarding a company's performance and prospects than individual investors or financial reporters might require. It is entirely appropriate to provide detailed nonmaterial information to those who request it. This practice, however, can be detrimental to the financial markets when a company goes into greater detail in its discussions with analysts and portfolio managers, yet refuses to provide the same level of information to the media or the general public upon request.

## Use of Mosaic Information

The mosaic theory is based on the concept that analysts may put together pieces of public information and nonmaterial, nonpublic information to create a mosaic from which a material conclusion may be drawn. However, an analyst may not use material, nonpublic information obtained from a company in this process. The information used in creating the mosaic may be gathered from all of the sources at the analyst's disposal, including the company itself and sources outside the company, such as suppliers, customers and competitors. An analyst may use conclusions reached under the mosaic theory as the basis for investment recommendations without the need for the company to release the information through broad, public means. A company is under no obligation to confirm or deny an analyst's conclusion reached under the mosaic theory.

The mosaic theory recognizes that analysts provide a valued service in culling and sifting available data, viewing it in light of their own knowledge of a particular industry and ultimately furnishing a distilled product in the form of reports. Reg FD suggests that skilled analysts can extract pieces of a "jigsaw puzzle" that would not be significant to the ordinary investor but are useful in constructing the analyst's ultimate judgment, and this remains a legitimate practice. The rule goes on to say, " an issuer is not prohibited from disclosing a nonmaterial piece of information to an analyst, even if, unbeknownst to the issuer, that piece helps the analyst complete a 'mosaic' of information that, taken together, is material." The SEC says that Reg FD is not intended to discourage discussions between companies and analysts on the basis of nonmaterial information or information that is material, but fully public.

## Distributing or Referring to Analysts' Reports

Companies are discouraged from distributing or referring to analysts' reports. The practice — particularly on the part of companies with minimal analyst coverage — of distributing analysts' reports to brokers, fund managers or individual investors is fraught with potential legal problems. First, analysts' reports are proprietary and should not be distributed without the approval of the analyst or analyst's firm. In addition, distributing an analyst's report, even with permission, may expose the company to the appearance of "entanglement" with the report, meaning the company runs the risk of appearing to embrace or endorse the report's contents and conclusions. Further, the distribution of analysts' reports, particularly those that are more optimistic about a company's prospects for performance than may be warranted, may be cited as evidence in shareholder suits of a "conspiracy" between the company and the analyst (or perhaps the analyst's firm) to defraud investors.

Through fact sheets and/or the IR section on their Web site, companies can list those analysts and their firms that are covering them but should refrain from including analysts' reports. Whatever the mode of communication, a company's risk in distributing reports is the same. Individuals who request analyst reports from companies should be referred to the analyst's firm, which may provide reports if it is the firm's policy to do so.

A company that distributes or refers to an analyst's "buy" recommendation must ask itself if it would be willing to make the same distribution should that analyst change his or her recommendation to a "sell."

## Dealing with Rumors or Leaks

The New York Stock Exchange-, Nasdaq- and American Stock Exchange-listed company manuals address the obligations of companies to respond to market rumors. Companies are generally required by their self-regulatory organization to respond publicly to market rumors if they are likely to have a material effect on their securities.

Under the federal securities law, however, where a company is not the source of a rumor, it may choose a "no comment" response to market rumors. A more palatable way of saying no comment is to say, "It is our policy not to respond to market rumors." To maintain a consistent no comment policy, a company should not comment even if no significant corporate developments are taking place or the company knows of no reason for stock activity. For example, it is an inconsistent (and likely ineffective) use of a no comment policy if a company were to say, "There are no significant corporate developments at this time," when such is the case, but respond, "No comment," when-

merger and acquisition developments are under consideration. Using a no comment policy in this fashion may act as a signal to the market and defeats the purpose of the policy.

A written disclosure policy, which identifies authorized spokespersons for the company and underscores how unauthorized leaks of information can place the company in a very vulnerable position, can aid a company in this area. A company's disclosure policy should also define how the company responds to market rumors under various contingencies. All authorized company spokespersons must be fully apprised of corporate developments so they do not fall into the trap of denying significant activity when, in fact, there are developments occurring. As mentioned before, the SEC has sanctioned both a corporation and its spokesperson for making misleading statements where the spokesperson denied the existence of merger talks when, in fact, talks were taking place without his knowledge (*SEC v. Carnation Co.*).

A company should, at a minimum, inform all employees who the authorized company spokespersons are and of those elements of the disclosure policy that are applicable to employees and/or those considered insiders (those covered by insider trading rules). Companies and their employees should avoid responding to rumors concerning the company in Internet chat rooms. Policies should be updated to address employees' use of technology with regard to disclosure issues, including participation in Internet chat rooms and use of e-mail.

## Responding to Rumors or Inquiries Regarding a Possible Earnings Decline

Companies are often called upon to respond to rumors or inquiries regarding possible earnings shortfalls below the current Street estimates. Under Reg FD, companies may no longer comment on or express comfort with the Street's earnings consensus unless they do so in a fully public forum or news release.

Should a company simply state the current range of Street estimates of its earnings, and go no further, it has not triggered a disclosure obligation.

## Quiet Period

Many companies voluntarily impose a "quiet period" before announcing earnings, during which time they will not comment on the company's business prospects for the current quarter. A quiet period helps shield a company that normally provides earnings guidance or commentary on business from commenting on that information once it has a better idea of what the final earnings are likely to be. NIRI surveys show that most companies begin their quiet period about three weeks in