**EXHIBIT F** – Part 2

advance of announcing their quarterly earnings. Some companies adopt a policy of not conducting meetings with analysts or investors or making presentations before investor conferences during their quiet period. Others continue such meetings or presentations but avoid any comment on business performance for the current quarter. Those that present before investor conferences will often not meet with analysts or investors in breakout sessions following these presentations in order to avoid the potential for selective disclosure of material, nonpublic information.

## Nondisclosure Briefings

Companies within certain industries occasionally conduct nondisclosure briefings for selected financial analysts and the trade press to provide background information, usually on products in research and development or in the conceptual stage. It is very important that the participants agree to maintain the information on a confidential basis and not use it for any purposes that may lead to illegal trading activity. Reg FD allows for the use of oral or written confidentiality agreements between companies and analysts or investors in which the recipients of confidential, nonpublic information agree not to use that information until it is publicly released. The SEC recommends that companies maintain a list of those individuals who orally agree to keep information confidential.

Reg FD creates a new situation with respect to the involvement of the trade press in these nondisclosure briefings in that communications between a company and the media are excluded from the rule. Therefore, while the rule does not prevent the media from using material, nonpublic information from a company, reporters may agree to "embargo" the information until the company releases it. Moreover, while Reg FD does not provide any sanctions against analysts who may use material, nonpublic information from a company, most firms have rules that prevent them from doing so.

A company still runs the risk of selective disclosure liability anytime it holds such a briefing, particularly if any unusual trading activity should occur that could be traced to the briefing. Therefore, the use of such briefings to disseminate information should be very carefully considered.

## Providing Material Information to Reporters on an Exclusive Basis

Companies should refrain from providing information on upcoming material events or announcements to a specific publication on an exclusive basis. Some companies, in anticipation of a major development, offer to give a specific publication details of the event, providing that it embargoes or holds the story until the day that the company makes the full public announcement. Although the practice does not violate rules regarding selective disclosure, it is always conceivable that the story

could break prior to the company's announcement. Newspapers often publish news items on their Internet page in the early morning hours before the printed version is circulated and before a company issues its news release.

NIRI believes that, out of fairness, the media should receive material information at the same time as everyone else, when a full public announcement is made. Providing exclusive news of a major event to one publication and not to others may well create a media relations problem.

## Duty to Correct/Duty to Update Material Changes in Information

If a company discovers that a statement it made was, in fact, materially incorrect at the time it was disclosed, the company is obliged to publicly issue a correction of the prior misstatement as soon as the error is discovered. Such a "duty to correct" arises when new facts are developed that render a previous disclosure false or misleading.

In contrast, there is no clear legal duty to update material changes in information that do not fall under a duty to correct. The Private Securities Litigation Reform Act explicitly states that this particular law does not impose on any person a duty to update forward-looking statements. Nevertheless, it is often prudent for a company to update its forward-looking statements. Publicly held companies would be well-advised, as a matter of good business and credible investor relations, to consider updating forward-looking statements to reflect material changes in information, to the extent possible.

Virtually all companies represented by NIRI's membership have IR sections on their Web sites. Although the Internet provides a tremendous opportunity to disseminate information to a wide audience on a timely basis, it also requires that a company be vigilant in keeping its information current, particularly with regard to material changes.

NIRI recommends that companies put dated information in an archive section on their Web site where there is an explicit warning that one is entering an area where information is being provided for historical purposes but may be dated and should not be relied on for making investment decisions.

# INFORMATION DISSEMINATION GUIDELINES

After the company decides that information is material and should be disclosed to the public, the process of dissemination begins. One of the defining functions of investor relations professionals is the dissemination of information to investors, analysts and the general public. There are many different issues to consider, and many different ways of properly disseminating information. Each company has its own unique position in its industry and in the general marketplace, and circumstances surrounding each disclosure may vary. There is no one correct way of disseminating information in every circumstance. There are, however, general guidelines regarding the dissemination of information that reflect the best practices within the industry along with the requirements contained in Reg FD and Reg G. (See Appendix B in this booklet for Frequently Asked Questions concerning the requirements in Reg FD and Reg G.)

## Use of Technology

Information should be released in a manner designed to reach the widest public audience possible, including the individual investor. Companies should encourage the use of multiple technologies to disseminate information. There are many different ways to reach investors and the public; some of the most obvious technologies include the major wire services, conference calls, broadcast fax and fax-on-demand services, e-mail, video conferences, Web sites and electronic EDGAR filings.

Although new technologies are important and useful ways to disseminate information, they are not substitutes for a broadly disseminated news release. The use of technology to disseminate timely or up-to-the-minute information should be used to supplement consistent and regular communication with investors. Certainly, electronic dissemination can be substituted for paper mailing, if requested. Companies should strive to disseminate all corporate sources of information. For example, a company should provide in its annual report items such as its telephone and fax numbers and e-mail and Internet addresses.

## Internet

The Internet has become a primary means for disseminating information about a company. There are still segments of the public that do not have access to the Internet, so companies must continue to use more traditional sources of dissemination for those who request it. It is just as important to

update and correct information that is contained on a company's Web site as it is to update and correct information made in oral or written statements. **NIRI urges companies to include the investor relations contact on the IR section of its Web site, preferably including a phone number.**

Companies should note that there can be a great deal of information on the Internet about the company that is not found in its IR section of the Web site, and that there are many sources of information about a company on the Internet that the company cannot control. Companies should also monitor other sites on the Internet for information about the company but should not respond to market rumors or participate in "chat rooms" about the company. Such responses may, under certain circumstances, be considered a form of selective disclosure. The fact that a company responds to one rumor and not others may leave the impression that the others are true.

## Conference Calls

Following news releases to the wire services, fully accessible webcast conference calls are the most widely used means for disseminating corporate information to the investment community. Conference calls are often used as a forum in which the company disseminates detailed information, expanding on information contained in the news release that has been issued prior to the call.

The information from conference calls should be made available to all interested parties, including investors, analysts and members of the media. Reg FD considers a fully accessible, nonexclusionary webcast or telephonic conference call as a means for real-time, full and fair disclosure. The rule calls for adequate notification of investors interested in upcoming webcasts or teleconferences. While the SEC recognizes that there are circumstances where a conference call must be held on short notice for the announcement of new material information, it believes under normal circumstances, interested investors should be given several days' notice of the upcoming call. Most companies notify investors at least a week in advance for quarterly conference calls. Proper notification means issuing a news release with the date, time and means for accessing the call. The use of push technology and the posting on the company's Web site are additional methods of providing notification. The last two alone do not constitute adequate public notification, however.

The SEC recommends companies retain their quarterly earnings conference call on their Web sites for at least a week. However, most companies leave these calls on their Web sites for a longer period of time during the quarter. If they believe the information in the call becomes dated, they can move it to the archive section of their Web sites. Under Reg G, if non-GAAP information is discussed in the conference call, the call (or a transcript of the call) should be retained on the com-

pany's Web site for one year. Another method of distributing conference call information is to make transcripts available upon request or place them on the company's Web site.

A company may want to use several means for achieving full disclosure. NIRI recommends that a fully accessible conference call should be preceded by a news release containing all new material information to be discussed during the call. If, however, information discussed in the call modifies or expands upon information included in the preceding news release, the fully accessible call serves as a means for full public disclosure.

Access issues with respect to handling questions from analysts and investors during conference calls are discussed in the subsequent section of this booklet on Guidelines Governing Relations Between Corporate Issuers and Analysts/Investors.

The advantage of issuing a news release before the conference call is that analysts and institutional investors have a chance to review its contents and are better prepared to ask questions during the call. Moreover, if the company wishes to provide earnings guidance or other forward-looking information for the next quarter or more, having that information in the news release, with the accompanying risk factors, fulfills the safe harbor requirements of the Private Securities Litigation Reform Act.

Moreover, under Reg G, if a company discloses nonpublic information during the conference call, in order to avoid the need to "furnish" that information on Form 8-K, the rule provides a 48-hour exemption. To comply with the exemption, a company must conduct its conference call within 48 hours of issuing its earnings release and furnish that release on Form 8-K prior to the conference call, along with posting the financial and statistical information together with any information required under Reg G on its Web site. Additionally, the conference call must be fully accessible to the public and properly announced in advance.

> NOTE: The term "furnish" differs from the term "filing" in a legal context. The SEC, in implementing Reg G, chose to have companies furnish their earnings releases and certain information considered under Reg G so that the information did not have the same but instead a more stringent legal liability as information that is filed with the commission.

## One-on-One Meetings

One-on-one meetings with individuals or groups are a common and indispensable way to disseminate information about a company and to answer legitimate requests for a discussion of long-term

strategies, as well as to provide detailed information about it. One-on-one meetings help to build goodwill and make a company more approachable in the eyes of the investment community. Companies should continue the practice of face-to-face meetings; however, companies should note that, as in all other types of meetings, there is the possibility that information may be selectively disclosed. Companies should conscientiously avoid discussing material, nonpublic information in one-on-one meetings. Having the IRO participate in meetings and telephone calls between senior management and members of the investment community helps ensure that questions are not answered that may elicit a material, nonpublic response. And, if there is an unintentional disclosure of such information, the IRO can issue a news release containing that information within 24 hours.

## Responsibilities of Analysts Who Receive Material, Nonpublic Information

Financial analysts who receive material, nonpublic information in their dealings with company spokespersons are subject to liability as "tippees" under the federal securities laws if they use that information as a basis for investment decisions. The appropriate course for the analyst who receives such information is to encourage the public dissemination of the information. Unless and until the information is disseminated publicly, the analyst may not legally trade in the company's securities, or change his or her recommendations with respect to those securities.

The AIMR *Standards of Professional Conduct* recognizes two divergent sets of circumstances in which an analyst may receive material, nonpublic information. The analyst's duties vary with these circumstances. First, analysts may receive information as a result of their confidential relationships with securities issuers. For example, an analyst may receive information when acting as a financial consultant, or as the representative of a rating agency, lender or underwriter to an issuer. When acting in these roles, analysts are likely to be considered "temporary insiders" of the issuer. In these situations, analysts can use the information they receive for its intended purpose without encouraging further disclosure of the information. They cannot, however, use the information for any other purpose or share the information with other members of their firms. Selective disclosure is not normally a concern in these circumstances. Note that analysts do not become temporary insiders by attending nondisclosure briefings but may incur tippee liability by basing investment decisions on information learned in such briefings. For this reason, and because of the potential breaches of duty discussed above, AIMR recommends that analysts should avoid such briefings.

Next, an analyst may receive information from an issuer although there is no confidential relationship between them. In this situation, the AIMR standard requires analysts to evaluate the materiality of the information they receive and consider whether the source of the information is violat-

ing a duty by disclosing it. The analyst should make these decisions in consultation with a compliance officer or supervisor. If the information is deemed material, the analyst should make reasonable efforts to achieve public dissemination of the information. This usually means encouraging the corporation to issue a news release or otherwise make the information public.

Until the information is publicly disseminated, the analyst should not take any investment action on the basis of the information. To be fully protected from liability, the analyst should refrain from taking any action at all with respect to the company's securities, even if that action can be justified on other grounds. An analyst is subject to insider trading liability for investment decisions made while he or she is in possession of material, nonpublic information, even if those decisions are made for independent reasons. Last, the analyst should not communicate the information to anyone other than designated supervisory and compliance personnel within his or her firm unless and until the information becomes public.

# GUIDELINES GOVERNING RELATIONS BETWEEN CORPORATE ISSUERS AND ANALYSTS/INVESTORS

Transparent, credible and consistent information, in good times and bad, is the lifeblood of efficient and fair capital markets. While all investors have access to extensive information directly from the company, financial analysts and professional investors play a most important role as intermediaries in the investment process.

To achieve fairness and credibility in the capital markets, it is important that corporations, analysts and investors not disrupt or threaten to disrupt the free flow of information among them in an attempt to inappropriately influence the behavior of those with whom they are communicating.

## Access to Information and Corporate Management

From the corporate perspective, issuers should not discriminate among analysts based on their prior research, opinions, recommendations, earnings estimates or research conclusions. Under Section 501 of the Sarbanes-Oxley Act, financial analysts must certify that their recommendations mean what they say. Under no circumstances should a company pressure an analyst to change a recommendation by threatening to withhold information or deny access to corporate management in the future. Nor should a corporation "blackball" an analyst or investor, thereby denying one access to information.

Many companies have limited resources, and the primary responsibility of management is to manage the business. Since companies receive information or access requests from many people — including financial analysts and professional and individual investors, as well as the media — they cannot expect to fulfill every request for direct access to specific corporate officers. Therefore, it is appropriate for companies to develop internal policies that establish general criteria for granting that access. Equitable-access policies help avoid the perception of favoritism.

All analysts, investors and the financial media should have access to the company's investor relations staff. This means that IROs must be empowered through access to senior management so they are fully abreast of corporate developments (even though they may not publicly discuss them) and be able to discuss corporate strategy to be credible spokespersons.

Minimal levels of access on the part of analysts and investors can include:

- Telephone, e-mail and direct access to the company's IRO;
- Teleconferences;
- Group and one-on-one meetings with individual and professional investors;
- Fully accessible webcasts, conference calls or investor presentations; and
- Annual shareholder meetings.

Qualified analysts should be afforded the opportunity to participate in webcast or telecast conference calls and other company investor and analyst activities. One-on-one meetings with individual or groups of analysts can also be beneficial in developing good working relationships with the investment community and provide for wider dissemination of information about the company to investors.

Assessing the quality of management is a critical aspect of a financial analyst's or a professional investor's overall assessment of a company and requires that they are able to develop and maintain an appropriate working relationship with company representatives.

## Review of Draft Analyst Reports/Models

Management and IROs should take special precautions if they are asked to review analysts' reports or earnings generation models prior to publication. Section 501 of SOX forbids analysts from showing a company the sections of research reports containing their conclusions, recommendations, price targets or valuations. Companies are limited in their review of the remaining sections of these draft documents to ensure factual accuracy of information that is in the public domain.

Extensive review and comment on research reports could expose the company to liability under relevant securities regulations and could be viewed as an endorsement of the report and its conclusions and "entangle" the company in the analyst's report.

Companies that review analyst reports or earnings models should consider the implications under Reg FD that might make it difficult to comment on an analyst's underlying assumptions, unless the company considers the assumptions to be nonmaterial or the topic has been discussed publicly. A best practice is to refer analysts to the company's fully public guidance information and have the analysts develop their research using the "mosaic" approach.

## Guidance of Analysts

Companies may choose to provide earnings guidance to analysts and investors. Earnings guidance is considered to be a point estimate, range of estimates, the company's model to forecast earnings or revenue estimates. According to a December 2003 NIRI survey, of the 77 percent of companies that provide earnings guidance, 9 percent provide a point estimate, 75 percent a range of estimates and 10 percent an earnings estimate model. Additionally, 67 percent provide revenue estimates.

Companies that do not provide earnings guidance, along with those that do, may provide other forms of guidance that might assist analysts in arriving at their estimates. These include:

- Qualitative statements about market conditions;

- Trend information that may impact the business of their company;

- Industry-specific information;

- Qualitative statements about high-level measures (revenues, clients, etc.);

- Estimates or forecasts of key factors that may drive earnings but not all factors that might be in their internal financial forecasts; and

- Qualitative information on business measures or assumptions.

If a company provides specific earnings guidance in public documents or forums, it may have a duty to update or correct that information publicly and in a timely manner when facts and circumstances change its forecasts. Material updates or corrections should be made in a news release or other fully public means defined by Reg FD before being provided to the investment community.

## Issuer-Paid Research

The economics of separating sell-side research from investment banking relationships are driving many sell-side firms to reduce their research coverage, resulting in some companies losing all sell-side coverage. An alternative that some may pursue is called "issuer-paid research." Under this concept, a company would pay for a research report that could be provided to professional and individual investors.

This form of research is fraught with potential conflicts of interest. Therefore, it is important that companies follow strict standards to avoid such conflicts and to achieve a higher degree of credibility in the research product. To that end, the following are the standards to which companies and analysts must adhere:

- Companies may compensate an analyst writing a research report in cash only and must not provide any compensation contingent on the content or conclusions for the research or the resulting impact on share price.

- The analyst must disclose in the report:

  ➤. The nature and amount of the compensation received for drafting the report;
  ➤ The nature and extent of any personal, professional or financial relationship the analyst, his or her firm or its parent, subsidiaries, agents or trading entities may have with the company, its personnel, parent, subsidiaries or agents;
  ➤ The author's credentials, including professional designations and experience that qualify him/her to produce the report; and
  ➤ Any matters that could reasonably be expected to impair his or her objectivity in producing the report.

- The analyst must certify that the analysis or recommendations, if any, contained in the report represent the true opinion of the author(s).

- The company hiring analysts to produce research must:

  ➤ Engage qualified analysts who are committed to producing objective and thorough research that fully discloses any matters that could reasonably be expected to impair their objectivity; and
  ➤ Not attempt to explicitly or implicitly influence the research, recommendations or behavior of the author(s).

Depending on how the research is written and distributed, investors can be misled into believing that the issuer-funded research appears to be from an independent source when, in reality, it is solicited and paid for by the company. Therefore, full disclosure, as required above, is essential to avoid such misperceptions.

## Company-Sponsored Trips for Analysts and Investors

Companies may sponsor trips for analysts and investors to see the company's operations in various locations. Some companies conduct their annual analyst meetings at company facilities to better demonstrate their lines of business. Most analysts are restricted by their firm's rules on what they may accept with respect to these trips.

Analysts and investors are expected to pay their ordinary expenses (transportation to and from the trip site). It is appropriate for companies to provide group transportation, meals and overnight

accommodations at the site. However, many firms have a policy that their analysts pay for their overnight accommodations at the site.

## Company Gifts for Analysts and Investors

Analysts and professional investors are often restricted by the Chartered Financial Analyst designation or their firms' policies on what they may accept in the form of gifts from companies they cover or in which they invest. Companies that manufacture low-cost consumer products will often provide a gift bag of these products at a site visit, or other group or individual presentations. If a company produces products that are not appropriate as a gift, alternative gifts are appropriate that do not exceed $50 in value.

## Conclusion

Companies, analysts and professional investors must establish and implement policies that govern the communication between them and are aimed at fostering good working relationships. The interests of the public are paramount. Only when companies, analysts and professional investors act with integrity and in a cooperative manner, respecting the responsibilities and duties of their respective professions, can an atmosphere conducive to objective research be achieved. Companies, analysts and professional investors must put their professional integrity, the interests of the investment community and the interests of the capital markets above their own interests.

# APPENDIX A
# SAMPLE CORPORATE DISCLOSURE POLICY

## Introduction

NIRI believes that it is important for companies to create and follow a written disclosure policy.

There are a few guidelines to follow in considering a written disclosure policy, as follows:

- There is no "one size fits all" policy. For example, many companies provide earnings guidance, while others do not.

- If the decision is to provide guidance, consideration should be given to the company's forecasting ability and accuracy, and to the inevitable situations where there would be a shortfall from guidance.

- Companies should consider disclosure practices among industry peers and the effectiveness of their own past disclosure policies and practices before committing to a written policy.

- It is critical to gain alignment to disclosure policy among the senior management team. The discussion of disclosure policy among the senior management team, though not necessarily the written policy, should include agreement on the specific level of disclosure. For example, the discussion might include the level of detail regarding product revenue and margins that will be provided to investors, beyond that which is required in SEC reporting, or the degree of disclosure regarding a new product and how long that level of disclosure would continue.

- To be effective, the policy must reflect the company's disclosure practice, rather than a disclosure "wish list."

This sample policy is based on a company that provides earnings guidance (a range of estimates) and reports non-GAAP information reconciled to relevant GAAP information, since this is what a majority of companies represented by NIRI's corporate membership do. The minority point of view on these issues, however, may be just as valid. NIRI's policy on such matters is that each company should adopt policies that are in its own best interest and in the interests of its investors.

## Statement of Commitment to a Consistent Disclosure Policy

(Company name) commits to providing timely, transparent, consistent and credible information to the investing public consistent with legal and regulatory requirements. It is imperative that disclosure be consistent in good times and bad, that selective disclosure is avoided at all times and that all parties in the investment community have fair access to information.

The goal of this disclosure policy is to develop and maintain realistic investor expectations by making all required disclosures on a broadly disseminated basis as defined in Regulation Fair Disclosure, Regulation G and the (name of exchange)-listed company disclosure requirements. Failure to achieve this purpose could result in significant liability for the company and, in some instances, certain employees.

## Whom and What Disclosures This Policy Covers

This policy covers all employees and board members of the corporation and its subsidiaries. It covers disclosures in SEC-filed documents, statements made in the company's annual and quarterly reports, news and earnings releases, communication between the company and analysts, investors and the news media, senior management speeches and presentations and information contained on the company's Web site and intranet.

This policy also prohibits all employees from discussing material, nonpublic company matters or developments with anyone outside the company (including family members, relatives or friends), except as permitted by this policy.

Nothing in this policy should be construed as prohibiting an employee from complying with local, state and federal laws and regulations, including those dealing with reporting emergencies, to appropriate noncompany agencies.

## Material Information

It is impossible to provide a complete definition of what constitutes "material" company information. Under the federal securities laws, information is material if its disclosure is likely to have an impact on the price of a security, or if reasonable investors would want to know the information before making an investment decision. In other words, information is material if it would altar significantly the total mix of information available regarding the security. Both positive and negative information can be material, as well as information that forecasts whether an event may or may not occur. Any questions concerning the materiality of particular information should be resolved in

STANDARDS OF PRACTICE FOR INVESTOR RELATIONS

favor of materiality. Examples of material information about the company include, but are not limited to:

- Announcements of earnings or losses;
- An actual change in earnings or in forecasted earnings that is higher or lower than the forecast;
- The launch of a new product or business;
- A pending or prospective merger, acquisition or tender offer;
- The sale of significant assets, or a significant subsidiary;
- The gain or loss of a substantial customer or supplier; and
- Major changes in senior management.

## Confidentiality

The maintenance of confidentiality is essential to the company, both legally and practically. Accordingly, the disclosure committee (as defined below) will take steps to ensure that material and other sensitive information will be carefully handled in order to avoid "selective disclosure." In addition, to avoid selective disclosure, the committee will be responsible for the timing of release of material information.

## Selective Disclosure

Selective disclosure is the disclosure of material, nonpublic information to any individual or group prior to the broad public dissemination of that information. It is against the law and company policy to selectively disclose material, nonpublic information to people or groups outside of the company at any time, unless those people or groups are covered by confidentiality or nondisclosure agreements.

## The Role and Responsibilities of the Disclosure Committee

The board of directors has authorized the establishment of a disclosure committee as suggested in Section 404 of the Sarbanes-Oxley Act to implement the internal control procedures for assessment and attestation of financial disclosures. This committee consists at a minimum of the general counsel, controller, chief investor relations officer, chief corporate communications officer, and risk management officer, with the committee reporting to the chief financial officer. (*In some companies the disclosure committee is headed by the CFO.*) In addition to assessing the accuracy and com-

pleteness of Form 10-K and Form 10-Q and news releases reporting corporate financial information and performance, and the process for public dissemination of information, the committee will decide when material developments justify public release, make recommendations to the chief executive officer on disclosure policies and meet as situations dictate.

It is essential that the disclosure committee be fully apprised of all material company develop-ments in order to evaluate and discuss those events to determine the appropriateness and timing for public release of information or whether the information should remain confidential, and if so, how that inside information is controlled.

The role of this committee should not be construed as conducting normal investor relations activi-ties by committee. It will systematically review the company's prior material disclosures in SEC filings and other public statements to determine whether any updating or correcting is appropriate. The committee will periodically review and update this policy, if needed.

## Designated Spokespersons and Their Responsibilities

Those designated in Reg FD as "covered persons" by the rule are senior management, members of the board of directors, investor relations professionals and others who regularly interact with securities market professionals, security holders and the news media. Those authorized by this policy to speak on behalf of the company are the chairman and chief executive officer, the chief financial officer, the investor relations officers and the corporate communications officers. Other employees of the company may be designated from time to time to speak on behalf of the company or to respond to specific inquiries from the investment community or the media. A spokesperson in the company's subsidiary operations will be designated to respond to local media queries with approval of the corporate communications officer.

## Instruction to Employees Who Are Not Authorized Spokespersons

Employees, other than those authorized to speak on behalf of the company, will be instructed that they are not to respond, under any circumstances, to inquiries from the investment community or the media unless specifically authorized to do so by an authorized spokesperson to ensure consis-tent disclosure and avoidance of selective disclosure.

Employees who are not authorized spokespersons who receive either direct or indirect inquiries from investors or the news media must refer all such inquiries to the appropriate, designated corpo-rate investor relations or communications officer.

## Policy on News Releases

A news release will be issued on new material developments, unless the disclosure committee determines that such developments should remain confidential for the time being and appropriate control of that insider information is instituted along with ensuring that insider trading on such information is prohibited.

Any new material information that is to be intentionally discussed or presented in any meeting or conversation with analysts or investors will be preceded by the issuance of a broadly disseminated news release. If new material information is unintentionally disclosed in such a meeting or discussion with a member or members of the investment community, the company will promptly (within 24 hours) issue a news release containing that information and will post that information on its Web site. To the extent practicable, the investor relations officer or someone intimately familiar with the company's disclosure record will accompany senior management officers in any meetings or discussions with analysts or investors in order to, as a minimum, monitor the conversation for any unintentional disclosure of new material information and to facilitate getting that information released promptly.

In compliance with Reg G, an earnings releases will be furnished on a Form 8-K within five business days from its release. However, under normal circumstances, the company will attempt to furnish its earnings release on Form 8-K prior to the earnings conference call to avoid, under the 48-hour exemption rule, having to furnish a transcript of the conference call on Form 8-K should new material information be discussed during the call. The company, however, will post that information promptly on its Web site.

The company will reconcile non-GAAP information to GAAP equivalent information in the earnings release and will promptly post that information on its Web site, in accordance with Reg G requirements. If non-GAAP information is discussed in the earnings conference call, the company will maintain the conference call on its Web site for one year.

> *NOTES: 1) Companies that report only GAAP results do not have to maintain their conference call on their Web site beyond the SEC recommended one-week minimum. However, from an IR perspective, companies are urged to retain the conference call transcript in an archived section of the Web site as part of the available information for current and prospective investors.*
>
> *2) Nasdaq-listed companies may disclose new material information during a conference call that is properly announced and is fully accessible to all in the*

*investing community through means of a webcast or teleconference. While it is not necessary to issue a news release under these circumstances, Nasdaq does require the company to inform its market surveillance people during trading hours at least 10 minutes in advance of the presentation of the nature of the information. NIRI recommends as a best practice that companies disclose all new material information in a news release first before discussing it in a webcast or telecast forum.*

*3) New York Stock Exchange-listed companies are required during trading hours to furnish their news releases to the exchange and to issue a news release following a conference call in which any new material information was disclosed during the call.*

## Conduct of Conference Calls

The company makes a practice of holding open, publicly accessible conference calls to discuss quarterly financial results and other significant events that arise in the course of its business. Normally, with regularly scheduled conference calls, the company will issue a news release at least one week in advance announcing the date, time of the call and how to access the call. Since the company normally discusses non-GAAP information in the call, the release will provide the location on the company's Web site where the required reconciled information will be available. The company will use its "push technology" to notify investors who have requested to be informed of upcoming conference calls.

Analysts and professional investors will have teleconference access to the call so they may participate in the question-and-answer part of the call. All others may listen to the call via the Internet on the company's Web site. The company will attempt to respond to as many questions as possible as time may allow.

An audio transcript of the call will be posted on the company's Web site for two weeks, following which the audio transcript will be placed in the "archive" section of the Web site. All transcripts retained in the archive are to be considered time-dated material and not a current representation of company views or forecasts.

## Investor Meetings

The company makes a practice of responding to analyst and investor inquiries in the form of phone conversations, one-on-one meetings with the investor relations officer and other members of

the senior management team and meetings with groups of analysts and investors. The purpose of these meetings is for investors to gain a better understanding of the strategies and fundamentals of the company, as well as to give analysts and investors the opportunity to personally meet and assess management. The company will not disclose material, nonpublic information selectively in these meetings. The company also participates in a number of both company-hosted and analyst-hosted conferences and other meetings, as schedules permit. A designated member of the investor relations staff will be present at all meetings held with analysts and investors. In the case of conferences or company-hosted presentations, every effort will be made to announce publicly that the presentation will be held and to webcast the presentation.

## Responding to Market Rumors

So long at it is clear that the company is not the source of a market rumor, the company's spokespersons will respond consistently to rumors saying, *"It is our policy not to comment on market rumors or speculation."* Should (the exchange or Nasdaq) request the company to make a definitive public statement in response to a market rumor that is causing significant volatility in the stock, the disclosure committee will consider the matter and make a recommendation to the CEO on whether to make an exception to this policy.

Rumors about the company that are posted in Internet chat rooms are covered by this policy. Employees should not respond to rumors about the company found in Internet chat rooms, and all rumors should be referred to designated company spokespeople for appropriate action.

## Handling Projections That Are Identified as Forward-Looking

The company will, from time to time, provide forward-looking information to enable the investment community to better evaluate the company and its prospects for performance. The company will provide analysts and investors with certain forecast information with respect to revenue projections, pricing and profit margin information, significant new product developments and projected demand or market potential for its products (or services) on a quarterly and annual basis. When making such forward-looking statements, the company will use the safe harbor as prescribed in the 1995 Private Securities Litigation Reform Act.

A forward-looking statement made in the company's written disclosures will be accompanied with meaningful cautionary language that warns investors that there is a risk the statement could change materially. In the case of oral forward-looking statements, the company will refer to the risk factors enumerated in other readily available written documents.

## Providing Earnings Guidance to Analysts and Investors

The company will attempt to provide in its earnings release a reasonable range of earnings esti-mates and underlying assumptions for the forthcoming year and may provide such guidance for the forthcoming quarter. It is the company's policy to update the range of estimates should it become likely that the range will change materially. That update will be done in a widely disseminated news release. The company may confirm its earlier guidance during the quarter so long as it has not changed materially. However, as the quarter progresses, once the company has a clearer fix on the financial or business related results for the quarter, it will no longer comment on its previous earn-ings guidance without first issuing a news release providing an update for the quarter.

The company will not comment on an analyst's estimate(s) in relation to the company's range of estimates except to refer the analyst to what the company has stated publicly. In the case of an ana-lyst whose estimate is well above or below the range of current analysts' estimates, the company may call the analyst and simply suggest that he or she look at what the company has publicly released but not go beyond that in terms of questioning the analyst's assumptions, etc.

The company will also provide other forms of guidance that may aid analysts and investors in making their own estimates or in making an investment decision. Such guidance may include:

- Qualitative statements about market conditions;
- Trend information that may affect the business of the company;
- Industry-specific information;
- Qualitative statements about high-level measures such as revenues, customers, etc.;
- Estimates or forecasts of factors that may drive earnings but not all factors that might be in the company's internal financial forecasts; and
- Qualitative information on business measures or assumptions.

## Quiet Period

The company will observe a quiet period commencing as soon as quarterly or year-end earnings are known and continuing until the earnings are publicly released. During the quiet period, though it is preferable to avoid investor meetings, the company may choose to participate in investor phone calls, meetings or conferences, but will not discuss current operations or results of the business.

## Reviewing Analysts' Draft Models or Reports

The company will review, upon the analyst's request, his or her earnings model or report only for factual accuracy of information that is in the public domain. The analyst, under the analyst conflict-of-interest rules in Sarbanes-Oxley, cannot provide the company his or her recommendation or price target for the company's stock.

## Analyst and Investor Access to Information and Company Officials

The company will provide fair access to company information and officials within the limits of its time and resources. All analysts and investors will at least have access to the company's investor relations officer and department. Requests for meetings with senior management will be met as schedules permit and may be determined by such criteria as the number of shares an investor holds in the company's securities, an analyst's or investor's knowledge of the company and the industry or industries in which the company operates, and how often the analyst or investor has met with top officials in the company.

Under no circumstances will the company deny an analyst or investor access to company information or officials on the basis of a negative recommendation on the company's stock or a decision to sell the company's stock.

## Distributing Analysts' Reports

Under no circumstances will the company distribute analysts' reports to the investing public. Instead, the company will post on the investor relations section of its Web site the names and firms of analysts who are currently covering the company.

## Providing Material Information to the Media

While the media are not covered under Reg FD, the company's policy is that the media will receive new material information at the same time the investment community and the public receive it. Therefore, the company will not engage in providing exclusive stories to the media of upcoming material events that have not been publicly announced.

# APPENDIX B
# FREQUENTLY ASKED QUESTIONS

*We are providing these "Frequently Asked Questions" solely as a general discussion of the issues. They should not be regarded as legal advice, which may be provided only by properly licensed attorneys and which depends on the facts of each situation.*

## EARNINGS CONFERENCE CALLS AND WEBCASTS

**Do I need to announce the date that my company will report its earnings?**

No, but it certainly is a good communication practice to do so.

**How should I announce the date?**

You can issue a press release or post it on your Web site.

**Does my company need to do a conference call when we report earnings?**

There is no requirement to do so, but such calls are an efficient way to disseminate information to a wide audience (instead of repeating details on numerous individual calls) and can satisfy Reg FD requirements for full disclosure.

**Do I need to webcast the conference call?**

A webcast conference call provides access to all investors who are interested in listening to your call. The SEC in Reg FD considers the fully accessible conference call as a means for full disclosure. Therefore, if new material information is discussed on the call, it is considered fully disclosed. Also, it gives the company spokesperson protection under Reg FD if he/she answers a question, knowing that the response is likely to be considered new material information. NIRI surveys show that 92 percent of companies represented by NIRI members conduct conference calls and virtually all are webcast.

**Is there a procedure for announcing the earnings conference call?**

The best practice is to issue a news release, preferably at least several days in advance of the call, and post the information on your Web site. The news release and Web posting should tell investors

the date and time of the call and how to access it. Note that if non-GAAP information is to be disclosed on the conference call, the press release should also include reference to the Web site location where the required reconciliation information will be available. In addition, the financial and statistical information contained in the presentation should be provided on the company's Web site. You also may use "push e-mail" to inform investors who have requested to be informed about upcoming earnings conference calls, but this should not be viewed as a substitute for a news release.

### Am I required to announce in advance other kinds of webcasts, such as presentations before investor conferences?

If it is a scheduled event, such as an investor conference presentation, you should announce it in advance using one of the methods stated in the previous Q&A so that it can satisfy Reg FD requirements for full disclosure.

### If we are conducting a press conference to announce a major event or other breaking news, how far in advance should we announce that it will be webcast?

That information can be provided in the news release announcing the event. An announcement that a call will be held on a certain date and time without providing a reason is likely to cause unnecessary and perhaps incorrect market speculation.

### Conference calls are priced based on the number of phone lines being used, which can get pretty expensive. Must I allow everyone to dial into the conference call or can I simply give them the Web site access information?

Web site access is sufficient.

### Who from the company should participate in the conference call?

The investor relations officer should definitely participate along with the chief financial officer. The chief executive officer and other members of senior management should participate regularly or at least periodically.

### Does the conference call need to allow listeners to ask questions?

No, it can be in a "listen-only" format.

## Can I disclose new material information on the conference call?

Yes, if you've publicly announced that a call will take place, but it is strongly advisable (and required by the NYSE) that any new material information be included in your earnings press release or in a subsequent news release issued shortly after the call.

## What if we unintentionally disclose new material information during the conference call?

Reg FD requires you to issue a news release containing that information or furnish (Item 9) or file (Item 5) an 8-K within 24 hours of the disclosure unless you publicly announced the fully accessible conference call. If the information relates to the company's results or operations or financial condition for a completed fiscal period, Item 12 of Form 8-K requires you to furnish the release on an 8-K within five business days. A single 8-K is sufficient for both purposes, but it must be filed by the earlier due date.

## If I issue an earnings news release followed by a conference call an hour later, must I furnish the release with a Form 8-K before the call starts if I know that no new material information will be disclosed on the call?

No. You have 48 hours from the time the news release is issued to conduct your conference call without having to furnish an 8-K. If, however, you disclose new material information during the call, and you haven't furnished the release with an 8-K prior to the call, you would have to furnish an 8-K to the SEC containing the new material information within 24 hours. (This also assumes you have properly announced the call in advance and how to access it.) Moreover, if you disclose any non-GAAP information on the call, you have to furnish additional information on the 8-K.

## REGULATION G

## Will the SEC be commenting on my press release?

Maybe, but the SEC does review all documents filed by companies at least every three years. As part of that review they may look at and comment on past press releases. The SEC also may look at press releases in response to news stories or enforcement-related inquiries. At the present time, the SEC is particularly concerned about the use of non-GAAP financial information in earnings releases and compliance with Reg G.

**Do I have to furnish the transcript of my earnings call on an 8-K?**

You do not if you have furnished the earnings release with a Form 8-K prior to the fully accessible conference call and the call is held within 48 hours of issuing the earnings release (a process that most companies appear to be establishing). This also assumes that you have properly announced the date and time of your conference call and how the public can access it.

**Does my earnings release have to comply with Reg G?**

Yes, Reg G applies to any disclosures of material information that include non-GAAP.

**Do I have to reconcile EBITDA to both net income and cash flow?**

The requirement is to reconcile to the most directly comparable measure. These measures can be used as either a performance measure or a liquidity measure or both. Therefore, your reconciliation will depend on the way(s) in which you are using the measure.

**We don't prepare our statement of cash flows until after the earnings release. Do I still have to reconcile EBITDA to cash flow?**

Yes, unless you are not using it as a liquidity measure. If you are using EBITDA as a performance measure, it should be reconciled to net income as presented in the statement of operations under GAAP.

**How do I develop a good reason for the non-GAAP measure?**

You should have discussions internally with the CFO, controller, accounting staff and others within your company as to how and why they use this information. Talk with analysts and find out why a non-GAAP measure may be useful to them and read their research reports. Read other companies' disclosure to see how they explain their use of non-GAAP measures.

**Analysts always ask for our EBITDA. Isn't that a good reason? We have also given it for many years.**

The SEC specifically said that just because analysts ask for the information is not a good reason. They want detailed disclosure as to the value of the information to investors and management and nonboilerplate.

## What if I am giving a non-GAAP measure for forward-looking information?

The reconciliation requirement still applies unless the reconciling information is not available without unreasonable effort. If you cannot provide the reconciliation, you should disclose that fact, identify the information that is unavailable and disclose its probable significance.

## What if you do not present non-GAAP information in the earnings release but do on the conference call?

You would need to provide a reconciliation of that information with the appropriate GAAP measure(s) and post it on your Web site pursuant to the procedures set forth in the answer below.

## What is the 48-hour exemption rule?

If you conduct your earnings conference call or webcast within 48 hours after issuing the earnings release and furnish or file it with an 8-K prior to the call, you can avoid filing another 8-K with the transcript of the call. This, again, assumes you are conducting a fully accessible conference call and that the public has received proper notification of the call and how to access it, including how to access the financial and statistical information contained in the conference call presentation, together with the reconciliation information required by Reg G. You must comply with the following criteria:

- The conference call is complementary to, and occurs within 48 hours of, the earnings release;

- The earnings release is furnished to the SEC on an 8-K prior to the conference call;

- The conference call is properly noticed, including instructions on when and how to access the call and the location of the company's Web site where the information is available, and the call is fully accessible; and

- The financial and statistical information contained in the presentation is provided on the company's Web site together with the reconciliation information required by Reg G.

## Where on my Web site should I put the Reg G information, and how long do I need to keep it?

There is no stated requirement, but the SEC suggests companies place it in their investor relations section and keep it there for one year.

**Can these rules be triggered by any event other than an earnings release and conference call?**

Yes, they can be triggered at investor conferences, industry panels, interviews and so on if there is disclosure of material, nonpublic information (Reg FD) or if the information relates to the company's results of operations or financial condition for a completed quarterly or annual period (Item 12 of Form 8-K).

**When a company discusses non-GAAP numbers orally in a one-on-one presentation, must it reconcile?**

No, oral comments don't need to be reconciled since a one-on-one is not considered a public event, such as a presentation at an investor conference.

**If a company doesn't put its guidance in the earnings press release but discusses guidance on a webcast conference call, must it furnish a transcript of the conference call on an 8-K?**

It depends. From the standpoint of Reg G, if earnings guidance is stated using non-GAAP measures, then a reconciliation of that information with the appropriate GAAP measures need not be furnished with an 8-K following the conference call so long as:

- The conference call is complementary to, and occurs within 48 hours of, the earnings release;

- The earnings release is furnished to the SEC on an 8-K prior to the conference call;

- The conference call is properly noticed, including instructions on when and how to access the call and the location of the company's Web site where the information is available, and the call is fully accessible; and

- The financial and statistical information contained in the presentation is provided on the company's Web site together with the reconciliation information required by Reg G.

From the standpoint of Reg FD, if the earnings guidance is stated on a GAAP basis only, an 8-K need not be furnished so long as the conference call has been properly noticed and fully accessible. Note, however, that the NYSE requires that any new material information be included in a news release issued shortly after the call.

## APPENDIX C
# GUIDELINES FOR IMPROVING THE QUALITY OF EARNINGS ANNOUNCEMENTS

*NIRI recognizes that companies differ fundamentally in their business models and industries and must use their best judgment on what information will enhance the quality of their earnings releases. One of NIRI's objectives is to encourage open and effective flow of information between corporations and financial stakeholders. Judicious consideration and implementation of the guidelines in this proposal will advance that objective.*

- **Include both a complete income statement and a complete balance sheet.** Earnings announcements should, at a minimum, include both a complete income statement and a complete balance sheet. Preferably a statement of cash flows should also be included. The income statement should include data for the current quarter, comparison to the prior-year quarter and, if informative, to the sequentially previous quarter, with similar comparisons for the year-to-date. The balance sheet should include data for the current period and the prior fiscal year-end and, if informative, comparisons with the prior-year comparable period. This disclosure gives investors the information to determine free cash flow and the company's ability to meet its financial requirements.

- **Put GAAP earnings up front and before pro forma results.** (See Reg G requirements for companies reporting non-GAAP information or results.)

- **Include key information in the earnings announcement.** Additional information that investors need or desire to evaluate a company's results is included in the MD&A of the 10-K and 10-Q filings. Often this information, typically of a nonmaterial nature, is discussed in conference calls and SEC filings but is omitted from press releases. This makes it harder for investors to obtain the information unless they listen to the conference call or wait for the relevant SEC filings. To improve transparency and encourage companies to be more forthcoming and expansive in disclosure, NIRI recommends that public companies either include a summary MD&A with their earnings announcement, or incorporate other critical information into the release.

Such information might include:

- ➤ A brief description of the company's business that clarifies how it makes money.

- ➤ The primary factors or trends, both short- and long-term, causing revenues to increase, decrease or remain flat. The company should also explain clearly and simply any changes to its policies on revenue recognition or expense deferment from those disclosed in the annual report/Form 10-K.

- ➤ A brief discussion of what drives other key data, such as gross profit, SG&A expenses, other income (expense), interest expense, income taxes and the effect of currency translation or transaction on net income.

- ➤ An explanation of any charges, including both pre- and after-tax numbers and whether there will or could be additional charges of a similar nature in future quarters.

- ➤ A brief discussion of liquidity and capital resources, including debt levels and key ratios, the adequacy of cash resources, cash provided from operations, capital expenditures, any anticipated changes in financing and any share repurchases.

- ➤ Key measures specific to its industry that a company uses to evaluate performance, such as same-store sales growth for retailers, or net interest margin for financial institutions.

- ➤ Any material changes in accounting practices adopted during the quarter, either due to changes in FASB requirements or by company choice.

- ➤ The company's current expectations for sales and earnings (if the company provides such guidance at all).

# APPENDIX D
# NIRI CODE OF ETHICS

## Regular Member Code of Ethics

**As a regular member of the National Investor Relations Institute, I will:**

1. Maintain my integrity and credibility by practicing investor relations in accordance with the highest legal and ethical standards.

2. Avoid even the appearance of professional impropriety in the conduct of my investor relations responsibilities.

3. Recognize that the integrity of the capital markets is based on transparency of credible financial and nonfinancial corporate information, and will to the best of my ability and knowledge work to ensure that my company or client fully and fairly discloses this important information.

4. Provide analysts, institutional and individual investors and the media fair access to corporate information.

5. Honor my obligation to serve the interest of shareholders and other stakeholders.

6. Discharge my responsibilities completely and competently by keeping myself abreast of the affairs of my company or client as well as the laws and regulations affecting the practice of investor relations.

7. Maintain the confidentiality of information acquired in the course of my work for my company or client company.

8. Not use confidential information acquired in the course of my work for my personal advantage nor for the advantage of related parties.

9. Exercise independent professional judgment in the conduct of my duties and responsibilities on behalf of my company or client.

10. Avoid any professional/business relationships that might affect, or be perceived to potentially affect, my ethical practice of investor relations.

11. Report to appropriate company authorities if I suspect or recognize fraudulent or illegal acts within the company.

12. Represent myself in a reputable and dignified manner that reflects the professional stature of investor relations.

## Associate Member Code of Ethics

**As an associate member of the National Investor Relations Institute, I will:**

1. Maintain my integrity and credibility as I provide service and support to my investor relations clients in accordance with the highest legal and ethical standards.

2. Keep myself abreast of the laws and regulations affecting the practice of investor relations for my investor relations clients.

3. Maintain the confidentiality of information acquired in the course of my work for my investor relations clients.

4. Not use confidential information acquired in the course of my work for my personal advantage nor for the advantage of related parties.

5. Exercise independent judgment in the conduct of my duties and responsibilities on behalf of clients.

6. Support my investor relations clients in their efforts to practice investor relations in an ethical manner.

## Enforcement and Communication of the NIRI Code of Ethics

NIRI urges compliance with its Code of Ethics by positively communicating the ideals of professional ethics and practice rather than through negative sanctions. However, members of NIRI who are sanctioned by an appropriate governmental agency or judicial body for violating laws or regulations affecting their professional activities may, upon recommendation of the NIRI Ethics Council, have their membership terminated by the NIRI board of directors following procedures in the institute's bylaws.